UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                 :

ABRAHAM and MINA REMBAUM, *et.*
*al.*,                 :

          Plaintiffs,   :        No. 10-CIV-4095 (SAS)

          vs.        :

BANCO SANTANDER, S.A., BANCO  :
SANTANDER INTERNATIONAL,
OPTIMAL INVESTMENT SERVICES,  :
S.A., and JONATHAN CLARK,   :

          Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT

**HUNTON & WILLIAMS LLP**
Samuel A. Danon (*pro hac vice*)
Gustavo J. Membiela (*pro hac vice*)
Paulo R. Lima
1111 Brickell Avenue, Suite 2500
Miami, FL 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460
Email: sdanon@hunton.com
Email: gmembiela@hunton.com
Email: plima@hunton.com

- and -

Shawn Patrick Regan
200 Park Avenue
New York, NY 10166
Telephone: (212) 309-1000
Facsimile: (212) 309-1100
Email: sregan@hunton.com

*Counsel for Defendants Banco Santander, S.A.,*
*Banco Santander International, Optimal Investment*
*Services, S.A., and Jonathan Clark*

# TABLE OF CONTENTS

Page

Factual Background ........................................................................................................ 1

Argument ....................................................................................................................... 1

I.      Plaintiffs Lack Standing To Assert Direct Claims for Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty, Gross Negligence, Breach of Contract and Unjust Enrichment. (Counts 5-7, 9, 10) ........................................ 1

      A.      The Law of The Bahamas—the Funds' Place of Incorporation—Governs Whether Plaintiffs' Claims are Direct or Derivative. ............................................ 2

      B.      Under the Rule in *Foss v. Harbottle* and the Reflective Loss Principle, as Recognized under Bahamian Law, Plaintiffs Lack Standing to Assert Claims to Recover Losses Incurred by the Funds. .................................................. 3

      C.      Under U.S. Law, Plaintiffs Also Lack Standing to Sue Directly. ............................ 4

II.     The Complaint Fails to State a Claim Under State Law. ........................................ 7

      A.      Plaintiffs' Tort Claims are Barred by the Lack of an Independent, Extra-Contractual Duty. (Counts 3-6). .......................................................................... 7

      B.      Plaintiffs Have Not Stated a Claim For Unjust Enrichment. (Count 10) ............... 9

      C.      The Complaint Fails To Establish the Existence of a Fiduciary Relationship between Plaintiffs and OIS or BSI. (Counts 5-6) ............................ 11

      D.      Plaintiffs Have Not Stated a Third-Party Beneficiary Claim. (Count 9) ............. 12

      E.      Plaintiffs Have Not Stated a Claim for Common Law Fraud. (Counts 1-2) ........ 13

      F.      Plaintiffs Do Not Adequately Plead Aiding and Abetting Claims. (Counts 7-8) ..................................................................................................................... 13

III.    The Complaint Fails to State Federal Securities Claims. (Counts 11-12) ......................... 14

      A.      The Exchange Act Does Not Apply Extraterritorially to the Transactions That Form the Basis for Plaintiffs' Federal Securities Law Claims. .................... 15

      B.      Plaintiffs Do Not Allege Actionable Misstatements or Omissions by Defendants in the Multiadvisors Explanatory Memoranda. ................................ 18

      C.      The Complaint Fails to Allege Facts Allowing a Strong Inference of Scienter. .......................................................................................................... 19

D.      The Complaint Fails To Allege With Adequate Particularity Actual Reliance, Which, in This Case, Cannot Be Presumed. .......................................... 24

E.      The Section 20(a) Claim Should Be Dismissed.  (Count 12) ................................ 25

IV.    Pioneer's Claims Should be Dismissed for Improper Venue.  (Counts 13-15) ................ 26

V.    The Santander Clients' Claims Should be Dismissed for Improper Venue. (Counts 1-12) .................................................................................................. 29

Conclusion ....................................................................................................................... 30

# TABLE OF AUTHORITIES

Page(s)

CASES

AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC,
  2005 WL 2385854 (S.D.N.Y. Sept. 26, 2005)..........................................................13

Anwar v. Fairfield Greenwich Ltd.,
  2010 WL 3341636 (S.D.N.Y. Aug. 18, 2010) ...........................................................6

Ashcroft v. Iqbal,
  129 S.Ct. 1937 (2009) .......................................................................10, 12, 17, 22

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,
  493 F.3d 87 (2d Cir. 2007)................................................................................15, 25

Barneli & Cie S.A. v. Dutch Book Funds, SPC, Ltd.,
  2010 WL 3504780 (Sup. Ct. N.Y. Cty. Aug. 9, 2010) ....................................8, 9, 12

Basic Inc. v. Levinson,
  485 U.S. 224 (1988).................................................................................................24

Batchelder v. Kawamoto,
  147 F.3d 915 (9th Cir. 1998) ....................................................................................2

Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.,
  448 F.3d 573 (2d Cir. 2006).......................................................................................9

Bullmore v. Ernst & Young Cayman Islands,
  846 N.Y.S.2d 145 (N.Y. App. Div. 1st Dep't 2007) ..................................................9

Cal. Pub. Emp. Ret. Sys. v. Sherman & Sterling,
  95 N.Y.2d 427 (2000) ..............................................................................................12

CBS Broad. Inc. v. Jones,
  460 F. Supp. 2d 500 (S.D.N.Y. 2006).......................................................................11

Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,
  511 U.S. 164 (1994)..................................................................................................18

Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,
  70 N.Y.2d 382 (1987) ............................................................................................7, 8

Cornwell v. Credit Suisse Group,
  2010 WL 3069597 (S.D.N.Y. July 27, 2010) ..........................................................16

*Debussy LLC v. Deutsche Bank AG*,
   2006 WL 800956 (S.D.N.Y. Mar. 29, 2006) ........................................................2, 6

*Debussy LLC v. Deutsche Bank AG*,
   242 F. App'x 735 (2d Cir. 2007) ........................................................5

*Direct Mail Prod. Servs. Ltd. v. MBNA Corp.*,
   2000 WL 1277597 (S.D.N.Y. Sept. 7, 2000) ........................................................28, 29

*Druck Corp. v. Macro Fund, Ltd.*,
   290 F. App'x 441 (2d Cir. 2008) ........................................................4

*Dueren v. Credit Suisse First Boston Corp.*,
   2003 WL 21767509 (S.D.N.Y. July 31, 2003) ........................................................5

*First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*,
   462 U.S. 611 (1983) ........................................................2

*Goldstein v. SEC*,
   451 F.3d 873 (D.C. Cir. 2006) ........................................................12

*Goldweber v. Harmony Partners, Ltd.*,
   2010 WL 3702508 (S.D. Fla. Sept. 16, 2010) ........................................................5

*In re Alstom SA Sec. Litig.*,
   2010 WL 3718863 (S.D.N.Y. Sept. 14, 2010) ........................................................16

*In re Asia Pulp & Paper Sec. Litig.*,
   293 F. Supp. 2d 391 (S.D.N.Y. 2003) ........................................................26

*In re Banco Santander Securities-Optimal Litig.*,
   2010 WL 3036990 (S.D. Fla. July 30, 2010) ........................................................15

*In re Bayou Hedge Fund Litig.*,
   534 F. Supp. 2d 405 (S.D.N.Y. 2007) ........................................................22, 23

*In re Bayou Hedge Funds Inv. Litig.*,
   472 F. Supp. 2d 528 (S.D.N.Y. 2007) ........................................................14

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
   540 F. Supp. 2d 800 (S.D. Tex. 2007) ........................................................25

*In re Goldman Sachs Mut. Funds Fee Litig.*,
   2006 U.S. Dist. LEXIS 1542 (S.D.N.Y. Jan. 17, 2006) ........................................................6

*In re Lloyd's Am. Trust Fund Litig.*,
   954 F. Supp. 656 (S.D.N.Y. 1997) ........................................................28

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)....................................................................25

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009)....................................................................19

*In re Sharp Int'l Corp.*,
    403 F.3d 43 (2d Cir. 2005)....................................................................................14

*In re Smith Barney Fund Transfer Agent Litig.*,
    2007 U.S. Dist. LEXIS 70828 (S.D.N.Y. Sept. 26, 2007)........................................6

*In re Société Générale Sec. Litig.*,
    2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010)........................................................16

*In re Tremont Sec. Law, State Law & Ins. Litig.*,
    703 F. Supp. 2d 362 (S.D.N.Y. 2010)....................................................................23

*Kalin v. Xanboo, Inc.*,
    2009 WL 928279 (S.D.N.Y. Mar. 30, 2009)..........................................................26

*Kaye v. Grossman*,
    202 F.3d 611 (2d Cir. 2000)..................................................................................10

*M+J Savitt, Inc. v. Savitt*,
    2009 WL 691278 (S.D.N.Y. Mar. 17, 2009)............................................................9

*M/S Bremen v. Zapata Off-Shore Co.*,
    407 U.S. 1 (1972)..................................................................................................27

*Manhattan Motorcars, Inc. v. Automobili Lamborghini*,
    244 F.R.D. 204 (S.D.N.Y 2007) .........................................................................7, 8

*Morrison v. Nat'l Australia Bank Ltd.*,
    130 S. Ct. 2869 (2010)..............................................................................15, 16, 17

*Newman v. Family Mgmt. Corp.*,
    2010 WL 4118083 (S.D.N.Y. Oct. 20, 2010)...................................................5, 6, 23

*Owens v. Gaffken & Barriger Fund, LLC*,
    2009 WL 3073338 (S.D.N.Y. Sept. 21, 2009)........................................................26

*Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*,
    603 F.3d 144 (2d Cir. 2010)..............................................................................18, 19

*Phillips v. Audio Active Ltd.*,
    494 F.3d 378 (2d Cir. 2007)..................................................................................27

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*,
    2010 WL 3860397 (S.D.N.Y. Oct. 4, 2010) ............................................................16

*Port Chester Elec. Const. Co. v. Atlas*,
    40 N.Y.2d 652 (1976) ............................................................12

*PPI Enters. (U.S.), Inc. v. Del Monte Foods Co.*,
    2003 WL 22118977 (S.D.N.Y. Sept. 11, 2003) ............................................................7, 8

*Primavera Familienstiftung v. Askin*,
    1996 WL 494904 (S.D.N.Y. Aug. 30, 1996) ............................................................7

*Robehr Films, Inc. v. Am. Airlines, Inc.*,
    1989 WL 111079 (S.D.N.Y. Sept. 19, 1989) ............................................................7

*Robin Bay Assocs. v. Merrill Lynch & Co.*,
    2008 WL 2275902 (S.D.N.Y. June 3, 2008) ............................................................8

*Roby v. Corp. of Lloyd's*,
    996 F.2d 1353 (2d Cir. 1993) ............................................................28

*San Diego Cty. Emps. Ret. Assn. v. Maounis*,
    2010 WL 1010012 (S.D.N.Y Mar. 15, 2010) ............................................................6

*SEC v. Cohmad Sec. Corp.*,
    2010 WL 363844 (S.D.N.Y. Feb. 2, 2010) ............................................................24

*South Cherry Street, LLC v. Hennessee Group LLC*,
    573 F.3d 98 (2d Cir. 2009) ............................................................19

*Stackhouse v. Toyota Motor Co.*,
    2010 WL 3377409 (C.D. Cal. July 16, 2010) ............................................................16

*Stephenson v. Citco Group Ltd.*,
    700 F. Supp. 2d 599 (S.D.N.Y. 2010) ............................................................5, 6

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008) ............................................................14, 15, 18, 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................19, 20, 22, 23

*Terra Sec. v. Citigroup, Inc.*,
    2010 WL 3291579 (S.D.N.Y. Aug. 16, 2010) ............................................................16

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004) ............................................................4

*West Palm Beach Police Pension Fund v. Collins Capital Low Volatility Performance Fund,*
  2010 WL 2949856 (S.D. Fla. July 26, 2010) ............................................................5

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.,*
  530 F. Supp. 2d 486 (S.D.N.Y. 2007) ..............................................................11, 12

*Wright v. Ernst & Young LLP,*
  152 F.3d 169 (2d Cir. 1998) ..............................................................................18

*Wynn v. AC Rochester,*
  273 F.3d 153 (2d Cir. 2001) ..............................................................................13

**STATUTES**

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(1) ...............................15

Securities Exchange Act, 15 U.S.C. § 78a, *et seq.* ................................................ passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9(b) .......................................................................................15

# FACTUAL BACKGROUND

Fifty Plaintiffs are non-U.S. persons and entities who allege they were shareholders in the Optimal Strategic U.S. Equity fund ("SUS") and lost substantially all of their investment as a result of the fraud perpetrated by Bernard L. Madoff ("Madoff").[1] The fifty-first Plaintiff, Pioneer International Services, Ltd. ("Pioneer"), is an investment advisory firm that arranged for 48 of the above Plaintiffs (collectively "Pioneer Clients") to invest in SUS. (SAC ¶¶ 8, 11-59.) The Pioneer Clients purchased SUS shares through Pioneer and had no interaction with the Defendants. The remaining two Plaintiffs (the "Santander Clients") allege that they were "induced" to invest in SUS by Banco Santander International ("BSI").[2] (SAC ¶¶ 62-63.) The Second Amended Complaint ("SAC") alleges that Defendants failed to conduct adequate diligence regarding Madoff, ignored "red flags" that should have alerted them to Madoff's fraud, and made misstatements and omissions in connection with the sale of SUS, causing Plaintiffs to lose their investments and allowing Defendants wrongfully to collect management fees.

# ARGUMENT

## I. Plaintiffs Lack Standing To Assert Direct Claims for Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty, Gross Negligence, Breach of Contract and Unjust Enrichment. (Counts 5-7, 9, 10)

Plaintiffs' claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, gross negligence, breach of contract and unjust enrichment are premised upon Defendants'

---

[1]    SUS is a sub-fund of Optimal Multiadvisors, Ltd. ("Multiadvisors" or the "Funds"), an investment company organized under the laws of The Bahamas. (SAC ¶¶ 69-71). Plaintiffs allege that the vast majority of the Funds' assets were invested through Madoff's firm, Bernard L. Madoff Investment Securities. (SAC ¶ 2).

[2]    Both BSI and Optimal Investment Services, S.A. ("OIS") are subsidiaries of Defendant Banco Santander S.A. ("Santander"). Defendant Jonathan Clark ("Clark") is an employee of OIS. (SAC ¶ 68). In the SAC, Plaintiffs refer to BSI as "Santander U.S."

alleged failure to perform adequate diligence on Madoff and failure to monitor SUS's investments with his firm. (*See, e.g.*, SAC ¶¶ 319, 329.) Putting aside the factual misapprehensions upon which they are based, these claims are barred because Plaintiffs—alleged only to be investors in the Funds—lack standing to assert them.

Under the laws of The Bahamas, which govern the affairs of the Funds, a shareholder lacks standing to bring claims directly to recover injuries suffered by the entity in which he or she holds shares; only the entity may sue because the claims belong to the entity alone. And even if U.S. law governed, which it does not, the same principle would dictate dismissal; at most, the claims asserted here could be asserted only through a derivative action, not through a direct shareholder action.

## A. The Law of The Bahamas—the Funds' Place of Incorporation—Governs Whether Plaintiffs' Claims are Direct or Derivative.

Whether a shareholder has standing to assert claims, or whether those claims belong to the corporation alone, is determined by the law of the state or country in which the company is incorporated. *Debussy LLC v. Deutsche Bank AG*, 05 Civ. 5550, 2006 WL 800956, at *2 (S.D.N.Y. Mar. 29, 2006) ("When deciding issues of 'shareholder standing,'…courts must look to the law of the fund's state of incorporation.") (citation omitted), *aff'd*, 242 F. App'x 735 (2d Cir. 2007). This "internal affairs doctrine" recognizes that the legal relationship between a corporation and its shareholders is governed by the law of the place of incorporation. *See First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983) ("[T]he law of the state of incorporation normally determines issues relating to the internal affairs of a corporation."); *see also Batchelder v. Kawamoto*, 147 F.3d 915, 920 (9th Cir. 1998) ("Under the 'internal affairs' doctrine, the rights of shareholders in a foreign company, including the right to sue derivatively, are determined by the law of the place where the company is incorporated.").

Because the Funds in which Plaintiffs invested are incorporated in The Bahamas, Bahamian law governs.

**B.** **Under the Rule in *Foss v. Harbottle* and the Reflective Loss Principle, as Recognized under Bahamian Law, Plaintiffs Lack Standing to Assert Claims to Recover Losses Incurred by the Funds.**

As set forth in the accompanying Rule 44.1 Declaration of Robert Hildyard, QC, Bahamian law is clear that a shareholder does not have standing to bring a direct action to redress wrongs sustained by the company of which he or she is a shareholder. (Hildyard Decl. ¶ 13 *et seq.*) Under the Rule in *Foss v. Harbottle*, a seminal English case decided by the House of Lords in 1843, only the corporation (here, the Funds) may bring suit for alleged breaches of duties owed to the corporation; shareholders may not. (Hildyard Decl. ¶ 15.)[3] And under a closely related principle (also recognized in The Bahamas), the "Reflective Loss Principle," the shareholder cannot recover for harms that "reflect" losses suffered by the corporation, even in situations in which it is owed a direct duty by an alleged wrongdoer. (Hildyard Decl. ¶¶ 23-24.) Rather, in such a case, the claims remain vested in the corporation, and the corporation alone can sue. The Rule in *Foss v. Harbottle* and the Reflective Loss Principle avoid the potential for duplicative recoveries, and prevent prejudice to the rights of corporate creditors and other shareholders. (Hildyard Decl. ¶ 27.) They also respect the directors' prerogative to determine whether it is in the corporation's interest to assert, prosecute, and settle claims against persons who have violated duties owed to the corporation. (Hildyard Decl. ¶ 16.)

The Rule in *Foss v. Harbottle* and the Reflective Loss Principle require the conclusion that Plaintiffs may not assert the breach of fiduciary duty, aiding and abetting breach of fiduciary

---

[3]     As explained by Mr. Hildyard, decisions of English courts are in practice treated as binding in The Bahamas. (Hildyard Decl. ¶ 5.)

duty, gross negligence, breach of contract and unjust enrichment claims. (Hildyard Decl. ¶ 31.)[4]

The gravamen of Plaintiffs' claims is that the Defendants failed to supervise adequately the investment of the Funds' assets, resulting in the loss of those assets. (*See, e.g.*, SAC ¶¶ 319, 328, 333, 344.) Thus, the Defendants are alleged to have breached duties owed to the Funds. Under Bahamian law (as well as U.S. law), shareholders cannot pursue these claims. (Hildyard Decl. ¶ 12.) Indeed, the only losses being claimed by the shareholders are the diminution of the value of their shares. Thus, the losses are entirely "reflective" because a restoration to the Funds of the losses they suffered would remedy Plaintiffs' individual losses. (Hildyard Decl. ¶ 23 ("[S]uch a 'loss' is merely reflective of or parasitic upon the loss suffered by the company. Put another way, if the company is restored, the shareholder's loss will be made good.").)

### C. Under U.S. Law, Plaintiffs Also Lack Standing to Sue Directly.

United States law is in accord with Bahamian law in recognizing the distinction between claims that may be asserted by shareholders and those that may be asserted only by the entity itself. To determine whether a shareholder has standing to bring a direct claim for common law torts, U.S. courts focus primarily on whether the corporation or the shareholder suffered the alleged injury. *See, e.g., Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004) (basing analysis on "[w]ho suffered the alleged harm — the corporation or the suing stockholder individually — and who would receive the benefit of the recovery or other remedy"). If the shareholder does not suffer an injury independent of any injury sustained by the corporation, that shareholder has no standing to bring a direct claim. *Id.*; *see also Druck Corp. v. Macro Fund, Ltd.*, 290 F. App'x 441, 443 (2d Cir. 2008) (affirming district court ruling that

---

[4]      As explained by Mr. Hildyard, the Rule in *Foss v. Harbottle* is a well-settled principle of Bahamian company law that applies to Bahamian corporations and their shareholders, including investment funds. (*E.g.*, Hildyard Decl. ¶¶ 13-16, 22, 31.) Because Multiadvisors is a Bahamian corporation, as is its sub-fund, SUS, the Rule in *Foss v. Harbottle* applies with equal force here.

plaintiff could not bring claims directly "because [plaintiff] cannot prevail without showing injury to . . . [the] Fund itself."). Moreover, in accord with the Reflective Loss Principle, a shareholder plaintiff does not have standing to assert claims when those claims are based on a loss that reflects merely the loss suffered by the corporation itself based on the breach of duties owed in the first instance to the corporation.[5]

Thus, in circumstances analogous to this case, courts routinely dismiss actions on the basis that a shareholder's direct claims alleging mismanagement of an investment fund's assets may be brought, if at all, by or on behalf of the fund itself. Indeed, in a number of cases involving similarly situated Madoff feeder funds, courts have dismissed such common law claims against investment advisors and other fund service providers for the very reason that the plaintiffs lacked standing to pursue derivative claims.[6] For example, in *Newman*, Judge Sand dismissed analogous common law claims against an investment advisor and other service

---

[5]     *See, e.g.*, *Debussy LLC v. Deutsche Bank AG*, 242 F. App'x 735, 735 (2d Cir. 2007) (finding a direct action unavailable because "the harm alleged by plaintiff was a harm to the [corporate entity] itself, as opposed to the investors individually, and any recovery would go to the [corporate entity]"); *Dueren v. Credit Suisse First Boston Corp.*, 02 CV 3921, 2003 WL 21767509, *3 (S.D.N.Y. July 31, 2003) ("Loss of investment value resulting from a breach of a duty owed to a corporation does not give rise to a direct cause of action by the corporation's shareholders.").

[6]     *See, e.g.*, *Newman v. Family Mgmt. Corp.*, 08 Civ. 11215, 2010 WL 4118083, *12 (S.D.N.Y. Oct. 20, 2010) ("A claim for deficient management or administration of a fund is a paradigmatic derivative claim."); *Stephenson v. Citco Group Ltd.*, 700 F. Supp. 2d 599, 610 (S.D.N.Y. 2010) (dismissing claims for lack of standing because the "gravamen of plaintiff's breach of fiduciary duty claims is a failure to administer the fund such that the Madoff Ponzi scheme would be discovered"); *West Palm Beach Police Pension Fund v. Collins Capital Low Volatility Performance Fund*, 09-80846-CIV, 2010 WL 2949856, *3 (S.D. Fla. July 26, 2010) ("By alleging that [defendant] failed to conduct the necessary due diligence to discover the Madoff Ponzi scheme, Plaintiff has pled a paradigmatic derivative claim."); *see also Goldweber v. Harmony Partners, Ltd.*, 09-61902-CIV, 2010 WL 3702508, *4 (S.D. Fla. Sept. 16, 2010) (concluding the plaintiff would lack standing to bring claims directly, but deciding the case on another issue).

providers to a Madoff feeder fund, holding that, despite the plaintiffs' attempt to plead direct claims:

> [e]ach [claim] is based on the alleged mismanagement of the [fund] through the failure to conduct adequate due diligence and to discover and act upon red flags, [and a] claim for deficient management or administration of a fund is a paradigmatic derivative claim.

2010 WL 4118083, at *12.[7] The only case among many Madoff-related feeder fund cases deciding this issue that has not dismissed these types of claims as derivative is *Anwar v. Fairfield Greenwich Ltd.*, 09 Civ. 0118, 2010 WL 3341636, *15-16 (S.D.N.Y. Aug. 18, 2010), which, in light of the significant authority holding to the contrary, appears to be an outlier. Thus, if contrary to the internal affairs doctrine, claims could be brought under U.S. law, they could be brought only derivatively, not directly.[8]

---

[7] *Cf.*, *San Diego Cty. Emps. Ret. Assn. v. Maounis*, 07 Civ 2618, 2010 WL 1010012, *20 (S.D.N.Y Mar. 15, 2010) ("The…allegation that [defendant-investment advisors] broke fiduciary duties to [plaintiff-shareholders] by failing to manage properly the Fund is, like Plaintiff's gross negligence claims, a classic claim of fund mismanagement that belongs to the Fund, and is therefore derivative."); *In re Goldman Sachs Mut. Funds Fee Litig.*, 04 Civ. 2567, 2006 U.S. Dist. LEXIS 1542, *20 (S.D.N.Y. Jan. 17, 2006) (reasoning that "claims of mismanagement of assets by defendants . . . fail to allege any injury independent of the alleged injury to the Funds" and dismissing on the ground that claims could have been brought in derivative capacity only); *In re Smith Barney Fund Transfer Agent Litig.*, 05 Civ. 7583, 2007 U.S. Dist. LEXIS 70828, *12 (S.D.N.Y. Sept. 26, 2007) (dismissing plaintiffs' direct claims against the fund's investment advisor because plaintiffs alleged harm to the funds but no distinct harm to themselves and such claims were derivative in nature); *Debussy LLC v. Deutsche Bank AG*, 05 Civ. 5550, 2006 WL 800956, *4 (S.D.N.Y. Mar. 29, 2006) (same).

[8] Plaintiffs' claim for Third Party Beneficiary/Breach of Contract (Count 9) also must be dismissed as derivative, since the allegations supporting this claim amount to nothing more than general allegations that the OIS breached its contractual duties to the Funds. (*See* SAC ¶ 344 ("OIS breached the Investment Management agreements by grossly failing to meet the obligations of these agreements to provide competent investment management services to Optimal U.S.").) Plaintiffs do not allege how such a breach harmed them independently of any harm to the Funds. *See Stephenson*, 700 F. Supp. 2d at 611 ("Plaintiff does not allege an independent injury or breach of contractual obligations specific to him, but rather a general breach of the contracts that is applicable to the partnership at large, and as such he could not demonstrate his own injury without demonstrating that the partnership was injured.").

## II. The Complaint Fails to State a Claim Under State Law.[9]

### A. Plaintiffs' Tort Claims are Barred by the Lack of an Independent, Extra-Contractual Duty. (Counts 3-6)

Plaintiffs' claims for breach of fiduciary duty, gross negligence, and negligent misrepresentation should be dismissed because any duty between OIS, the Funds' investment manager, and Plaintiffs, the shareholders, is based on the Investment Management Agreement ("IMA") between OIS and Multiadvisors and, thus, is duplicative of the breach of contract claim.

Under New York law, tort claims premised on contractual obligations may not be brought "unless a legal duty independent of the contract itself has been violated." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987). The duty alleged must "spring from circumstances extraneous to, and not constituting elements of the contract." *Id.; see also PPI Enters. (U.S.), Inc. v. Del Monte Foods Co.*, 99 Civ. 3794, 2003 WL 22118977, *26 (S.D.N.Y. Sept. 11, 2003) ("New York law…does not permit a tort claim to stand when it merely duplicates an alleged breach of contract.").[10]

---

Accordingly, these claims are also derivative."); *Primavera Familienstiftung v. Askin*, 95 Civ. 8905, 1996 WL 494904, *17 (S.D.N.Y. Aug. 30, 1996) (dismissing direct claim for third party beneficiary/breach of contract for lack of standing).

[9] Defendants do not concede that New York law governs these claims, which do not involve any New York individuals or entities.

[10] Plaintiffs' tort claims also are barred by the economic loss rule, which does not allow a plaintiff to bring tort claims to remedy merely economic damages that do not involve personal or property injury. *See, e.g., Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.P.A.*, 244 F.R.D. 204, 220 (S.D.N.Y 2007) ("New York courts restrict plaintiffs who have suffered economic loss, but not personal or property injury to an action for the benefit of their bargains."). Here, Plaintiffs do not allege that they have suffered any personal or property damage, only the economic losses related to their investment in SUS. (*See, e.g.*, SAC ¶¶ 309, 316, 321.) This type of injury is not recoverable in tort. *See Robehr Films, Inc. v. Am. Airlines, Inc.*, 85 CIV. 1072, 1989 WL 111079, *5 (S.D.N.Y. Sept. 19, 1989) ("[Plaintiff] alleges only economic loss in its proposed negligence claim. It does not claim any personal injury or damage to property, as is required to recover in tort."). New York courts have applied the economic loss

As discussed in § I *supra*, an investment advisor to a fund owes no legal duty to the

fund's shareholders; its duty lies to the fund, which alone may assert claims against the advisor if

the advisor breaches those duties. *See Barneli & Cie S.A. v. Dutch Book Funds, SPC, Ltd.*,

600871/08, 2010 WL 3504780, at *7 (Sup. Ct. N.Y. Cty. Aug. 9, 2010) ("[T]here is no basis for

a fiduciary duty between [shareholders in a fund] and [the fund's investment manager]… [The

investment manager] owes no legal duty to [the fund's shareholders].").  OIS, therefore, owes no

legal duty to Plaintiffs.  Instead, OIS owes a duty to the Funds, and this duty is based on

obligations delineated in the IMA.[11]

But even if OIS did owe SUS shareholders a legal duty, such a duty would not be

independent of the contractual duties established by the IMA.  Indeed, the SAC acknowledges as

much.  Plaintiffs' claim for breach of contract—a third party claim based on OIS's alleged

breach of the IMA by failing to provide competent investment management services to SUS—

rests on the same allegations of fund mismanagement that support their tort claims.[12]  (*Compare*

SAC ¶ 344 ("OIS breached the Investment Management [A]greements by grossly failing to meet

---

rule to bar not only breach of fiduciary duty and negligence claims, but also negligent
misrepresentation claims. *See, e.g., Manhattan Motorcars*, 244 F.R.D. at 220; *PPI Enters.*, 2003
WL 22118977, at *27.

[11]     The IMA is an agreement between OIS and Multiadvisors.  A copy of the IMA,
dated January 7, 2008, is attached as Exhibit A to the Declaration of Paulo R. Lima.  Among
other things, it provides that OIS "will manage the investment…with a view to achieving the
objects of the Fund as set forth in the Explanatory Memorandum." IMA ¶ 3.  Elsewhere in the
IMA, OIS "agree[d] to use its best effort and judgment and due care in exercising the authority
granted to it" to manage the Funds' assets. *Id.* ¶ 4.

[12]     *See, e.g., Clark-Fitzpatrick*, 70 N.Y.2d at 390 (dismissing tort claims because
"[e]ach…is merely a restatement, albeit in slightly different language of the 'implied' contractual
obligations asserted in the cause of action for breach of contract"); *Robin Bay Assocs. v. Merrill
Lynch & Co.*, 07 Civ. 376, 2008 WL 2275902, *3 (S.D.N.Y. June 3, 2008) (dismissing breach of
fiduciary duty claim because "there is almost total overlap between Plaintiff's claims for breach
of contract and fiduciary duty").

the obligations of these agreements to provide competent investment management services to [SUS]") *with id.* ¶ 328 ("OIS…breached their fiduciary duties to Plaintiffs by failing to conduct adequate due diligence and monitoring with respect to [SUS's] investments") *and id.* ¶ 319 ("Defendants failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional").) As such, Plaintiffs' tort claims are duplicative of their contract claim and must be dismissed.[13]

### B.     Plaintiffs Have Not Stated a Claim For Unjust Enrichment.  (Count 10)

Plaintiffs' unjust enrichment claims should be dismissed because Plaintiffs fail to plead facts sufficient to state a claim. "To prevail on a claim for unjust enrichment under New York law, a plaintiff must establish (1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006). "To bring such a claim, the plaintiff must have bestowed the benefit on the defendant." *M+J Savitt, Inc. v. Savitt*, 08 Civ. 8535, 2009 WL 691278, *10 (S.D.N.Y. Mar. 17, 2009) ("It is not sufficient for defendant to receive some indirect benefit – the benefit received must be specific and direct to support an unjust enrichment claim.").

Plaintiffs cannot allege that a benefit was conferred on OIS by Plaintiffs because OIS's fees were paid by the Funds directly to OIS as their investment advisor, and not by Plaintiffs.

---

[13]     In a letter to the Court submitted in conjunction with their SAC, Plaintiffs cited *Bullmore v. Ernst & Young Cayman Islands*, 846 N.Y.S.2d 145, 148 (N.Y. App. Div. 1st Dep't 2007), for the proposition that some cases allow both tort and contract claims to be brought against investment advisors. *Bullmore*, however, is inapplicable here because it was a suit brought by a fund (or, more precisely, its liquidator) – not its shareholders – against an investment advisor. *See Barneli*, 2010 WL 3504780, at *6 (distinguishing *Bullmore* on the ground that it "involved a breach of fiduciary duty action asserted by liquidators on behalf of a collapsed hedge fund against the fund's managing investment advisers"). Such a suit is precisely what the rule of *Foss v. Harbottle* contemplates.

*See* June 2004 Explanatory Memorandum ("EM") at 31 (SAC Ex. 13) ("Optimal SUS shall pay the Investment Manager an investment management fee . . ."). Similarly, because Clark is alleged to have been compensated directly by OIS, and not by the Funds (SAC ¶ 68), the connection between his compensation and Plaintiffs' investments is even more attenuated. Absent a plausible allegation that a benefit has been conferred directly upon these Defendants, Plaintiffs' unjust enrichment claims fail as a matter of law. *See, e.g., Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (dismissing unjust enrichment claims because plaintiff failed to "establish the specific and direct benefit [to defendants] necessary to support an unjust enrichment claim").

As to Santander and BSI, the Complaint alleges that these Defendants collected fees that ultimately originated with Plaintiffs. (SAC ¶¶ 347, 349.) But Plaintiffs have not alleged any facts to show that they conferred a benefit directly on Santander or BSI. Indeed, Plaintiffs actually contracted with an affiliate of BSI (*see* fn. 14 *infra*), and any benefit ultimately conferred on Santander, as BSI's corporate parent, is even more indirect. Consequently, Plaintiffs' conclusory allegations do not plausibly support a claim against Santander or BSI. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). The Court should reject Plaintiffs' attempt to turn a contract-based unjust enrichment claim into a strict liability tort, where any time circumstances beyond a defendant's knowledge or control result in a loss, a dissatisfied plaintiff who paid for services can seek compensation even though the services were rendered.

Finally, the unjust enrichment claim asserted by the Santander Clients against BSI and Santander also must be dismissed because the "sales charge" and "management fee" paid to BSI (SAC ¶ 262) were paid pursuant to written contracts—their account agreements with Santander

Bank & Trust, Ltd. ("SBT"), the entity with which they actually contracted.[14] "Under New York law . . . the existence of a valid and enforceable written contract governing a particular subject matter precludes recovery in . . . unjust enrichment for occurrences or transactions arising out of the same matter." *CBS Broad. Inc. v. Jones*, 460 F. Supp. 2d 500, 506 (S.D.N.Y. 2006). Plaintiffs allege "[BSI] has kept these sales charges, fees, and commissions, and has not returned the monies to Plaintiffs." (SAC ¶ 262.) But BSI's entitlement to those fees is set forth in those clients' account agreements with SBT. (*See* SBT Terms & Conditions Governing Accounts, § 41 (Lima Declaration, Exh. B) (requiring client to pay management fee to SBT and disclosing related "fees, charges, and expenses" payable to other entities, including SBT "affiliates or subsidiaries").) Therefore, the unjust enrichment claim must be dismissed.

### C. The Complaint Fails To Establish the Existence of a Fiduciary Relationship between Plaintiffs and OIS or BSI. (Counts 5-6)

Plaintiffs' claims against Defendants for breach of fiduciary duty and gross negligence are premised on the existence of a fiduciary relationship and a corresponding duty. (SAC ¶¶ 318, 327.) Under New York law, however, a fiduciary duty exists only "when one has reposed trust or confidence in the integrity or fidelity o[f] another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another." *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 503 (S.D.N.Y. 2007) ("*WWE*"). "Moreover, the elements of a breach of fiduciary duty based in fraud must be plead with particularity." *Id.* at 504.

---

[14]     *See* SAC ¶ 252 (alleging "Plaintiff Galinanes' bank account…is with [SBT]"); *id.* ¶ 251 (naming two BSI employees who "handled" the Broccoli Plaintiffs' account, but failing to name entity with whom they contracted).

Beyond alleging that "OIS was responsible for directing the investment and trading activities of Optimal U.S." and "[BSI] had substantial direction and control over marketing Optimal U.S. and communications with Plaintiffs" (SAC ¶¶ 325-26), Plaintiffs do not plead facts required to support a breach of fiduciary duty claim. *See WWE*, 530 F. Supp. 2d at 503. As to OIS, investment advisors to a fund owe fiduciary duties only to the Funds and not to investors themselves. *See Goldstein v. SEC*, 451 F.3d 873, 881 (D.C. Cir. 2006) ("The adviser owes fiduciary duties only to the fund, not to the fund's investors."); *Barneli*, 2010 WL 3504780, *6 (holding that fund investment advisor owes no fiduciary duty to fund shareholder). As to BSI, Plaintiffs plead no facts showing that they had any relationship with BSI, much less one giving rise to fiduciary duties. Absent any specific factual allegations, Plaintiffs' claims for breach of fiduciary duty and gross negligence against OIS and BSI must be dismissed.

**D.    Plaintiffs Have Not Stated a Third-Party Beneficiary Claim.  (Count 9)**

Under New York law, to plead a third-party beneficiary claim against OIS, Plaintiffs must show: "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost." *Cal. Pub. Emp. Ret. Sys. v. Sherman & Sterling*, 95 N.Y.2d 427, 434-35 (2000). "[A]n intent to benefit the third party must be shown and, absent such intent, the third party is merely an incidental beneficiary with no right to enforce the particular contracts." *Port Chester Elec. Const. Co. v. Atlas*, 40 N.Y.2d 652, 655 (1976).

Plaintiffs assert, in purely conclusory fashion, that they are "third-party beneficiaries to the Investment Management agreements entered into between OIS and Optimal U.S." (SAC ¶ 342.) But Plaintiffs provide no factual support for their claim. *Iqbal*, 129 S.Ct. at 1949. Plaintiffs do not attach the IMA, nor do they cite a single provision in the IMA. Indeed, the IMA

is a standard bilateral contract wherein each party agreed to give consideration in exchange for a benefit. OIS agreed to "manage the investment and reinvestment of the assets of the Fund." IMA ¶ 1. In consideration for these services, the Fund agreed to pay OIS "an investment management fee . . . out of the assets of each class of Shares." *Id.* ¶ 5. In short, because the IMA contains no reference to Plaintiffs at all, much less that they were the "immediate, rather than incidental" beneficiaries, the third party beneficiary claim must be dismissed.

### E.   Plaintiffs Have Not Stated a Claim for Common Law Fraud.  (Counts 1-2)

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001). Because the elements of common law fraud "are substantially identical to those governing § 10(b), the identical analysis applies." *AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC,* 01 Civ 11448, 2005 WL 2385854, *16 (S.D.N.Y. Sept. 26, 2005). Like Plaintiffs' claims under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), their common law fraud claims must be dismissed because Plaintiffs have failed to allege that any Defendant knew the alleged misrepresentations were false or made such alleged misrepresentations with the intention to induce reliance. *See* § III.C. *infra*.

### F.   Plaintiffs Do Not Adequately Plead Aiding and Abetting Claims. (Counts 7-8)

Recognizing the weakness of their breach of fiduciary duty and fraud claims, Plaintiffs allege in the alternative that Santander and BSI are liable as aiders and abettors for the alleged breaches of their corporate affiliate, OIS. (SAC ¶¶ 330-40.) But Plaintiffs cannot rely merely on the corporate relationship between these Defendants to manufacture an aiding and abetting claim. A claim for aiding and abetting requires: "(1) the existence of an underlying tort; (2)

defendant's actual knowledge of the underlying tort; and (3) defendant's provision of substantial assistance in the commission of the underlying tort." *In re Bayou Hedge Funds Inv. Litig.*, 472 F. Supp. 2d 528, 532 (S.D.N.Y. 2007). Plaintiffs have not pleaded these elements.

First, as noted in §§ II.C., E. *supra*, OIS did not owe fiduciary duties to Plaintiffs, and Plaintiffs have failed to state a claim that OIS committed fraud; therefore, aiding and abetting claims based on such allegations must fail. Second, Plaintiffs have not pleaded facts that, if true, would constitute "substantial assistance" by Santander or BSI to OIS with respect to its alleged breaches. *See In re Sharp Int'l Corp.*, 403 F.3d 43, 50 (2d Cir. 2005) ("Substantial assistance may only be found where the alleged aider and abettor affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach [of fiduciary duty] to occur"); *In re Bayou*, 472 F. Supp. 2d at 532-33 (dismissing aiding and abetting fiduciary duty and fraud claims where, *inter alia*, plaintiffs failed to allege substantial assistance). The allegations in counts 7 and 8 are wholly conclusory and are not sufficient to state a claim under the *Iqbal/Twombly* plausibility standard.

## III. The Complaint Fails to State Federal Securities Claims. (Counts 11-12)

Plaintiffs allege that OIS and Clark violated Section 10(b) of the Exchange Act, and seek redress under Rule 10b-5. Plaintiffs also assert Santander violated Section 20(a), which imposes liability on persons who, while not "primary" violators, nevertheless control them. Both claims must be dismissed because the SAC fails to plead a primary violation.

To plead a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omissions and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). Plaintiffs must allege that

each defendant's conduct satisfies each of these elements, and must meet the relevant pleading standards with respect to each. *Id.* at 158. Claims under Section 10(b) and Rule 10b-5 also must meet the heightened pleading standards of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).[15]

### A.    The Exchange Act Does Not Apply Extraterritorially to the Transactions That Form the Basis for Plaintiffs' Federal Securities Law Claims.

Plaintiffs cannot state federal securities law claims because the Exchange Act does not apply extraterritorially to the foreign-cubed transactions underlying their claims. *See Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2884 (2010) (holding that Exchange Act applies "only to transactions in securities listed on domestic exchanges, and domestic transactions in other securities"). One district court already has concluded, in a case involving these *same foreign securities*, that the purchases by non-U.S. persons were extraterritorial transactions not covered by the Exchange Act. *In re Banco Santander Securities-Optimal Litig.*, 2010 WL 3036990, *5 (S.D. Fla. July 30, 2010) ("In this case, the Plaintiffs neither purchased shares on an American stock exchange, nor did they purchase shares in the United States. They made off-shore purchases in off-shore Bahamian investment funds closed to United States investors.").

---

[15]    Rule 9(b) requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns*, 493 F.3d at 99. The PSLRA requires a class action plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Here too, Plaintiffs are non-U.S. persons[16] who purchased shares in those same off-shore funds

in transactions completed overseas — i.e., foreign-cubed transactions.

Courts interpreting *Morrison* have noted that whether a sale or purchase is a domestic

transaction hinges on where the security changed hands. *See Cornwell v. Credit Suisse Group*,

08 Civ 3758, 2010 WL 3069597, *1 (S.D.N.Y. July 27, 2010) (noting that, under *Morrison*,

"§ 10(b) claims would not extend to foreign securities trades executed on foreign exchanges even

if purchased or sold by American investors, and even if some aspects of the transaction occurred

in the United States"); *Stackhouse v. Toyota Motor Co.*, 2010 WL 3377409, *1 (C.D. Cal. July

16, 2010) (noting that *Morrison* "leaves little doubt that [the Supreme Court] believed that

United States securities laws should defer to the law of the country where the security is

exchanged").[17] As discussed below, Plaintiffs' conclusory allegation that "[t]he purchases and

sales of the shares of Optimal U.S. by Plaintiffs and the Class took place in the United States"

---

[16]     Plaintiffs in this case allege that they reside in the following countries:  21 in
Israel, 13 on the Island of Guernsey, 6 in the British Virgin Islands, 4 in Colombia, 1 in
Switzerland, 1 in Mexico, 1 in Panama, 1 in the Netherlands, 1 on the Island of Jersey, and 2
Plaintiffs in unspecified foreign countries.  (SAC ¶¶ 11-63).

[17]     Courts have read *Morrison* expansively, dismissing Exchange Act claims, even
though the complaints alleged some domestic activity. *See, e.g., Plumbers' Union Local No. 12
Pension Fund v. Swiss Reinsurance Co.*, 08-Civ-1958, 2010 WL 3860397, *9–10 (S.D.N.Y. Oct.
4, 2010) (dismissing claims of U.S. investors who purchased shares of a Swiss corporation on a
Swiss exchange even though the investors placed a purchase order with broker in the U.S.); *In re
Société Générale Sec. Litig.*, 08-Civ-2495, 2010 WL 3910286, *5–7 (S.D.N.Y. Sept. 29, 2010)
(dismissing the claims of U.S. investors who, while physically present in the U.S., purchased
shares of a foreign bank listed on a foreign exchange, as well as claims of U.S. investors who
purchased American Depository Receipts in the U.S.); *In re Alstom SA Sec. Litig.*, 03-Civ-6595,
2010 WL 3718863, *2–3 (S.D.N.Y. Sept. 14, 2010) (dismissing "the claims of Plaintiffs who
purchased securities on foreign exchanges" even though "such purchases were initiated in the
United States" and the securities were registered and listed on the NYSE); *Terra Sec. v.
Citigroup, Inc.*, 09-Civ-7058, 2010 WL 3291579, *4–5 (S.D.N.Y. Aug. 16, 2010) (dismissing
claims of foreign investors who purchased fund-linked notes through a Norwegian securities firm
even though "heart of the alleged fraud" occurred in the U.S.).

(SAC ¶ 352) is belied by the EMs attached to the SAC and, thus, may be ignored. *Iqbal*, 129 S.Ct at 1951.

Here, the securities purchased by Plaintiffs, none of whom were U.S. citizens or residents, were shares of SUS, which were exchanged in private transactions completed in Ireland. Ireland is where the Fund's administrator, HSBC Securities Services (Ireland) Limited ("HSSI"), was located and where prospective Fund purchasers — including Plaintiffs — were required to mail and fax their completed subscription forms. (*See* January 2008 EM at 37-38 (SAC Exh. 15) (listing HSSI's fax number and address in Dublin and stating "this Subscription Form should be sent to the following address and/or facsimile number, and if sent by facsimile, the original **must** follow by post") (emphasis in original).) Moreover, the sale of Fund shares became final only upon the Administrator's acceptance of the Subscription Form. *Id.* at 36 ("Directors reserve the right to defer acceptance of such subscription until monies are cleared"). Notwithstanding Plaintiffs' allegations concerning Madoff's purported trading strategy, [18] Plaintiffs' purchases of their Fund shares were complete upon acceptance of the subscription forms by HSSI *in Ireland*. As such, they are not domestic transactions and cannot provide a basis for claims under United States securities law.

---

[18] Plaintiffs cite several EMs to allege that Madoff's purported investment strategy for Optimal SUS consisted of "purchasing a basket of thirty to forty large-capitalization S&P 100 stocks" as well as other securities including S&P Index put and call options, and U.S. Treasury Bills. (*See* SAC ¶¶ 357, 361-62). But the fact that Madoff was supposed to buy U.S. securities as a component of the SUS Fund does not change the location where Plaintiffs purchased the securities at issue here — shares of SUS. As the Supreme Court explained, "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States…[b]ut the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Morrison*, 130 S. Ct. at 2884 (emphases in original). *See also* fn. 17 *supra*.

**B.      Plaintiffs Do Not Allege Actionable Misstatements or Omissions by Defendants in the Multiadvisors Explanatory Memoranda.**

To plead a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege that each defendant made a false statement or omission. *Stoneridge*, 552 U.S. at 157. Private plaintiffs may sue only persons who make material misrepresentations or omissions or employ a manipulative device, *i.e.,* primary violators. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994). "[A] secondary actor cannot incur primary liability under the Act for a statement not attributed to that actor at the time of its dissemination." *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998).

Nearly all of the alleged misstatements identified in the SAC come from the EMs, which are attached to the SAC at Exhibits 11-16. (*See* SAC ¶¶ 187-216, 354-367.) As their cover pages make clear, however, the EMs were issued by Multiadvisors (*see, e.g., id.* ¶ 189, Ex. 11 at 6), which Plaintiffs emphasize is not a defendant. (SAC ¶ 69.)

Although the EMs plainly show they were issued by Multiadvisors, Plaintiffs allege they were drafted by OIS. (SAC ¶ 217.) They base that allegation on discrete language in the Multiadvisors Memoranda that is purportedly similar to certain language in the Courvoisier Memoranda. (*Id.* ¶¶ 217-219.) Thus, Plaintiffs are alleging that OIS should be liable for statements in the EMs because OIS allegedly helped create them.

However, the Second Circuit recently rejected the "creator" standard of liability and held that "secondary actors can be liable in a private action under Rule 10b-5 for only those statement that are *explicitly attributed* to them. The mere identification of a secondary actor as being involved in a transaction, or the public's understanding that a secondary actor 'is at work behind the scenes' are alone insufficient." *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 155

(2d Cir. 2010) (emphasis added).[19] And while the EMs discuss the role of OIS as the investment manager, this reference is insufficient to subject OIS to liability under Section 10(b). *See id.* at 158. Because the EMs do not explicitly attribute any of the alleged misrepresentations to OIS or Clark, any claims based on misrepresentations or omissions from the EMs should be dismissed.

### C. The Complaint Fails to Allege Facts Allowing a Strong Inference of Scienter.

Plaintiffs also fail to plead scienter. A plaintiff can plead scienter by alleging facts creating a strong inference that each defendant exhibited "a mental state embracing intent to deceive, manipulate or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). "[T]he scienter element [also] can be satisfied by a strong showing of reckless disregard for the truth", which the Second Circuit has interpreted as "'conscious recklessness'—i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence." *South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009). This standard is limited to conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it . . . or to evidence that the defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Id.* Finally, plaintiffs "must plead scienter for each defendant." *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 303 (S.D.N.Y. 2009).

To test the sufficiency of a plaintiff's allegations of scienter, the Supreme Court has directed courts to engage in a comparative analysis, examining "all of the facts alleged" and "consider[ing] plausible nonculpable explanations for the defendant's conduct." *Tellabs*, 551

---

[19]     The Supreme Court presently is considering whether a fund advisor can be held liable for statements made by its funds. *See Janus Capital Group, Inc. v. First Der. Traders*, No. 09-525 (Sup. Ct.) (argued Dec. 7, 2010).

U.S. at 323. A complaint's allegations must thus be examined "holistically" with "omissions and ambiguities count[ing] against inferring scienter." *Id.* at 326. At the end of the day, the "strong inference" of scienter must be one that is "more than merely 'reasonable' or 'permissible' — it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324.

The SAC alleges that OIS and Clark misled the Funds' investors by asserting that they would take due care in "selecting and monitoring the managers to whom it entrusted" the Funds' assets, and by stating that the monies the Funds invested with Madoff were in fact invested by Madoff in actual securities (stocks, options, and Treasury bills). (SAC ¶¶ 359-384.) In an effort to satisfy the scienter requirement, the SAC makes boilerplate allegations that these misstatements were made with knowledge that they were untrue or with reckless disregard as to their truth. (*Id.* ¶¶ 369-70.) Those allegations are insufficiently particular and, indeed, highly implausible, in light of the numerous allegations regarding the extensive due diligence efforts that were undertaken and Defendants' reasonable (widely shared) belief that Madoff was a reputable, regulated broker, who held and traded actual securities on behalf of his customers.

The SAC does not plead facts creating a strong inference that OIS and Clark *knowingly* misled Fund investors that their assets had been invested with a broker who, in fact, was not investing their money. To the contrary, the allegations attest to the uniform, albeit honestly mistaken, understanding of Defendants, their agents and employees that Madoff was a legitimate broker-dealer (*see, e.g.*, SAC, Ex. 2 at 4 ("Second Courvoisier Memo") ("As mentioned above, Madoff is regulated by the NASD . . . . His financial and regulatory standing is good.")), who held custody of securities on behalf of his thousands of customers, including those of the Funds (*see, e.g.*, *id.* ¶ 122 ("Defendants had unquestioningly relied" on "Madoff's representations" that "the trade purportedly documented had actually been executed"); *id.* ¶ 109 ("OIS . . . accepted

these explanations about . . . Delivery and Copying Risk at face value . . . ."); *id.* ¶ 145 ("Madoff

confirmed that . . . the assets of these funds . . . [are] held in the DTC.") (quoting *id.*, Second

Courvoisier Memo, Ex. 2 at 4); *id.* ¶ 147 ("Clark . . . attempted to confirm the existence of a

segregated account" and "called the DTC . . . wh[ich] confirmed that Madoff held an account

there").

Similarly, the very allegations that Plaintiffs advance to assert that Defendants' due

diligence efforts were inadequate overwhelmingly show that OIS was, in fact, performing

extensive, expensive, on-site due diligence. To that end, the SAC alleges, "[i]n September 2002,

Banco Santander ordered OIS to send a team to investigate and meet with Madoff." (SAC ¶ 87.)

The employment of those dedicated personnel and the efforts they undertook (*e.g.*, *id.* ¶ 97

("[Clark] conducted further due diligence on Madoff and wrote another report")) would have

been a pointless waste of resources had Defendants known that Madoff was not investing Fund

assets. The SAC and its exhibits detail the extensive due diligence efforts undertaken by

Defendants. (*E.g.*, *id.* ¶¶ 87-92, 97-99, 120-23, 135-39, 145-66.) The fact that those efforts

failed to detect Madoff's fraud does not show they did not take place, much less that Defendants

*knew* they did not take place. Thus, Plaintiffs' theory that OIS and Clark knowingly lied about

conducting due diligence and knowingly misrepresented that the Funds had deposited assets with

a broker who was pursuing a specific securities investment strategy, is highly implausible.

Nor can Plaintiffs satisfy the scienter requirement by suggesting that Defendants' alleged

misstatements were made with *severe* recklessness as to their truth. It is not severely reckless for

OIS, which sent a team to investigate Madoff (*id.* ¶ 87), and hired Clark "to monitor Madoff" (*id.*

¶ 68), and took the additional steps described in the SAC, to represent that "[OIS] uses an

intensive and thorough due diligence process" (*id.* ¶ 168 (quoting OIS's 2005 Due Diligence

Questionnaire).) The suggestion that Defendants were severely reckless when they stated that Madoff was in fact trading securities is equally flawed. That the SEC—which, unlike Defendants, had the ability to ascertain Madoff's custody of securities—failed to detect his fraud, strongly supports a competing inference whose consideration *Tellabs* compels. 551 U.S. at 324. The far more likely inference is that Defendants, like thousands of other sophisticated investors worldwide, believed that Madoff, a registered broker-dealer regulated by the SEC and the NASD and in good standing with those agencies, actually held and traded the securities reflected in the thousands of trade tickets and statements he sent to OIS. (SAC ¶ 136).

In sum, Plaintiffs' allegations fail to support an inference of scienter that is "cogent and compelling . . . in light of other explanations." *Tellabs*, 551 U.S. at 324; *see also Iqbal*, 129 S. Ct. at 1949 ("The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."). If Madoff's scheme was so obviously fraudulent and so easily detectable, there is no rational explanation as to why thousands of sophisticated investors continued to invest vast sums of money with Madoff and why the SEC concluded, after considering some of the same "smoking guns" cited by Plaintiffs, that there was "no evidence of fraud." *See Tellabs*, 551 U.S. at 326.

The widespread failure of others with equal or greater capacity to detect fraud was particularly significant in *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 418 (S.D.N.Y. 2007), *aff'd sub nom. South Cherry St. LLC v. Hennessee Group LLC*, 573 F.3d 98 (2d Cir. 2009), a case strikingly similar to this one. In *Bayou*, the plaintiffs, who had lost money in a Ponzi scheme orchestrated by a hedge fund, alleged that their investment advisor committed securities fraud based on a number of misrepresentations concerning its due diligence of the fraudulent hedge fund. *Id.* at 407-12. Those plaintiffs attempted to plead scienter by asserting,

*inter alia*, that, because the defendant "assumed both an initial and ongoing duty to [the plaintiffs] to investigate [the hedge fund] thoroughly, . . . its failure to uncover the . . . fraud demonstrates that it breached that duty, and that the breach of duty demonstrates the requisite recklessness." *Id.* at 416. The court dismissed the complaint, holding that the plaintiffs had failed to plead scienter. The court found that:

> One substantial competing inference this court may draw from these alleged facts is that due diligence would not have uncovered the fraud. The Complaint alleges that [the hedge fund] concealed the fraud from investors, the public, investment advisors, other industry professionals and regulators . . . for *nine years*. Given that [the principals of the hedge fund] managed to deceive the entire investing community for nearly a decade, [the plaintiffs'] allegation that [the defendant] would necessarily have uncovered the fraud had it conducted the due diligence it promised is far from compelling.

*Id.* at 418 (emphasis in original). Here, as in *Bayou*, a large number of investors and government agencies had enormous incentive to ensure that Madoff ran a legitimate operation. In the end, none uncovered the fraud; it was only Madoff's confession to family members and, later, the FBI that led to his arrest. Here, as in *Bayou*,

> the inference of recklessness alleged by plaintiff[s] — that [defendants'] failure to uncover the fraud evidences a reckless lack of due diligence — [is] less compelling than an opposing inference — that [defendants'] failure to discover the fraud merely places [them] alongside the SEC, the IRS, and every other interested party that reviewed [the hedge fund's] finances. The inference proposed by [plaintiffs] is thus not "strong in light of other explanations," and [their] pleading cannot survive a motion to dismiss.

*Id.* (quoting *Tellabs*, 551 U.S. at 324).

"[C]ourts considering similar red flag allegations in the aftermath of the Madoff affair have found [that] Plaintiffs' allegations are insufficient to establish scienter." *Newman v. Family Mgmt. Corp.*, 08 Civ. 11215, 2010 WL 4118083, *8 (S.D.N.Y. Oct. 20, 2010); *see also In re Tremont Sec. Law, State Law & Ins. Litig.*, 703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010) (finding the "more compelling inference" was that Madoff was "proficien[t] in covering up his scheme

and eluding the SEC and other financial professionals"); *SEC v. Cohmad Sec. Corp.*, 09 Civ. 5680, 2010 WL 363844, *2 (S.D.N.Y. Feb. 2, 2010) (dismissing complaint for failure to plead scienter because "nowhere does [it] allege any fact that would have put defendants on notice of Madoff's fraud. Rather, the complaint supports the reasonable inference that Madoff fooled the defendants as he did individual investors, financial institutions, and regulators."). Accordingly, Plaintiffs' 10b-5 claims should be dismissed.

### D. The Complaint Fails To Allege With Adequate Particularity Actual Reliance, Which, in This Case, Cannot Be Presumed.

"Reliance by the plaintiff upon the defendant's" misrepresentations is an "*essential*" element of any securities fraud claim, one that provides the "'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury.'" *Stoneridge*, 552 U.S. at 159 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988)) (emphasis supplied). A plaintiff is excused from pleading reliance only where the fraud-on-the-market presumption applies. The presumption relieves a plaintiff of the need to prove that (s)he both knew of and relied on a misstatement of material fact when (s)he bought a widely and publicly traded security, on the theory that all publicly available "information is reflected in the market price of the security." *Stoneridge*, 552 U.S. at 159. The presumption only applies where a security's price is set through the operation of a "well-developed," "efficient market." *Basic*, 485 U.S. at 247-48. The presumption is inapplicable here because the EMs made clear that "[t]here [wa]s no public market," let alone an efficient and developed market, for such shares (Oct. 2008 EM (SAC Ex. 16) at 2), SUS shares were not registered for trading (*id.* at 3), and transfers of shares could be rejected at the sole discretion of the SUS directors (*id.* at 2). Furthermore, the value of SUS shares was not set by market forces — i.e., the aggregated bids of investors based on publicly available information. Instead it was set by the Fund by dividing the net asset value ("NAV") of

the Fund by the number of shares issued (*id.*), which is fundamentally different from the way in which prices of securities traded on public exchanges are determined.

Because the fraud-on-the-market presumption does not apply here, Plaintiffs must allege actual reliance on Defendants' alleged misrepresentations. But the SAC does not contain any particularized allegation that Plaintiffs relied on the supposed misrepresentations identified therein. *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 540 F. Supp. 2d 800, 813, 816, 830-31 (S.D. Tex. 2007) (rejecting boilerplate allegations of reliance in securities fraud case in which no presumption of reliance applied); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 493 (S.D.N.Y. 2006) (dismissing securities claims because plaintiffs failed to allege "that they personally read specific actionable misstatements"). To the contrary, Plaintiffs make the conclusory allegation that they "relied, to their detriment, on such misleading statements and omissions in purchasing shares in Optimal U.S." (SAC ¶ 370.) Such allegations are plainly insufficient to plead reliance with the requisite particularity. *See, e.g.*, *In re Enron Corp.*, 540 F. Supp. 2d at 813.

### E. The Section 20(a) Claim Should Be Dismissed. (Count 12)

Because Section 20(a) liability is derivative, to plead a violation thereof, Plaintiffs must properly allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *See ATSI Commc'ns*, 493 F.3d at 108. As set forth above, the SAC does not state a claim for primary liability under Section 10(b), and thus there can be no derivative, "control" liability for Santander. *See id.* Even if a primary violation had been adequately pleaded, the allegations fail to satisfy the other elements of controlling person liability.

Plaintiffs allege that Santander "had day-to-day control and exercised day-to-day control of OIS and its operations." (SAC ¶ 372.) Those types of conclusory allegations are "bare legal conclusion[s], and . . . not entitled to the presumption of truth." *Owens v. Gaffken & Barriger Fund, LLC*, 08 Civ. 8414, 2009 WL 3073338, *12 (S.D.N.Y. Sept. 21, 2009). The SAC also alleges that Santander had day-to-day control over OIS solely because "OIS was a wholly owned subsidiary of Banco Santander at all relevant times" (SAC ¶ 372). However, simply asserting control of an entity based on an ownership stake — however large — is, without more, insufficient to maintain a Section 20(a) cause of action. *See In re Asia Pulp & Paper Sec. Litig.*, 293 F. Supp. 2d 391, 396 (S.D.N.Y. 2003) (rejecting plaintiffs' "one-firm, unified-company theory" against parent company for control person liability).

Plaintiffs also have not met the third prong of the test, as they have failed to plead culpable participation with any particularity against Santander. *See Kalin v. Xanboo, Inc.*, 04 Civ. 5931, 2009 WL 928279 at *12 (S.D.N.Y. Mar. 30, 2009) (holding that "a plaintiff must adequately allege that the defendant acted at least with recklessness"). Indeed, the generalized allegation that Santander "had the power to influence and control, and did influence and control, directly or indirectly, the decision making of OIS" (SAC ¶ 373) falls well short of the non-conclusory allegations necessary to plead control for the purposes of Section 20(a).

## IV. Pioneer's Claims Should be Dismissed for Improper Venue. (Counts 13-15)[20]

The claims asserted by Pioneer must be dismissed because those claims arise out of the Private Placement Agreement ("PPA") between Pioneer and Multiadvisors, which contains an exclusive forum selection clause requiring that disputes be resolved in the courts of The

---

[20] Pioneer asserts counts 13 through 15 against "all Defendants except [BSI]." (SAC ¶¶ 375, 381, 388). Neither the Pioneer Clients, nor the Santander Clients are parties to those counts.

Bahamas.[21] An agreement to resolve disputes arising out of a contract in a chosen forum, to the exclusion of all others, is a mandatory forum selection clause" which is entitled to a "presumption of enforceability," that can be rebutted only if the party challenging enforcement makes a "sufficiently strong showing that 'enforcement would be unreasonable or unjust or the clause was invalid for such reasons as fraud or overreaching.'" *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383-84, 386 (2d Cir. 2007) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)).

Pursuant to the PPA, Pioneer agreed to locate investors for Multiadvisors' sub-funds, including SUS, in exchange for a "placement fee." The PPA contains an exclusive forum selection clause, which provides that the parties "irrevocably submit[] any disputes which may arise from this agreement to the exclusive jurisdiction of the courts of the Commonwealth of The Bahamas." PPA at § 19. Pioneer's claims necessarily arise out of the PPA and, therefore, are within the scope of the forum selection clause. Pioneer's theory of liability is that (1) Defendants made misstatements and omissions to Pioneer concerning the monitoring and/or management of SUS; (2) based on that alleged misconduct, Pioneer recommended that the individual Plaintiffs invest in SUS; and (3) as a result of those investments, Pioneer suffered "loss of business, reputational damage, and loss of fees that would [have] been earned had the Pioneer Plaintiffs continued to invest in Optimal U.S." (SAC ¶¶ 380, 387.) Of course, the "fees that would [have] been earned" are none other than the placement fees specified *in the PPA*. *See* PPA § 7. The Second Circuit has held that forum selection clauses covering disputes "arising out of" agreements are "not restricted to pure breaches of the contracts containing the clauses."

---

[21]    A copy of the PPA, dated December 20, 2007, is attached as Exhibit C to the Lima Declaration.

*Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir. 1993) (holding that claim alleging securities violations by defendants "necessarily relates to" agreement that permitted plaintiffs to participate as purchasers in securities market in the first place and, therefore, forum selection clause applied). The same is true here.

Furthermore, all Defendants are entitled to enforce the forum selection clause. A forum selection clause may bind even non-parties to a contract if "the relationship between the non-party and the signatory [is] sufficiently close so that the non-party's enforcement of the forum selection clause is foreseeable by virtue of the relationship between the signatory and the party sought to be bound." *Direct Mail Prod. Servs. Ltd. v. MBNA Corp.*, 99 Civ 10550, 2000 WL 1277597, *3 (S.D.N.Y. Sept. 7, 2000) (citing *In re Lloyd's Am. Trust Fund Litig.*, 954 F. Supp. 656, 670 (S.D.N.Y. 1997)). If the non-signatory seeking enforcement is a third-party beneficiary to the agreement, then it automatically satisfies the "closely-related" requirement, although "third-party beneficiary status is not required." *Direct Mail*, 2000 WL 1277597, at *3.

OIS may enforce the clause as a named third-party beneficiary to the PPA. *See* PPA §§ 1, 7 (naming OIS, as "investment manager," and providing that it would be entitled to a management fee for managing assets brought into the Funds by Pioneer). Clark is entitled to enforce the forum selection clause because he is an OIS employee. *See Roby*, 996 F.2d at 1360 (holding that individual employees "are entitled to rely on the contract clauses incorporated into their employers' agreements"). Finally, Santander is entitled to enforce the forum selection clause because it is sufficiently "closely-related" to Multiadvisors. In fact, Pioneer acknowledges this close relationship, stating that the reason that it "considered investing in Optimal U.S. at all" was because of the involvement of Santander, "an established and respected large financial institution." (SAC ¶ 225.) Thus, it was foreseeable to Pioneer that Santander, as

a "closely-related" entity, would seek to enforce the forum selection clause in the PPA.  *See Direct Mail*, 2000 WL 1277591, at *3.  Because Pioneer's claims are governed by the exclusive forum selection clause in the PPA, its claims must be litigated in The Bahamas, and counts 13 through 15 must be dismissed for improper venue.

## V.  The Santander Clients' Claims Should be Dismissed for Improper Venue.  (Counts 1-12)

Similarly, the claims asserted by the Santander Clients (Galinanes and Broccoli) must be dismissed for improper venue based on the exclusive forum selection clause in the SBT Terms & Conditions, whereby those Plaintiffs agreed to "irrevocably submit to the *exclusive jurisdiction* of the Commonwealth of the Bahamas in any action or proceeding arising out of or relating to the Account or this agreement and irrevocably agree that *all claims* in respect of any action or proceeding may be heard and determined in those courts."  (SBT Terms & Conditions § 78) (emphases added). [22]  Given the breadth of this provision, the Santander Clients cannot plausibly contest that their claims arise out of their investment accounts with SBT and, as such, are subject to the forum selection clause.

Moreover, as discussed in § IV *supra*, although the Terms & Conditions are part of the Santander Clients' agreements with SBT, all Defendants may enforce the provision because they are sufficiently "closely related" to SBT and such enforcement was foreseeable to the Santander Clients.  *See Direct Mail*, 2000 WL 1277597, at *3.  In fact, the Terms & Conditions expressly

---

[22]     Because Pioneer and the Santander Clients are bound by forum selection clauses requiring them to litigate their claims in The Bahamas, the most efficient treatment of this case is to require the individual Pioneer Clients to litigate there as well, thereby allowing all claims to be resolved in a single forum.  This result is consistent with, indeed compelled by, the PPA's broad forum selection clause.  Defendants reserve the right to raise this argument in the context of a forum *non conveniens* motion, which the Court has advised the Parties that it will entertain, if necessary, following disposition of the instant motion.

provide that SBT could "engage other agents or subagents (that may be Bank's affiliates) to provide investment advisory, brokerage, and other services to Bank for the Advisory Accounts." (*Id.* §21(L)). As such, the Court should enforce the forum selection clause and dismiss the Santander Clients' claims for improper venue.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court dismiss the Second Amended Class Action Complaint.

Dated: December 30, 2010

Respectfully submitted,

By:   /s/ Paulo R. Lima
      Samuel A. Danon (*pro hac vice*)
      Gustavo J. Membiela (*pro hac vice*)
      Paulo R. Lima
      **HUNTON & WILLIAMS LLP**
      1111 Brickell Avenue, Suite 2500
      Miami, FL 33131
      Telephone: (305) 810-2500
      Facsimile: (305) 810-2460
      Email:    sdanon@hunton.com
      Email:    gmembiela@hunton.com
      Email:    plima@hunton.com

      - and -

      Shawn Patrick Regan
      200 Park Avenue
      New York, NY 10166
      Telephone: (212) 309-1000
      Facsimile: (212) 309-1100
      Email:    sregan@hunton.com

      *Counsel for Defendants Banco Santander, S.A., Banco Santander International, Optimal Investment Services, S.A., and Jonathan Clark*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on December 30, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to counsel of record listed below:

Edward W. Miller, Esq.
648 Franklin Avenue, 2nd Floor
Garden City, New York 11530
*Counsel for Plaintiffs*

                                 /s/ Paulo R. Lima
For Hunton & Williams LLP