UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
⋮
ABRAHAM and MINA REMBAUM, *et. al.*,
⋮
           Plaintiffs,          No. 10-CIV-4095 (SAS)
⋮
              vs.
⋮
BANCO SANTANDER, S.A., BANCO SANTANDER INTERNATIONAL, OPTIMAL INVESTMENT SERVICES, S.A., and JONATHAN CLARK,
⋮
           Defendants.
⋮
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT

**HUNTON & WILLIAMS LLP**
Samuel A. Danon (*pro hac vice*)
Gustavo J. Membiela (*pro hac vice*)
Paulo R. Lima
1111 Brickell Avenue, Suite 2500
Miami, FL  33131
Telephone:  (305) 810-2500
Facsimile:  (305) 810-2460
Email:  sdanon@hunton.com
Email:  gmembiela@hunton.com
Email:  plima@hunton.com

- and -

Shawn Patrick Regan
200 Park Avenue
New York, NY 10166
Telephone:  (212) 309-1000
Facsimile:  (212) 309-1100
Email:  sregan@hunton.com

*Counsel for Defendants Banco Santander, S.A., Banco Santander International, Optimal Investment Services, S.A., and Jonathan Clark*

I.  **Under New York Choice of Law Principles, the Internal Affairs Doctrine Dictates Application of Bahamian Law.[1]**

The internal affairs doctrine governs the determination of who has standing to bring tort claims generally, without regard to the nature of the defendant or the claim asserted. That determination falls squarely within the contours of the internal affairs doctrine because "[t]he choice between derivative and direct litigation is a choice about how (and by whom) the internal affairs of the firm are managed," *Bagdon v. Bridgestone/Firestone, Inc.*, 916 F.2d 379, 382 (7th Cir. 1990), whether or not a defendant is an officer/director, *e.g.*, *Seybold v. Groenink*, No. 06 Civ. 772, 2007 WL 737502, at *5-*6 (S.D.N.Y. Mar. 12, 2007), or a non-corporate actor, such as an investment manager or accountant, *e.g.*, *Saltz v. First Frontier, LP*, No. 10 Civ. 964, 2010 WL 5298225, at *12 (S.D.N.Y. Dec. 23, 2010).[2]

In place of the internal affairs doctrine, Plaintiffs argue that the "interests analysis" test is the governing choice of law principle. But these two principles of New York choice of law jurisprudence have separate areas of application and are not mutually exclusive. The question of what law governs the substantive adjudication of torts that are properly pleaded (the question interest analysis attempts to answer, namely, which jurisdiction has "the greatest interest in the litigation," *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 684 (N.Y. 1985)), presupposes an action in which the parties pleading those torts have the right to assert them. And even if the

---

[1] Given the page limitation, Defendants do not address all of the arguments in Plaintiffs' Opposition Brief [D.E. # 25] ("Opp."), but do not waive any arguments previously raised in the Motion to Dismiss [D.E. # 15].

[2] In an effort to avoid *Foss v. Harbottle* and the Reflective Loss Principle, Plaintiffs' expert, Mr. Sweeting, suggests that the Bahamian Investment Funds Act of 2003 ("IFA") reflects a possible source of direct liability on the part of service providers to individual fund investors. (Sweeting Decl. ¶¶ 15-19.) Mr. Hildyard addresses this Bahamian law issue in his supplemental declaration, and explains it is a red herring. (Sweeting Decl. ¶ 19; Hildyard Supp. Decl. ¶ 8.)

choice of standing law were not separate from choice of substantive law, all that would mean would be that "interest analysis" would dictate that all principles of New York law, including New York's internal affairs doctrine, *see In re BP p.l.c. Derivative Litig.*, 507 F. Supp. 2d 302, 307 & n.14 (S.D.N.Y. 2007), would also apply.  As Defendants argued earlier, New York/U.S. law, like Bahamian/U.K. law, would treat Plaintiffs' non-fraud claims as claims that may be asserted derivatively, not directly.  (Mot. 4-6.)  But Defendants still argue for the application of Bahamian law, both because it is the law whose application the New York internal affairs doctrine directs, and because Plaintiffs' argument based upon *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991) — which they misread as a matter of U.S. law, *see* § III *infra* — has no apparent analogue under Bahamian law.  Plaintiffs' Bahamian law expert identifies none.

**II.     The Fund's Two-Tier Equity Structure Has No Bearing on Plaintiffs' Standing, Because the Fund Suffered a Loss.**

Plaintiffs argue that, because of the Fund's two-tier equity structure, the Participating shares that Plaintiffs owned became worthless, whereas the Ordinary shares, owned by OIS, which had voting rights, but no right to participate in the Fund's returns, were not affected. Plaintiffs' argument confuses (voting) shareholder loss with Fund loss.  Whether or not the shareholders who held voting shares suffered a loss, it cannot reasonably be disputed that the Fund suffered a catastrophic loss: *viz.*, the immediate elimination of the value of nearly all its assets when Madoff's firm collapsed.  It is precisely because the Fund suffered such a loss, which the Fund has standing to bring claims to recover (as it has in the Madoff brokerage firm liquidation proceeding, where it is presently the holder of the largest approved claim), that the Rule in *Foss v. Harbottle* has application.  (*See* Hildyard Supp. Decl. ¶ 11.)

### A. The Difference in Potential Recovery Between Plaintiffs and the Fund Has No Bearing on Plaintiffs' Standing.

Plaintiffs also argue that, to the extent the Fund suffered a loss, it suffered a "different loss" from the loss the suing shareholders suffered. (Opp. 18). That is not true. The out-of-pocket losses the Fund and its investing shareholders suffered stem from the same, single cause, Madoff's fraud. Indeed, because SUS was a fund that invested entirely in the Madoff firm and its fraudulent strategy, and because the value of Plaintiffs' shares was determined solely with reference to the value of those holdings, the correlation between Plaintiffs' and the Fund's losses was "more than usually exact." (Hildyard Supp. Decl. ¶ 20.)

To be sure, due to the fluid nature of the Fund's share ownership, individual fundholders' out-of-pocket losses varied depending upon when they partially or fully redeemed their shares. But that will be true of any corporate wrong committed over a long period of time (or disclosed at a time distant from the time at which it occurred). It does not mean that the shareholders' losses, individually or collectively, are not "reflective of" — *i.e.*, "parasitic upon" (Hildyard Decl. 23) — the losses the corporation has suffered. Much less does it mean that it makes sense to confer a right of individual recovery upon individual shareholders to vindicate, for that will bring about the same problems — inconsistent, multiple recoveries; prejudice to creditors — that *Foss v. Harbottle* is designed to prevent. (Hildyard Decl. ¶¶ 23-25.) Like any investor in a corporation, shareholders are by agreement tied into the venture in which they have invested — they must "follow the fortunes of the fund," (Hildyard Supp. Decl. ¶ 21; *see also* Hildyard Supp. Decl. ¶¶ 13, 17-18, 22.)

Even if New York law applied to this issue, "New York courts have consistently held that diminution in the value of shares," regardless of the amount of diminution, "is quintessentially a

derivative claim." *Higgins v. New York Stock Exch., Inc.*, 806 N.Y.S.2d 339, 349 (Sup. Ct. N.Y. Cty. 2005) (citation omitted). New York courts have not required derivative claims to be undifferentiated in order to proceed as such. *See, e.g.*, *id.* at 348. There is no requirement under either New York or Bahamian law that, for a derivative claim to lie, the diminution in share value must be the *same* for all shareholders, but rather only that the loss claimed be derived from *some* diminution in share value, as are the Plaintiffs' claimed losses here.

### III. *Wagoner* Does Not Apply.

Plaintiffs argue that the "*Wagoner* Rule" permits them to bring claims that would otherwise belong to the Fund because a fund cannot assert a claim where that fund was involved in a defendant's wrongdoing. *Wagoner*, 944 F.2d at 118. The argument is misplaced because Bahamian law applies, and Plaintiffs' Bahamian law expert does not identify any analogue of *Wagoner* under Bahamian law. But even if U.S. law applies, Plaintiffs misread *Wagoner*. It has no application in this setting.

*Wagoner* is concerned with situations in which an entity's shareholders stand *in pari delicto* with third parties the entity is suing, for in *Wagoner*, the bankrupt corporation that was attempting to assert claims against its broker had a single, controlling shareholder (Kirschner) who was clearly complicit in the alleged wrongdoing. "[T]o the extent the demand alleges money damages to HMK itself, it is uncontested that HMK's sole stockholder and decisionmaker, Kirschner, not only knew of the bad investments, but actively forwarded them." 944 F.2d at 120. In such a case, *Wagoner* holds that *creditors* of the corporation, not the entity (or, if bankrupt, its bankruptcy trustee), are the proper parties to assert any claim on behalf of the bankrupt corporation. "A claim against a third party for defrauding a corporation with the cooperation of management accrues to *creditors*, not to the guilty corporation. . . . We therefore hold that the trustee lacks standing to bring the second claim, *which belongs solely to the*

- 4 -

*creditors*." *Id.* (emphases added). *Wagoner* says nothing about whether the *shareholder* could have asserted the claim, had he not been complicit in the wrong. Defendants submit that if that question had been presented, the answer would have been "no," for all the reasons set forth above and in their opening brief, and that only the entity (or its bankruptcy trustee) could bring the claim to vindicate the entity's losses. *See, e.g.*, *In re CBI Holding Co.*, 529 F.3d 432, 448 (2d Cir. 2008) (finding estate representative had standing to sue auditor for losses resulting from undiscovered fraud under "adverse interest" exception to *Wagoner*). Here, Plaintiffs are *shareholders* in SUS, not its *creditors*, and neither they nor Defendants assert that they were complicit in Madoff's fraud. As such, *Wagoner* is inapplicable.

### IV.    Plaintiffs' Federal Securities Law Claims Are Barred by *Morrison*.

Plaintiffs are 50 foreign persons and trusts who allege they purchased shares in a foreign investment fund (whose prospectus expressly stated that it could not be sold in the U.S.) through investment accounts held in foreign financial institutions. In an effort to conjure up a connection to the United States, Plaintiffs rely on documents[3] that (i) were neither attached nor referenced in the SAC; (ii) do not pertain to any Plaintiff or Defendant in this suit; and (iii) do not relate to the fund that Plaintiffs purchased. These documents cannot support an inference that SUS shares were purchased in the U.S. First, the Explanatory Memoranda ("EMs") attached to the SAC show that the purchase of Plaintiffs' shares of SUS could only occur in Ireland, which is where the EMs required clients to mail their subscription forms and payment, and where the Fund made

---

[3] Exhibit A to the Opp. is a set of four "Contract Notes" allegedly generated by non-party Santander Bank & Trust Ltd. ("SBT"). While the documents do not identify the account holder, a court filing stamp across the top identifies it as having been filed in the action styled *Solymar Investments, Ltd., et al. v. Banco Santander, S.A., et al.*, No. 10-cv-20695 (S.D. Fla.). The plaintiffs in that action all allege that they invested in SUS through their investment accounts with SBT. But the documents bear no connection to any Plaintiffs or Defendants in this case.

- 5 -

the decision whether to issue shares. (Mot. 17.) Second, Plaintiffs have not, and cannot, show any link between these documents and their accounts or the SUS shares that they purchased.

Disregarding the EMs and the arguments in the Defendants' Motion, Plaintiffs incorrectly assert that Defendants "do not dispute that the shares of Optimal U.S. were bought in New York." (Opp. 3.) Defendants previously had not specifically challenged New York as the place of purchase because Plaintiffs did not plead it in the SAC, which focuses on alleged sales by Banco Santander International in Miami and makes no mention of supposed transactions in New York. Plaintiffs cited New York for the first time in their Opposition by attaching the "Contract Notes," which their counsel apparently has scavenged from a different case.

The Pioneer Plaintiffs' reliance on the Contract Notes is especially untenable and implausible. Their contention that the documents (which were not even referenced in the SAC) show that their purchases "took place in the United States" (Opp. 2) directly contradicts the allegations in the SAC that "[t]hese investments were made from the Pioneer Plaintiffs' bank accounts at Banc Julius Baer in Geneva, Switzerland." (SAC ¶ 11.) As they do not even attempt to allege a connection to SBT or facts showing how investments made in Geneva, Switzerland can be treated as New York purchases, the Pioneer Plaintiffs cannot rely on the Contract Notes.

The remaining Plaintiffs who assert securities claims, Solange and Gaston Broccoli, claim they were "induced" to purchase shares in Optimal SUS ("SUS") by Defendant Banco Santander International ("BSI"). (SAC ¶ 62.) However, they have not identified the specific Santander entity that actually held their accounts and, instead of attaching trade confirmations bearing their own names, the Broccolis rely on Contract Notes sent by SBT to *other investors*.[4]

---

[4] The Broccolis' reliance on these SBT documents is especially puzzling given their argument that they are not subject to the forum selection clause in their SBT account agreement because

Moreover, in paragraph 2 of the certifications attached to the SAC, all Plaintiffs certified that they invested in "Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd." However, the documents attached to the Opp. pertain to "Optimal Arbitrage Ireland Fund" and "Optimal Strategic U.S. Equity Ireland Fund."  (Opp. Ex. B.)  In sum, the Court should not allow Plaintiffs to rely on these documents, which do not pertain to them or the funds they purchased.

Plaintiffs also minimize and mischaracterize two critical cases interpreting the holding of *Morrison*.  First, they suggest this Court should ignore the opinion in *In re Banco Santander Secs.-Optimal Litig.*, 732 F. Supp. 2d 1305 (S.D. Fla. 2010), because the plaintiffs in that case did not plead "that the purchases of Optimal U.S. shares took place in the United States." (Opp. 4.)  This is simply not true, as the plaintiffs in that case had alleged that sales occurred through the United States.  (*See* Optimal MDL Consol. Amd. Compl. ¶ 15 (alleging "OIS, Santander, and Santander Miami…indiscriminately sold the Optimal Funds through Santander Miami") (relevant excerpts attached as **Exhibit A** to the Supplemental Declaration of Paulo R. Lima).) That court nonetheless held that U.S. securities law did not apply in that case, which involved these same securities.  *See In re Banco Santander*, 732 F. Supp. 2d at 1317 ("They made off-shore purchases in off-shore Bahamian investment funds closed to United States investors.  The Plaintiffs' securities fraud claims therefore do not survive *Morrison*.").

Plaintiffs also distort the holding in *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372 (S.D.N.Y. 2010), stating that the court "concluded that the location of the 'completion' of the purchase did not determine 'whether Plaintiffs' purchases of the Offshore Funds' shares occurred in the United States.'" (Opp. 3 n.4.)  In *Anwar*, the plaintiffs argued that theirs were

---

they contend this dispute is unrelated to their SBT accounts. (Opp. 30.)  If that is the case, they cannot rely on SBT-generated documents to support their position that they purchased securities in New York.

U.S. transactions because "Plaintiffs' subscription agreements were accepted by the Funds, and that this approval occurred in New York City," 728 F. Supp. 2d at 405, while the defendants countered that the transactions were foreign because the plaintiffs had "sent their subscription agreements to an administrator in Amsterdam" (*id.*).  Judge Marrero deferred ruling on the location of purchase in order to compile "a more developed factual record."  *Id.*  In this case, there is no need to wait, as Plaintiffs do not contest that the subscription forms, and payment, were sent to the Fund administrator in Ireland and acceptance occurred in Ireland.  (Mot. 17.)[5]

## V.   The Complaint Fails To Allege Facts Permitting a Strong Inference of Scienter.

Plaintiffs argue that they have pleaded scienter by alleging simply that Defendants had "motive and opportunity" to commit the fraud.  (Opp. 7-9.)  Putting aside whether such circumstantial proof of scienter can suffice when the allegations of scienter are not "cogent and compelling," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007), the only motive that Plaintiffs attribute to Defendants is their desire to earn a management fee.  (SAC ¶ 175, Opp. 8-9.)  Such a fee would have been earned regardless of which Optimal fund Plaintiffs invested in, and thus did not supply a motive for Defendants to make misstatements about the SUS fund in particular.  *See Saltz v. First Frontier, LP*, No. 10 Civ. 964, 2010 WL 5298225, at

---

[5]  In addition to the cases cited in their Motion, Defendants respectfully refer the Court to *Absolute Activist Value Master Fund Ltd. v. Homm*, No. 09 CV 08862, 2010 WL 5415885 (S.D.N.Y. Dec. 22, 2010), a case decided after submission of Defendants' Motion, on facts analogous to this case.  In *Homm*, the court held that *Morrison* barred claims asserted by foreign hedge funds against mostly foreign defendants who had purchased, on the plaintiffs' behalf, "illiquid shares directly from the companies through private placements."  *Id.* at *5.  The Court placed great emphasis on the fact that the shares at issue were in corporations that "were registered with the SEC, however, their shares were not traded on a domestic exchange"; instead, the shares were purchased "directly from the companies through private placements."  *Id.*  As such, the court held that the plaintiffs "took great pains to avoid the regulations imposed by federal securities laws that apply to domestic market transactions" and thus "[i]t would be illogical, and inconsistent with *Morrison*, to allow them to seek redress in this Court."  *Id.*

*6 (S.D.N.Y. Dec. 23, 2010) (finding no unique "motive" for Madoff feeder fund where it received fees that were not "exorbitant or at all in excess of the industry standard"); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008) ("The desire to earn management fees is a motive generally possessed by hedge fund managers, and as such, does not suffice to allege a 'concrete and personal benefit' resulting from fraud."). Nor would such a fee have redounded directly to Defendant Clark, a mere employee.

Plaintiffs also have failed to allege that Defendants knew or were reckless in not knowing about Madoff's fraud. Plaintiffs rely primarily on *Anwar* to argue that certain "red flags" associated with the Madoff fraud rendered continued investment in Madoff and statements regarding the soundness of/due diligence associated with the same "reckless." But *Anwar* has proven to be an outlier among the growing group of cases that have analyzed (and discounted) similar allegations of scienter in Madoff feeder fund cases. (*See* Mot. 23-24, citing *Newman v. Family Mgmt. Corp.*, 08 Civ. 11215, 2010 WL 4118083, *8 (S.D.N.Y. Oct. 20, 2010); *In re Tremont Sec. Law, State Law & Ins. Litig.*, 703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010); *SEC v. Cohmad Sec. Corp.*, 09 Civ. 5680, 2010 WL 363844, *2 (S.D.N.Y. Feb. 2, 2010); *see also Saltz*, 2010 WL 5298225, at *5-6 (granting motion to dismiss for failure to plead scienter).)

## VI.   Plaintiffs Are Bound by the Forum Selection Clauses in the Relevant Agreements.

Plaintiffs hope that, by renaming the agreements cited by Defendants, they can convince the Court that those agreements do not cover their claims and, thus, the Court should ignore the forum selection clauses. (*See* Opp. 29 (calling the Private Placement Agreement ("PPA") a "sales commission agreement" and labeling the SBT Terms & Conditions Governing Accounts a "bank account agreement").) While Plaintiffs argue the PPA covers only commissions paid by the Fund to Pioneer and that "Pioneer is not suing to recover those commissions" (Opp. 29), Pioneer plainly asserts claims seeking to recover fees arising out of the PPA. (SAC ¶¶ 380, 387

(alleging injury including "loss of fees that would [have] been earned had the Pioneer Plaintiffs continued to invest in Optimal U.S.").)  Plaintiffs' failure to counter this argument is telling.

Plaintiffs Galinanes and Broccoli make the disingenuous argument that their claims are not covered by the SBT Terms & Conditions because they "do not sue here because the money was improperly taken out of the account or for any banking-related reason."  (Opp. 30.)  As the Terms & Conditions make clear, they plainly govern Plaintiffs' investment accounts held through SBT, the same accounts through which they purchased shares of the Funds.  (*See* Lima Supp. Decl. Ex. B, at 3 (defining "Accounts" governed by the Terms & Conditions to include "your deposit accounts…and nondiscretionary investment management and advisory accounts…with Bank").)  Finally, Plaintiffs question the applicability of the Terms & Conditions submitted by Defendants.  Plaintiffs' argument is misplaced, as the version of the Terms & Conditions applicable to each client's account are the Terms & Conditions that are presently in place, not those that were in place when the clients signed their agreements.  (*See* Lima Supp. Decl. Ex. B § 60 ("Bank reserves the right to amend or rescind the terms and conditions set forth in this Agreement at any time…[A]ll amendments will take effect, with respect to an Account, thirty (30) calendar days after the date of the notice mailed…to you.").)  Regardless, the previous version of the Terms & Conditions, dated November 2001, also contains a Bahamian forum selection clause.  (*See* Nov. 2001 SBT Terms & Conditions at § 39, (Lima Supp. Decl. Ex. C).)[6]

---

[6] Plaintiffs also argue the specific language of the two clauses requires a narrow reading.  (Opp. 29.)  But the clause in the PPA broadly covers "disputes which may arise from this agreement," while the SBT Terms & Conditions clause covers "proceeding[s] arising out of or relating to the Account or this Agreement."  (Mot. 27, 29).  *See Scherk v. Alberto-Culver Co.*, 417 U.S. 506 (1974) (holding claims "arising out of" contract for sale of business covered securities violations related to the sale); *Nycal Corp. v. Inoco PLC*, No. 98-7058, 1998 WL 870192, at *3 (2d Cir. Dec. 9, 1998) ("In many areas of law, however, the use of 'arising out of' language in a contract is considered unambiguous and viewed as reasonably supporting only a broad reading.").

Dated:  February 18, 2011

        Respectfully submitted,

By:   /s/ Paulo R. Lima
Samuel A. Danon (*pro hac vice*)
Gustavo J. Membiela (*pro hac vice*)
Paulo R. Lima
**HUNTON & WILLIAMS LLP**
1111 Brickell Avenue, Suite 2500
Miami, FL  33131
Telephone:  (305) 810-2500
Facsimile:  (305) 810-2460
Email:    sdanon@hunton.com
Email:    gmembiela@hunton.com
Email:    plima@hunton.com

- and -

Shawn Patrick Regan
200 Park Avenue
New York, NY 10166
Telephone:  (212) 309-1000
Facsimile:  (212) 309-1100
Email:    sregan@hunton.com

*Counsel for Defendants Banco Santander, S.A., Banco Santander International, Optimal Investment Services, S.A., and Jonathan Clark*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on February 18, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to counsel of record listed below:

Edward W. Miller, Esq.
648 Franklin Avenue, 2nd Floor
Garden City, New York 11530

LABATON SUCHAROW LLP
Joel H. Bernstein, Esq.
Javier Bleichmar, Esq.
Alan I. Ellman, Esq.
140 Broadway
New York, New York 10005
*Counsel for Plaintiffs*

                                      /s/ Paulo R. Lima
                                      For Hunton & Williams LLP