USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/2/11

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
                                                           :
**IN RE OPTIMAL U.S. LITIGATION**          :     <u>**OPINION AND ORDER**</u>
                                                           :
                                                           :     **10 Civ. 4095 (SAS)**
                                                           :
                                                           :
------------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.      INTRODUCTION

        This putative class action arises out of Plaintiffs' investment in the

Optimal Strategic U.S. Equity fund ("Optimal U.S."), which in turn invested one-

hundred percent of its assets with Bernard L. Madoff ("Madoff") and his firm,

Bernard L. Madoff Investment Securities LLC ("BMIS").  Plaintiffs' Second

Amended Complaint ("SAC") alleges that Defendants – Optimal U.S.'s investment

advisor, an employee thereof, and two closely-affiliated Banco Santander entities –

failed to conduct adequate diligence regarding Madoff, ignored "red flags" that

should have alerted them to Madoff's fraud, and made misstatements and

omissions in connection with the sale of Optimal U.S. shares, causing Plaintiffs to

lose their investments and allowing Defendants wrongfully to collect management

fees.  Defendants now move to dismiss all fifteen counts asserted in the SAC,

including thirteen state law and two federal securities law claims.

## II.    BACKGROUND[1]

### A.    The Funds and Sub-Funds (Non-Parties)

Optimal U.S. and Optimal Arbitrage Ltd. (together, the "Funds") are sub funds of Optimal Multiadvisors, Ltd. ("Optimal Multiadvisors"), an investment fund incorporated in the Commonwealth of the Bahamas.[2]  Optimal Multiadvisors offered non-voting participating shares ("Participating Shares") in Optimal U.S. to Plaintiffs and other similarly situated investors, each share constituting a pass-through economic interest proportional to the Plaintiff's investment with Madoff.[3]

### B.    Defendants

There are four named defendants in this action.

Banco Santander, S.A. ("Banco Santander"), headquartered in Madrid, Spain, is the parent company of Grupo Santander, one of the largest financial conglomerates in the world.[4]

Optimal Investment Management Services, S.A. ("OIS"), an investment management company incorporated in Switzerland, is a wholly-owned

---

[1]    Unless otherwise noted, all facts are drawn from the SAC and presumed true for the purposes of this motion.

[2]    *See* SAC ¶¶ 69, 70.

[3]    *See id.* ¶ 71.

[4]    *See id.* ¶ 65.

subsidiary of Banco Santander.[5]  OIS owned all ordinary voting shares ("Voting

Shares") of Optimal Multiadvisors[6] and served as the investment manager of

Optimal U.S.[7]

Banco Santander International ("Santander U.S.") is also a wholly-

owned subsidiary of Banco Santander, headquartered in Miami, Florida.[8]  It

conducts business in the United States as an Edge Act corporation organized under

Section 25A of the Federal Reserve Act.[9]

Jonathan Clark was employed in New York by OIS and Santander

Investment Securities, Inc. ("Santander Investment") from mid-2003 until mid-

2008.[10]  Clark reported to Hugh-Burnaby Atkins, the head of OIS's New York

office, and to Manuel Echeverria, Optimal U.S.'s original tie to Madoff.[11]  Hired in

---

[5]       *See id.* ¶ 67.

[6]       *See id.* ¶ 70.

[7]       *See id.* ¶ 4.

[8]       *See id.* ¶ 66.

[9]       12 U.S.C. §§ 611 et seq.

[10]      *See* SAC ¶ 68.

[11]      *See id.*  In the 1990s, when Optimal U.S. began investing Plaintiffs'
assets with Madoff, Echeverria served as head of Banco Santander's International
Private Banking Division's Portfolio Management and Fund Management Group.
*See id.* ¶ 4.  In 2001, the International Private Banking Division was renamed OIS
and established as a subsidiary of Banco Santander (rather than merely an

2003 to monitor Madoff, Clark, together with Atkins, "handled [Optimal U.S.] day-to-day."[12]

### C.   Plaintiffs

#### 1.   "Pioneer" and "Pioneer Plaintiffs"

The "Pioneer Plaintiffs" are fifty-six non-U.S. persons and entities who invested in Optimal U.S. based on advice provided by Pioneer International Ltd. ("Pioneer"), an investment advisory firm incorporated in the British Virgin Islands with principal headquarters in Hertzlia, Israel; Pioneer's advice was in turn based on Defendants' misrepresentations.[13]  The Pioneer Plaintiffs are residents primarily of Israel, the Island of Guernsey, the British Virgin Islands, and Colombia; the remainder are residents of Panama, Mexico, Switzerland, the Netherlands, and the Island of Jersey.[14]

Pioneer and Optimal Multiadvisors are parties to a Private Placement Agreement ("PPA") that "regulates and controls the contractual relationship between [Optimal Multiadvisors] . . . and Pioneer [], as non-exclusive private

---

unincorporated entity); functionally little, if anything, changed.  *See id.* ¶ 5.

[12]     *Id.* ¶ 68.

[13]     *See id.* ¶¶ 11-60.

[14]     *See id.* ¶¶ 12-60.  The Island of Jersey is a British Crown Dependency off the coast of Normandy, France.

placement agent, for the Private Placement of the Optimal Funds."[15]  The PPA

provides that "[i]n consideration of the services provided by [Pioneer], [Optimal

Multiadvisors] shall pay a placement fee . . . based on the net investment value [of

Optimal U.S.] as of month end" to be "calculated monthly by [Optimal

Multiadvisors], and paid quarterly . . . ."[16]  The last section of the PPA contains a

forum selection clause:

> **19.  Applicable Law and Jursidiction**
> . . .  Each of the parties hereto irrevocably submits any disputes
> which may arise from this agreement to the exclusive jurisdiction
> of the courts of the Commonwealth of The Bahamas.[17]

### 2.    "Santander Plaintiffs"[18]

The "Santander Plaintiffs" are three foreign citizens/non-U.S.

residents including Solange Broccoli, Gaston Broccoli, and Hugo Valentin

Galinanes.[19]  Although all three held their Optimal U.S. investments in accounts

---

[15]    Ex. C to Declaration of Paulo R. Lima, counsel for Defendants, in
Support of Defendants' Motion to Dismiss ("Lima Decl."), § 2 (hereinafter
"PPA").  I may properly consider Defendants' evidentiary submissions to
determine whether this Court is the proper forum for this action.  *See infra* Part
IV.A.

[16]    PPA § 7.

[17]    *Id.* § 19.

[18]    The Pioneer Plaintiffs and Santander Plaintiffs are referred to
collectively as "Plaintiffs," with Pioneer separately designated as "Pioneer."

[19]    *See* SAC ¶ 62.

with non-party Santander Bank & Trust, Ltd. in the Bahamas ("SBT Bahamas"),[20]

Santander U.S. was responsible for marketing and selling shares of Optimal U.S. to

each of the Santander Plaintiffs.[21]  Santander U.S. employees based in Miami

would "regularly offer to open bank accounts at Santander affiliates in the

Bahamas or Switzerland, and invest in [Optimal U.S.]."[22]  Individuals opening

accounts at SBT Bahamas (such as the Santander Plaintiffs) were required to sign

"Santander PRIVATE BANKING" "Account Agreement[s] (including Terms and

Conditions)."[23]  The "Terms and Conditions Governing [SBT] Accounts"[24] in turn

contained a Bahamian forum selection clause under which SBT account-holders

> irrevocably submit to the exclusive jurisdiction of The
> Commonwealth of The Bahamas in any action or proceeding

---

[20]    *See id.* ¶ 252; 4/15/11 Letter from Plaintiffs to the Court in Response to Questions Posed During 4/13/11 Conference Call ("4/15/11 Pl. Letter") at 2.

[21]    *See* SAC ¶ 251.  *See also id.* ¶ 247 ("Santander U.S. mailed bank statements, [Optimal U.S.] explanatory memoranda, and other documents relating to [Optimal U.S.] regardless of whether the investor had an account at Santander U.S. or at a non-U.S.-based Santander banking affiliate."); *id.* ¶ 251 ("Galinanes never spoke with anyone from [SBT Bahamas].  Nicholas Coubrough and Ximena Goni were the Santander U.S. bankers who handled [Solange and Gaston Broccoli's] investments.").

[22]    *Id.* ¶ 253.

[23]    *See id.* ¶ 254; SBT Bahamas Account Agreement (Including Terms and Conditions) ("Account Agreement"), Ex. 25 to SAC, at 1.

[24]    Terms and Conditions Governing Accounts, Santander Bank & Trust Ltd. ("SBT Terms & Conditions"), Ex. B to Lima Decl.

arising out of or relating to the Account or this Agreement, and irrevocably agree that all claims in respect of any action or proceeding may be heard and determined in those courts.[25]

### D.    Madoff's Fraud

Madoff raised billions of dollars under the guise of operating an investment fund, kept secret from the U.S. government,[26] which purportedly utilized a "split strike conversion" strategy involving the purchase and sale of U.S. equity securities and options.[27]   On December 11, 2008, Madoff admitted that his investment advisory operation was "a giant Ponzi scheme."[28]   There is no record of BMIS or Madoff having cleared a single purchase or sale of securities at the major clearing house in this country (the Depository Trust & Clearing Corporation) or

---

[25]     *Id.* § 78 (emphasis added).

[26]     *See* SAC ¶ 80.

[27]     *See id.* ¶ 81.  As described in a June 2004 Explanatory Memorandum ("EM"), this strategy involved purchasing a basket of thirty to forty large capitalization S&P 100 stocks (to correlate with the general market); purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount; and selling out-of-the-money S&P 100 Index call options representing a dollar amount of the underlying index equivalent to the dollar amount of the basket of shares purchased.  *See id.* ¶ 202 (citing June 2004 EM, Ex. 13 to SAC, at 30-31). "'This strategy aims to limit losses when stock prices decline while still affording an upside potential that is capped to the strike price of the short call when the stock prices rise.  The long/short call position constitutes a 'synthetic' short of the market, which provides a hedge against the long stock positions.'"  *Id.* (quoting June 2004 EM, Ex. 13 to SAC, at 30-31).

[28]     *Id.* ¶ 83.

any other trading platform on which BMIS could have reasonably traded securities.[29]  Nor is there any evidence that Madoff or BMIS ever purchased or sold any of the options reported to BMIS's investment advisory investors, such as OIS.[30]

### E.    Optimal U.S.'s Investment in Madoff; Red Flags

Optimal U.S. began investing Plaintiffs' assets with Madoff in the late 1990s based on Echeverria's relationship with Madoff.[31]  Over the years, Echeverria continued to increase the funds under management with Madoff as Echeverria's meetings and visits to Madoff's offices cemented the relationship.[32] These meetings and visits raised numerous red flags about Madoff that Defendants concealed from Plaintiffs while failing to perform the due diligence they had agreed to perform pursuant to Optimal U.S. offering documents.[33]  For example, Defendants knew (but did not disclose) that Madoff concealed his advisory

---

[29]    *See id.* ¶ 81.

[30]    *See id.* ¶ 82.

[31]    *See id.* ¶ 84.

[32]    *See id.*

[33]    *See id.*

business from the SEC[34] and from the investment community generally;[35] that

Madoff did not charge an investment management fee, implausibly foregoing

millions in advisory fees;[36] that Madoff acted as an investment advisor, broker, and

custodian, a highly irregular combination;[37] that Madoff's family members

controlled BMIS;[38] that Madoff refused to provide any independent verification of

actual trading;[39] that Defendants' internal quantitative due diligence software

showed that Madoff's returns could not be replicated and were mathematically

implausible;[40] that, in Defendants' view, Madoff did not have independent

auditors;[41] and that Optimal U.S.'s contracts with Madoff were not executed by the

correct parties.[42]

### F.    False Representations to Pioneer

---

[34]     *See id.* ¶¶ 85-92.

[35]     *See id.* ¶¶ 93-99.

[36]     *See id.* ¶¶ 100-103.

[37]     *See id.* ¶¶ 104-113.

[38]     *See id.* ¶¶ 114-118.

[39]     *See id.* ¶¶ 119-148.

[40]     *See id.* ¶¶ 149-161.

[41]     *See id.* ¶¶ 162-164.

[42]     *See id.* ¶¶ 165-166.

Pioneer, which traditionally did not invest in single manager hedge funds (such as Madoff), considered investing in Optimal U.S. in late 2007 principally because it believed an established and respected large financial institution (Banco Santander/OIS) had performed and would continue to perform ongoing due diligence and oversee the investment.[43]  During a meeting with OIS representatives on October 29, 2007, in Geneva, Switzerland, an OIS representative offered to put Clark, an OIS employee, on the phone, in order to respond to Pioneer's questions about Optimal U.S. and due diligence on Madoff.[44] During the call, Clark stated that he worked out of Banco Santander's and OIS's New York office where he maintained regular contact with the Madoff operation and monitored Madoff; that Madoff provided "full transparency" to Defendants who monitored Madoff's trading on a "segregated account" for Optimal U.S. on a continuous basis (a falsehood); and that Defendants had given Madoff an investment "mandate" that he executed under their control and daily monitoring.[45]

### G.   False and Misleading Statements and Omissions in Optimal U.S. Explanatory Memoranda and Marketing Materials

Defendants sold investments in Optimal U.S. pursuant to EMs that

---

[43]   *See id.* ¶¶ 224-225.

[44]   *See id.* ¶¶ 227-228.

[45]   *See id.* ¶¶ 229-230.

contained no disclosure of Madoff or BMIS,[46] contained terse risk disclosures,[47] and claimed that OIS made the investment decisions, while the "Broker Dealer" (Madoff) was merely responsible for execution.[48]  In fact, Defendants abdicated all investment management functions over Optimal U.S. to Madoff while charging full management fees of millions of dollars per year.[49]  Defendants also issued to Plaintiffs numerous updates, performance reports, and marketing and sales materials that contained "uniform misrepresentations and material omissions that induced Plaintiffs to invest and retain their investment in [Optimal U.S.]."[50]  Defendants failed to disclose that no one had conducted meaningful due diligence on Madoff prior to establishing Optimal U.S. and selecting Madoff as an execution agent and broker for Optimal U.S.; no one was meaningfully monitoring or independently verifying Madoff's trading activity; Defendants had effectively no access to Madoff's operations; and Defendants had no independent basis for stating that Madoff was executing a split-strike conversion strategy.[51]

---

[46]     *See id.* ¶ 194.

[47]     *See id.* ¶¶ 195-201.

[48]     *See id.* ¶ 203.

[49]     *See id.* ¶¶ 6, 223.

[50]     *Id.*

[51]     *See id.* ¶ 234.

### H.    Defendants' Involvement in Optimal U.S.

OIS drafted the EMs provided to Optimal U.S. investors,[52] who were required to acknowledge that they had received such documents as a condition to buying shares in Optimal U.S.[53]  To provide reassurance of OIS's capabilities, the EMs emphasized that Banco Santander stood behind OIS,[54] and an October 2008 OIS presentation on Optimal U.S. emphasized that the reason to invest in Optimal U.S. was its affiliation with Banco Santander.[55]  All EMs and marketing materials "were distributed by OIS, Santander U.S, and other subsidiaries of Banco Santander, without regard for corporate structure and formalities."[56]  Moreover, Banco Santander and its affiliates were "deeply involved in risk management at OIS, especially with respect to [Optimal U.S.]."[57]  Finally, in addition to the annual management fee charged by OIS based on the market value of Optimal U.S. each year – a management fee that OIS shared with Santander U.S. as compensation for Santander U.S.'s sales efforts – Santander U.S. charged Plaintiffs a sales

---

[52]    *See id.* ¶¶ 217-220.

[53]    *See id.* ¶ 233.

[54]    *See id.* ¶ 206.

[55]    *See id.* ¶ 244.

[56]    *Id.*

[57]    *Id.* ¶ 258.

percentage of the amount invested at the time of their investment in the Funds.[58]

## I.    Plaintiffs' Claims and Defendants' Arguments

The Pioneer and Santander Plaintiffs assert the following claims: (1) common law fraud against OIS, Banco Santander, and Clark, and negligent misrepresentation against all four Defendants, in connection with Plaintiffs' decisions to purchase and hold Optimal U.S. shares (Counts I-IV); (2) gross negligence against all Defendants (Count V); (3) breach of fiduciary duty against OIS and Santander U.S. (Count VI); (4) aiding and abetting both breach of fiduciary duty and fraud against Banco Santander and Santander U.S. (Counts VII-VIII); (5) third party beneficiary breach of contract against OIS (Count IX); (6) unjust enrichment against all Defendants (Count X); (7) violation of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act")[59] and Rule 10b-5[60] promulgated thereunder against OIS and Clark (Count XI); and (8) violation of section 20(a) of the Exchange Act[61] against Banco Santander (Count VII).  Pioneer asserts common law fraud, negligent misrepresentation, and gross negligence

---

[58]      *See id.* ¶ 262.

[59]      15 U.S.C. § 78j.

[60]      17 C.F.R. § 240.10b5.

[61]      15 U.S.C. § 78t(a).

claims against OIS, Banco Santander, and Clark (Counts XIII-XIV).  Defendants

advance three primary arguments in their motion to dismiss: *first*, that the

Bahamian forum selection clauses contained in the PPA and the SBT Terms &

Conditions govern the Pioneer and Santander Plaintiffs' claims; *second*, that the

Exchange Act does not apply to the "extraterritorial" transactions forming the basis

for Plaintiffs' federal securities claims; and *third*, that Plaintiffs' common law

claims fail either for lack of standing or for failure to state a claim.  I address each

argument in turn.

## III.   LEGAL STANDARDS

### A.   Motion to Dismiss

In deciding a motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6), the court evaluates the sufficiency of the complaint under the

"two-pronged approach" suggested by the Supreme Court in *Ashcroft v. Iqbal.*[62]

First, a court "'can choose to begin by identifying pleadings that, because they are

no more than conclusions, are not entitled to the assumption of truth.'"[63]

"Threadbare recitals of the elements of a cause of action, supported by mere

---

[62]     556 U.S. ---, ---, 129 S.Ct. 1937, 1950 (2009).

[63]     *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 129 S.Ct. at 1950).  *Accord Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010).

conclusory statements, do not suffice" to withstand a motion to dismiss.[64]  Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[65]  To survive a Rule 12(b)(6) motion to dismiss, the allegations in the complaint must meet a standard of "plausibility."[66]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[67]  Plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[68]

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents

---

[64]    *Iqbal*, 129 S.Ct. at 1949 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[65]    *Id.* at 1950.  *Accord Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).

[66]    *Twombly*, 550 U.S. at 564.

[67]    *Iqbal*, 129 S. Ct. at 1949 (quotation marks omitted).

[68]    *Id.* (quotation marks omitted).

incorporated by reference in the complaint."[69]  However, the court may also

consider a document that is not incorporated by reference, "where the complaint

'relies heavily upon its terms and effect,' thereby rendering the document 'integral'

to the complaint."[70]

### B.    Federal Rule of Civil Procedure 9(b)

Rule 9(b) provides that "the circumstances constituting fraud . . . shall

be stated with particularity."  To satisfy the particularity requirement, a complaint

must: "'(1) specify the statements that the plaintiff contends were fraudulent, (2)

identify the speaker, (3) state where and when the statements were made, and (4)

explain why the statements were fraudulent.'"[71]  However, "intent, knowledge, and

other conditions of mind may be averred generally."[72]

### C.    Amendments to Pleadings

"Rule 15(a) provides that, other than amendments as a matter of

---

[69]    *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)
(citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

[70]    *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir.
2006)).  *Accord Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156
(2d Cir. 2006).

[71]    *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)
(quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)).

[72]    Fed. R. Civ. P. 9(b).

-16-

course, a party may amend the party's pleading only by leave of court or by written

consent of the adverse party; and leave shall be freely given when justice so

requires."[73]  "[W]hether to permit a plaintiff to amend its pleadings is a matter

committed to the Court's sound discretion."[74]  The Supreme Court has explained

that:

> [i]f the underlying facts or circumstances relied upon by a plaintiff
> may be a proper subject of relief, he ought to be afforded an
> opportunity to test his claim on the merits.  In the absence of any
> apparent or declared reason – such as undue delay, bad faith or
> dilatory motive on the part of the movant, repeated failure to cure
> deficiencies by amendments previously allowed, undue prejudice
> to the opposing party by virtue of allowance of the amendment,
> futility of amendment, etc. — the leave sought should, as the rules
> require, be "freely given."[75]

"Where it appears that granting leave to amend is unlikely to be productive,

however, it is not an abuse of discretion to deny leave to amend."[76]

## IV.   FORUM SELECTION CLAUSES

---

[73]    *Slayton v. American Express Co.*, 460 F.3d 215, 226 n.10 (2d Cir. 2006) (quotation marks omitted).

[74]    *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (quotation marks omitted).

[75]    *Foman v. Davis*, 371 U.S. 178, 182 (1962).  *Accord, e.g.*, *Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002).

[76]    *Lucente v. International Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (quotation marks and citations omitted).

A.    **Applicable Law**[77]

>  Determining whether to dismiss a claim based on a forum
>  selection clause involves a four-part analysis.  The first inquiry is
>  whether the clause was reasonably communicated to the party
>  resisting enforcement.   The second step requires [courts] to
>  classify the clause as mandatory or permissive, *i.e.*, to decide
>  whether the parties are required to bring any dispute to the
>  designated forum or simply permitted to do so.  Part three asks
>  whether the claims and parties involved in the suit are subject to
>  the forum selection clause.  If the forum clause was communicated
>  to the resisting party, has mandatory force and covers the claims
>  and parties involved in the dispute, it is presumptively
>  enforceable.  The fourth, and final, step is to ascertain whether the
>  resisting party has rebutted the presumption of enforceability by
>  making a sufficiently strong showing that enforcement would be
>  unreasonable or unjust, or that the clause was invalid for such
>  reasons as fraud or overreaching.[78]

In making this four-part determination, a court may rely on "pleadings and

affidavits"[79] but "[a] disputed fact may be resolved in a manner adverse to the

---

[77]    Neither the Supreme Court nor the Second Circuit has "specifically
designated a single clause of Rule 12(b) as the proper procedural mechanism to
request dismissal of a suit based upon a valid forum selection clause."  *Asoma
Corp. v. SK Shipping Co., Ltd.*, 467 F.3d 817, 822 (2d Cir. 2006) (quotation marks
omitted).  In any case, "where one party has shown an apparently governing forum
selection clause, the party opposing litigation in the so designated forum must
make a strong showing to defeat that contractual commitment."  *Id.*

[78]    *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383-84 (2d Cir. 2007)
(quotation marks and citations omitted).

[79]    *Anwar v. Fairfield Greenwich Ltd.*, 742 F. Supp. 2d 367, 371
(S.D.N.Y. 2010) ("*Anwar II*") (citing *Tropp v. Corp. of Lloyd's*, 385 Fed. App'x
36, 37 (2d Cir. 2010); *New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG*,
121 F.3d 24, 26 (2d Cir. 1997) (noting that district court reviewed "pleadings,

plaintiff only after an evidentiary hearing."[80]

Regarding step three, courts apply "general contract law principles and federal precedent to discern the meaning and scope of the forum clause."[81] Under those principles,

> when ascertaining the applicability of a contractual provision to particular claims, [courts] examine the substance of those claims, shorn of their labels.  This approach is consistent with the focus on factual allegations rather than on the causes of action asserted when deciding whether a [forum selection] clause applies to particular claims.[82]

## B. The Forum Selection Clause in the PPA Between Pioneer and Optimal Multiadvisors Does Not Bind Pioneer

Defendants OIS, Clark, and Banco Santander move to dismiss Pioneer's claims against them for (1) common law fraud, (2) negligent misrepresentation, and (3) gross negligence on the grounds that those claims "arise

---

affidavits, and other papers"); *TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 375 n.3 (S.D.N.Y. 2010) ("In deciding a motion to dismiss [due to a forum selection clause] pursuant to either Federal Rule of Civil Procedure 12(b)(1) or 12(b)(3), a court may consider evidentiary matters outside the pleadings, by affidavit or otherwise, regarding the existence of jurisdiction.") (quotation marks omitted)).

[80]   *New Moon*, 121 F.3d at 29.

[81]   *Phillips*, 494 F.3d at 386.

[82]   *Id.* at 388-89 (internal citations omitted) (citing *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 173 (2d Cir. 2004); *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987)).

out of the [PPA] between Pioneer and [Optimal] Multiadvisors, which contains an exclusive forum selection clause requiring that disputes be resolved in the courts of The Bahamas."[83]  As a reminder, under that clause, Pioneer "irrevocably submits *any disputes which may arise from this agreement* to the exclusive jurisdiction of the courts of the Commonwealth of The Bahamas."[84]  Defendants argue that because the damages Pioneer claims it suffered include the "loss of fees that would [have] been earned had the Pioneer Plaintiffs continued to invest in [Optimal U.S.]," and because those fees are "none other than the placement fees specified *in the PPA*,"[85] Pioneer's claims necessarily arise out of the PPA and, therefore, are within the scope of the forum selection clause.[86]  Plaintiffs counter that Pioneer's *claims* are not subject to the forum selection clause because the PPA "concerns only Pioneer's role as placement agent and the commissions that [Optimal Multiadvisors] paid Pioneer" and because Pioneer is "not suing to recover those

---

[83]     Defendants' Memorandum of Law in Support of Motion to Dismiss ("Def. Mem.") at 26-27.

[84]     PPA § 19 (emphasis added).

[85]     Def. Mem. at 27 (citing SAC ¶¶ 380, 387) (emphasis in original).

[86]     Pioneer does not dispute that the PPA was "reasonably communicated to [it]" or that the forum selection clause contained in the PPA is "mandatory." *Phillips*, 494 F.3d at 386 ("A forum selection clause is viewed as mandatory when it confers exclusive jurisdiction on the designated forum or incorporates obligatory venue language.").

-20-

commissions and is not suing [Optimal Multiadvisors]."[87]  Upon an "examin[ation

of] the substance of [Pioneer's] claims as they relate to the precise language of the

clause,"[88] I find the forum selection clause inapplicable to Pioneer's claims.

### 1.    Meaning of "Arise From"

To "*arise out of*" means "'to originate from a specified source,' and

generally indicates a causal connection."[89]  Those words do not "encompass[] all

claims that have some possible relationship with the contract, including claims that

---

[87]    Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion
to Dismiss ("Opp. Mem.") at 29.

[88]    *Phillips*, 494 F.3d at 389 (citing *New Moon*, 121 F.3d at 33 ("The
scope of the forum selection clause is a contractual question that requires the courts
to interpret the clause and, where ambiguous, to consider the intent of the
parties.").  *Accord John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp.*, 119 F.3d 1070,
1075 (3d Cir. 1997) ("[W]hether or not a forum selection clause applies depends
on what the specific clause at issue says.")).

[89]    *Phillips*, 494 F.3d at 389 (quoting Websters Third New International
Dictionary 117 (1981)) (citing *Coregis Ins. Co. v. American Health Found., Inc.*,
241 F.3d 123, 128 (2d Cir. 2001)).  Defendants do not argue that this Court should
interpret "arise from" any differently from "arise out of."  *See* Def. Mem. at 27
(arguing that "Pioneer's claims necessarily *arise out of* the PPA . . . .") (emphasis
added).  Although Defendants direct the Court to *Roby v. Corporation of Lloyd's*,
where the Second Circuit found "no substantive difference . . . between the phrases
'relating to,' 'in connection with' or 'arising from,'" it made clear that such a
finding was limited to "the present context," 996 F.2d 1353, 1361 (2d Cir. 1993) –
where the court was considering both arbitration clauses *and* forum selection
clauses, and where the forum selection clauses pertained to disputes "*of whatsoever
nature* arising out of *or relating to*" and for "all purposes of and *in connection
with*" the agreements, *id.* at 1359, 1361 (emphases added).  In any event, the court
treated the words "arising from" as equivalent to "arising out of."  *See id.* at 1361.

-21-

may only '*relate to*,' be '*associated with*,' or '*arise in connection with*' the contract."[90]   In *Phillips v. Audio Active Ltd.*, the Second Circuit rejected the Seventh Circuit's conclusion that "all disputes the resolution of which arguably depend on the construction of an agreement 'arise out of' that agreement,"[91] noting the "significan[ce]" of "the absence of a congressional policy on forum clauses prompting us to err on the side of coverage."[92]   Thus, the *Phillips* court "[saw] no reason to presume the parties meant anything other than the dictionary definition of the term ["to arise under"]: to originate from a specified source."[93]   "This meaning is especially likely where parties wishing to designate a mandatory forum to hear a broader category of disputes are free to do so."[94]

---

[90]    *Phillips*, 494 F.3d at 389 (emphasis added).

[91]    *Omron Healthcare, Inc. v. Maclaren Exps. Ltd.*, 28 F.3d 600, 603 (7th Cir. 1994).

[92]    *Phillips*, 494 F.3d at 390 (acknowledging that "[l]ike the Seventh Circuit, typically we view phrases similar to 'arise out of' *in arbitration clauses* to cover collateral matters that implicate issues of contract construction," but "declin[ing] to import whole the interpretive guidelines developed by the federal courts to assess the scope of arbitration clauses into the present context" because "[o]ur assessment of the scope of arbitration clauses is governed by the Federal Arbitration Act which establishes as a matter of federal law that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, including where the problem at hand is the construction of the contract itself") (quotation marks and citations omitted) (emphasis added).  *Id.* at 389-90.

[93]    *Id.* at 390.

[94]    *Id.*

-22-

The *Phillips* court then stated the relevant inquiry: "whether [plaintiff's] rights" (there, predicated on valid ownership of copyrights to certain songs) "originate from" the agreement containing the forum selection clause[95] (there, a recording contract providing that "'any legal proceedings that may *arise out of* [the contract] are to be brought in England'"[96]).  The court held that they did not; plaintiff was "assert[ing] no rights or duties under that contract."[97]  Therefore, the federal copyright claims did not "arise out of the contract" and consequently fell outside the scope of the forum selection clause.[98]

### 2.  Pioneer's Claims Do Not "Arise From" the PPA

Applying *Phillips*' analytical framework, it is clear that Pioneer does not assert any rights or duties under the PPA in bringing its fraud, negligent misrepresentation, or gross negligence claims.  The "substance" of those claims is

---

[95]     *Id.*

[96]     *Id.* at 382 (quoting the recording contract at issue) (emphasis added).

[97]     *Id.* at 392 ("Appellant does not rely on the recording contract to establish his ownership of the relevant copyrights, but on his authorship of the work, a status . . . entitled to copyright protection.") (distinguishing "[plaintiff's] case from one in which a plaintiff-creator asserts that the relevant copyrights reverted to him upon breach of contract by the defendants").  *Id.* at 390-91.

[98]     *Cf. Bense v. Interstate Battery Sys. of Am.*, 683 F.2d 718, 720 (2d Cir. 1982) (forum selection clause that applied to "causes of action arising *directly or indirectly* from [the agreement]" covered federal antitrust actions) (emphasis added).

that OIS, Clark, and Banco Santander falsely represented to Pioneer that OIS

would invest its monies in a legitimate fund and that Defendants would monitor,

verify, and conduct due diligence into the investments made with Madoff.[99]  To

state these three claims collectively, Pioneer must show that Defendants (1)

knowingly made (2) false and misleading misrepresentations and/or omissions; (3)

Pioneer's justifiable reliance upon those representations; (4) direct and proximate

(5) damages; and (6) Defendants' duty, as a result of a special relationship, to

impart full and correct information and to exercise due care in the management of

the Pioneer Plaintiffs' assets.[100]  Based on this recitation, Pioneer's right to sue on

these claims does not "originate from, and therefore 'arise out of,' the [PPA]."[101]  It

arises out of *OIS*'s, *Clark*'s, and *Banco Santander*'s extra-contractual duties to

accurately represent the manner in which the Pioneer Plaintiffs' monies would be

invested and to invest those monies with due care – duties not specified in the PPA,

which instead outlines *Pioneer*'s duties *as a placement agent*.[102]  Moreover, to the

---

[99]      *See* SAC ¶¶ 376-393.

[100]     *See Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (citing
*Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996)); *Hydro
Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

[101]     *Phillips*, 494 F.3d at 391.

[102]     *See, e.g.*, PPA § 3.4 ("[Pioneer] acknowledges and agrees that the
shares or units of [Optimal U.S.] cannot be offered, directly or indirectly, to 'US

extent the PPA contains any "representations" by Optimal Multiadvisors,[103]

Pioneer is not suing over them; it is suing over the alleged misrepresentations and

omissions contained in the EMs, the marketing materials, and Clark's

misstatements during a telephone conference on October 29, 2007.[104]

It is true that the "fees that would [have] been earned" under the PPA

comprise part of the damages Pioneer seeks for Defendants' alleged fraud and

negligent misrepresentation.  But Pioneer also seeks damages for loss of business

and reputational damage; moreover, the dispute does not center on, *e.g.*, Pioneer's

"right" to those fees *under the PPA*.  Indeed, without the PPA, Pioneer's claims

---

Persons' as defined in the relevant prospectus or offering memorandum of the
Optimal Funds."); *id.* § 5 (enumerating certain "Rights and Duties of [Pioneer]");
*id.* § 11 (describing the "Duty [of Pioneer] to Exercise Due Diligence").  *Accord*
Transcript of Pre-Motion Conference Held on November 4, 2010 ("11/4/10 PMC
Tr.") at 17:23-18:3 ("There's nothing [in the PPA] saying that disputes concerning
the sale of shares by the purchasers of shares are in any way governed by [the
PPA] in any fashion.  There's nothing in here saying that it applies to anything
other than the finder's fee to which Pioneer is entitled for selling the fund shares.")
(Mr. Miller, counsel for Plaintiffs).

[103]    *See, e.g.*, PPA § 12.2(c) (representing that Optimal Multiadvisors is
"duly authorized and licensed . . . by any relevant authority or self-regulatory body
to carry out the activities and services covered by [the PPA].").

[104]    *Accord* 11/4/10 PMC Tr. at 22:6-7 ("Plaintiffs are suing on the
offering memoranda which contain no forum selection clause.") (Mr. Miller,
counsel for Plaintiffs).

would be just as tenable.[105]  For these reasons, I decline to dismiss Pioneer's claims for improper venue.[106]

### C.    The Santander Plaintiffs Are Bound by the Forum Selection Clause Contained in the SBT Terms and Conditions

Defendants argue that the Santander Plaintiffs' claims should be dismissed for improper venue based on the "exclusive forum selection clause in the SBT Terms & Conditions"[107] according to which those plaintiffs agreed to "irrevocably submit to the exclusive jurisdiction of The Commonwealth of The Bahamas in *any action or proceeding arising out of or relating to the Account or this Agreement*, and irrevocably agree that all claims in respect of any action or

---

[105]    *See Phillips*, 494 F.3d at 391 ("Indeed, if [plaintiff] were to succeed in persuading the trial court of his interpretation of the recording contract, success on the merits of his copyright claims would leave the recording contract undisturbed.").  *Cf. Bense*, 683 F.2d at 721-22 (contract containing forum clause was the source of the right, duty and injury asserted by the plaintiff where plaintiff could only show injury by demonstrating that the defendant had breached the contract by terminating without due cause).

[106]    Defendants do not move to dismiss Counts XIII-XV for failure to state claims.  However, Defendants intend to file a forum *non conveniens* motion, which this Court advised the parties it would entertain following disposition of the instant motion.  *See* Def. Mem. at 29 n.22; 11/4/10 PMC Tr. at 27:19-21.  Therefore, in light of this Court's holding that the forum selection clause does not apply to Counts XIII-XV, Defendants may argue, in conjunction with their forum *non conveniens* motion (or any renewed motion to dismiss), that the claims nonetheless should be dismissed under Rule 12(b)(6).

[107]    Def. Mem. at 29.

proceeding may be heard and determined in those courts."[108]  "Given the breadth of

this provision," Defendants argue, "the Santander [Plaintiffs] cannot plausibly

contest that their claims arise out of their investment accounts with SBT and, as

such, are subject to the forum selection clause."[109]  The Santander Plaintiffs argue

that because they are not suing "for any banking-related reason" – such as money

being "improperly taken out of the account" – their claims are not covered by the

SBT Terms & Conditions, which "concern only the handling of bank accounts."[110]

        The Santander Plaintiffs are wrong.  The Terms & Conditions make

clear that they govern not only traditional "bank accounts," but also the Santander

Plaintiffs' investment accounts held through SBT – the accounts through which

they purchased shares of Optimal U.S.[111]  Thus, the question is not whether the

---

[108]    SBT Terms & Conditions, Ex. B to Lima Decl., § 78 (emphasis added).  The Santander Plaintiffs do not contest the applicability of the SBT Terms & Conditions to their accounts.  *See* Transcript of Teleconference Held on April 13, 2011 ("4/13/11 Teleconf. Tr.") at 11:3-6.

[109]    Def. Mem. at 29.

[110]    Opp. Mem. at 3.  *Accord* 11/4/10 PMC Tr. at 20:14-15 ("[The SBT Terms & Conditions do not] apply to the investment side of the banking activity at all.") (Mr. Miller, counsel for Plaintiffs).

[111]    *See* SBT Terms & Conditions, Ex. B to Supplemental Declaration of Paulo R. Lima in Support of Defendants' Motion to Dismiss ("Lima Supp. Decl."), at 3 (defining "Accounts" governed by the Terms & Conditions to include "any and all accounts maintained by [a client] and [SBT], including, but not limited to, . . . deposit accounts . . . and nondiscretionary investment management and advisory

SBT Terms & Conditions apply to the Santander Plaintiffs' accounts, but whether this "action" "aris[es] out of or relat[es] to" the Santander Plaintiffs' investment accounts with SBT such that "all claims in respect of [this] action" shall be heard in the courts of The Bahamas.

### 1.    Meaning of "Relating To"

The term "related to" is typically defined more broadly [than the phrase "arising out of"] and is not necessarily tied to the concept of a causal connection.  Webster's Dictionary defines "related" simply as "connected by reason of an established or discoverable relation."  The word "relation," in turn, as "used esp[ecially] in the phrase 'in relation to,'" is defined as a "connection" to or a "reference" to.  Courts have similarly described the term "relating to" as equivalent to the phrases "in connection with" and "associated with," and synonymous with the phrases "with respect to," and "with reference to," and have held such phrases to be broader in scope than the term "arising out of."[112]

### 2.    The Santander Plaintiffs' Action Is "Relat[ed] to" Their SBT Accounts

The Santander Plaintiffs' action is "unquestionably 'connected to,' 'associated with,' and brought 'with reference to'"[113] their investment accounts with SBT.  The action centers on their purchases of Optimal U.S. shares upon the

------

accounts.").

[112]    *Coregis*, 241 F.3d at 128-29 (citations omitted).  *Accord Wyeth*, 119 F.3d at 1074 ("To say that a dispute 'arise[s] . . . in relation to' [an] [a]greement is to say that the origin of the dispute is related to that agreement[.]").

[113]    *Coregis*, 241 F.3d at 130.

recommendation and through representatives of Santander U.S. in Santander-affiliated accounts otherwise covered by the SBT Terms & Conditions – accounts they opened specifically to invest in Optimal U.S.[114]  In *Anwar II*, Judge Victor Marrero of this Court similarly concluded that a forum selection clause, contained in the "Terms and Conditions" applicable to plaintiffs' bank accounts with the Singapore Branch of Standard Chartered Bank, covered plaintiffs' "dispute about Standard Chartered's diligence in investigating [a Madoff feeder fund] and its representations about [that fund]."[115]  The clause was "broadly worded," he noted, "to encompass 'any dispute arising out of or in connection with these [Terms and Conditions], any Account, Transaction, or any Service.'"[116]  The factual scenario here is virtually identical.

Moreover, Plaintiffs' own pleadings evince the extent to which the Santander Plaintiffs' SBT accounts are "related to" this action.  According to the SAC, in 2008, when "Banco Santander affiliates implemented certain procedures

---

[114]    *See* SAC ¶¶ 253-256.

[115]    742 F. Supp. 2d at 373.  Like the Santander Plaintiffs, the *Anwar II* plaintiffs first signed a "Private Bank Account Application" in order to open their accounts which expressly incorporated separate "terms and conditions" containing a forum selection clause.  *See id.* at 372.

[116]    *Id.* (quoting the forum selection clause contained in the terms and conditions at issue in that case).

that indicated growing concerns about Madoff," it was SBT Bahamas – the entity

with which the Santander Plaintiffs held their accounts – that executed a waiver

with "private banking clients" who wished to "remain in the fund" ("SBT

Waiver").[117]  Under the SBT Waiver, clients like the Santander Plaintiffs

"accept[ed] the following":

> "[SBT] has informed you that your investment in Optimal U.S.
> may exceed the concentration limits recommended by [SBT],
> based specifically in [*sic*] the investment profile you have selected
> for your account with [SBT], for investments in Hedge Funds
> managed by one manager."[118]

In addition, the SBT Waiver expressly "provided the client the opportunity to

review the clients' investments and reduce the exposure to Optimal U.S." and

"provided various opportunities to ask questions and receive answers concerning

Optimal U.S."[119]  The Santander Plaintiffs received these communications – which

form part of the basis for their fraud claims – *because* they held accounts through

SBT Bahamas that were governed by the SBT Terms & Conditions.  There can be

no genuine dispute that this action "aris[es] out of or relat[es] to [their]

---

[117]    SAC ¶ 263.

[118]    *Id.* ¶ 264 (quoting the SBT Waiver, Ex. 29 to SAC) (translated to
English).

[119]    *Id.* ¶ 265 (citing the SBT Waiver).

Account[s]."[120]

Finally, the Santander Plaintiffs are suing *Santander U.S.* – the entity whose employees allegedly "regularly offer[ed] to open bank accounts at Santander affiliates in the Bahamas or Switzerland [for investors], and invest in Optimal U.S."[121] and mailed Plaintiffs their account statements.[122]  In fact, without Santander U.S. as a named defendant in this action, the *only* remaining (and not so firm) ground[123] for this Court's subject matter jurisdiction is the Exchange Act.[124] If the Exchange Act claims are dismissed, this Court's jurisdiction would likely be based entirely on the theory that, under the Edge Act, this suit "aris[es] out of transactions involving international or foreign banking" and names a "corporation

---

[120]    SBT Terms & Conditions § 78.

[121]    SAC ¶ 253.

[122]    *See id.* ¶ 252 ("Plaintiff Galinanes . . . regularly received his bank statements mailed from [Santander U.S.] in Miami.").  Given these allegations, Plaintiffs' argument that "Defendants are . . . far[] removed from the [SBT] accounts because the account[s are] with non-party [SBT] Bahamas" is disingenuous at best.  Opp. Mem. at 30.

[123]    *See infra* Part V.B.

[124]    The Class Action Fairness Act is also an alleged basis for jurisdiction, but given that I am dismissing the Santander Plaintiffs from this action, the only remaining plaintiffs are Pioneer and the Pioneer Plaintiffs who, according to the SAC, "are atypical from everyone else in the class because there were specific representations made to them that were made to no one else in the class."  11/4/10 PMC Tr. at 8:5-9 (Mr. Membiela, counsel for Defendants).

organized under the laws of the United States" – Santander U.S.[125]  Plaintiffs

cannot have it both ways.  Either this action arises out of transactions involving

banking (in which case the forum selection clause applies) or it does not (in which

case this Court does not have Edge Act jurisdiction).[126]  For all of these reasons –

and because Plaintiffs have made no argument to "rebut[] the presumption of

enforceability"[127] – I hold that this action "relate[s] to" the Santander Plaintiffs'

investment accounts, and is therefore governed by the Bahamian forum selection

clause.

### 3.    All Defendants May Enforce the Forum Selection Clause

Of course, Plaintiffs are not suing SBT; they are suing Santander U.S.,

Banco Santander (its parent), OIS (another Banco Santander subsidiary), and Clark

(an OIS employee).  A forum selection clause may bind non-parties to a contract if

"the relationship between the non-party and the signatory [is] sufficiently close so

---

[125]    12 U.S.C. § 632.

[126]    *Accord* 11/4/10 PMC Tr. at 19:21-20:1 ("The way [Plaintiffs have]
pled [their claims, they arise out of their SBT accounts] because [they] have
alleged that the Santander entities operate as a unitary entity and that these shares
were bought in [those accounts].  And also, it's part of [their] Edge Act
jurisdiction, [they're] specifically alleging that [their claims] come[] out of the
transaction of their banking relationship.") (Mr. Membiela, counsel for
Defendants).

[127]    *Phillips*, 494 F.3d at 384.

that the non-party's enforcement of the forum selection clause is foreseeable by virtue of the relationship between the signatory and the party sought to be bound."[128]  In discerning whether parties are "closely related," courts look to whether the non-signatory "[is an] intended beneficiar[y] entitled to enforce" the clause in question.[129]  "As Professor Corbin has said, a third party will have an enforceable right 'if the promised performance will be of pecuniary benefit to him and the contract is so expressed as to give the promisor reason to know that such benefit is contemplated by the promisee as one of the motivating causes of his making the contract.'"[130]  However, "'while . . . third-party beneficiaries to a contract would, by definition, satisfy [this] requirement[ ] . . . , a third-party beneficiary status is not required.'"[131]

---

[128]    *Direct Mail Prod. Servs. Ltd. v. MBNA Corp.*, No. 99 Civ. 10550, 2000 WL 1277597, at *3 (S.D.N.Y. Sept. 7, 2000) (citing *In re Lloyd's Am. Trust Fund Lit.*, 954 F. Supp. 656, 670 (S.D.N.Y. 1997)).

[129]    *Roby*, 996 F.2d at 1358 (alterations in original).

[130]    *Id.* at 1359 (quoting 4 Arthur L. Corbin, Corbin on Contracts § 776, at 18 (3d ed. 1967)).

[131]    *Direct Mail*, 2000 WL 1277597, at *3 (quoting *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998)).  *Accord Roby*, 996 F.2d at 1358 (holding that forum selection clause contained in contracts between Lloyd's and its investors applied to investors' securities fraud claims against the syndicates that competed for investments within Lloyd's, in light of the broad language of the clause and the syndicates' pecuniary interest in uniform resolution of the claims).

Defendants Santander U.S., Banco Santander, and OIS are sufficiently "closely related" to SBT such that enforcement of the forum selection clause by those entities was foreseeable to the Santander Plaintiffs.  For example, section 21L of the SBT Terms & Conditions[132] expressly provides that SBT could "engage other agents or subagents (that may be [SBT's] affiliates) to provide investment advisory, brokerage, and other services to [SBT] for the Advisory Accounts."[133]  Of course, the Santander Plaintiffs' claims against Santander U.S., Banco Santander, and OIS – all SBT affiliates – are based on those Defendants' provision, albeit indirectly, of such "investment advisory . . . services to SBT."[134]  Thus, section 21L indicates that "the signatories [to the SBT account agreements incorporating the SBT Terms & Conditions] intended the contract to benefit related [Santander] companies" and "gave [the Santander Plaintiffs] reason to know that one of the reasons motivating [SBT] to enter the contract was a desire to confer a

---

[132]    *See* SBT Terms & Conditions, Attachment to 4/20/11 Email from Paulo R. Lima in Support of Defendants' Motion to Dismiss ("4/20/11 Lima Email"), § 21L.  Section 21L, while referenced in Defendants' Reply Memorandum, was inadvertently excluded from the attachments to the Lima Declarations.

[133]    *Id.*  Similarly, the SBT Waiver distributed to the Santander Plaintiffs in 2008 "explained that the investment in Optimal U.S. was not guaranteed by [SBT] [or] *any of its affiliates*."  SAC ¶ 265 (citing SBT Waiver) (emphasis added).

[134]    SBT Terms & Conditions, Attachment to 4/20/11 Lima Email, § 21L.

pecuniary benefit on related [Santander] companies."[135]

Furthermore, the Santander Plaintiffs received their SBT bank statements *from Santander U.S.*,[136] the entity allegedly responsible for opening bank accounts at Santander affiliates for the express purpose of investing in Optimal U.S.[137]  Moreover, the SAC characterizes the Defendants as "[o]perat[ing] [a]s [a] [u]nitary [o]rganization."[138]  For example, "Optimal U.S. was marketed and sold indistinctly by Banco Santander's subsidiaries, including OIS and Santander U.S."[139]  A necessary component of the Santander Plaintiffs' fraud allegations against Banco Santander is that those plaintiffs invested in Optimal U.S. (through SBT accounts) in "reliance upon the good name of [Banco] Santander since OIS was presented to the world as [Banco] Santander's hedge fund arm."[140]  Considered

---

[135]    *Direct Mail*, 2000 WL 1277597, at *4.  *Accord Roby*, 996 F.2d at 1358-59.  Indeed, as alleged, "Santander U.S. charged Plaintiffs a sales charge at the time of the investment in the funds that was a percentage of the amount invested."  SAC ¶ 262.

[136]    *See* SAC ¶ 247.

[137]    *See id.* ¶ 253.

[138]    *Id.* at 66 (heading).  *Accord id.* ¶ 245 ("Banco Santander, OIS, and Santander U.S. formed a tight weave of connections in which each entity played an essential role with respect to Optimal U.S.").

[139]    *Id.* ¶ 244.

[140]    *Id.* ¶ 257.

in conjunction with section 21L of the SBT Terms & Conditions, "it was entirely foreseeable that [] related [Santander] companies might [provide investment advisory services to SBT clients] and thereby become bound up in any disputes premised upon allegations of [impropriety related to the SBT accounts]."[141] Therefore, Santander U.S., Banco Santander, and OIS may properly assert the SBT forum selection clause in their defense.  As for Clark, whose "liability arises out of the same misconduct charged against [OIS]" – an entity sufficiently closely related to SBT to enforce the forum selection clause – he, too, may enforce the forum selection clause as an employee of OIS.[142]  For all of these reasons, Counts I-XII are dismissed to the extent they are brought by the Santander Plaintiffs, who must litigate these claims in The Bahamas.

## V.  Exchange Act Claims[143]

### A.  Applicable Law

---

[141]   *Direct Mail*, 2000 WL 1277597, at *4.

[142]   *See, e.g.*, *Roby*, 996 F.2d at 1360 ("Courts in this and other circuits consistently have held that employees or disclosed agents of an entity that is a party to an [] agreement [containing a forum selection clause] are protected by that agreement. . . .  If it were otherwise, it would be too easy to circumvent [forum selection clauses] by naming individuals as defendants instead of [entities].").

[143]   Given my dismissal of the Santander Plaintiffs from this action, references hereinafter to "Plaintiffs" are to the "Pioneer Plaintiffs" only, with "Pioneer" designated separately.

"To prevail in a Rule 10b-5 action based on subsection [10](b), a plaintiff must prove that 'in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff's] injury.'"[144]  Secondary actors cannot incur primary liability under the [Exchange] Act for a statement not attributed to that actor at the time of its dissemination."[145]  Section 10(b) applies to "only . . . [1] the purchase or sale of a security listed on an American stock exchange, and [2] the purchase or sale of any other security in the United States."[146]

## B.   Plaintiffs Adequately Allege that the Exchange Act Applies to Plaintiffs' "Purchases" of Optimal U.S. Shares

Defendants argue that Plaintiffs "cannot state federal securities law claims because the Exchange Act does not apply extraterritorially to the foreign-

---

[144]   *Vacold LLC v. Cerami*, 545 F.3d 114, 121 (2d Cir. 2008) (quoting *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999)).

[145]   *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998).  A secondary actor is "any part[y] who [is] not employed by the issuing firm whose securities are the subject of allegations of fraud."  *Pacific Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 148 n.1 (2d Cir. 2010) (hereinafter "*PIMCO*").

[146]   *Morrison v. National Austla. Bank Ltd.*, 130 S. Ct. 2869, 2884 (2010).

cubed transactions underlying their claims."[147]  They direct the Court to *In re Banco-Santander Securities-Optimal Litigation*,[148] where a federal district court in Florida dismissed plaintiffs' federal securities claims because they "neither purchased shares on an American stock exchange, nor did they purchase shares in the United States.  They made off-shore purchases in off-shore Bahamian investment funds closed to United States investors."[149]

    Although the shares purchased by Plaintiffs are identical to those at issue in *Banco-Santander Securities-Optimal Litigation*, the pleadings are slightly different for, here, Plaintiffs have inserted a crucial sentence into the SAC: "[t]he purchases and sales of the shares of [Optimal U.S.] by Plaintiffs and the Class took place in the United States."[150]  But Defendants argue that this allegation regarding

---

[147]    Def. Mem. at 15 (citing *Morrison*, 130 S. Ct. at 2884).  "Foreign-cubed" transactions are those in which "(1) foreign plaintiffs [are] suing (2) a foreign issuer in an American court for violations of American securities laws based on securities transactions in (3) foreign countries."  *Morrison*, 130 S.Ct. at 2894 n.11 (Stevens, J., concurring) (quotation marks omitted).

[148]    Nos. 09-MD-02073-CIV, 09-CV-20215-CIV, 2010 WL 3036990 (S.D. Fla. July 30, 2010).

[149]    *See id.* at *5.

[150]    SAC ¶ 352.  *See* Opp. Mem. at 3-4 ("Plaintiffs in [*Banco-Santander Securities-Optimal Litigation*] were not aware that the purchases of [Optimal U.S.] shares took place in the United States, and did not plead that in the complaint nor even argue it.") (original emphasis removed).

    Defendants call this allegation "conclusory."  Def. Mem. at 16.

the U.S. locus of purchases and sales is "belied by the EMs attached to the SAC, and, thus, may be ignored."[151]  In particular, they point to the January 2008 EM, which directs prospective Fund purchasers to mail and fax their completed subscription forms to the Fund's administrator, HSBC Securities Services (Ireland) Limited ("HSSI"), in *Ireland*.[152]  Moreover, based on the EM's warning that "[d]irectors reserve the right to defer acceptance of such subscription until monies are cleared,"[153] Defendants argue that "the sale of the Fund shares became final only upon the Administrator's acceptance of the Subscription Form."[154]  Therefore, "they are not domestic transactions and cannot provide a basis for claims under United States securities law."[155]

---

Indeed, now that the "focus of the Exchange Act" is no longer "upon the place where . . . deception originated, but upon *purchases and sales* of securities *in the United States*," *Morrison*, 130 S.Ct. at 2884 (emphasis added), whether a technical "purchase" or "sale" of those securities has taken place in this country appears to be the crucial question, and one that has both factual and legal elements.

[151]    Def. Mem. at 17 (citing *Iqbal*, 129 S.Ct. at 1951).

[152]    *See* January 2008 EM, Ex. 15 to SAC, at 37-38 (listing HSSI's fax number and address in Dublin and stating "this Subscription Form should be sent to the following address and/or fascimile number, and if sent by fascimile, the original **must** follow by post") (emphasis in original).

[153]    *Id.* at 36.

[154]    Def. Mem. at 17.

[155]    *Id.*

The defendants in "*Anwar I*"[156] – another Madoff feeder-fund case litigated in this district – made a similar argument: because a number of administrative tasks associated with subscribing to shares in the "Offshore Funds" occurred in other countries – including Plaintiffs' sending their subscription agreements to an administrator in Amsterdam and to the Offshore Funds' investment manager in Bermuda – the transactions in question did not occur in the United States.[157]  But Plaintiffs countered that no transaction occurred until Plaintiffs' subscription agreements were *accepted* by the Funds, and that this approval occurred in *New York*, where Fairfield Greenwich Group – which founded and operated the Funds – had an office, and where much of its executive staff was concentrated.[158]  Judge Marrero deferred ruling on the question because it presented "a novel and more complex application of *Morrison*'s transactional test" given that the case "allegedly [did] not involve securities purchases or sales executed on a foreign exchange."[159]  Indeed, in adopting its "clear test" for the application of the Exchange Act, the *Morrison* court seemed most concerned with

---

[156]    *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 401 n.8 (S.D.N.Y. 2010) ("*Anwar I*").

[157]    *See id.* 405.

[158]    *See id.*

[159]    *Id.*

eliminating "interference with foreign securities regulation"[160] – a concern that is somewhat lessened in the context of transactions in securities not traded on foreign exchanges. Accordingly, Judge Marrero found "that a more developed factual record [was] necessary to inform a proper determination as to whether Plaintiffs' purchases of the Offshore Funds' shares occurred in the United States."[161]

In this case, Plaintiffs do not contest that the subscription forms were sent to the Fund administrator in Ireland or that "acceptance" occurred in Ireland.[162] Instead, they contend the shares were "purchased" where they were issued,[163] and that the Optimal U.S. shares were issued in *New York*. As evidence,

---

[160]    *Morrison*, 130 S. Ct. at 2886. *Accord id.* at 2884 ("We know of no one who thought that the Act was intended to 'regulat[e]' foreign securities exchanges – or indeed who even believed that under established principles of international law Congress had the power to do so.").

[161]    *Anwar I*, 728 F. Supp. 2d at 405.

[162]    They do point out, however, that Optimal U.S. investors who made their subscription payments in U.S. dollars by telegraphic transfer (*i.e.*, wire transfer) sent their payments to HSBC Bank USA Inc. *See* January 2008 EM, Ex. 15 to SAC, at 37. "A search of the Swift and ABA Codes listed in the Optimal U.S. Subscription Form for HSBC Bank USA Inc., *see id.*, indicates that HSBC Bank USA Inc. is located at 452 Fifth Avenue, New York, New York 10018." 4/15/11 Pl. Letter at 2. Nevertheless, it is Plaintiffs' position that "[w]here payment is made, . . . where the money comes from and where it's transferred to does not necessarily indicate where [the shares are] ultimately [purchased]." 4/13/11 Teleconf. Tr. at 19:2-4 (Mr. Miller, counsel for Plaintiffs).

[163]    4/13/11 Teleconf. Tr. at 19:16-19 ("In this case, it's where the shares were issued is where the purchase actually is consummated. Until then the money

they submit two "Contract Notes" issued by Santander U.S. to "Inversiones Mar Octava," an Optimal U.S. shareholder and a plaintiff in *In re Banco Santander Securities-Optimal Litigation.*[164]  The contract notes read, "WE BOUGHT [SOLD] FOR YOUR ACCOUNT IN : NYS."[165]  Drawing all reasonable inferences in Plaintiffs' favor, the Contract Notes support Plaintiffs' allegation that the purchases of Optimal U.S. "took place in the United States."[166]  Defendants' argument, while promising, is better-suited for a motion for summary judgment in the context of a more fully-developed factual record that unequivocally establishes where all of Plaintiffs' shares were "issued," where they wired their subscription

---

is in the air.  And whether it's in the air over Ireland or any other place doesn't really amount to much.") (Mr. Miller, counsel for Plaintiffs).

[164]   No. 09-20215-CIV (S.D. Fla.).  *See* 4/15/11 Pl. Letter at 1; Contract Notes, Ex. A to 4/15/11 Letter; Certification of Inversiones Mar Octava, Ex. B to 4/15/11 Letter.  This Court may consider the Contract Notes on this motion to dismiss because Plaintiffs relied on them in framing the SAC.  *See supra* note 70; 4/13/11 Teleconf. Tr. at 20:15-19 ("[The contract notes were] relied upon in Plaintiff[s'] complaint in – this underlying statement in paragraph 352 that the purchases took place in the United States.") (Mr. Ellman, counsel for Plaintiffs).

[165]   Contract Notes.

[166]   SAC ¶ 352.  Defendants argue that the Contract Notes directly contradict the SAC's allegations that Plaintiffs' investments "were made from [their] bank accounts at Banc Julius Baer in Geneva Switzerland," SAC ¶ 11.  However, the statement, "WE BOUGHT FOR YOUR ACCOUNT IN : NYS" is ambiguous; it does not necessarily mean that the account-holder's account was located in New York.  Drawing all reasonable inferences in Plaintiffs' favor, it means the shares were purchased or issued there.

payments, what the statement "WE BOUGHT FOR YOUR ACCOUNT IN : NYS" means, and where their subscription agreements were "accepted."  At this stage, Plaintiffs' allegation that the purchases "took place in the United States,"[167] factually supported by the Contract Notes, suffices to establish the applicability of the Exchange Act to the transactions in question.

### C.    Plaintiffs' Section 10(b) Claims Against OIS and Clark, and Section 20(a) Claim Against Banco Santander, Survive Defendants' Motion to Dismiss

Plaintiffs allege that OIS and Clark violated section 10(b) of the Exchange Act, and that Banco Santander is liable under section 20(a) as a "control person" of OIS.  Defendants move to dismiss on the grounds that the Exchange Act does not apply to the transactions of which Plaintiffs complain; that Plaintiffs have failed to allege (1) actionable misstatements or omissions,[168] (2) scienter, and (3)

---

[167]    SAC ¶ 352.

[168]    Plaintiffs sue Clark only for his allegedly "false and misleading statements to Pioneer."  SAC ¶ 368.  *Accord id.* ¶ 11 ("Each of the Pioneer Plaintiffs invested in Optimal U.S. pursuant to an investment advisory agreement with Pioneer, and based on the advice provided by Pioneer, which was based on Defendants' misrepresentations."); Opp. Mem. at 4 ("Plaintiffs did not sue Clark for the statements in the EMs, only for the statements he made directly to Pioneer.").  In moving to dismiss the federal securities claims against them, OIS and Clark discuss *only* the alleged misstatements and omissions contained in the *EMs* without challenging the adequacy of the SAC's allegations that the Pioneer Plaintiffs (1) relied on Clark's statements *to Pioneer* or (2) attributed the "advice provided by Pioneer" to Clark.  SAC ¶ 11.  *See PIMCO*, 603 F.3d at 155 ("Secondary actors can be liable in a private action under Rule 10b-5 for only those

reliance; and that Plaintiffs' allegations fail to satisfy the elements of "control person" liability.  For reasons that will be explained at a conference scheduled for Tuesday, May 10, 2011 at 3:30 p.m., Plaintiffs' section 10(b) claims against OIS and Clark, and their section 20(a) claim against Banco Santander as a "control person" of OIS, survive Defendants' motion to dismiss.

## VI.   Common Law Claims

### A.   Standing

Defendants argue that Plaintiffs lack standing to assert direct claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, gross negligence, breach of contract, and unjust enrichment because any wrongs sustained were sustained by *the Funds*, the only entities that may bring suit directly.[169]  In order to assess this argument, I must first determine what law applies to the question of shareholder standing.

#### 1.   Choice of Law

##### a.   New York Choice-of-Law Rules

In diversity actions, federal courts follow the choice-of-law rules of

---

statements that are *explicitly attributed* to them.") (emphasis added).

[169]   *See* Def. Mem. at 1-3.

the forum state to determine the controlling substantive law.[170]  Under New York

choice-of-law rules, courts first determine whether there is a substantive conflict

between the laws of the relevant choices.[171]  "In the absence of substantive

difference . . . a New York court will dispense with choice of law analysis; and if

New York law is among the relevant choices, New York courts are free to apply

it."[172]

### i.    Internal Affairs Doctrine

New York follows the internal affairs doctrine, which generally

requires that "questions relating to the internal affairs of corporations are decided

in accordance with the law of the place of incorporation."[173]  This doctrine

"recognizes that only one State should have the authority to regulate a

---

[170]    *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *GlobalNet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006).

[171]    *See GlobalNet Financial.com*, 449 F.3d at 382 ("The New York Court of Appeals has held that 'the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'") (quoting *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993)).

[172]    *International Bus. Mach. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004).

[173]    *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1234 (2d Cir. 1996) (citations omitted).  *Accord City of Sterling Heights Police and Fire Ret. Sys. v. Abbey Nat.*, *PLC*, 423 F. Supp. 2d 348, 363 (S.D.N.Y. 2006).

corporation's internal affairs – matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders – because otherwise a corporation could be faced with conflicting demands."[174] The internal affairs doctrine "typically requires a court to consider the law of the place of incorporation to decide a shareholder standing issue."[175]

### ii.    Tort Actions: Interest Analysis

To resolve conflicts in tort cases, New York applies an "interest analysis" to identify the jurisdiction that has the greatest interest in the litigation based on the occurrences within each jurisdiction, or contacts of the parties with

---

[174]    *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982).  *Accord* Restatement (Second) of Conflict of Laws § 302 cmt. e ("Uniform treatment of directors, officers and shareholders is an important objective which can only be attained by having the rights and liabilities of those persons with respect to the corporation governed by a single law.").

[175]    *Anwar I*, 728 F. Supp. 2d at 401 n.8 (citing *Aboushanab v. Janay*, No. 06 Civ. 13472, 2007 WL 2789511, at *6 (S.D.N.Y. Sept. 26, 2007)).  *Accord Newman v. Family Mgmt. Corp.*, No. 08 Civ. 11215, 2010 WL 4118083, at *11 (S.D.N.Y. Oct. 20, 2010) ("The question of standing to bring a derivative suit is governed by the law of the state of organization."); *Stephenson v. Citco Group Ltd.*, 700 F. Supp. 2d 599, 608 (S.D.N.Y. 2010) ("When deciding issues of shareholder standing, that is, whether claims should be brought directly or derivatively, courts must look to the law of the fund's state of incorporation.") (quotation marks omitted); *Debussy LLC v. Deutsche Bank AG*, No. 05 Civ. 5550, 2006 WL 800956, at *3 (S.D.N.Y. Mar. 29, 2006) (same).

each jurisdiction, that "'relate to the purpose of the particular law in conflict.'"[176]

When the law is one which regulates conduct, "the law of the jurisdiction where

the tort occurred will generally apply because that jurisdiction has the greatest

interest in regulating behavior within its borders."[177]  A tort occurs in "the place

where the injury was inflicted," which is generally where the plaintiffs are

located.[178]

> **b.     This Court May Apply New York Law to the
>         Question of Shareholder Standing Because There Is
>         No Conflict Between New York and Bahamian Law**

Plaintiffs urge this Court to apply New York law to the question of

shareholder standing "because none of the Defendants include the Fund or its

directors and, instead, consist of third-party service providers"[179] and because New

---

[176]     *GlobalNet Financial.com*, 449 F.3d at 384 (quoting *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 197 (1985)).  *Accord Finance One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 337 (2d Cir. 2005) (citation omitted) (the interest analysis is a "flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation").

[177]     *GlobalNet Financial.com*, 449 F.3d at 384.

[178]     *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001) (citation and quotation marks omitted).  *Accord Sack v. Low*, 478 F.2d 360, 365-66 (2d Cir. 1973) (interpreting New York law).

[179]     Opp. Mem. at 18 (citing *Tyco Int'l, Ltd. v. Kozlowski*, No. 02 Civ. 7317, 2010 WL 4903201, at *6-7 (S.D.N.Y. Dec. 10, 2010); *Anwar I*, 728 F. Supp.

York "has the most significant *interest* in the litigation."[180]  Although New York's

interest in the litigation would be my primary focus were I determining whether to

apply New York or Bahamian *tort law* to Plaintiffs' *substantive* claims, that is not

my inquiry.  Rather, my inquiry is whether Plaintiffs – the parties pleading those

torts – have *standing* to assert them.[181]  And *that* question is governed by the

internal affairs doctrine.[182]  Therefore, Plaintiffs' argument for the application of

New York law – at least on these grounds – is inapposite.

However, Defendants concede that "United States law is in accord

---

2d at 401 n.8; *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 194 (S.D.N.Y. 2006); *Ackert v. Asuman*, 218 N.Y.S.2d 814, 817-18 (Sup. Ct. N.Y. Co. 1961)).

[180]      *Id.* at 17 (emphasis added).

[181]      Defendants' Reply to Plaintiffs' Opposition to Motion to Dismiss ("Def. Reply") at 1 (quoting *Schultz*, 65 N.Y.2d at 197).  In this vein, aside from *Anwar I*, none of the cases cited by Plaintiffs in support of their argument addressed the question of whether the law of the state of incorporation should apply to determine whether plaintiffs had *standing* to bring certain claims; instead, they addressed whether foreign law should govern *the claims themselves*.  *See Tyco*, 2010 WL 4903201, at *6 (rejecting defendant's argument that "Bermuda law should apply to [plaintiffs'] *claims of constructive fraud and forfeiture*") (emphasis added); *Ackert*, 218 N.Y.S.2d at 817 ("a stockholder's derivative *action* such as this does not involve the internal affairs of the corporation in whose behalf it is brought") (emphasis added); *Pension Comm.*, 446 F. Supp. 2d at 194 (rejecting defendants' argument that "[British Virgin Islands] law should apply to *the claims* against them under the internal affairs doctrine") (emphasis added).

[182]      *See* Def. Reply at 1 (citing *Bagdon v. Bridgestone/Firestone, Inc.*, 916 F.2d 379, 382 (7th Cir. 1990)).

-48-

with Bahamian law,"[183] citing New York law.[184]  Indeed, Defendants' application

of Bahamian and New York law demonstrates that there are no genuine differences

between the two.[185]  Therefore, because "New York law is among the relevant

choices," this Court is "free to" – and does – apply it.[186]

### 2.   New York Law of Shareholder Standing

"Under New York law, a shareholder may bring an individual suit if

the defendant has violated an independent duty to the shareholder, whether or not

the corporation may also bring an action,"[187] although "damages may be limited so

---

[183]     Def. Mem. at 4.

[184]     *See id.* at 4-5 (citing *Druck Corp. v. Macro Fund Ltd.*, 290 Fed. App'x 441, 443 (2d Cir. 2008)).

[185]     *See id.* at 3-4 (contending that, under Bahamian law, (1) only the Fund "may bring suit for alleged breaches of duties owed" and (2) "a shareholder cannot recover for harms that 'reflect' losses suffered" by the Fund (the "Reflective Loss Principle" under Bahamian law)).

[186]     *International Bus. Machs.*, 363 F.3d at 143-44.  *Accord Anwar I*, 728 F. Supp. 2d at 401 n.8 (applying New York law in part because "even if Delaware law, the place of the Domestic Funds' incorporation, were applied to claims relating to the Domestic Funds, the result would be the same").

[187]     *Ceribelli v. Elghanayan*, 990 F.2d 62, 63-64 (2d Cir. 1993) (citations omitted).  *Accord Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 408-09 (S.D.N.Y. 2005) (direct action allowed under New York law because, while "some mismanagement and self-dealing . . . may have been involved," the "principal wrong . . . appears to have been a valuation fraud that injured plaintiffs, not the Funds").

as to avoid a double recovery."[188]   "[U]nder New York law an allegation of

misrepresentation of present fact that is the inducement for the contract may state a

[direct] claim for fraud."[189]   However, "allegations of mismanagement or diversion

of assets by officers or directors to their own enrichment, without more, plead a

wrong to the corporation only, for which a shareholder may sue derivatively but

not individually."[190]

---

[188]   *Ceribelli*, 990 F.2d at 63-64.  *But see Druck*, 290 Fed. App'x at 443 (finding claim "derivative, not direct, because [plaintiff] cannot prevail without showing injury to [the fund] itself.").

[189]   *Druck*, 290 Fed. App'x at 444 (quotation marks omitted).  *Accord Ceribelli*, 990 F.2d at 65 n.3 ("When misrepresentations induce a buyer to purchase stock, and the losses suffered are a foreseeable consequence of the misrepresentations, the misrepresentations proximately cause the buyer's injuries."); *Coronado Dev. Corp. v. Millikin*, 22 N.Y.S.2d 670, 675 (Sup. Ct. N.Y. Co. 1940) ("[D]epreciation resulting from the *dissemination of false information* as to corporate assets or business or management, as distinguished from a wrongful withholding or taking or dissipation of corporate property or interference with its business, necessarily constitutes a direct injury to individual stockholders and is a wrong to them rather than to the corporation . . . .") (emphasis added).  *But see San Diego Cty. Emps. Ret. Ass'n v. Maounis*, No. 07 Civ. 2618, 2010 WL 1010012, at *20 (S.D.N.Y. Mar. 15, 2010) ("Plaintiff's claim [for breach of fiduciary duty based on the making of misrepresentations] is derivative [under Delaware law], because the misrepresentations that allegedly caused its losses injured not just Plaintiff, but the Fund as a whole.").

[190]   *Abrams v. Donati*, 66 N.Y.2d 95, 953 (1985) ("For a wrong against a corporation a shareholder has no individual cause of action, though he loses the value of his investment or incurs personal liability in an effort to maintain the solvency of the corporation.").  *Accord Debussy*, 2006 WL 800956, at *3 ("When the duty implicated in a breach of duty claim is the normal duty to manage the affairs of the corporation . . . [t]hat duty is owed to the corporation and not

### 3. Plaintiffs Lack Standing to Assert Direct Claims for Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty, Gross Negligence, Breach of Contract, and Unjust Enrichment (Counts V-VII and IX-X)

Defendants argue that Plaintiffs' claims for breach of fiduciary duty (Count VI), aiding and abetting breach of fiduciary duty (Count VII), gross negligence (Count V), third party beneficiary breach of contract (IX), and unjust enrichment (Count X) should be dismissed, because "[t]he gravamen of Plaintiffs' claims is that the Defendants failed to supervise adequately the investment of the Funds' assets, resulting in the loss of those assets," thereby breaching duties owed only to the Funds.[191]  They point to "a number of cases involving similarly situated Madoff feeder funds" in which "courts have dismissed such common law claims against investment advisors and other fund service providers for the very reason that the plaintiffs lacked standing to pursue derivative claims."[192]  Upon a close

---

separately or independently to the stockholders.  Therefore, the injury flowing from a claim of mismanagement – although . . . not by a corporate board of directors but rather by the portfolio manager of [a] Trust's assets – is a wrong to the corporation.").

[191]    Def. Mem. at 4.

[192]    *Id.* at 5 (citing *Newman*, 2010 WL 4118083, at *12; *Goldweber v. Harmony Partners, Ltd.*, No. 09-61902-CIV, 2010 WL 3702508, at *4 (S.D. Fla. Sept. 16, 2010); *West Palm Beach Police Pension Fund v. Collins Capital Low Volatility Performance Fund*, No. 09-80846-CIV, 2010 WL 2949856, at *3 (S.D. Fla. July 26, 2010); *Stephenson*, 700 F. Supp. 2d at 610).

assessment of all five claims,[193] I conclude that each is "a classic claim of fund

mismanagement that belongs to the Fund, and is therefore derivative."[194]

> ### a.   Plaintiffs' Claims for Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty, Gross Negligence and Unjust Enrichment Are Derivative

Plaintiffs' breach of fiduciary duty claim is based on Defendants'

alleged "fail[ure] to conduct adequate due diligence and monitoring with respect to

Optimal U.S.'s investments, by failing to follow-up on red flags that would have

caused them to discover that Madoff was perpetrating a Ponzi scheme, and by

pocketing hundreds of millions of dollars in fees based on fraudulent asset values

and investment returns."[195]  Similarly, Plaintiffs' gross negligence claim is based

on Defendants' alleged

> fail[ure] to perform adequate due diligence before selecting BMIS
> as Optimal U.S.'s execution agent for its split strike conversion
> strategy, and before allowing BMIS to serve as custodian for
> Optimal U.S.; fail[ure] to properly monitor Madoff and BMIS on
> an ongoing basis to any reasonable degree; and fail[ure] to take
> adequate steps to confirm BMIS's purported account statements,

---

[193]   *See Stephenson*, 700 F. Supp. 2d at 610 ("[T]here is no reason that some claims arising out of a case or controversy could not be direct while other claims arising out of that case or controversy are properly derivative.").

[194]   *San Diego Cty*, 2010 WL 1010012, at *20 (citing *Debussy*, 2006 WL 800956, at *3).

[195]   SAC ¶ 328.

returns, transactions and holding of Optimal U.S.'s assets.[196]

Finally, Plaintiffs' unjust enrichment claim is based on the same alleged "unlawful acts and omissions and breaches of fiduciary duties" asserted in Plaintiffs' breach of fiduciary duty and gross negligence claims.[197]

These claims are derivative because "[e]ach is based on the alleged mismanagement of the [] Fund through the failure to conduct adequate due diligence and to discover and act upon red flags."[198]  The cases to which Plaintiffs

---

[196]    *Id.* ¶ 319.

[197]    *Id.* ¶ 346.

[198]    *Newman*, 2010 WL 4118083 at *12 (dismissing plaintiffs' direct claims for breach of fiduciary duty, gross negligence and mismanagement, malpractice and professional negligence, unjust enrichment, and aiding and abetting breach of fiduciary duty).  *Accord West Palm Beach*, 2010 WL 2949856, at *3 (dismissing as derivative plaintiff's claims for breach of fiduciary duty, gross negligence, and unjust enrichment because "[b]y alleging that [the investment manager] failed to conduct the necessary due diligence to discover the Madoff Ponzi scheme, Plaintiff has pled 'a paradigmatic derivative claim.'") (quoting *Stephenson*, 700 F. Supp. 2d at 610); *Stephenson*, 700 F. Supp. 2d at 610 (dismissing plaintiff's breach of fiduciary duty claim as "'a paradigmatic derivative claim'" after concluding that "'[t]he gravamen of plaintiff's breach of fiduciary duty claims [was] a failure to administer the fund such that the Madoff Ponzi scheme would be discovered'") (quoting *Albert v. Alex. Brown Mgmt. Serv., Inc.*, Nos. Civ.A. 762-N, Civ.A. 763-N, 2005 WL 2130607, at *13 (Del. Ch. Aug. 26, 2005)); *San Diego Cty.*, 2010 WL 1010012, at *20 (finding plaintiff's "first allegation – that Defendants broke fiduciary duties to [plaintiff] by failing to manage properly the Fund – is, like Plaintiff's gross negligence claims, a classic claim of fund mismanagement that belongs to the Fund, and is therefore derivative.") (citing *Debussy*, 2006 WL 800956, at *3).

direct this Court are distinguishable.[199]  In *Anwar I*, Judge Marerro sustained direct claims for gross negligence, breach of fiduciary duty, and unjust enrichment against investment managers,[200] but only after he rejected defendants' "blanket characterization" of plaintiffs' common law claims as "mismanagement of the Funds;"[201] instead, he found that "[t]he principal wrong asserted by the Plaintiffs here is essentially nondisclosure of or failure to learn facts which should have been disclosed based on duties that were independently owed to Plaintiffs."[202]  Although Judge Marrero's characterization would apply to Plaintiffs' claims for *negligent misrepresentation* and *fraud* in this case – which I will permit to proceed – their breach of fiduciary duty, gross negligence, and unjust enrichment claims simply do not allege "inducement" such that "recovery . . . would only flow to those individuals . . . who were so induced."[203]

Similarly, the claims sustained as direct in *Fraternity Fund Limited v.*

---

[199]    *See* Opp. Mem. at 19-20 (citing *Anwar I*, 728 F. Supp. 2d at 415; *Pension Comm.*, 446 F. Supp. 2d at 199-200; *Fraternity Fund*, 376 F. Supp. 2d at 409).  *See also id.* at 26 (citing *People ex rel. Cuomo v. Merkin*, No. 450879/09, 2010 WL 936208, at *10-11 (Sup. Ct. N.Y. Co. Feb. 8, 2010)).

[200]    *See Anwar I*, 728 F. Supp. 2d at 414-16, 421.

[201]    *Id.* at 400.

[202]    *Id.* at 401 n.9.

[203]    *Stephenson*, 700 F. Supp. 2d at 612.

*Beacon Hill Asset Management LLC* and *People ex rel. Cuomo v. Merkin* "were

misrepresentation claims, not mismanagement claims."[204]  And in sustaining a

breach of fiduciary duty claim against a fund administrator brought by investors,

*Pension Committee of University of Montreal Pension Plan v. Banc of America*

*Securities, LLC* did not address the question of shareholder standing.[205]  For all of

these reasons, I dismiss as derivative Plaintiffs' claims for unjust enrichment, gross

negligence, and breach of fiduciary duty, and the aiding and abetting claim upon

which the breach of fiduciary duty claim is based.

> **b.     The Third Party Beneficiary Breach of Contract
>         Claim Is Derivative**

Plaintiffs assert a breach of contract claim against OIS on the theory

that they are third-party beneficiaries to the Investment Management Agreement

("IMA")[206] entered into between OIS and Optimal U.S.[207]  But even if Plaintiffs

---

[204]     *West Palm Beach*, 2010 WL 2949856, at *3 (distinguishing *Fraternity Fund*, 376 F. Supp. 2d at 409).  *See Fraternity Fund*, 376 F. Supp. 2d at 409; *Merkin*, 2010 WL 936208, at *11 ("Here, the wrongs alleged include [the investment manager's] misrepresentations and omissions . . . . [T]he investors were injured when they invested or retained their investments in reliance upon the misstatements.").

[205]     *See Pension Comm.*, 446 F. Supp. 2d at 196-97.  *Cf. id.* at 205 (denying the fund administrator's motion to dismiss plaintiffs' common law *fraud* claims for lack of standing).

[206]     *See* IMA, Ex. A to Lima Decl.  In exchange for "an investment management fee . . . out of the assets of each class of Shares," OIS agreed under

were third-party beneficiaries to the IMA, they

> could not demonstrate an injury (a breach of that contract)
> independent of injury to [Optimal OIS] (the promisee and primary
> beneficiary of the contract).  Plaintiff[s] do[] not allege an
> independent injury or breach of contractual obligations specific to
> [them], but rather a general breach of the [IMA] that is applicable
> to the [Fund] at large, and as such [they] could not demonstrate
> [their] own injury without demonstrating that the [Fund] was
> injured.[208]

Accordingly, Plaintiffs' third party beneficiary breach of contract claim against

OIS is also derivative in nature, and is dismissed.[209]

---

the IMA to "use its best effort and judgement [*sic*] and due care in exercising the
authority granted to it [under the IMA]" and was liable to Optimal U.S. for any
loss "aris[ing] from willful default or gross negligence in performance of [OIS's]
obligations or duties or where the Investment Manager did not act honestly, with
good faith or with a view to the best interests of the Fund."  *Id.* at 4.

[207]    *See* Opp. Mem. at 26.

[208]    *Stephenson*, 700 F. Supp. 2d at 611 (citing *Primavera
Familienstiftung v. Askin*, No. 95 Civ. 8905, 1996 WL 494904, at *9 (S.D.N.Y.
Aug. 30, 1996) (finding third party breach of contract claim derivative)).  *Accord
Orban v. Field*, Civ. A. No. 12820, 1993 WL 547187, at *9 (Del. Ch. Dec. 30,
1993) ("The idea of shareholders having directly enforceable rights as third party
beneficiaries to corporate contracts is, I think, one that should be resisted.  One of
the consequences of limited liability that shareholders enjoy is that the law treats
corporations as legal persons not simply agents for shareholders.").

[209]    Because I dismiss Plaintiffs' third-party beneficiary breach of contract
claim, their negligent misrepresentation claim cannot be "duplicative" of the
breach of contract claim, as OIS argues.  *See* Def. Mem. at 8.  And because this is
the only ground on which any of the four Defendants moves to dismiss Plaintiffs'
negligent misrepresentation claim, that claim survives this motion.

I note that although the *Anwar I* court sustained Plaintiffs' third-party beneficiary breach of contract claim under similar circumstances, it did so without deciding whether that claim was direct or derivative.[210]  Moreover, in finding that Plaintiffs were the intended beneficiaries of the Fund's contract with the investment manager in that case, the *Anwar I* court reasoned that

> [i]t comports with common sense that an entity hired to manage the investments of a pool of capital, particularly considering the massive Funds at issue here, is intended to give a benefit to the investors.  The very purpose of pooling capital may be to maximize investment opportunities, leverage and profits by virtue of sheer volume, while avoiding the transaction costs associated with each investor having a separate contract with an investment manager and still benefitting directly from the manager's expertise.[211]

Of course, this will be the case with respect to any investment pool.  Moreover, this logic also explains why the right to sue for breach of the contract belongs to the *Fund*, not to its shareholders.[212]

---

[210]    *See Anwar I*, 728 F. Supp. 2d at 402 (deferring ruling on the question of standing because Plaintiffs' "asymmetrical injury" argument was "ripe for further factual development").

[211]    *Id.* at 419.

[212]    Similarly, while it is true (as Plaintiffs point out) that individual shareholders' out-of-pocket losses varied depending upon when they partially or fully redeemed their shares (due to the fluid nature of the Fund's share ownership), *see* Opp. Mem. at 21, that will be true in any case alleging corporate malfeasance over a long period of time.  But mere variation in losses does not give rise to claims by individual shareholders alleging corporate malfeasance.  *See* Def. Reply

### c.    Leave to Replead

In light of my (1) application of New York law and (2) holding that Plaintiffs lack standing to bring these five claims, Plaintiffs are granted leave to replead the claims as derivative, and to allege facts showing why, if applicable, demand would be futile or otherwise excused.[213]  Defendants may then renew their motion to dismiss these claims, at which point I will consider (1) Defendants' arguments that Plaintiffs have nevertheless failed to state claims and (2) Plaintiffs' argument that the "Wagoner Rule" nevertheless imbues Plaintiffs with standing[214] – an issue this Court believes would benefit from additional briefing exploring when the "Wagoner Rule" should apply as opposed to shareholder standing doctrines such as demand futility.

---

at 3.  Nor does the Fund's two-tier equity structure have any bearing on Plaintiffs' standing, as Plaintiffs mistakenly argue.  *See* Opp. Mem. at 20 (arguing that because Plaintiffs' "Participating shares" became worthless while OIS's "Ordinary shares" were not affected, the diminution in value of Plaintiffs' shares "did not accrue to the corporation itself").

[213]     *See Marx v. Akers*, 88 N.Y.2d 189, 198-201 (1996); *Sacher v. Beacon Assocs. Mgmt. Corp.*, No. 005424/09, 2010 WL 1881951, at *12 (N.Y. Sup. Ct. Nassau Co. Apr. 26, 2010).

[214]     *See* Opp. Mem. at 21 (citing *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991) ("A claim against a third party for defrauding a corporation with the cooperation of management accrues to the *creditors*, not to the guilty corporation. . . .  We therefore hold that the [bankruptcy] trustee lacks standing to bring the [] claim, *which belongs solely to the creditors*.") (emphasis added)).

### B.    Common Law Fraud-Based Claims

### 1.    Applicable Law[215]

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."[216]  Because the elements of common-law fraud in New York are "substantially identical to those governing § 10(b), the identical analysis applies."[217]

To state a claim for aiding and abetting fraud under New York law, a plaintiff must plead facts showing (1) the existence of a fraud; (2) defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance

---

[215]    Defendants "do not concede that New York law governs these claims, which do not involve any New York individuals or entities."  Def. Mem. at 7. However, they neither state which jurisdiction's laws they believe should apply nor argue that that jurisdiction's laws are in conflict with New York tort law.  Thus, this Court is "free to apply" New York law because it is "among the relevant choices."  *International Bus. Mach.*, 363 F.3d at 143.

[216]    *Wynn*, 273 F.3d at 156 (citing *Lama*, 88 N.Y.2d at 421).

[217]    *AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC*, No. 01 Civ. 11448, 2005 WL 2385854, at *16 (S.D.N.Y. Sept. 26, 2005) (citation and quotation marks omitted).

to advance the fraud's commission.[218]  "The knowledge requirement of an aiding and abetting fraud claim is satisfied by alleging actual knowledge of the underlying fraud."[219]  "Substantial assistance may only be found where the alleged aider and abettor affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur."[220]  Moreover, the plaintiff must allege that the aiding and abetting defendant proximately caused the harm on which the primary liability is predicated.[221]  At least with respect to an aiding and abetting fraud claim, the "substantial assistance" and "causation" elements are interrelated – "[w]hether the assistance is substantial or not is measured . . . by whether the action of the aider and abettor proximately caused the harm on which the primary liability is predicated."[222]

### 2. Plaintiffs' Primary Fraud Claims (Counts I-II)

---

[218]  *See Wight v. Bankamerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000).

[219]  *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005) (citation omitted).

[220]  *In re Sharp Int'l Corp.*, 403 F.3d 43, 50 (2d Cir. 2005).  *Accord Pension Comm.*, 446 F. Supp. 2d at 210.

[221]  *See McDaniel v. Bear, Stearns & Co.*, 196 F. Supp. 2d 343, 359 (S.D.N.Y. 2002) (quotation and citation omitted) (with respect to aiding and abetting fraud claim, "[p]roximate cause exists where defendant's actions were a substantial factor in the sequence of responsible causation, and plaintiff's injury was reasonably foreseeable or anticipated as a natural consequence").

[222]  *Winnick*, 406 F. Supp. 2d at 256 (quotation and citation omitted).

Plaintiffs assert common law fraud claims against OIS, Clark, and Banco Santander on the basis of misrepresentations made in connection with Plaintiffs' purchases of shares in Optimal U.S.[223]  In one paragraph, Defendants move to dismiss these claims because "Plaintiffs have failed to allege that any Defendant [1] knew the alleged misrepresentations were false [scienter] or [2] made such alleged misrepresentations with the intention to induce reliance," directing the Court to OIS's and Clark's arguments for why the section 10(b) claims against them should be dismissed.[224]

For the same reasons that Plaintiffs' section 10(b) claims against OIS and Clark survive this motion – reasons that will be explained at the May 10th conference – Plaintiffs' common law fraud claims against those two defendants may also proceed.[225]  However, there is a dearth of briefing on the adequacy of Plaintiffs' common law fraud allegations as to the third defendant named in Counts I-II, Banco Santander – no doubt due to the page limits imposed by this Court. Therefore, I defer ruling on the issue.  Defendants are invited to revisit their

---

[223]     *See* SAC ¶¶ 289-294.

[224]     Def. Mem. at 13.

[225]     *See AIG*, 2005 WL 2385854, at *16 (the elements of common-law fraud in New York are "substantially identical to those governing § 10(b)") (citation and quotation marks omitted).

argument that Plaintiffs have failed to state a claim for fraud against Banco

Santander, either in a renewed motion to dismiss (if Plaintiffs file a third amended

complaint) or in conjunction with their proposed forum *non conveniens* motion.

### 3.      Plaintiffs' Aiding and Abetting Fraud Claims (Counts VII and VIII)

Plaintiffs allege that Banco Santander and Santander U.S. are liable as

aiders and abettors to OIS's alleged fraud.[226]  Defendants argue that Plaintiffs have

not pleaded facts that, if true, would constitute "substantial assistance" by

Santander U.S. or Banco Santander.  While Plaintiffs have pleaded sufficient facts

as to Banco Santander, they have not done so as to Santander U.S.  The SAC

alleges that in September 2002, Banco Santander ordered OIS to send a team to

investigate and meet with Madoff and a number of New York law firms.[227]  The

investigation resulted in at least two internal memoranda that were written by

OIS's in-house counsel and addressed to Echeverria[228] raising issues that "went to

the heart of Madoff's Ponzi scheme,"[229] but that were ignored both by OIS and

Banco Santander.  Moreover, Banco Santander "was deeply involved in risk

---

[226]      *See* SAC ¶¶ 335-340.

[227]      *See id.* ¶ 87.

[228]      *See id.*

[229]      *See id.* ¶ 89.

management at OIS;"[230] its Internal Audit team oversaw OIS's risk controls.[231]

Finally, Banco Santander was "an active and integral participant in preparing,

drafting and making false representations to Plaintiffs"[232] and actively marketed

Optimal U.S. based on the Banco Santander name.[233]  Thus, Plaintiffs have

adequately alleged that Banco Santander substantially assisted OIS's fraud.[234]

However, Plaintiffs fail to state a claim against Santander U.S. for

aiding and abetting OIS's fraud, as allegedly perpetrated upon the Pioneer

---

[230]    *Id.* ¶ 258.  In an October 2008 presentation about Optimal U.S., OIS emphasized repeatedly the pervasive role of its corporate parent, Banco Santander. *See id.*; "Optimal U.S. October 2008 Presentation," Ex. 21 to SAC.  That presentation was distributed to investors by OIS, Santander U.S., and other subsidiaries of Banco Santander, without regard for corporate structure and formalities.  *See* SAC ¶ 244.

[231]    *See* SAC ¶¶ 259-261.

[232]    *Id.* ¶ 338.

[233]    *See id.* ¶¶ 257-259.

[234]    Defendants do not explicitly attack Plaintiffs' aiding and abetting claim for failure to allege Banco Santander's "actual knowledge of the underlying fraud," a required element.  *Winnick*, 406 F. Supp. 2d at 252.  However, as noted above, *see supra* Part VI.B.2, in their discussion of Plaintiffs' fraud claims, Defendants argue that "Plaintiffs have failed to allege that any Defendant knew the alleged misrepresentations were false," referring the Court to their discussion of OIS's and Clark's scienter but failing to discuss in any detail Plaintiffs' allegations as to whether Banco Santander acted with the requisite level of scienter. Therefore, if and when Defendants revisit this argument in the context of (once again) moving to dismiss Plaintiffs' fraud claims, they are invited to seek dismissal of Plaintiffs' aiding and abetting claims on this ground as well.

Plaintiffs.  The SAC focuses entirely on Santander U.S's marketing and sales efforts directed toward the private banking clients of Santander U.S. and other Santander affiliates – not the Pioneer Plaintiffs.[235]  In the absence of any allegations rendering plausible the inference that the Pioneer Plaintiffs' injury was a direct or reasonably foreseeable result of Santander U.S.'s conduct,[236] this claim fails.

## VII.  CONCLUSION

For the aforementioned reasons, and for reasons that will be explained at a conference scheduled for May 10, 2011, at 3:30 p.m., Defendants' motion to dismiss is granted in part and denied in part.  The Clerk of Court is directed to close this motion (Docket No. 14).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            May 2, 2011

---

[235]      *See id.* ¶¶ 246-257.

[236]      *See, e.g., Kolbeck*, 939 F. Supp. at 249.

-64-

**- Appearances -**

**For Plaintiffs:**

Edward W. Miller, Esq.
575 Lexington Avenue
Suite 2840
New York, New York 10022
(212) 758 1625

Alan Ian Ellman, Esq.
Javier Bleichmar, Esq.
Joel H. Bernstein, Esq.
Labaton Sucharow, LLP
140 Broadway
New York, New York 10005
(212) 907-0877

**For Defendants:**

Gustavo J. Membiela, Esq.
Samuel A. Danon, Esq.
Hunton & Williams
1111 Brickell Avenue
Miami, Florida 33131
(305) 810-2500

Paulo Roberto Lima, Esq.
Shawn Patrick Regan, Esq.
Hunton & Williams, LLP(NYC)
200 Park Avenue, 52nd Floor
New York, New York 10166
(212) 309-1395