# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE OPTIMAL U.S. LITIGATION | ) )<br>)  No. 10-cv-4095 (SAS)<br>)  ECF CASE<br>) |

## THIRD AMENDED CLASS ACTION COMPLAINT



EDWARD W. MILLER (EM-8489)
648 Franklin Avenue, 2nd Floor
Garden City, New York 11530
Tel: (516) 280-7377

LABATON SUCHAROW LLP
Joel H. Bernstein (JB-0763)
Javier Bleichmar (JB-0435)
Alan I. Ellman (AE-7347)
140 Broadway
New York, New York 10005
Tel: 212-907-0700
Fax: 212-818-0477

*Counsel for Lead Plaintiffs
and Lead Counsel for the Class*

ROBBINS GELLER RUDMAN &
DOWD LLP
Jack Reise
Michael L. Greenwald
120 E. Palmetto Park Road, Suite 500
Boca Raton, Florida 33432-4809
Tel: (561) 750-3000
Fax: (561) 750-3364

*Additional Plaintiffs' Counsel*

# TABLE OF CONTENTS

Page

GLOSSARY OF DEFINED TERMS ............................................................................ vi

I.    NATURE OF THE ACTION ................................................................. 1

II.   THE PARTIES......................................................................................... 3

      A.    PLAINTIFFS ............................................................................... 3

      B.    DEFENDANTS ............................................................................ 9

III.  RELEVANT NON-PARTIES ............................................................... 11

IV.   JURISDICTION AND VENUE ............................................................ 12

V.    BACKGROUND FACTS ...................................................................... 14

VI.   SUBSTANTIVE ALLEGATIONS ....................................................... 15

      A.    DEFENDANTS CONCEALED NUMEROUS INDICIA OF FRAUD
            FROM PLAINTIFFS AND FAILED TO PERFORM THE DUE
            DILIGENCE AGREED TO IN THE OFFERING DOCUMENTS ................... 15

            1.    Defendants Did Not Disclose That Madoff Was Concealing His
                  Advisory Business From The SEC ........................................... 15

            2.    Defendants Did Not Disclose Madoff's Inexplicable Demand for
                  Secrecy ...................................................................................... 18

            3.    Defendants Were Aware That Madoff Did Not Charge An
                  Investment Management Fee, Implausibly Foregoing Millions In
                  Advisory Fees ............................................................................ 19

            4.    Defendants Were Aware That Madoff Acted As Investment
                  Advisor, Broker, And Custodian – A Combination Which Was
                  Highly Irregular ........................................................................ 20

            5.    Defendants Did Not Disclose That Family Members Controlled
                  BMIS ........................................................................................... 22

            6.    Defendants Did Not Disclose That Madoff Refused To Provide
                  Any Independent Verification Of Actual Trading ..................... 23

                  (a)    Defendants Did Not Disclose That Madoff Refused To
                         Identify Any Trading Counterparty ............................... 24

(b)    Defendants Did Not Disclose Madoff's Failure To Provide Any Independent Trading Confirmations ..................................... 29

(c)    Defendants Did Not Disclose That Madoff Only Provided Trade Confirmations In Paper Form, Two Days After Execution ..................................................................... 30

(d)    Defendants Did Not Disclose That They Could Not Confirm The Existence Of A Segregated Account For Optimal U.S. ................................................................ 32

7.    Defendants Did Not Disclose That Their Internal Quantitative Due Diligence Software Showed That Madoff's Returns Could Not Be Replicated And Were Mathematically Implausible ................................. 33

8.    Defendants Did Not Disclose That, In Their View, Madoff Did Not Have Independent Auditors .................................................... 37

9.    Defendants Did Not Disclose The Absence Of Contractual Documentation With Madoff .................................................... 38

B.    INTERNAL DOCUMENTS SHOW THAT DEFENDANTS ACTED WITH KNOWLEDGE OR RECKLESS DISREGARD ...................................... 39

1.    Defendants Did Not Follow Their Own Internal Due Diligence Guidelines And Procedures........................................................ 39

2.    Defendants' Primary Concern With Madoff Was Not The Safeguard Of Their Clients' Assets, But Defendants' Own Liability........................................................................... 41

3.    Defendants Ignored The Red Flags Because Optimal U.S. Was "Very Profitable" ...................................................................... 43

4.    Defendants Knew How To Take Adequate Precautions With Respect To Custodial And Counterparty Risk In Other Contexts ........... 43

(a)    The 2002 Custodian And Administration Agreement .................. 43

(b)    The Currency Overlay Agreement................................. 44

C.    THE FALSE AND MISLEADING STATEMENTS IN THE EXPLANATORY MEMORANDA ........................................................ 46

1.    The July 2001 Explanatory Memorandum ................................. 46

2.    The May 2002 Explanatory Memorandum................................. 49

3.    The June 2004 Explanatory Memorandum................................. 49

4.  The October 2006 Explanatory Memorandum .......................................... 54

5.  The January 2008 Explanatory Memorandum........................................... 55

6.  The October 2008 Explanatory Memorandum .......................................... 56

7.  OIS Made The False Statements In The Explanatory Memoranda .......... 57

D.  DEFENDANTS MADE ADDITIONAL FALSE REPRESENTATIONS
    TO THE PIONEER PLAINTIFFS ...................................................................... 60

E.  DEFENDANTS' FALSE REPRESENTATIONS AND OMISSIONS IN
    MARKETING THE FUNDS................................................................................ 62

    1.  Defendants' False Representations and Omissions Regarding the
        Funds' Track Record of Profitability......................................................... 63

    2.  Defendants Operated As A Unitary Organization .................................... 66

        (a)  Santander U.S. Marketed And Sold Optimal U.S......................... 66

        (b)  Santander U.S. Officers Sold Optimal U.S. In Latin
             America........................................................................................... 67

        (c)  Santander U.S. Sent Communications And Information
             From Miami Even To Clients With Accounts Not With
             Santander U.S. ............................................................................... 68

        (d)  Santander U.S. Opened
             Bank Accounts In Bahamas and Switzerland ............................... 68

        (e)  Banco Santander Used Its Website To Promote OIS and
             Optimal U.S. .................................................................................. 69

        (f)  Banco Santander And Its Affiliates Oversaw Risk
             Management At OIS ....................................................................... 69

    3.  Santander U.S. Unjustly Profited From Optimal U.S.............................. 71

F.  CONDUCT BY THE DEFENDANTS IN 2008 INDICATES GROWING
    ALARM ABOUT MADOFF AND AN EFFORT TO CONCEAL
    DEFENDANTS' WRONGFUL CONDUCT ....................................................... 71

    1.  Santander U.S. And Bahamas Attempted (Unsuccessfully) To
        Avoid Liability For Optimal U.S. By Having Investors Sign
        Waivers ...................................................................................................... 71

    2.  Echeverria Left OIS In June 2008 And Banco Santander Sent A
        Director To Meet With Madoff On Thanksgiving Day 2008................... 73

3.      Banco Santander Settled The Claw Back Suit Filed By The Madoff
        Trustee Prematurely To Prevent The Release Of Incriminating
        Information ............................................................................................... 74

VII.    CLASS ACTION ALLEGATIONS ................................................................ 78

CAUSES OF ACTION .............................................................................................. 79

        COUNT I
        COMMON LAW FRAUD
        (Purchaser Claims) ........................................................................................ 79

        COUNT II
        COMMON LAW FRAUD
        (Holder Claims) ............................................................................................. 80

        COUNT III
        NEGLIGENT MISREPRESENTATION
        (Purchaser Claims) ........................................................................................ 83

        COUNT IV
        NEGLIGENT MISREPRESENTATION
        (Holder Claims) ............................................................................................. 84

        COUNT V
        GROSS NEGLIGENCE ................................................................................. 86

        COUNT VI
        BREACH OF FIDUCIARY DUTY ............................................................... 88

        COUNT VII
        AIDING AND ABETTING BREACH OF FIDUCIARY DUTY .................. 89

        COUNT VIII
        AIDING AND ABETTING FRAUD .............................................................. 90

        COUNT IX
        THIRD PARTY BENEFICIARY
        BREACH OF CONTRACT ............................................................................ 93

        COUNT X
        UNJUST ENRICHMENT .............................................................................. 94

        COUNT XI
        VIOLATION OF THE SECURITIES LAWS
        Section 10(b) of the Exchange Act and Rule 10b-5 ...................................... 94

1.    False And Misleading Statements And Omissions About the Split Strike Conversion Strategy ...................................................................... 96

2.    False And Misleading Statements And Omissions About Due Diligence For Optimal U.S. ...................................................................... 97

3.    False And Misleading Statements And Omissions About Madoff's Investments in U.S. Treasury Bills For Optimal U.S. ............................ 98

4.    False And Misleading Statements And Omissions About Optimal U.S.'s "Deposits" With Madoff for Optimal U.S. .................................... 99

5.    Misleading Statements And Omissions About The "Possibility" That Madoff Will Abscond With Optimal U.S.'s Assets ........................ 99

6.    Defendant Clark's False Statements ...................................................... 100

COUNT XII
VIOLATION OF THE SECURITIES LAWS
Section 20(a) of the Exchange Act .................................................................. 101

COUNT XIII
COMMON LAW FRAUD
(Alleged By Pioneer) ...................................................................................... 102

COUNT XIV
NEGLIGENT MISREPRESENTATION
(Alleged by Pioneer) ...................................................................................... 103

COUNT XV
GROSS NEGLIGENCE
(Alleged by Pioneer) ...................................................................................... 105

PRAYER FOR RELIEF ................................................................................ 106

JURY TRIAL DEMAND .............................................................................. 106

# GLOSSARY OF DEFINED TERMS

**Defined Term**                              **Definition**

ADRs....................................................American Depositary Receipts of Banco Santander
Trading on the New York Stock Exchange

AIMA....................................................Alternative Investment Management Association

Atkins...................................................Hugh-Burnaby Atkins

Banco Santander ...................................Defendant Banco Santander, S.A.

Bermuda Trust .......................................Bermuda Trust (Dublin) Limited

BMIS....................................................Bernard L. Madoff Investment Securities LLC

Botín.....................................................Emilio Botín

Broccoli.................................................Plaintiffs Solange and Gastón Broccoli

BSCH International.................................Santander Central Hispano International, the
predecessor entity to Santander U.S.

CA........................................................Custodian Agreement Dated November 28, 2002
between Bermuda Trust, Optimal U.S., Optimal
Arbitrage and Certain Other Optimal Funds (Ex. 9)

CAFA....................................................Class Action Fairness Act of 2005, 28 U.S.C. §
1332(d)(2)

CBOE....................................................The Chicago Board Options Exchange

Charul...................................................Marcelo Charul

Clark......................................................Defendant Jonathan Clark

Clark Report...........................................Report written by Clark in July 2006 (Ex. 3)

Class......................................................All Persons or Entities, Excluding Those Specified in
¶10, who (i) Owned Shares of Optimal U.S. on
December 10, 2008 or (ii) Purchased Shares of Optimal
U.S. During the Class Period and Were Damaged
Thereby

Class Period ...........................................From May 19, 2005 to December 10, 2008

Claw Back Lawsuits ................................Lawsuits the Madoff Trustee has Filed Against Feeder Funds for Refusing to Return Monies Withdrawn from BMIS

COA ......................................................Currency Overlay Agreement between Optimal Multiadvisors and Overlay Management (Ex. 10)

Courvoisier .............................................Karine Courvoisier

Courvoisier Memoranda .........................Two Internal Memoranda Written by OIS's In-House Counsel, Courvoisier (Exs. 1-2)

CR .........................................................Clark Report, Report Written by Clark in July 2006 (Ex. 3)

Currency Overlay Agreement .................Currency Overlay Agreement between Optimal Multiadvisors and Overlay Management (Ex. 10)

Custodian Agreement..............................Custodian Agreement Dated November 28, 2002 between Bermuda Trust, Optimal U.S., Optimal Arbitrage and Certain Other Optimal Funds (Ex. 9)

DDQ.......................................................AIMA's Illustrative Questionnaire For Due Diligence

DTC........................................................The Depository Trust & Clearing Corporation

EM..........................................................Explanatory Memorandum

Echeverría ..............................................Manuel Echeverría

Exchange Act ..........................................The Securities Exchange Act of 1934

FCM .......................................................First Courvoisier Memorandum, Memorandum Written by Courvoisier to Echeverría Regarding Legal Risks for the Group (Ex. 1)

First Courvoisier Memorandum...............Memorandum Written by Courvoisier to Echeverría Regarding Legal Risks for the Group (Ex. 1)

FOFIX-Madoff Results...........................Riskdata Analysis of Madoff's Supposed Split Strike Conversion Strategy Using FOFIX, Published February 9, 2009 (Ex. 8)

Fortis Bahamas.......................................Fortis Fund Services (Bahamas) Limited

Galinanes................................................Plaintiff Hugo Valentin Galinanes

Gauvain ..................................................Toby Gauvain

Goldblatt ................................................Mark Goldblatt

Gonen....................................................Dafna Gonen

Inder Rieden.............................................Anthony L.M. Inder Rieden

Investment Advisory..............................The Investment Advisory Business Unit of BMIS

Jaitly.....................................................Rajiv Jaitly

Jaitly Memorandum ................................Memorandum Prepared by Rajiv Jaitly Shortly After July 20, 2006 (Ex. 4)

January 2008 EM ....................................Explanatory Memorandum Dated January 2008 (Ex. 15)

January 2008 Presentation ......................Detailed presentation about Optimal U.S. made by OIS in January 2008 (Ex. 7)

JM ........................................................Jaitly Memorandum.  Memorandum Prepared by Rajiv Jaitly Shortly After July 20, 2006 (Ex. 4)

July 2001 EM..........................................Explanatory Memorandum Dated July 2001 (Ex. 11)

Julius Baer..............................................Banc Julius Baer in Geneva, Switzerland

June 2004 EM .........................................Explanatory Memorandum Dated June 2004 (Ex. 13)

KMR law Firm.........................................Katten Muchin Rosenman LLP

Madoff....................................................Bernard L. Madoff

Madoff Trustee........................................Irving H. Picard

May 2002 EM ..........................................Explanatory Memorandum Dated May 2002 (Ex. 12)

Mr. Picard ..............................................Irving H. Picard

NASD......................................................National Association of Securities Dealers, Inc.

October 2006 EM.....................................Explanatory Memorandum Dated October 2006 (Ex. 14)

October 2008 EM.....................................Explanatory Memorandum Dated October 2008 (Ex. 16)

OIM........................................................Optimal Investment Management Ltd.

OIS ........................................................Defendant Optimal Investment Services, S.A.

Optimal Arbitrage .....................................Optimal Arbitrage Ltd.

Optimal Multiadvisors .............................Optimal Multiadvisors Ltd.

Optimal U.S. ............................................Optimal Strategic U.S. Equity Ltd.

Optimal U.S. 3Q'08 Report .....................OIS Report for Optimal U.S. for the Quarter Ending
                                                                          September 30, 2008 (Ex. 18)
Optimal U.S.
October 2008 Presentation.......................October 2008 Optimal U.S. Presentation Entitled
                                                                          "Optimal Investment Services: Optimal Strategic US
                                                                          Equity" (Ex. 21)

Overlay Management...............................Overlay Asset Management S.A.

Pars..........................................................Ayca Pars

Participating Shares ................................Non-Voting Participating Shares Offered by Optimal
                                                                          Multiadvisors in Optimal U.S.

Pioneer ....................................................Plaintiff Pioneer International Ltd.

Pioneer Plaintiffs.....................................Plaintiffs Abraham and Mina Rembaum, Alberto and
                                                                          Angela Bellow, AM Pharmatec Planning and
                                                                          Engineering, Anvey Zion Holdings 1999 Bayshore 11B
                                                                          S.A., Catherine Irit Geron, Catherine Said, Turtlecreek,
                                                                          David and Naomi Noam, Dov Goldwyn, FTC as
                                                                          Trustee of 18 Trust, Adelaide Trust, Matilde Trust,
                                                                          Buds Trust, Judge Trust, Man on the Moon Trust, Max
                                                                          2 Trust, Mazal Trust, Mirage Trust, Nifla Trust, Posp
                                                                          Trust, Sonia Trust, Vivien Trust, and FTC Rosslina
                                                                          Properties, Gal and Michal Nachson, Giftline
                                                                          Operations Inc. Ltd., Gloria Arredondo, Gohan
                                                                          Investments Ltd., Jacqueline Taub, Flamenco
                                                                          Investments Ltd., Trust, Meir Feder, Michal Tulpan,
                                                                          Moshe Scheuer, NIG Engineers Ltd, Nili Gold, Rami
                                                                          and Yael Lipman, Robin Sand, Ruth Tamir, Stuart and
                                                                          Jean Lipman, Wine Divine C.V., Yair and Channa
                                                                          Sharef, Zeev and Yafa Mark, Panacota, Dipreca,
                                                                          Penseys Limited, Kittlebrook Ltd, Ana Stroh, and
                                                                          Pimos.

Prince ......................................................Gilles Prince

Plaintiffs..................................................Plaintiffs Broccoli, Galinanes, and Silvana, together
                                                                          with the Pioneer Plaintiffs

PSLRA ....................................................Private Securities Litigation Reform Act, 15 U.S.C. §78u-4 et seq.

PwC........................................................PricewaterhouseCoopers LLP

S&P 100 ..................................................The Standard & Poor's 100

Sacerdote................................................Diego Sacerdote

Santander Bahamas..................................Santander Bank & Trust Ltd.

Santander Investment...............................Santander Investment Securities, Inc.

Santander U.S. .........................................Defendant Banco Santander International

Santander Switzerland .............................Banco Santander (Suisse) S.A.

SCM ........................................................Second Courvoisier Memorandum, Memorandum from Courvoisier to Echeverría Regarding Meeting with Madoff September 18-19, 2002 (Ex. 2)

Second Courvoisier Memorandum ..........Memorandum from Courvoisier to Echeverría Regarding Meeting with Madoff September 18-19, 2002 (Ex. 2)

SEC ........................................................Securities and Exchange Commission

Silvana ...................................................Plaintiff Silvana Worldwide Corp.

Suárez.....................................................Daniel Suárez

Tamir......................................................David Tamir

Trustee Kingate Action ...........................*Irving H. Picard v. Kingate Global Fund, Ltd. et al.*, No. 08-01789, Adv. Pro. No. 09-1161 (Bankr. S.D.N.Y.)

Waiver....................................................2008 Waiver sent to Private Banking Clients invested in Optimal U.S. Purporting to Ratify Madoff as the Sole Manager (Ex. 29)

Waterhouse .............................................Patricio Waterhouse

Zihnali ....................................................Balkir Zihnali

2005 DDQ................................................2005 Due Diligence Questionnaire (Ex. 5)

2008 DDQ................................................2008 Due Diligence Questionnaire (Ex. 6)

Plaintiffs, individually and on behalf of all others similarly situated, by and through their counsel, allege the following based upon personal knowledge and counsel's investigation.

## I.  NATURE OF THE ACTION

1.  This case arises from Plaintiffs' investments with Bernard L. Madoff ("Madoff") and his firm Bernard L. Madoff Investment Securities LLC ("BMIS").[1]

2.  Plaintiffs invested in a so-called Madoff feeder fund named Optimal Strategic U.S. Equity Fund ("Optimal U.S."), which was purportedly limited to investments in U.S. securities.  Optimal U.S., however, was nothing more than a pass-through vehicle which invested one-hundred percent of its assets with Madoff.  It had no employees, offices, or operations of its own.  When the Madoff's Ponzi scheme unraveled, the fund's $3.2 billion in assets simply vanished.

3.  Optimal U.S. was created, controlled, and managed by subsidiaries of Defendant Banco Santander, S.A. ("Banco Santander").   Banco Santander is the parent company of one of the largest financial conglomerates in the world with over 100,000 employees ("Grupo Santander").  Grupo Santander, which is not a Defendant, conducts its vast international business through numerous subsidiaries, which it controls by selecting their officers, appointing their directors, and owning all or a majority of the voting shares.

4.  One of the critical subsidiaries of Banco Santander at issue here was Defendant Optimal Investment Services, S.A. ("OIS"), which served as the investment manager of Optimal U.S.  Optimal U.S.'s investment in Madoff dated back to the late 1990's and was initiated by Manuel Echeverría ("Echeverría").  Echeverría at the time was the head of Banco Santander's International Private Banking Division's Portfolio Management and Fund Management Group.

---

[1]     "Plaintiffs" refers to all plaintiffs except Pioneer International Ltd. ("Pioneer").

Echeverría is currently facing criminal charges in Switzerland for "criminal mismanagement" in connection with Optimal U.S.'s investment with Madoff.

5.      In 2001, the International Private Banking Division was renamed OIS, and established as a subsidiary, rather than merely an unincorporated entity.  Echeverría received the new title of "Chief Executive Officer of Optimal Investment Services."  Nevertheless, there was no change in the management and control of OIS's investments with Madoff through Optimal U.S.  The same few employees continued to perform the same limited functions necessary to raise money and transfer it to Madoff.  Besides a new name and title, functionally little, if anything, changed.

6.      As had been the case from inception, Defendants continued to abdicate all investment management functions over Optimal U.S. while charging full management fees of millions of dollars per year.   Suspiciously, Madoff did not charge any fees for managing the $3.2 billion Optimal U.S. fund.  Pursuant to industry standards, however, Madoff could have charged tens of millions of dollars every year.

7.      Defendants ignored this obvious red flag, driven by their intent to profiteer and preserve this self-serving arrangement.  Instead of asking questions and demanding answers regarding Madoff's failure to charge advisory fees along with a plethora of other irregular practices alleged below, Defendants turned a blind eye for more than a decade.

8.      At the same time that Defendants failed to conduct any meaningful due diligence, they made false representations to the contrary.  The offering documents for Optimal U.S. contained numerous false and misleading statements concerning Defendants' supposedly careful due diligence and close supervision of Madoff's operation.  Defendants also made similar verbal statements to the "Pioneer Plaintiffs" (defined below at ¶¶ 12-59).  Because of these false

statements and wrongful conduct, Plaintiffs invested their monies in Optimal U.S., which they have now lost.  Pioneer, as the investment advisor who recommended that the Pioneer Plaintiffs invest in Optimal U.S. based on Defendants' misrepresentations, suffered substantial reputational damage and loss of business.

9.      Accordingly, Plaintiffs sue Defendants here for violations of the Federal Securities Laws, as well as New York State Law.  Specifically, Plaintiffs assert common law claims, *inter alia*, for fraud, negligent misrepresentation, breach of fiduciary duty, gross negligence, and unjust enrichment, as well as, claims under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b5, promulgated thereunder.

10.      Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of all persons or entities who, (i) owned shares of Optimal U.S. on December 10, 2008, or (ii) purchased shares of Optimal U.S. from May 19, 2005, to December 10, 2008 (the "Class Period"), and were damaged thereby (the "Class"). Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, assigns, or immediate family members of any such individual or entity.

## II.      THE PARTIES

### A.      PLAINTIFFS

11.      **Pioneer International Ltd.** ("Pioneer") is incorporated in the British Virgin Islands and its principal headquarters are located in Hertzlia, Israel.  Each of the Pioneer Plaintiffs invested in Optimal U.S. pursuant to an investment advisory agreement with Pioneer, and based on the advice provided by Pioneer, which was based on Defendants' misrepresentations.  These investments were made from the Pioneer Plaintiffs' bank accounts at

Banc Julius Baer in Geneva, Switzerland ("Julius Baer").  While the Pioneer Plaintiffs have standing to bring direct claims as the ultimate parties in interest who bore the ultimate loss, the Pioneer Plaintiffs have also obtained assignments of all claims from Julius Baer to avoid any doubt that they, collectively and individually, are entitled to bring this action.

12.     Plaintiffs **Abraham and Mina Rembaum** are residents of Colombia and invested in Optimal U.S. on or about July 23, 2008.

13.     Plaintiffs **Alberto and Angela Bellow** are residents of Colombia and invested in Optimal U.S. on or about January 29, 2008.

14.     Plaintiff **AM Pharmatec Planning and Engineering** is a resident of Israel and invested in Optimal U.S. on or about November 30, 2007.

15.     Plaintiff **Anvey Zion Holdings 1999** is a resident of Israel and invested in Optimal U.S. on or about November 28, 2007.

16.     Plaintiff **Bayshore 11B S.A.** is a resident of Panama and invested in Optimal U.S. on or about July 26, 2007.

17.     Plaintiff **Catherine Irit Geron** is a resident of Israel and invested in Optimal U.S. on or about November 20, 2007.

18.     Plaintiff **Catherine Said** is a resident of Israel and invested in Optimal U.S. on or about December 1, 2008.

19.     Plaintiff **Turtlecreek** is a resident of the British Virgin Islands and invested in Optimal U.S. on or about August 27, 2008.

20.     Plaintiffs **David and Naomi Noam** are residents of Israel and invested in Optimal U.S. on or about August 27, 2008.

21.     Plaintiff **Dov Goldwyn** is a resident of Israel and invested in Optimal U.S. on or about April 28, 2008.

22.     Plaintiff **FTC as Trustees of 18 Trust** is a resident of the Island of Guernsey and invested in Optimal U.S. on or about January 29, 2008.

23.     Plaintiff **Adelaide Trust** is a resident of the Island of Guernsey and invested in Optimal U.S. on or about June 26, 2008.

24.     Plaintiff **Matilde Trust** is a resident of the Island of Guernsey and invested in Optimal U.S. on or about July 27, 2007.

25.     Plaintiff **Buds Trust** is a resident of the Island of Guernsey and invested in Optimal U.S. on or about June 26, 2008.

26.     Plaintiff **Judge Trust** is a resident of the Island of Guernsey and invested in Optimal U.S. on or about August 27, 2008.

27.     Plaintiff **Man on the Moon Trust** is a resident of the Island of Guernsey and invested in Optimal U.S. on or about December 27, 2007.

28.     Plaintiff **Max 2 Trust** is a resident of the Island of Guernsey and invested in Optimal U.S. on or about February 27, 2008.

29.     Plaintiff **Mazal Trust** is a resident of the Island of Guernsey and invested in Optimal U.S. on or about April 16, 2008.

30.     Plaintiff **Mirage Trust** is a resident of the Island of Guernsey and invested in Optimal U.S. on or about October 29, 2007.

31.     Plaintiff **Nifla Trust** is a resident of the Island of Guernsey and invested in Optimal U.S. on or about October 29, 2007.

32.     Plaintiff **Posp Trust** is a resident of the Island of Guernsey and invested in Optimal U.S. on or about December 27, 2007.

33.     Plaintiff **Sonia Trust** is a resident of the Island of Guernsey and invested in Optimal U.S. on or about March 27, 2008.

34.     Plaintiff **Vivien Trust** is a resident of the Island of Guernsey and invested in Optimal U.S. on or about January 29, 2008.

35.     Plaintiff **FTC Rosslina Properties** is a resident of the British Virgin Islands and invested in Optimal U.S. on or about April 26, 2007.

36.     Plaintiffs **Gal and Michal Nachson** are residents of Israel and invested in Optimal U.S. on or about April 28, 2008.

37.     Plaintiff **Giftline Operations Inc. Ltd.** is a resident of the British Virgin Islands and invested in Optimal U.S. on or about November 30, 2007.

38.     Plaintiff **Gloria Arredondo** is a resident of Mexico and invested in Optimal U.S. on or about April 28, 2008.

39.     Plaintiff **Gohan Investments Ltd.** is a resident of Israel and invested in Optimal U.S. on or about July 27, 2007.

40.     Plaintiff **Jacqueline Taub** is a resident of Israel and invested in Optimal U.S. on or about August 27, 2008.

41.     Plaintiff **Flamenco Investments Ltd**. is a resident of Switzerland and invested in Optimal U.S. on or about March 28, 2007.

42.     Plaintiff **Meir Feder** is a resident of Israel and invested in Optimal U.S. on or about September 26, 2008.

43.     Plaintiff **Michal Tulpan** is a resident of Israel and invested in Optimal U.S. on or about July 28, 2008.

44.     Plaintiff **Moshe Scheuer** is a resident of Israel and invested in Optimal U.S. on or about July 25, 2008.

45.     Plaintiff **NIG Engineers Ltd.** is a resident of Israel and invested in Optimal U.S. on or about November 30, 2007.

46.     Plaintiff **Nili Gold** is a resident of Israel and invested in Optimal U.S. on or about June 26, 2008.

47.     Plaintiffs **Rami and Yael Lipman** are residents of Israel and invested in Optimal U.S. on or about July 27, 2007 and June 26, 2008.

48.     Plaintiff **Robin Sand** is a resident of Israel and invested in Optimal U.S. on or about December 24, 2007.

49.     Plaintiff **Ruth Tamir** is a resident of Israel and invested in Optimal U.S. on or about August 13, 2008.

50.     Plaintiffs **Stuart and Jean Lipman** are residents of Israel and invested in Optimal U.S. on or about January 29, 2008.

51.     Plaintiff **Wine Divine C.V.** is a resident of The Netherlands and invested in Optimal U.S. on or about August 27, 2008.

52.     Plaintiffs **Yair and Channa Sharef** are residents of Israel and invested in Optimal U.S. on or about August 27, 2008.

53.     Plaintiffs **Zeev and Yafa Mark** are residents of Israel and invested in Optimal U.S. on or about August 27, 2008.

54.     Plaintiff **Panacota** is a resident of Colombia and invested in Optimal U.S. on or about September 3, 2008.

55.     Plaintiff **Dipreca** is a resident of Colombia and invested in Optimal U.S. on or about May 3, 2008.

56.     Plaintiff **Penseys Limited** is a resident of the Island of Jersey and invested in Optimal U.S. on or about June 26, 2008.

57.     Plaintiff **Kittlebrook Ltd.** is a resident of the British Virgin Islands and invested in Optimal U.S. on or about December 27, 2007.

58.     Plaintiff **Ana Stroh** is a resident of Israel and invested in Optimal U.S. on or about May 28, 2008.

59.     Plaintiff **Pimos** is a resident of the British Virgin Islands and invested in Optimal U.S. on or about July 28, 2008.

60.     The foregoing Plaintiffs referenced in paragraphs 12-59 are collectively referred to as the "Pioneer Plaintiffs."

61.     The Pioneer Plaintiffs attach copies of their certifications setting forth their transactions in Optimal U.S. as required by the Private Securities Litigation Reform Act, 15 U.S.C. §78u-4 et seq. ("PSLRA").  Due to the activities alleged herein, the Pioneer Plaintiffs have lost all, or substantially all, of their investment in Optimal U.S., and have paid substantial advisory fees for illusory services.

62.     Plaintiffs **Solange and Gastón Broccoli** ("Broccoli") are foreign citizens, and not United States residents, who invested in Optimal U.S.   Santander U.S. (defined below at ¶ 67) and its agents, induced Plaintiffs Broccoli to invest in Optimal U.S.  A copy of Plaintiffs Broccoli's certifications setting forth their transactions in Optimal U.S. are attached hereto as

required by the PSLRA.  Due to the activities alleged herein, Plaintiffs Broccoli lost all, or substantially all, of their investments in Optimal U.S., and paid substantial advisory fees for illusory services.

63.     Plaintiff, **Hugo Valentin Galinanes** ("Galinanes"), is a foreign citizen, and not a United States resident, who invested in Optimal U.S.  Santander U.S., and its agents, induced Plaintiff Galinanes to invest in Optimal U.S.  This investment occurred before the Class Period and therefore does not form the basis for any Exchange Act claims, only common law claims. Due to the activities alleged herein, Plaintiff Galinanes lost all, or substantially all, of his investment in Optimal U.S., and paid substantial advisory fees for illusory services.

64.     Plaintiff **Silvana Worldwide Corp.** ("Silvana") is, and was at all relevant times hereto, incorporated in Panama.  Silvana invested in Optimal U.S. on or about March 12, 2008. These investments were made from Silvana's bank account at Dresdner Bank in Switzerland.  A copy of Silvana's certification setting forth its transactions in Optimal U.S. is attached hereto as required by the PSLRA.

65.     Plaintiffs Broccoli, Galinanes, and Silvana, together with the Pioneer Plaintiffs, are referred to herein as "Plaintiffs."

**B.     DEFENDANTS**

66.     Defendant **Banco Santander, S.A.** ("Banco Santander") is the parent company of Grupo Santander, the largest financial institution in Spain, and one of the largest financial conglomerates in the world.  Its headquarters are located in Madrid, Spain.  Through wholly-owned subsidiaries, Banco Santander has hundreds of offices in the United States, including Miami, New York, Houston, Los Angeles, San Diego and Seattle.

(a)     Banco Santander has submitted annual reports to the Securities and Exchange Commission (the "SEC") since 1999 by filing Form 20-F pursuant to the Exchange

Act.  As set forth in the Form 20-F filed on June 30, 2009, for the annual period ending

December 31, 2008, Banco Santander had three different securities registered with the SEC: (i)

American Depositary Receipts, each representing the right to receive one Share of Capital Stock

of Santander ("ADRs"), (ii) shares of Capital Stock, and (iii) Non-cumulative guaranteed

preferred stock of Santander Finance.  The ADRs trade on the New York Stock Exchange.

There were 8.0 billion shares of capital stock outstanding as of December 31, 2008.

   (b) Banco Santander has permanent offices located at 45 East 53rd Street,

New York, New York 10022, and according to its Form 20-F for the period ending December

31, 2007 and filed June 30, 2008, had "significant operations in New York."

   (c) An SEC No Action Letter, dated August 18, 2008, states that Banco

Santander also conducts securities business in the continental United States through Santander

Investment Securities Inc., Banesto Securities, Inc., and Abbey National Securities, Inc.

   (d) Banco Santander has at least 28 different subsidiaries in the United States,

as set forth in its 2007 Form 20-F.

   (e) On January 30, 2009, Banco Santander acquired Sovereign Bank.

Sovereign Bank was the 19th largest financial institution in the Unites States, by assets, as of

December 31, 2007.  Sovereign Bank's current home page on the Internet, at the top and in a

bold red box, prominently displays the Santander logo next to the "Santander" name.   Sovereign

has 750 branches and 2,300 ATMs in the United States.

   67. Defendant **Banco Santander International** ("Santander U.S.") is a wholly-

owned subsidiary of Banco Santander.  It conducts business in the United States as an Edge Act

corporation organized under Section 25A of the Federal Reserve Act, 12 U.S.C. §§ 611 et seq.

Santander U.S. is supervised by the Federal Reserve Board.  Its headquarters are in Miami, at

1401 Brickell Avenue, Miami, Florida 33131.  It also has offices in New York, Houston, Los Angeles, San Diego, and Seattle.  In 2007, it earned $233 million in net income, had total assets of $42 billion, and had loans outstanding of approximately $32 billion.

68.     Defendant **Optimal Investment Management Services, S.A.** ("OIS") is an investment management company, incorporated in Switzerland in July 2001, with almost $10 billion in assets under management as of January 7, 2008.  OIS is a wholly-owned subsidiary of Banco Santander.  OIS's principal offices are located at 5-7 Rue Ami-Lévrier, CH-1201, Geneva, Switzerland, with additional offices located in New York, Miami, and Madrid.  OIS was, and continues to be, the investment manager for Optimal U.S.

69.     Defendant **Jonathan Clark** ("Clark") was employed in New York by OIS and Santander Investment Securities, Inc. ("Santander Investment") from mid-2003 until mid-2008. Clark was hired in 2003 to monitor Madoff.  Clark reported to Hugh-Burnaby Atkins ("Atkins") and Echeverría.  Atkins was the head of OIS's New York office.  Clark, together with Atkins and the rest of the New York office, handled Optimal U.S. day-to-day.  Upon information and belief, Clark carries a United States passport, is currently employed in New York City, and resides in New Jersey.

## III.     RELEVANT NON-PARTIES

70.     Optimal Multiadvisors, Ltd. ("Optimal Multiadvisors"), which is not a Defendant in this action, was incorporated in 1995 as an International Business Company under the laws of the Commonwealth of the Bahamas.  Optimal Multiadvisors is an investment fund classified as a Standard Fund pursuant to the provisions of the Investment Funds Act and Regulations of the Bahamas.  The registered address of Optimal Multiadvisors is Fort Nassau Centre, Marlborough Street, P.O. Box N-4875, Nassau, Bahamas.

71.     OIS controlled Optimal Multiadvisors through its ownership of all ordinary voting shares (the "Ordinary Shares").  The Ordinary Shares did not entitle OIS to an economic return based on the investment with Madoff.

72.     Optimal U.S. and Optimal Arbitrage Ltd., which are not Defendants in this action, are Trading Companies of Optimal Multiadvisors (effectively, sub funds).  Optimal Multiadvisors offered non-voting participating shares ("Participating Shares") in Optimal U.S. to Plaintiffs and other similarly situated investors.  These Participating Shares constituted a pass-through economic interest proportional to the Plaintiff's investment with Madoff.

## IV.     JURISDICTION AND VENUE

73.     This Court has jurisdiction over the Exchange Act claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

74.     This Court has jurisdiction over the state law claims pursuant to:

(a)     the Court's supplemental jurisdiction, 28 U.S.C. § 1367(a); and

(b)     the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) ("CAFA").

With respect to CAFA, (i) the amount in controversy exceeds the jurisdictional amount of $5,000,000, (ii) the Class consists of hundreds, and perhaps thousands of individuals, and (iii) at least one Plaintiff is a citizen of a foreign state and one Defendant is a citizen of a State.

75.     This Court has subject matter jurisdiction pursuant to Section 632 of the Edge Act, 12 U.S.C. § 632, which provides that,

> Notwithstanding any other provision of law, all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking, or banking in a dependency or insular possession of the United States, or out of other international or foreign financial operations, either directly or through the agency, ownership, or control of branches or local institutions in dependencies or insular possessions of the United States or in foreign countries, shall be

deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits.

76.     This action meets all the elements required by § 632.  Plaintiffs assert common law claims.  Santander U.S. is an Edge Act banking corporation organized under Section 25A of the Federal Reserve Act, 12 U.S.C. §§ 611 et seq.   And the suit herein arises out of transactions involving international or foreign financial operations.  Accordingly, this Court has original jurisdiction of all common law claims which are deemed to arise under the laws of the United States.

77.     This Court has personal jurisdiction over all Defendants because all Defendants:

(a)     have systematic and continuous contacts with New York, including:

(i)     maintaining offices in New York;

(ii)    being citizens of New York;

(iii)   establishing investment accounts with BMIS in New York;

(iv)    maintaining ongoing investment activity in BMIS accounts, including transferring all of Plaintiffs' investments to BMIS in New York as custodian of such assets;

(v)     making telephone calls, faxing and mailing documents and directing computer and internet communications to New York;

(vi)    receiving fees derived from the foregoing activity conducted in New York; or

(b)     are subject to New York's long-arm statute, N.Y. C.P.L.R. § 302, because Defendants transacted business in New York concerning the allegations in this Complaint and purposefully availed themselves of the privilege of conducting activities in this forum.

78.     Banco Santander and OIS are also subject to personal jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(2), commonly referred to as the federal long-arm statute.

79.     The exercise of personal jurisdiction over the Defendants by this Court is appropriate and will not offend traditional notions of fair play and substantial justice because each of the Defendants had sufficient minimum contacts with New York.

80.     Venue in this judicial District is proper pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because substantial acts in furtherance of the alleged wrongdoing and/or its effects have occurred within this District.  Additionally, Defendants maintain offices and conduct substantial business in this District.

## V.     BACKGROUND FACTS

81.     Madoff operated a stock brokerage business named Bernard Madoff Investment Services LLC ("BMIS") of which he was chairman and chief executive officer.  Madoff ran BMIS mainly through his family, including his brother Peter, and sons Andrew and Marc. Madoff raised billions of dollars under the guise of operating an investment fund which he kept secret from the U.S. government as detailed below.

82.     The investment fund purportedly invested using a split strike conversion strategy. The strategy involved the purchase and sale of equity securities and options.  Although investors in the investment advisory business received monthly or quarterly statements purportedly showing the value of their investments, as well as the growth of and profit from those accounts over time, these statements were a complete fabrication.  There is no record of BMIS or Madoff having cleared a single purchase or sale of securities at the major clearing house in the country – the Depository Trust & Clearing Corporation ("DTC") – or any other trading platform on which BMIS could have reasonably traded securities.

83.     Additionally, there is no evidence that Madoff or BMIS ever purchased or sold any of the options reported to BMIS's investment advisory investors.  Options related to the Standard & Poor's 100 ("S&P 100") companies are typically traded on the Chicago Board

Options Exchange ("CBOE").  There are no records of Madoff or BMIS ever having purchased or sold any options on the CBOE.

84.     On December 11, 2008, federal authorities arrested Madoff and charged him with violations of the securities laws after he admitted that his investment advisory operation was "a giant Ponzi scheme."  Madoff subsequently pled guilty to an 11-count criminal indictment and has been sentenced to serve 150 years in prison.

## VI.     SUBSTANTIVE ALLEGATIONS

85.     Optimal U.S. began investing Plaintiffs' assets with Madoff in the late 1990s based on Echeverría's relationship with Madoff.  Over the years, Echeverría continued to increase the funds under management with Madoff as Echeverría's meetings and visits to Madoff's offices cemented the relationship.   Based on these meetings and visits, however, Defendants learned of numerous red flags which had raised serious concerns.  Yet, Defendants never communicated to Plaintiffs the red flags they had discovered and, instead, concealed Defendants' serious concerns from Plaintiffs.

### A.     DEFENDANTS CONCEALED NUMEROUS INDICIA OF FRAUD FROM PLAINTIFFS AND FAILED TO PERFORM THE DUE DILIGENCE AGREED TO IN THE OFFERING DOCUMENTS

#### 1.     Defendants Did Not Disclose That Madoff Was Concealing His Advisory Business From The SEC

86.     Defendants knew while soliciting, accepting, and transferring Plaintiffs' monies to Madoff that Madoff had defrauded the SEC by concealing the existence of his investment advisory business and purportedly multi-billion dollar fund.

87.     Madoff concealed that he acted as an investment advisor by not registering with the SEC despite the requirement to do so.  Pursuant to the Investor Advisors Act of 1940, 15 U.S. Code, Sec. 80a-1, *et seq.*, a person who advises others "as to the advisability of investing in,

purchasing, or selling securities" with $25 million or more under management is required to register as an "investment advisor" with the SEC.  An investment advisor must also file quarterly "F-13" reports listing all securities owned.

88.     Defendants' knowledge of Madoff's ongoing fraud on the SEC was evidenced in internal memoranda prepared by OIS.  In September 2002, Banco Santander ordered OIS to send a team to investigate and meet with Madoff and a number of New York law firms.  The investigation resulted in at least two internal memoranda written by OIS in-house counsel, Karine Courvoisier ("Courvoisier"), and addressed to Echeverría (the "Courvoisier Memoranda") (Exs. 1 and 2).[2]

89.     The two Courvoisier Memoranda bracketed a visit to Madoff in New York by OIS representatives on September 18 and 19, 2002.  The First Courvoisier Memorandum ("FCM") was written before the visit and the Second Courvoisier Memorandum afterwards ("SCM," together with FCM the "Courvoisier Memoranda").  The memoranda were prepared on letterhead of OIS and Santander Central Hispano – the predecessor to the Santander Group.

90.     The issues raised in the memoranda went to the heart of Madoff's Ponzi scheme, among other things, because they raised questions about the existence of the assets supposedly held by Madoff.  For example, one of the numerous irregularities identified in Madoff's operation included Madoff's denial of his role as an investment adviser and his failure to register with the SEC.

> Madoff insists he does not act as an investment adviser and therefore he/[BMIS] is not a registered investment adviser with the SEC.
>
> (SCM, Ex. 2 at 1).

---

[2]     Plaintiffs have concurrently filed herewith a "Compendium of Exhibits to the Second Amended Class Action Complaint."  All Exhibits ("Ex.") are in the Compendium.

91.     Courvoisier then explained that to avoid the SEC reporting requirements for investment advisors, especially the requirement to list the securities owned (of which there were none), Madoff claimed that he operated exclusively a securities "brokerage business," and that any investment advice given to clients was "solely incidental" to the conduct of his business as a broker." (SCM, Ex. 2 at 1).  This was simply false.  While a broker must receive client instructions to execute trades, Madoff had complete control over Optimal U.S.'s investments and did not consult or inform Defendants of the supposed transactions.  Defendants never ordered, directed, nor suggested, a single trade to Madoff.  In fact, Madoff did not inform Defendants of the trades he supposedly executed on behalf of Optimal U.S. until days after execution.

92.     Defendants understood for another reason that Madoff's excuse as to why he was not an investment advisor was false or, at best, seriously doubtful.  Madoff himself represented to Defendants that the brokerage business (which was real and not fictitious) was separate from the investments made on behalf of Optimal U.S. and the other feeder funds, which were part of the advisory business.

93.     Moreover, U.S. counsel who was consulted by OIS advised Defendants that Defendants needed a legal opinion from Madoff's counsel that Madoff did not need to register as an investment advisor.  (SCM, Ex. 2 at 5-6).  Despite all this, Madoff refused to register as an investment advisor.  Defendants understood that, in so doing, Madoff was evading the requirement that he file quarterly reports of all securities holdings, which is required for all investment advisors.  Defendants did not disclose their knowledge of Madoff's fraud on the SEC to investors, nor did Defendants disclose that they had serious concerns about Madoff's registration status with the SEC.

**2.** **Defendants Did Not Disclose Madoff's Inexplicable Demand for Secrecy**

94.     Just as Madoff concealed the existence of his fund from the SEC, Madoff insisted

that Optimal U.S. not reveal his name to Plaintiffs, and that Defendants not disclose his name in

any of their prospectuses or other documents.  Courvoisier highlighted this alarming fact in her

first memorandum:

> It should be noted that Madoff is very secretive. . . . Madoff does
> not permit any customer, including us, to disclose his/[BMIS's]
> name.

> (FCM, Ex. 1 at 1).

95.     Whereas other investment funds take steps to publicize themselves and strive to

create a "buzz" among investors to promote business, Madoff inexplicably took extreme steps to

keep his fund secret.  Madoff had no website, promotional materials, brochures, or even

prospectuses.  Written marketing or explanatory materials relating to Madoff simply did not

exist.  There was no trace.

96.     There is no plausible, legitimate reason for an investment advisor with

presumably billions under management to have no written promotional materials or web site, and

to insist that investors keep the fact of their investment with him secret.  For this reason,

Defendants were concerned about Madoff's secrecy:

> **Our primary main concern is that Madoff did not permit any
> customer – including us – to disclose his/[BMIS's] name in any
> prospectus, financial statements, etc.**

> (SCM, Ex. 2 at 3) (emphasis added).

97.     Defendants, however, never sought an explanation.

98.     Indeed, years later, another OIS employee conducted further due diligence on

Madoff and wrote another report which continued to raise concerns about Madoff's secrecy.  In

July 2006, Defendant Jonathan Clark wrote a report for Defendants in which he "collect[ed]
work done over the last two years researching Madoff Securities and its counterparties on
organizational aspects." (the "Clark Report," CR, Ex. 3 at 1).  The Clark Report was prepared in
New York where Defendant Clark worked in the offices of Defendant Banco Santander, as
evidenced by the 212-area code listed on the front page, and the New York email address,
ois@schny.com.  *Id.*

99.     In his report, Defendant Clark noted as the first item under the heading
"**Summary areas of potential risk**," that Madoff's operation was "**shrouded in secrecy**." (CR,
Ex. 3 at 1) (emphasis added).  Defendants never disclosed to Plaintiffs that Defendants were
entrusting Plaintiffs' funds to an operation "shrouded in secrecy."

100.    Yet, Defendants understood that Madoff's demand that Defendants keep his name
secret, together with the lack of written materials, allowed Madoff to conceal the existence of his
advisory business from the SEC.

### 3.     Defendants Did Not Disclose That Madoff Did Not Charge An Investment Management Fee, Implausibly Foregoing Millions In Advisory Fees

101.    Madoff did not charge lucrative investment advisory fees.  Whereas investment
managers in hedge funds nearly always charge a fee based on a percentage of assets managed
and a percentage of profits, Madoff charged neither.  These fees are commonly referred as to
2/20 – that is, 2% of assets under management and 20% of profits.  On Optimal U.S.'s $3.2
billion investment alone, Madoff was relinquishing $64 million annually, simply counting the
2% assets under management fee.   And this, in a privately held company.

102.    Courvoisier alerted Echeverría to the fact that Madoff did not charge the Optimal
Funds for supposedly managing billions of dollars of client funds: "[Madoff] is not paid any kind
of advisory, management or performance fee." (SCM, Ex. 2 at 1).

103.     Madoff's failure to charge an investment management fee was a red flag that something was seriously amiss – especially because Defendants understood the reasons Madoff did not charge an investment advisory fee: (i) to conceal from the SEC that he was acting as an investment advisor, and (ii) to enable Defendants and the other feeder funds to pocket all management fees, thereby motivating feeder funds to continue investing with Madoff.

104.     Defendants did not disclose to investors that Defendants had invested their funds with an individual who did not charge any fee for managing billions of dollars.

> **4.     Defendants Were Aware That Madoff Acted As Investment Advisor, Broker, And Custodian – A Combination Which Was Highly Irregular**

105.     Madoff's operating structure was highly irregular in that a single party purportedly played all three primary financial and fiduciary roles.  Madoff claimed to direct the investment of the monies, execute trades, and act as custodian of monies and assets of the fund, leaving the fund with no third party oversight.

106.     Although in some instances the investment advisor and broker-dealer functions are combined in a single party, it is unheard of, and a profound departure from generally accepted industry standards of care, to combine these two functions with custody of the assets.

107.     Basic requirements for fund of funds, which invest in other funds, such as Optimal U.S., is third party oversight and cross-checks to avoid significant reliance upon the honesty of a single person.  As renowned securities expert and Columbia Law School Professor John Coffee said, "[b]eing your own custodian violates the first rule of common sense, you can't be your own watchdog."

108.     In addition, because BMIS was also a broker-dealer, BMIS generated its own trading confirmations for investors as well.  By combining the broker-dealer entity with an investment custodian, BMIS created an insulated, self-sustaining financial enterprise which

generated all reporting to its investors – including Optimal U.S. – without any third-party
oversight.

109.    As set forth in the Second Courvoisier Memorandum, Banco Santander and OIS
were well aware that Madoff's self-custody was a highly unusual arrangement, which made it
virtually impossible to verify the existence of assets as well as the integrity of the account
statements issued by BMIS.  In a section titled "Custody/Segregation of Assets," the
memorandum said:

> When asked why we could not custody the securities with an
> external custodian, Madoff replies that logistically it would have
> been impossible for him to ensure errorless delivery ["Delivery
> Risk"].  In executing sell orders he would need to have physical
> control of the assets, and if the assets were somewhere else, there
> could be delays (as he actively trades) and additional costs.
>
> Another reason for being his own custodian is that he does not
> want anybody to know when he is in the market and to be able to
> copy his investment strategy ["Copying Risk"].  The fact that
> people would have this information could jeopardize the strategy.
>
> (SCM, Ex. 2 at 4; emphasis supplied).

110.    OIS never pressed Madoff further and accepted these explanations about
supposed Delivery and Copying Risk at face value, without any confirmation, verification, or
investigation.

111.    Madoff's simplistic explanations, however, were logically flawed.  Even under
Madoff's supposed explanation of how his operation worked, and OIS's understanding of it,
Madoff had to execute large volumes of options with counterparties, which exposed Madoff to
Delivery and Copying Risk.  The fact that Madoff had counterparties to execute option contracts
was the critical component of the "split strike conversion" strategy because it provided the
downside protection which Madoff and OIS touted as the strategy's centerpiece.  If Madoff

traded the options with counterparties, he would face "Delivery Risk" and "Copying Risk" with them.

112.    Moreover, financial markets are built to ensure proper delivery. The settlement and delivery process is fairly standardized and any failures are typically rectified with counterparties on a timely basis. Otherwise, every single trader in the financial markets would have a strong interest in self-custody. Self-custody, however, is an extremely rare exception. The fact that Delivery and settlement risks were purportedly an issue raised by Madoff should have heightened OIS's due diligence of Madoff's internal systems to understand why those systems carried risks not otherwise seen in the industry.

113.    Yet, neither OIS, nor the other Defendants, who were sophisticated financial market participants, ever investigated this inconsistency. The Second Courvoisier Memorandum, thus, demonstrates that OIS had more interest in "papering" the file with a routine memorandum that parroted Madoff's incongruous statements, rather than in conducting meaningful due diligence.

114.    This concern was flagged by Defendants, but pointedly ignored, to Plaintiffs' detriment. Rather than at the very least heightening their due diligence given the known risk of a self-custodial relationship, Defendants failed to ever conduct even basic due diligence.

### 5.    Defendants Did Not Disclose That Family Members Controlled BMIS

115.    Virtually all key positions in Madoff's operation were held by immediate family members. Having all key positions in a multi-billion dollar fund held by members of a single family presented a huge risk and indication of something amiss. This was raised with concern in yet another memorandum prepared in July 2006, this time by Rajiv Jaitly ("Jaitly") (the "Jaitly Memorandum" or "JM").

116.     Jaitly was a senior Risk Officer at OIS from 2005 until approximately December 2007.  He was primarily responsible for operational due diligence.  Jaitly was also a member of the Management Committee at OIS and met with Madoff on numerous occasions.

117.     On February 1, 2006, Jaitly, Atkins, and Defendant Clark visited the offices of BMIS and met with Madoff.  This is set forth in the Jaitly Memorandum, which is undated, but based on an email attached to the document it was prepared shortly after July 20, 2006.  (JM, Ex. 4 at 47).

118.     Jaitly described the risk presented by having Madoff's immediate family members (including "his wife who comes in three times a week to do the books") holding all key positions as "a major issue": "**A major issue is that the key controls are all in the hands of family members**." (JM, Ex. 4 at 4) (emphasis added).

119.     Defendants did not disclose this to investors.  Defendants did not disclose that all key positions were held by immediate family members of the owner, a highly unusual circumstance, presenting and indicating the potential for an obvious risk of fraud.  Defendants also did not disclose that they had concerns and viewed this as a "major issue."

### 6.     Defendants Did Not Disclose That Madoff Refused To Provide Any Independent Verification Of Actual Trading

120.     Madoff never provided Defendants any confirmation of the information concerning their supposed account, other than his word.  There was no identification of trading counterparties, no independent confirmation of any trade, and no identification of any segregated account.  When asked for such basic information and confirmations, Madoff refused and Defendants did not push the matter any further.  Defendants then concealed this material fact from investors, including Plaintiffs.

> **(a)** **Defendants Did Not Disclose That Madoff Refused To Identify Any Trading Counterparty**

121.    Madoff claimed to be routinely trading billions of dollars in option contracts with private parties outside of regulated exchanges, often referred to as the "over the counter" market. This was an integral element of his split strike conversion strategy.  Critically, however, Madoff's daily trading reports to Defendants did not list the counterparties with whom he supposedly traded options.  Without knowing the identities of the supposed counterparties, Defendants had no way of knowing if the reported trades were taking place at all, let alone assessing the level of risk of counterparty default.

122.    According to the Second Courvoisier Memorandum, because Defendants were deeply worried about this issue, they sought legal advice from law firms in New York.  These law firms provided certain recommendations concerning the multiple red flags identified above, including the lack of identification or confirmation of actual trading counterparties. (SCM, Ex. 2 at 4).  The law firm of KMZ Rosenman, for example, made two critical recommendations:

> -    Clarify if the Funds are held in a segregated omnibus account and if they are commingled with securities held for others;
>
> -    **Review a transaction confirmation (ticket) for option transactions regarding the counterparty risk issue.**

(SCM, Ex. 2 at 5).

123.    Both recommendations sought confirmation of a critical issue: did Madoff actually interact with the outside world?  The confirmation ticket for option transactions with a counterparty sought to ensure that counterparties existed and that they were reliable counterparties that would not default.  Confirmation tickets would have identified the counterparty.  A simple phone call to the supposed counterparty, seeking confirmation that the

trade purportedly documented had actually been executed, would have undermined Madoff's representations; representations upon which Defendants had unquestioningly relied.

124.    Other law firms further identified counterparty risk as critical.  For example, Shearman & Sterling recommended that OIS "review [over-the-counter] option status, counterparty risk would be eliminated if option transactions are 'crossed' through the exchange." Accordingly, two different law firms had raised a red flag with respect to counterparty risk, yet OIS never contacted a single counterparty in over a decade of investing with Madoff, or worse, did contact a counterparty and discovered that Madoff did not trade with them and ignored the red flag.  (SCM, Ex. 2 at 4).

125.    One of the simple steps which U.S. counsel advised Defendants to take (to "review a transaction confirmation ticket for option transactions regarding the counterparty risk issue") was nothing new to OIS.  Its own due diligence guidelines and industry standards demanded the same.  (SCM, Ex. 2 at 5).

126.    OIS's due diligence guidelines were set forth in two responses to a so-called Due Diligence Questionnaire submitted by OIS to the Alternative Investment Management Association ("AIMA").  OIS submitted the two responses in 2005 and 2008 (the "2005 DDQ" and "2008 DDQ").  The 2005 DDQ shows that Defendants well understood the critical importance of confirming the existence of, and interactions with, outside parties, and the significance of Madoff's refusal to even identify them.  OIS regularly contacted the third parties which interacted with the underlying funds in which OIS invested as part of its due diligence process.

> Q: Do you perform due diligence checks on the administrator or any other service provided to the targeted funds? If so, please describe:

A:  Yes, we do carry due diligence on the fund's administrator to
     see how they price the portfolio and where they obtain their
     prices from.  **We also talk to the prime brokers the fund
     uses as any other third party providers.**

Q:  Do you contact the outside audit company prior to approval?

A:  The analysis of audit reports is integrated in the due diligence
     process.  We may contact the outside audit company, but it is
     not a condition sine qua non for approval.

(2005 DDQ, Ex. 5 at 19; emphasis supplied).

127.    The critical importance of contacting the underlying fund's third-party providers

(such as counterparties, prime brokers, and auditors), and of being comfortable with who they

were, was obvious to OIS because it had already suffered serious losses in the past.  As set forth

in the 2005 DDQ, during the Russian debt default in August 1998 one of the funds in which OIS

had invested collapsed because of a counterparty's failure to honor its obligations:

In August 1998, we [OIS] were invested in the III High Risk
Opportunities Fund.  This fund was partly invested in Russian
debt.  They had contracted a "Non Deliverable Forward"
(Dollar/Ruble) as their hedge with two reputable financial
institutions.  As the Russian crisis unfolded, the two institutions
refused to honour the NDFs and the fund collapsed.  This issue is
still in litigation today[, seven years later].

(2005 DDQ, Ex. 5 at 23).

128.    The 2008 DDQ further showed that OIS understood that operational due diligence

was an important risk mitigation procedure.  In describing its risk management approach, OIS

explained that operational risks required that OIS fully analyze Madoff's counterparties:

Q:  Describe how risk management is structured within your
     organisation?

A:  . . . . Risks are dealt across various departments as it lies at the
     heart of our investment process.  Our thorough due diligence
     process ensures that the highest standards of quality are met
     when selecting hedge funds.  The application of our investment
     process is controlled by our legal & compliance unit.  This unit

> is also responsible for checking the compliance of Optimal funds with their prospectus, investment philosophy and regulators. Investment risks are dealt by our dedicated quantitative analysis & investment risk management team. They focus their analysis on market risk, control of risk limits and analysis of the underlying hedge fund risk management organization. The third category or risk is operational risks at the level of hedge funds. As this is not a rewarding risk for our investors, our operational risk analysis analyze in detail the business structure of each hedge fund in the portfolio, their legal setup, documentation, or **counterparties . . . .**

(2008 DDQ, Ex. 6 at 19; emphasis supplied).

129.    Despite the fact that OIS's internal due diligence guidelines mandated a review of Madoff's supposed counterparties, this was never carried out. Indeed, while the Courvoisier Memoranda shows that in 2002 Defendants had concerns about the counterparties, the Jaitly Memorandum shows that again in 2006 Defendants remained concerned and alarmed about their inability to confirm the existence of such counterparties. (JM, Ex. 4 at 1).

130.    In the "Summary of Issues & Action Points," the Jaitly Memorandum states that the trade reports from Madoff "do[] not show who the counterparty to the trade was as it is based on an average fill allocation. We also do not know who the counterparties are to the [over the counter] Options entered into." (*Id.* at 2). It then adds, "[c]onsequently the issues that arise from an operational perspective in relation to the maintenance of these accounts following this visit and subsequent review of the documents available in Optimals [sic] files are as follows." (*Id.*).

> **Risk of Fraud and misrepresentation process**.
>
> **One of the difficulties with this account is the current inability to verify actual trading activity in the market through counterparty and other market user intelligence.**

(JM, Ex. 4 at 4) (emphasis added).

131.    The Jaitly Memorandum also set forth a series of "Action Points." (*Id.* at 5). One of the key points was to "[f]ollow up on conducting a review of transactions done for us at

Madoff's offices at the next visit performed by operational risk." (*Id.* at 5). Jaitly was emphatic in his reaction to Madoff's failure and refusal to provide such information and the obligation and necessity for Defendants to demand and obtain it. Focusing on Madoff's failure and refusal to confirm the existence of actual trades, counterparties, or segregated accounts, Jaitly stated in bold underlined: **"no request was made to review how a trade is made . . . there is absolutely no reason why Optimal should not make [such a] request."** (*Id.* at 13) (emphasis in original).

132.     Just as Defendants had ignored the legal advice from U.S. counsel to "review a transaction confirmation ticket for option transactions" in 2002, they ignored the same emphatic advise from their own senior Risk Officer in 2006.

133.     Further, Defendant Clark, in his July 2006 report also emphasized that the counterparty risk was still a potential risk with nothing having been done to verify the existence or creditworthiness of any counterparty. (CR, Ex. 3 at 1):

> Summary areas of potential risk:
>
> - Privately owned family business shrouded in secrecy
>
> - **Counterparty risk in the options trading**
>
> - No independent custody of client assets (Madoff is the custodian)
>
> - Lack of transparency into client accounts, through either clearing or banking accounts (although this is standard brokerage procedure)
>
> - No independent verification of trading activity (unlike a standard hedge fund that has a primer [sic] broker)
>
> - Not regulated as an investment advisor
>
> - Lack of realistically independent auditor – Friehling & Horowitz is a very small firm with Madoff as its only major client

(CR, Ex. 3 at 1) (emphasis added).

134.   The Clark Report explained many of these risks in additional detail and provided evidence not included in the Jaitly Memorandum that heightened the risk of fraud.  Regarding the counterparty risk, Clark had attempted to locate Madoff's counterparties, but after several attempts, had failed.

> The options trading employed by the strategy is exposed to counterparty risk . . . . The fund diversifies risk with twelve trading counterparties, with whom 'performance assurance' contracts are in place.  This diversification also serves the purpose of concealing positioning.
>
> **We have not yet found a source at the major dealers with whom to confirm Madoff options trading activity (neither has Fairfield).**
>
> (CR, Ex. 3 at 3) (emphasis added).

135.   In effect, when Madoff refused to identify the counterparties, Defendants were unable to find any.  Madoff's refusal to identify the private counterparties with whom he claimed to be regularly engaged in multi-billion dollar options trading lent itself to few reasonable explanations, if any, other than fraud.  This was yet another red flag which Defendants concealed from Plaintiffs.

### (b)   Defendants Did Not Disclose Madoff's Failure To Provide Any Independent Trading Confirmations

136.   A precondition for conducting ongoing due diligence of stock and option trading on the scale claimed by Madoff is "transparency" or the ability to "see the trades."  That refers to the ability to see the name of the stock traded, the number of shares or options purchased or sold, the price paid or received, and the date, time, and the exchange or counterparty with whom the trade took place, all in real time.

137.   The only information which Madoff provided to Defendants consisted of self-generated paper summaries, which only included average trade prices, with no time, and only a

date of execution.  There was no disclosure of the counterparties for the options.  Also, unlike most investment managers, even those much smaller than Madoff held himself out to be, Madoff did not provide Defendants with electronic access to real time information.

**(c)    Defendants Did Not Disclose That Madoff Only Provided Trade Confirmations In Paper Form, Two Days After Execution**

138.    The limited trading information Madoff purported to share with Defendants was only released non-electronically (via facsimile to "Banco Santander" in New York) a day or two after the day of the supposed transaction.  Madoff's lack of technological sophistication did not comport with his reputation in the industry.  He was known as the "father" of computerized trading.  Thus, the absence of electronic reporting in favor of fax and mailed paper trading records was even more irregular.

139.    Madoff's issuance of only manually generated paper confirmations was also at odds with Madoff's own documents provided to OIS concerning Madoff's automated capabilities.  "Madoff's Guide To Order Handling," attached to the Jaitly Memorandum, stated, "we [*i.e.*, BMIS] also offer an on-line audit trail documentation system." (JM, Ex. 4 at 3 and 20).  Madoff's Guide continued by stating that "[o]ur sophisticated proprietary automation and unparalleled client service delivers an enhanced execution that is virtually unmatched in our industry."  (*Id.* at 19).

140.    Madoff had also told OIS that he was "trying to achieve a paperless trading room," which was at direct odds with Madoff's refusal to provide Defendants with anything more than manually generated paper summaries, two-days after execution. (*Id.* at 10 and 12).  When Clark asked Madoff point blank during the visit for electronic copies, Madoff refused.  (*Id.* at 12).

30

141.     Importantly, reporting trading immediately, rather than a day or two later, would have made no difference to Madoff's purported desire for secrecy because his split strike conversion strategy, supposedly, did not make money day-trading.  The strategy was supposedly executed over a number of days, weeks, and sometimes months.  Accordingly, the only plausible explanation for the day-to-two day delay was that Madoff needed sufficient time to fabricate the information.

142.     Madoff's primitive paper trading reports were also totally contradicted by an OIS presentation to Santander about Optimal U.S. on January 2008 (the "January 2008 Presentation," Ex. 7).  OIS touted Madoff as being at the forefront of financial technology:

> [BMIS's] position at the forefront of computerized trading is widely acknowledged in the US financial community and it is very well known for its fine pricing as well as its ability to execute most orders in seconds with sophisticated proprietary automation and enhanced execution.

> (January 2008 Presentation, Ex. 7 at 15; emphasis in original).

143.     Madoff's paper confirmations were also suspect for another reason.  They were often verifiably wrong.  As reported by the Madoff Trustee, Irving Picard, Madoff reported hundreds of trades to feeder funds at prices that were simply outside the daily trading range.  (Compl., at 16, *Irving H. Picard v. J. Ezra Merkin et al,* No. 08-01789 (Bankr. S.D.N.Y.).  Those trades simply could not have been executed.  Thus, even with the deficient paper reports provided by Madoff, Defendants had conclusive evidence of fraud had they simply checked.

144.     Despite their obligation to confirm that Madoff was actually trading rather than simply taking his word for it, Defendants did not demand verification of a single trade from Madoff during its February 2006 visit.  Defendants did not, because as it is made clear in another section of the Jaitly Memorandum, Defendants were afraid to ask Madoff:

> Given the apparent sensitivity of the relationship with this manager
> no request was made to review how a trade is made and allocated
> to a client . . . .

(JM, Ex. 4 at 13).

145.    Defendants accepted Madoff's refusal to provide them with any confirmation of

his trading contrary to the advice of their lawyers and own senior Risk Officer.  In addition,

Defendants did not disclose this to Plaintiffs nor the fact that they were simply recycling

information Madoff had provided them, but which they, nor any other third party, had ever

independently verified.

>            **(d)      Defendants Did Not Disclose That They Could Not Confirm
>                      The Existence Of A Segregated Account For Optimal U.S.**

146.    Madoff claimed to maintain a segregated account for Optimal U.S. and

represented to Defendants that their account was at the DTC: "Madoff confirmed that there is no

margin arrangement with the Funds and that the assets of these funds under the control of

[BMIS] are segregated and held in the DTC ("Depository Trust Co.") in the name of the Funds."

(SCM, Ex. 2 at 4).  Defendants never obtained confirmation that Madoff, indeed, had a

segregated account for Optimal U.S.

147.    In 2002, U.S. counsel advised Defendants to "clarify if the Funds [were] held in a

segregated omnibus account or if they are commingled with securities held for others."  (SCM,

Ex. 2 at 5).  By 2006, Defendants had still failed to confirm that a segregated account existed.

Risk Officer Jaitly, in his 2006 Memorandum, documented that OIS had still not confirmed the

existence of an Optimal U.S. segregated account: "nothing in the documentation reviewed to-

date indicates that properly segregated client account have been set up for the receipt of cash and

from which the transactions on an execution only basis will be managed." (JM, Ex. 4 at 3).

148.     The Clark Report also attempted to confirm the existence of segregated account. Yet, Clark was unable to obtain any such confirmation.  Defendant Clark called the DTC, where Madoff had represented that he held segregated client accounts.  Clark spoke with an account executive who only confirmed that Madoff held an account there, but not that Madoff held segregated client accounts. (CR, Ex. 3 at 4).  Defendants never disclosed to investors that they could not confirm the existence of a segregated account.

149.     In sum after Clark had "collect[ed] work done over the last two years researching Madoff Securities and its counterparties on organizational aspects," neither Clark nor OIS could verify any of Madoff's critical representations.  OIS's investment with, and due diligence on, Madoff was predicated on nothing more than blind faith.

### 7.     Defendants Did Not Disclose That Their Internal Quantitative Due Diligence Software Showed That Madoff's Returns Could Not Be Replicated And Were Mathematically Implausible

150.     Madoff claimed to produce unprecedented, consistent positive returns utilizing his split strike conversion strategy of buying stocks and hedging with puts and calls.  Madoff purportedly generated positive returns in approximately 97% of the months for nearly two decades, with only minuscule declines during the few other months.

151.     No other investment firm utilizing this strategy had obtained returns approaching Madoff's claimed consistency.  Traders who were interviewed on the subject in 2001, in two highly reputable financial publications, were incredulous about Madoff's streak.

> Some on Wall Street remain skeptical about how Madoff achieves such stunning double-digit returns using options alone.  The recent MAR Hedge report, for example, cited more than a dozen hedge fund professionals, including current and former Madoff traders,

who questioned why no one had been able to duplicate Madoff's returns using this strategy.[3]

152.    Madoff's claimed returns did in fact lead "other investment banks and investment professionals" to quickly conclude that Madoff's numbers "simply did not add up." (Nelson D. Schwartz, *European Banks Tally Losses Linked To Fraud,* N.Y. Times, Dec. 16, 2008, at B1). Despite this deep skepticism in the financial community, and even though Banco Santander was the largest and most sophisticated financial institution to invest billions with Madoff, Banco Santander never even sought an explanation for Madoff's uncanny claimed returns.

153.    Madoff's unparalleled winning streak also defied Defendants' own statistical models.  As set forth below, Defendants' internal due diligence guidelines required use of quantitative replication software to test the plausibility of an investment firm's results.  This software showed that Madoff's returns were essentially implausible.

154.    Specifically, according to the 2008 DDQ, OIS relied on a quantitative analytics tool called FOFIX, a statistical model that seeks to identify hidden risks in a portfolio.  (2008 DDQ, Ex. 6 at 20).  In effect, FOFIX serves to confirm that the supposed investing strategy of a portfolio is being executed, otherwise the results of the FOFIX analysis would show deviations from the expected risk profiles.  The 2008 DDQ stated:

> Quantitative risk analysis:
>
> Hedge funds are analysed quantitatively by our dedicated team. State of the art statistics are calculated so that we can assess if the hedge fund possesses the desired characteristics that we seek, like for example capital protection, participation in the upside performance of markets, low correlation, liquidity. **This analysis is completed by a complex statistical non-linear style analysis with our FOFIX tool.  Risk profiles are calculated for each hedge fund in order to estimate the systematic factors influencing the returns of the fund.**

---

[3]    May 2001, MAR/Hedge, No. 89, May, 2001, "Madoff tops charts; skeptics ask how," as quoted in Barron's, May 2001, "Don't Ask, Don't Tell."

34

> **These are then compared with the qualitative analysis of
> our research analyst and deviation from expected risk
> profiles need to be explained. . . .**

(2008 DDQ, Ex. 6 at 20; emphasis supplied).

155.    FOFIX was created by a company called Riskdata that specializes in providing

quantitative risk management tools to hedge funds, funds of funds (such as OIS), mutual funds,

and other institutional investors.

156.    On February 9, 2009, shortly after Madoff's Ponzi scheme unraveled, Riskdata

published the results of its analysis of Madoff's supposed split strike conversion strategy using

FOFIX.  ("FOFIX-Madoff Results," Ex. 8).  The February 2009 analysis was entitled "The

Madoff Case: Quantitative Beats Qualitative!"  The subheading said, "Two Red Flags: Bias

Ratio and Risk Profile Clearly Pointed to Problems With Madoff."  (*Id*. at 1).  The introductory

section summarized Riskdata's findings as follows:

> **Numbers tell a story and clearly have an order that should be
> hard to fake**.  What appears to be too good to be true can be
> measured . . . . anyone paying attention to quantitative advances in
> hedge fund risk management suspected that Madoff was a scam to
> be avoided.  Amongst the quant techniques useful in detecting
> fraud, the most efficient is the Bias Ratio, invented by Adil
> Abdulali of Protégé Partners and available in Riskdata's suite of
> analytics.  **In Madoff's case, a calculation of the Bias Ratio
> points to the fallacy of Madoff's returns.  In addition, an
> accurate analysis of Madoff investment Risk Profile is
> inconsistent with its style and peer group**.

(FOFIX-Madoff Results, Ex. 8 at 2; emphasis supplied).

157.    In measuring the Bias Ratio, the FOFIX-Madoff Results applied that

measurement to 2,290 funds that executed a somewhat similar strategy to Madoff.  *(Id*. at 2).

Over 2,200 funds had a Bias Ratio of 3 or below.  Sixty-five additional funds exhibited Bias

Ratios between three and six.  (*Id*. at 2-3).  Only twenty funds had Bias Ratios of six or above.

Among them was Bayou, with a Bias Ratio of approximately 6.3, and which had admitted in

2005 that it had fabricated its returns – just like Madoff.  **Madoff had a higher Bias Ratio than Bayou – a Bias Ratio exceeding 6.5**.  (*Id.*).

158.    The second quantitative parameter that clearly showed that something was seriously wrong with Madoff was the Risk Profile.  The Risk Profile explained,

> which market factors are the most important drivers and how the fund reacts to changes in these factors.  It is [Riskdata's] experience that, even when performances themselves cannot be replicated, the risk profile stays the same, i.e. relevant risk factors are the same between the original fund returns and the replication.  In the present case, an option strategy like the one described by Madoff . . . has certain characteristics.
>
> *Id.* at 5.

159.    The Risk Profile showed that Madoff's option strategy should have been highly sensitive to volatility and equity prices.  In other words, large swings in volatility and equity prices should have had strong effects on Madoff's reported returns.  Yet, Madoff's returns were effectively immune to volatility and equity prices.  (*Id.*)  Even more telling, the Risk Profile of Madoff's returns showed it was "quite unstable: factors to which it [was] sensitive tend to change from month to month, which is surprising given that the strategy announced [was] stable with very little space for discretionary choices."  (*Id.* at 6).  Madoff's "risk profile[] [was] a total mismatch for the advertised trading strategy."  (*Id.*)

160.    OIS admitted it utilized FOFIX and purportedly relied on it when conducting due diligence.  Indeed, OIS's 2008 DDQ specifically noted that when quantitative measurements flashed red and showed that a manager was not executing the advertised strategy, this information was sent to Madrid:

> Potential breaches of the risk parameters would be immediately notified to the Chief Operating Officer and if appropriate to the Chief Executive Officer.   Breaches would be reported and presented at the Investment Committee Meeting and reported to the **Group's Risk Monitoring Division in Madrid**.

(2008 DDQ, Ex. 6 at 20; emphasis supplied).

161.    The involvement of Grupo Santander's Risk Monitoring Division in Madrid was further detailed in additional responses included in the 2008 DDQ, especially in terms of risk controls:

> Q:  Does the company use any formal risk limits? Or informal risk
>     guidelines?  If so, please describe how they are used.
>
> A:  The Company agrees risk control criteria on the portfolio with
>     Santander Asset Management Central Risk Control unit based
>     **in Madrid**.

(2008 DDQ, Ex. 6 at 20, 22; emphasis supplied).

162.    Either Defendants violated their policies and failed to use FOFIX on Madoff, or OIS followed its polices and used FOFIX and informed Banco Santander's management of the "breach of the risk parameter."  If so, Banco Santander's top management "in Madrid" simply ignored the FOFIX results, to Plaintiffs' detriment.

### 8. Defendants Did Not Disclose That, In Their View, Madoff Did Not Have Independent Auditors

163.    According to Madoff, his fund was audited by an outside accounting firm – Friehling & Horowitz.  Friehling & Horowitz had three employees and only one working accountant.  Its offices were located in a strip mall in New City, New York next to a pizza parlor.  OIS's internal memoranda raised serious doubts about the independence of the auditors and the reliability of those audits.  Yet, Defendants never once attempted to review one of Madoff's supposed audits or seriously question his auditors and the auditors' procedures.

164.    Defendant Clark met with Madoff's auditor, David Friehling.  His conclusion was that the "external auditor cannot be considered realistically independent."  (CR, Ex. 3 at 6).  In fact, Defendant Clark admitted that not even Optimal U.S.'s auditor (PricewaterhouseCoopers, "PwC") provided any real comfort.  "The PWC audit of the SUS fund does not provide

independent verification of account activity." (*Id.* at 6). This was the case because "PWC's audit for Optimal U.S. relies entirely on Madoff produced documentation. PWC compares Madoff's monthly client statement with the administrator's (HSBC) statement. This means that nothing is really independently verified as both are sourced from the same place" – Madoff. (*Id.* at 7).

165. Defendants never informed investors of the material fact that Madoff had no independent auditor and utilized an undersized and non-independent accountant.

### 9. Defendants Did Not Disclose The Absence Of Contractual Documentation With Madoff

166. The 2006 Jaitly Memorandum raised serious concerns about the existing documentation between Madoff and Optimal U.S. In a section entitled "Integrity and Enforceability of contractual arrangements with the Broker Dealer," Jaitly pointed out that there was no contract with Madoff, or at a minimum, not one executed by the correct parties. (JM, Ex. 4 at 2).

> [I]f you look at the trading authorisation under which our accounts are managed it is not clear who the arrangement is with – whether it is Madoff the individual or Madoff the Corporation.
>
> * * *
>
> If it has been signed on . . . behalf [of the Optimal Funds] it needs to say so **otherwise in my view this agreement is invalid**
>
> * * *
>
> **The Option Agreement appears to have been signed by the wrong legal entity.**
>
> * * *
>
> What is crucial to remember is that if we don't have the right entity signing – it is going to be very difficult for us to enforce any rights – should a problem arise because of privity of contract issues.
>
> (JM, Ex. 4 at 2, 47, 48, 49).

167. Simply put, OIS had failed to enter into the appropriate contracts with Madoff, which left Optimal U.S. vulnerable and facing critical legal deficiencies. Nevertheless, OIS

continued to authorize the investment of cash with Madoff on behalf of Optimal U.S. and never

corrected the absence of a proper contract.  Defendants also never informed investors of this

material fact.

    **B.**    **INTERNAL DOCUMENTS SHOW THAT DEFENDANTS ACTED WITH KNOWLEDGE OR RECKLESS DISREGARD**

        **1.**    **Defendants Did Not Follow Their Own Internal Due Diligence Guidelines And Procedures**

168.    The Due Diligence Questionnaires setting forth OIS's due diligence guidelines

repeatedly emphasized the importance of due diligence and the supposed thoroughness of OIS's

procedures.  This stands in stark contrast with Defendants' failure to conduct minimal due

diligence on Madoff.

169.    The 2005 DDQ, for example, stated as follows:

> Q:  What is the company's competitive edge in the strategy and style allocation process?
>
> A:  We stress the importance of performing thorough due diligence – on an ongoing basis – on the managers with whom we invest. We want to know how the manager makes money and how he or she is able to protect capital in difficult times.  We want to challenge the manager in face-to-face meetings, to see how he would react in a given situation.  Our careful attention in this area has allowed us to avoid the well-publicized cases of manager fraud.
>
> (2005 DDQ, Ex. 5 at 16; emphasis supplied).
>
> Q:  Please describe, in detail, the company's due diligence process including the investment, legal and compliance and operational due diligence procedures.  Provide examples of reports and working papers, where available.
>
> A:  [OIS] uses an intensive and thorough due diligence process that has been developed and "fine tuned" through our many years of experience over the last decade . . . . Our risk manager and in-house legal counsel will ensure all non-investment due diligence (operational and legal) and risk control for all new/existing investments.  They will provide an opinion on all

managers from an operational risk perspective to the
Investment Committee prior to investment decisions are made.

(2005 DDQ, Ex. 5 at 18; emphasis supplied).

170.    The 2008 DDQ includes similar statements:

Q:  What is the company's competitive edge in the strategy and style allocation
process?

A:  We have the resources, processes and experience to conduct
thorough due diligence on target funds.

(2008 DDQ, Ex. 6 at 13; emphasis supplied).

Q:  Summarise your manager selection process:

A:  The typical criteria a manager should meet to qualify for
selection [includes] . . . . risk controls . . . .

* * *

Q:  Please describe, in detail, the company's due diligence process
including the investment, legal and compliance and operational
due diligence procedures.  Provide examples of reports and
working papers, where available.

A:  The due diligence process is split into investment and non-
investment processes.

Investment processes include . . .

-  Due diligence is performed on both middle and back
office operations

Non-investment processes include . . .

-  Review of business structures and terms
-  Evaluation of manager's business plans and operational
infrastructure

* * *

Q:  Where does your due diligence process differ from that of
others in the marketplace?

A:  . . . . We have a defined investment and risk control process
that can be replicated for any review done on a manager.

40

> We have the resources, market intelligence and procedures and controls of a world class financial institution/recognised bank which is in the global top 10.

> (2008 DDQ, Ex. 6 at 14).

> Q:  Do you have a dedicated operational due diligence team?

> A:  Yes. Optimal is committed to building a dedicated independent operational risk management team which will deal with operational risk and due diligence.  It is one of a handful of asset managers in the alternative asset space with dedicated resources in this area.

> (2008 DDQ, Ex. 6 at 15).

171.    Accordingly, Defendants' abysmal failure to conduct meaningful due diligence on Madoff was certainly not the result of a lack of knowledge, experience, or resources.  Defendants knew the specific procedures necessary to conduct adequate due diligence, were repeatedly and explicitly advised to perform those procedures, and purposefully and knowingly refrained from doing so.  This, Defendants did not disclose to investors.

### 2.    Defendants' Primary Concern With Madoff Was Not The Safeguard Of Their Clients' Assets, But Defendants' Own Liability

172.    The Courvoisier Memoranda evince a clear preoccupation with Defendants' own liability rather than the safekeeping of Plaintiffs' assets.  Indeed, the trigger for the Courvoisier Memoranda is concern over Santander's "legal risks."  The First Courvoisier Memoranda begins as follows:

> In reviewing the legal documentation related specifically to the management of [the Optimal Funds], the Santander Central Hispano Group . . . has detected **a number of issues that may involve legal risks for the Group**.  These issues need to be analysed and resolved.

> (FCM, Ex. 1 at 1; emphasis supplied).

41

173.   This concern over Santander's liability is again manifested in the Second

Courvoisier Memoranda after meeting with Madoff.  The memorandum states as follows:

> The purpose of the meetings [with Madoff] was to discuss the actual contractual arrangements between [Madoff] and [the Optimal Funds]. . . . . [and] to reduce any potential exposure of Optimal Investment Management Ltd., Optimal Multiadvisors Ltd, the Funds, [OIS] and the **reputation of the Santander Group generally**.

> (SCM, Ex. 2 at 1; emphasis supplied)

174.   Similarly, when Courvoisier raised concerns about Madoff's self-custody, the

ultimate resolution consisted of attempting (unsuccessfully) to pass on the liability to the

custodian.  Never did Defendants confirm that the assets existed.

> It has to be noted that the custody of Optimal Multiadvisors Ltd (including the Funds) is in the process of being changed to Bermuda Trust (Dublin) Ltd . . . This entity has agreed to appear in the Prospectus as the official custodian of the fund above mentioned.  This entity will then delegate its duties to [Madoff] and appoint it as a sub-custodian.  **The new custodian will keep all the exposure/responsibility** in case of liquidation of the fund as neither Madoff nor any of the Santander entities will be disclosed in the Prospectus as custodian.

> (SCM, Ex. 2 at 4; emphasis supplied).

175.   Defendants' consistent concern with their liability and "exposure," and their

belief (albeit, incorrect) that they had adequately insulated themselves, explains Defendants'

ongoing and passive acceptance of all the risks and red flags they had uncovered.  Even the Jaitly

Memorandum reflects Defendants' willful and wanton conduct or, at a minimum, reckless

disregard.  Jaitly indicated that although Madoff had represented that there was one additional

person who made the investment decisions in addition to Madoff, Defendants never identified

that person and did not even inquire.  (JM, Ex. 4 at 11).

### 3. Defendants Ignored The Red Flags Because Optimal U.S. Was "Very Profitable"

176.     In January 2008, OIS made a detailed internal presentation about Optimal U.S. (the "January 2008 Presentation," Ex. 7).  In a slide featuring key statistics about Optimal U.S., one of the bullet points read: "Very profitable business for the Group, average management fee above 2%." (January 2008 Presentation, Ex. 7 at 3; emphasis in original).  OIS, thus, emphasized the huge profits Defendants reaped from Optimal U.S. to incentivize its sales force to sell more, while ignoring the tremendous risks Defendants knew Madoff posed to investors.

177.     Indeed, the source of the profitability was the source of the risk, since Santander could never have taken a full management fee had Madoff done so, while Madoff's failure to charge for his services was a red flag of fraud.

### 4. Defendants Knew How To Take Adequate Precautions With Respect To Custodial And Counterparty Risk In Other Contexts

#### (a) The 2002 Custodian And Administration Agreement

178.     On November 28, 2002, Optimal U.S., together with certain other Optimal funds, entered into a custodian agreement with Bermuda Trust (Dublin) Limited ("Bermuda Trust") (the "Custodian Agreement" or "CA," Ex. 9).

179.     The Custodian Agreement is virtually contemporaneous with the Courvoisier Memoranda written only two months earlier.  Yet, the contrast could not be starker with respect to the care and oversight that OIS had over the custody of the funds by Bermuda Trust compared to the custody and administration of the investment with Madoff.

180.     One of the areas of oversight concerned proxies and the voting of the shares held by Bermuda Trust.  Because Bermuda Trust would hold equity securities in the name of Optimal U.S., these equity securities provided the beneficial owner (*i.e.*, Optimal U.S.) with the right to vote in company matters.  Accordingly, the Custodian Agreement specified the rights and

procedures of Optimal U.S. and Bermuda Trust in connection with proxies and voting.  In a

section of the agreement entitled "Voting and Other Action," the Custodian Agreement stated:

> The Custodian shall deliver, or cause to be delivered, to the
> Company [e.g., Optimal Multiadvisors] and/or the Trading
> Companies [i.e., Optimal U.S.] copies of all notices, proxies and
> proxy soliciting materials received by it or its nominee or agent
> appointed hereunder in relation to any of the Securities held by any
> of them for the account of the Company or the relevant Trading
> Company.  The Custodian shall not, and shall procure that no
> nominee of the Custodian shall, vote in respect of any of the
> Securities held by any of them for the account of the Company or
> the relevant Trading Company, except in accordance with proper
> instructions.

> (CA ¶ 10(A), Ex. 9 at 13).

181.   Pursuant to the Custodian Agreement, Optimal U.S. could thus vote the shares it

owned but that were held indirectly by the Custodian.  Neither OIS, Banco Santander, nor

Optimal U.S., however, could have ever voted the shares supposedly held by Madoff because

Madoff never owned any shares.  During the time Optimal U.S. invested with Madoff, which

exceeded a decade, no one at Optimal U.S., OIS, or Banco Santander ever asked Madoff for the

proxy materials.  They never asked to vote a single one of the shares they supposedly owned

even though Optimal U.S. purportedly held investments worth more than $3 billion in U.S.

equities as of December 2008.

### (b)    The Currency Overlay Agreement

182.   Another agreement that evidenced the care that OIS took to set up controls and

procedures with third-party vendors that far surpassed those with Madoff was the Currency

Overlay Agreement (the "Currency Overlay Agreement" or "COA," Ex. 10).  Optimal

Multiadvisors had entered into a Currency Overlay Agreement with Overlay Asset Management

S.A. ("Overlay Management") as of October 2006. (October 2006 EM, Ex. 14 at 11).   The

agreement is dated October 1, 2008.

183.    The purpose of the Currency Overlay Agreement was for OIS to outsource its currency hedging requirements.  OIS needed to hedge its currency risk because the supposed underlying investments by Madoff were in U.S. dollars, but OIS and Banco Santander offered some shares in Optimal U.S. denominated in Euros and Japanese Yen.  To prevent currency swings from distorting the returns supposedly provided by Madoff in U.S. dollars, OIS needed to hedge that risk.

184.    Importantly, Overlay Management only executed the hedging strategy – just like Madoff purportedly only executed the split strike conversion strategy.  Overlay Management was not the ultimate counterparty with which Optimal U.S. hedged its currency exposure.  Instead, Overlay Management simply was the expert in executing the hedge.

185.    Because Overlay Management was not the ultimate counterparty, the Currency Overlay Agreement specified the counterparty with whom Overlay Management could trade.  Given that Optimal U.S. had billions of dollars invested in U.S. dollars and hundreds of millions in Euros and Yen, the counterparty had to be financially sound.  Accordingly, the specified counterparty was HSBC Bank Plc - HSBC Services in London.  (COA Appendix C, Ex. 10 at 14).  In addition, the Currency Overlay Agreement also required that Overlay Management send Optimal a "copy of all trade confirmations."  (COA ¶ 5, Ex. 10 at 3).

186.    Accordingly, OIS could easily confirm and verify that Overlay Management was actually hedging Optimal U.S.'s currency exposure. Not only would OIS receive trade confirmations, but OIS also knew that the trades were carried out with HSBC Bank in London.  Accordingly, OIS could always regularly check by calling or contacting HSBC London and confirming that, indeed, HSBC London had the other leg of the currency hedge.

187.    In sharp contrast, OIS had no similar clause in its contract with Madoff to ensure that Madoff's counterparties were acceptable.

C.    **THE FALSE AND MISLEADING STATEMENTS IN THE EXPLANATORY MEMORANDA**

1.    **The July 2001 Explanatory Memorandum**

188.    Defendants sold investments in Optimal U.S. pursuant to the EMs.  One of those EMs is dated July 2001 (the "July 2001 EM," Ex. 11).  The July 2001 EM was distributed to investors worldwide from Miami, Florida, as evidenced by a cover letter dated August 15, 2001, from Santander Central Hispano International ("BSCH International") listing its address on Brickell Avenue in Miami, Florida, and enclosing the EM.  (*Id.*).  BSCH International was the predecessor entity to Santander U.S.

189.    The August 15 letter also announced the creation of a new hedge fund unit, Defendant OIS, with "headquarters in Geneva and divisions in Miami and New York."  The new hedge fund unit "had been created with a group of professionals with more than ten years of experience at Banca Privada Internacional [BPI] specialized in the analysis and selection of hedge funds."  As a result, the name of the master fund changed from BPI Multiadvisors Limited to Optimal Multiadvisors Limited, as of July 1, 2001.

190.    The July 2001 EM set forth the terms of the investments in Optimal U.S.  It first described the legal structure of the fund:

> Optimal Multiadvisors, Ltd. ("the Fund") is a multi-portfolio investment company incorporated under the laws of the Commonwealth of the Bahamas in August 15, 1995, under the provisions of the International Business Companies Act, 1989 (No. 2 of 1990) with limited liability and unlimited duration.  The Funds principal office is located at Montague Sterling Centre, East Bay Street, Nassau, Bahamas.  The Trading Companies [i.e., the sub funds, such as Optimal U.S. and Optimal Arbitrage] were incorporated in the Commonwealth of Bahamas, under the same regulation, in October 1999.

46

(July 2001 EM, Ex. 11 at 6).

191.     The investment manager at the time was Optimal Investment Management Ltd.

("OIM").  While OIM was legally the investment manager, the July 2001 EM explained that the

investment decisions were made by Banco Santander and OIS:

> [OIM had appointed an Advisory Committee] to assist in its
> investment decisions and in the allocation of funds.  The Advisory
> Committee [would] assist the Investment Manager by coordinating
> and conducting due diligence work and by providing financial
> research to the Investment Manager.  Members of the advisory
> committee are qualified investment professionals of the research
> advisory team of the International Private Banking Units of
> Santander Central Hispano, S.A. . . .

 (July 2001 EM, Ex. 11 at 8).

192.     This is the same International Private Banking Unit which had been converted

into OIS in July 2001.  There is no indication, and it is highly unlikely, that OIM had any

employees or offices, given that its address was a Post Office Box, and the same as the address

of Optimal Multiadvisors and the administrator (Fortis Bahamas).

193.     To leave no doubt that Banco Santander's name was behind the entire enterprise,

in the section describing the role and functions of the investment manager, the July 2001 EM

added:

> The Investment Manager [OIM] is a wholly owned subsidiary of
> Santander Central Hispano Bank & Trust (Bahamas) Ltd.
> Santander Central Hispano Bank & Trust (Bahamas) Ltd. provides
> management and advisory services to the offshore institutional
> clients of Santander Central Hispano SA.  It has approximately
> $750 million in assets under management.

(July 2001 EM, Ex. 11 at 9).

194.     The July 2001 EM further stated that OIM conducted a careful analysis of the

ultimate investment managers – i.e., Madoff:

> The Investment Manager shall select managers with varied investment styles who have established records of success or who the Investment Manager believes demonstrate the potential to become outstanding investment managers. . . . The Investment Manager, with the assistance of the advisory committee, bases its investment decisions on a careful analysis of many investment managers.

> (July 2001 EM, Ex. 11 at 9; emphasis supplied).

195.    There was no disclosure of Madoff or BMIS, however, nor any meaningful description of the split strike conversion strategy.  The July 2001 EM limited its explanation of the investment strategy of Optimal U.S. to the following two statements:

> The investment objective of OPTIMAL Strategic US Equity Ltd. is to achieve long-term capital appreciation.  This Trading Company seeks to achieve this objective by investing in a single investment manager that invests primarily in equity securities of S&P 500 companies.

> (July 2001 EM, Ex. 11 at 6).

> \* \* \*

> OPTIMAL Strategic US Equity Series invests its assets with a single fund manager.  The manager invests primarily in a basket of S&P 100 stocks.  The manager also employs an index option overlay as a hedge against adverse market movements and to preserve existing investor capital.  The strategy is quantitative in nature and seeks to achieve consistent mid-teen annual returns over a long-term horizon.

> (July 2001 EM, Ex. 11 at VII).

196.    The risk disclosures were similarly terse.  The most relevant risk disclosure concerned "Counterparty Risk."  It recognized that, if Madoff traded with other market participants (e.g., Bear Stearns or Lehman), Madoff could lose money if the counterparty went bankrupt or did not honor its side of the transaction.  Any such loss would be incurred by the ultimate investors here, Plaintiffs.

197.    The Counterparty Risk disclosure set forth in the July 2001 EM leaves no doubt that Defendants understood, at the time, the importance of Madoff's counterparties.  Even

assuming that Madoff had not been running a Ponzi scheme, and assuming that Madoff actually had executed the split strike conversion strategy, one of the major risks to Madoff and Optimal U.S. were the counterparties.  If Madoff's counterparties failed to honor their obligations, Defendants understood that Optimal U.S. would lose money.  Accordingly, if there was one critical aspect to the due diligence here, it was the counterparties.

### 2.      The May 2002 Explanatory Memorandum

198.    The May 2002 Explanatory Memorandum (the "May 2002 EM," Ex. 12) is substantially similar to the July 2001 EM and does not have any meaningful additional disclosures.  Indeed, most of the disclosures are identical, including the disclosures concerning the legal structure of Optimal Multiadvisors (*supra* ¶ 190; May 2002 EM, Ex. 12 at 6), investment objectives (*supra* ¶ 195; May 2002 EM, Ex. 12 at 7, 25), Counterparty Risk (*supra* ¶ 196; May 2002 EM, Ex. 12 at 17), and due diligence to be conducted (*supra* ¶ 194; May 2002 EM, Ex. 12 at 10).

### 3.      The June 2004 Explanatory Memorandum

199.    The June 2004 Explanatory Memorandum (the "June 2004 EM," Ex. 13) includes risk disclosures which clearly reflect the meeting between Madoff and OIS in September 2002. For the first time, the EM warned, in the section dedicated to Optimal U.S., that Madoff could abscond with the monies because he was the custodian and broker of Optimal U.S.:

> Possibility of Fraud or Misappropriation
>
> Neither the Fund, Optimal SUS nor the Custodian has actual custody of the assets.  Such actual custody rests with the Broker-Dealer [Madoff] and/or its affiliated broker-dealer.  Therefore, there is the risk that the Broker-Dealer could abscond with those assets.  There is always the risk that the assets with the Broker-Dealer could be misappropriated.  In addition, information supplied by the Broker-Dealer may be inaccurate or even fraudulent.  The Investment Manager [OIS] and the Administrator are entitled to rely on such information (provided they do so in

good faith) and are not required to undertake any due diligence to confirm the accuracy thereof.

(June 2004 EM, Ex. 13 at 35).

200.    The boilerplate disclosure that "[t]here is always risk. . . ." says little about the probability of that risk materializing.  Indeed, that disclosure was meaningless given that, at the time of the "disclosure," the possibility had already occurred.  OIS, the investment manager for Optimal U.S., had either already failed to conduct any due diligence to determine the scope of that possibility, or conducted the due diligence and ignored its results.

201.    The June 2004 EM further identified Madoff's options trading counterparty risk to be critical:

> *Risk of Over-the-Counter Options Trading*.  The Broker-Dealer may execute options transactions in the over-the-counter market. Trading equity and options in the over-the-counter market is subject to counterparty risk and is without the protection afforded with respect to options transactions on regulated exchanges through the Options Clearing Corporation.

(June 2004 EM, Ex. 13 at 34).

202.    That statement only suggested the risk of **actual** options trading.  OIS, as the Investment Manager for Optimal U.S., had failed to conduct any due diligence or ignored the results of any due diligence it did conduct.  Accordingly, the risk that **actual** options trading could result in losses was irrelevant, as **no** options trading ever occurred, a fact that Defendants failed to confirm, or meaningfully investigate.

203.    Another important change introduced in the June 2004 EM was a much more complete and thorough description of Madoff and his investment strategy, although without naming Madoff or BMIS.  This description is nearly identical to the description suggested by the Courvoisier Memoranda in 2002.  In the section dedicated to Optimal U.S., the EM stated:

[Optimal U.S.] seeks to obtain long-term capital appreciation of its assets through the utilization of non-traditional options trading strategies.  In attempting to achieve its investment objective, the Fund and Optimal SUS have established a discretionary account with a US broker-dealer (the "Broker-Dealer") registered with both the [SEC] and [NASD].  The Broker-Dealer is responsible for the execution of the fund's trading strategy and all investment decisions in the account at the Broker-Dealer are effected by the Investment Manager.

* * * *

The assets of the fund are deposited with the Broker-Dealer.

* * * *

The Broker-Dealer, which employs approximately 200 people, acts as a market maker in stocks and convertible securities.  Most of the stocks for which it acts as a market maker are also listed on the New York Stock Exchange.

* * * *

The strategy utilized by the Broker-Dealer is called "split-strike conversion" and entails:

  (i)  purchasing a basket of thirty (30) to forty (40) large capitalization S&P 100 stocks which together account for the greatest weight of the Index and therefore, when combined, present a high degree of correlation with the general market;

 (ii)  purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount; and

(iii)  selling out-of-the-money S&P 100 Index call options representing a dollar amount of the underlying index equivalent to the dollar amount of the basket of shares purchased.

The strategy aims to limit losses when stock prices decline while still affording an upside potential that is capped to the strike price of the short call when stock prices rise.  The long/short call position constitutes a "synthetic" short of the market, which provides a hedge against the long stock positions.  Proprietary systems continuously optimize the basket of stocks to replicate the performance of the overall market at low cost.  Put and call option positions are actively managed as strike prices and maturities are

51

adjusted in response to relative valuations and general market movements.

* * * *

The options transactions executed for the benefit of Optimal SUS are effected, primarily, in the over-the-counter market, not on a registered options exchange. The Broker-Dealer is not a market maker in options.

(June 2004 EM, Ex. 13 at 30-31; emphasis supplied).

204.     Critically, the EM claimed that OIS made the investment decisions, while the

Broker-Dealer (Madoff) was purportedly merely responsible for execution.

All decisions with respect to the general management of the fund are made by [OIS] who has complete authority and discretion in the management and control of the business of the fund . . . . As a result, the success of the fund for the foreseeable future will depend largely upon the ability of [OIS], and no person should invest in the fund unless willing to entrust all aspects of the management of the fund to [OIS], having evaluated their capability to perform such functions.

* * *

Although the Broker-Dealer has limited investment discretion as to the selection of securities or other property purchased or sold by or for the fund's account, the Broker-Dealer has discretion with respect to the timing and size of transactions and to the extent described in the agreement entered in between the Broker-Dealer, the Fund and Optimal SUS.

(June 2004 EM, Ex. 13 at 32; emphasis supplied).

205.     The June 2004 EM further disclosed that Madoff served as an agent of Optimal

U.S. "The Broker-Dealer acts as the agent and attorney-in-fact of Optimal SUS in connection

with its sale of securities to Optimal SUS and the purchase of securities from Optimal SUS"

(June 2004 EM, Ex. 13 at 30).

206.     The Memorandum further reassured investors about the due diligence and care

that OIS would take in selecting and monitoring the managers to whom it entrusted the Funds'

assets (including the so-called "Broker-Dealer"), and emphasized that OIS "specialised" in such selection:

> (a)    "[OIS] bases its investment decisions on a careful analysis of many investment managers," (June 2004 EM, Ex. 13 at 12);

> (b)    "[OIS] shall select managers with varied investment styles who have established records of success or who [OIS] believes demonstrate the potential to become outstanding investment managers," (June 2004 EM, Ex. 13 at 12);

> (c)    "[OIS] specialises in advising multi-manager and multi-strategy portfolios," (June 2004 EM, Ex. 13 at 10); and

> (d)    "Custodial risk . . . . [Optimal U.S.] must satisfy itself to ensure that such third party [such as Madoff] has and maintains the necessary competence, standing and expertise appropriate to hold the assets concerned."  (June 2004 EM, Ex. 13 at 22).

207.    As further reassurances of OIS's capabilities, the June 2004 EM emphasized that Banco Santander stood behind OIS.  "The Investment Manager is an indirect wholly owned subsidiary of the Santander Central Hispano Group and provides research, advisory and investment management services in alternative investment strategies to its clients with over US$2.5 billion in assets under management."  OIS has "offices located in Geneva, New York, and Madrid."  (June 2004 EM, Ex. 13 at 10; emphasis supplied).

208.    Pursuant to the June 2004 EM, Optimal U.S.'s annual investment management fee for the class A, B, and C shares sold to Plaintiffs and the Class increased to 2.15%, 1.65%, and 1.15%, respectively (June 2004 EM, Ex. 13 at 31).  Of this fee, 0.15% was directly allocated to Echeverría's personal compensation.  The June 2004 commissions represented an increase ranging from 65% to 25% compared to the May 2002 commissions of 1.50%, 1.00%, and 0.80%,

for the class A, B, and C shares, respectively.  These commissions ostensibly charged by OIS were shared by OIS with other Banco Santander affiliates (particularly, Santander U.S.) to compensate their sales efforts.

209.    Finally, the June 2004 EM reflected a change of address for Optimal Multiadvisors to:

> Fort Nassau Centre
> Marlborough Street
> P.O. Box N-4875
> Nassau, Bahamas

210.    This is the same address as the address of the fund's attorneys, Lennox Paton. This reflects the fact that Optimal U.S. had no independent operations, offices, employees, or personnel, and was nothing more than an investment vehicle – in substantial measure, a conduit to invest solely with Madoff.  (June 2004 EM, Ex. 13 at 1).

### 4.    The October 2006 Explanatory Memorandum

211.    The October 2006 Explanatory Memorandum is substantially similar to the June 2004 EM  (the "October 2006 EM," Ex. 14).  Indeed, most of the disclosures are identical to those in the June 2004 EM, including the disclosures concerning the,

(a)    "Possibility of Fraud or Misappropriation" (*supra* ¶ 199; October 2006 EM, Ex. 14 at 36);

(b)    "Risk of Over-the-Counter Options Trading" (*supra* ¶ 201; October 2006 EM, Ex. 14 at 35);

(c)    Counterparty Risk (June 2004 EM, Ex. 13 at 22; October 2006 EM, Ex. 14 at 22);

(d)    description of the Broker-Dealer (i.e., Madoff) (*supra* ¶ 203; October 2006 EM, Ex. 14 at 31);

(e)      limited discretion of the Broker-Dealer (*supra* ¶ 204; October 2006 EM, Ex. 14 at 33-34);

(f)      Broker-Dealer was an agent and attorney-in-fact of Optimal U.S. (*supra* ¶ 205; October 2006 EM, Ex. 14 at 31); and

(g)      due diligence and care to be carried out by OIS (*supra* ¶ 206; October 2006 EM, Ex. 14 at 12, 22).

212.   The October 2006 EM further reiterated that OIS had offices in New York and that it was a wholly-owned subsidiary of Banco Santander.  (October 2006 EM, Ex. 14 at 10).

### 5.      The January 2008 Explanatory Memorandum

213.   The January 2008 Explanatory Memorandum is substantially similar to the October 2006 EM (the "January 2008 EM," Ex. 15).  Indeed, most of the disclosures are identical to those in the October 2006 EM, including the disclosures concerning the:

(a)      "Possibility of Fraud or Misappropriation" (*supra* ¶ 211(a); January 2008 EM, Ex. 15 at 33);

(b)      "Risk of Over-the-Counter Options Trading" (*supra* ¶ 211(b); January 2008 EM, Ex. 15 at 32);

(c)      Counterparty Risk (*supra* ¶ 211(c); January 2008 EM, Ex. 15 at 22);

(d)      description of the Broker-Dealer (i.e., Madoff) (*supra* ¶ 211(d); January 2008 EM, Ex. 15 at 28);

(e)      limited discretion of the Broker-Dealer (*supra* ¶ 211(e); January 2008 EM, Ex. 15 at 31);

(f)      Broker-Dealer was an agent and attorney-in-fact of Optimal U.S.; (*supra* ¶ 211(f); January 2008 EM, Ex. 15 at 28); and

(g)     due diligence and care to be carried out by OIS (*supra* ¶ 211(g); January 2008 EM, Ex. 15 at 11-12, 22).

### 6.     The October 2008 Explanatory Memorandum

214.    The last EM prior to the revelation of Madoff's Ponzi scheme on December 11, 2008, is dated October 2008 (the "October 2008 EM," Ex. 16).  The October 2008 EM is substantially similar to the October 2006 and January 2008 EMs, and most of the disclosures are identical to those in the October 2006 EM, including the disclosures concerning the:

(a)     "Possibility of Fraud or Misappropriation" (*supra* ¶ 211(a); October 2008 EM, Ex. 16 at 34);

(b)     "Risk of Over-the-Counter Options Trading" (*supra* ¶ 211(b); October 2008 EM, Ex. 16 at 33);

(c)     description of the Broker-Dealer (i.e., Madoff) (*supra* ¶ 211(d); October 2008 EM, Ex. 16 at 29);

(d)     Broker-Dealer was an agent and attorney-in-fact of Optimal U.S.; (*supra* ¶ 211(f); October  2008 EM, Ex. 16 at 29);

(e)     limited discretion of the Broker-Dealer (*supra* ¶ 211(e); October 2008 EM, Ex. 16 at 31-32); and

(f)     due diligence and care to be carried out by OIS (*supra* ¶ 211(g); October 2008 EM, Ex. 16 at 11, 22-23).

215.    One change, however, concerned Echeverría, who had left OIS in the Summer of 2008, and was no longer a Director of Optimal Multiadvisors.  Echeverría was replaced by Esteban Estévez who had also been named CEO of OIS.  (January 2008 EM, Ex. 15 at 9).

216.    There were a number of additional critical changes, however, that evidenced Defendants' serious concern about Madoff.  The counterparty risk disclosure included a new

paragraph about the possibility of default by, or complete collapse of, Madoff.  (October 2008 EM, Ex. 16 at 22).  Similarly, the "Custodial Risk" disclosure also added a new paragraph about broker-dealer insolvency.  (October 2008 EM, Ex. 16 at 22-23).

217.    These purported "disclosures," however, did not adequately inform investors of the extent of Defendants' own concerns about Madoff and BMIS.  By describing the "risk" in the future tense, Defendants represented that the assets were presently intact, which was false.  Nor did those purported "disclosures" obviate Defendants' obligations to conduct necessary due diligence on Madoff on behalf of Plaintiffs and the Class.  In fact, Defendants continued to fail to conduct any due diligence or, alternatively, continued to ignore the results of their due diligence.  Indeed, it was a misrepresentation to speak of the risk of failure or insolvency of the custodian (i.e., Madoff) since it was already a longstanding reality.

### 7.    OIS Made The False Statements In The Explanatory Memoranda

218.    The false and misleading representations in the Explanatory Memoranda were made by OIS.  Indeed, OIS drafted the EMs and controlled the process.  This is evident from the Courvoisier Memoranda.  The First Courvoisier Memorandum proposed that the prospectus include a description of Madoff and his split strike conversion strategy.  This description is virtually identical to the one set forth in the prospectuses beginning in June 2004, and set forth above in paragraph 203.  There were only two significant differences between the text proposed in the First Courvoisier Memorandum and the text ultimately included in the prospectuses: (i) the substitution of Madoff's name with the generic term, "Broker-Dealer," (at Madoff's insistence), and (ii) the inclusion of a sentence saying that "the assets of the fund are deposited with the Broker-Dealer."  (FCM, Ex. 1 at 2-3; *infra* ¶ 203).

219.    The First Courvoisier Memorandum further reflected a concern that arose from the fact that Madoff had to buy and sell options from private counterparties (the so-called over-

the-counter market), and not through an exchange.  The risk of operating with counterparties

rather than an exchange is that Madoff (and therefore Optimal U.S.) had counterparty risk – *i.e.*,

risk that the other side would not perform due to bankruptcy or other liquidity problems.

Accordingly, Courvoisier proposed the following disclaimer for the EM:  "The options

transactions executed [by Madoff] for the benefit of Optimal U.S. are effected, primarily, in the

over-the-counter market, not on the registered options exchange.  BLM [i.e., Madoff] is not a

market maker in options."  (FCM, Ex. 1 at 4).  The EMs ultimately included this identical

disclaimer except that the reference to Madoff as "BLM" was deleted, and only referred to as

"the Broker-Dealer."  (*infra* ¶ 203 ).

220.    OIS's control of the statements in the EMs is also evident from the Second

Courvoisier Memoranda.  In the section which addressed the "Contractual Agreement with

Madoff," Courvoisier explained that OIS would redraft the disclosures concerning Madoff

pursuant to Madoff's instructions.

> In reviewing the Information Memorandum of Fairfield Sentry
> Ltd., Madoff explains that it is not correct to say that Fairfield has
> a "discretionary account" at [BMIS], as stated under the
> "Investment Policies" of this document.  If this was the case,
> Madoff/[BMIS] would choose what security to buy (as an
> investment advisor would do).  However, if he only chooses the
> time when he trades, then he has no "discretion."  The only
> decision/discretion he makes/has is on the timing and the price.  In
> other words, Madoff/[BMIS] only executes the investment strategy
> that the investment adviser gives him to implement.

> (SCM, Ex. 2 at 2).

221.    Madoff and OIS then executed an "additional letter" documenting the

understanding that Madoff had discretion with respect to the timing and price of the stocks, but

was limited to purchasing stocks included in the S&P 100.  (SCM, Ex. 2 at 3).  The language

from the letter was incorporated into the June 2004 EM, which stated that Madoff had "limited

investment discretion."  The June 2004 EM, including all the ones subsequently issued, represented that all investment decisions were made by OIS: "The success of the fund for the foreseeable future will depend largely upon the ability of the Investment Manager [i.e., OIS]." (October 2006 EM, Ex. 14 at 33; January 2008 EM, Ex. 15 at 7 and 30).

222.    The above statements were, of course, misleading.  Madoff's control, decision making authority, and discretion to invest Optimal U.S.'s assets had not changed in any way from prior years.  Yet, the EMs issued in 2001 and 2002 had correctly identified Madoff as the "manager," and stated that Madoff made all decision: "the independent manager [i.e., Madoff] will make all decisions with respect to the investments of [Optimal U.S.].  The success of [Optimal U.S.] for the foreseeable future may depend largely upon the ability of the manager [i.e., Madoff] to continue to oversee the implementation of the investment strategy."  (July 2001 EM, Ex. 11 at VII; May 2002 EM, Ex. 12 at 26).

223.    In a word, Defendants drastically altered the EMs after 2002 in order to misrepresent the relationship between the parties, and falsely claim that OIS played an active ongoing role in the management of Optimal U.S.  The repeated references in the EMs issued after the 2002 meeting with Madoff to "the fund's trading strategy" as merely "executed" by the Broker Dealer, but under the supervision of OIS, were misleading statements designed to create the misimpression that Defendants had control and were actively involved in making investment decisions.  OIS made these false statements knowingly or with reckless disregard.

224.    In truth, Defendants had neither control nor any active role other than to funnel billions of dollars of Plaintiffs' monies to Madoff in return for tens of millions in unearned investment management fees.  Indeed, Defendants' entire decision making process consisted

solely of their decision to wire the funds to Madoff, who made all decisions and had complete control of the investments.

### D.   DEFENDANTS MADE ADDITIONAL FALSE REPRESENTATIONS TO THE PIONEER PLAINTIFFS

225.   As a longstanding practice, Pioneer did not invest in single manager hedge funds such as Madoff.  Such hedge funds require oversight through ongoing due diligence.  Although Pioneer was equipped to perform due diligence, it was not equipped to perform **ongoing** due diligence on hedge funds.  Accordingly, Pioneer never invested in single manager hedge funds other than in rare instances where a desirable, consistent performing single manager had ongoing due diligence performed upon it by a known and responsible third party.

226.   In late 2007, Pioneer learned of a desirable single manager for which Pioneer would not have to perform ongoing due diligence oversight since the fund was overseen by Defendants.  It was principally for this reason – that an established and respected large financial institution had performed and would continue to perform ongoing due diligence and oversee the investment – that Pioneer considered investing in Optimal U.S. at all.

227.   Pioneer first met with Defendants on October 29, 2007, in the offices of Julius Baer in Geneva, Switzerland.  The OIS representative was Vice President of Business Development, Ayca Pars ("Pars").   The representatives for Pioneer at the meeting were Chief Investment Officer David Tamir ("Tamir"), Chief Operations Officer Dafna Gonen ("Gonen"), and Chief Executive Officer of Pioneer Global Funds Mark Goldblatt ("Goldblatt").

228.   Pioneer's main goals at the October 29, 2007, meeting were: (1) to learn more about Optimal U.S. and, if found to be a desirable investment, (2) to determine whether Defendants were performing meaningful ongoing due diligence and were sufficiently involved in

the underlying fund's operations (*i.e.*, Madoff).  Accordingly, Pioneer representatives Tamir and Gonen asked Pars numerous questions.

229.    Pars indicated, however, that she was unable to answer Pioneer's questions about due diligence since those functions were performed by Defendants in New York City.  Accordingly, Pars offered to get an OIS employee on the phone, Defendant Clark, in order to respond to Pioneer's questions about Optimal U.S. and due diligence on Madoff.  Pars arranged for a conference call with Banco Santander's offices in New York.

230.    In the conference call, Defendant Clark stated that he worked out of Banco Santander's and OIS's New York City office where he maintained regular contact with the Madoff operation and monitored Madoff.  Clark explained that although Madoff managed the account, Defendants monitored Madoff from New York.  Clark assured Pioneer that Madoff provided "full transparency" to Defendants who monitored Madoff's trading on a "segregated account" for Optimal U.S. on a continuous basis.

231.    Clark further represented that Defendants worked together with Madoff and were far from being passive investors.  Defendants were supposedly fully informed and actively involved participants.  Madoff's discretion over the investment decisions, Clark claimed, was limited because Defendants played an active and ongoing decision making role in the investment.  Defendants had given Madoff an investment "mandate" and Madoff executed the mandate under their control and daily monitoring.  Defendants supposedly determined the stocks and equities that were to be traded by Madoff who executed the trades and exercised limited judgment within defined guidelines.

232.    As set forth herein, the truth about Defendants' due diligence on Madoff was far different than Clark represented it to Pioneer on October 29, 2007: (a) Defendants performed no

meaningful due diligence on Madoff; and, (b) Defendants were well aware of numerous red flags of fraud, which were highly material and which Clark concealed from Pioneer.

233.    Each and every one of the above misrepresentations and failures to divulge material facts were made on October 29, 2007, from the offices of Banco Santander and OIS in New York.

### E.    DEFENDANTS' FALSE REPRESENTATIONS AND OMISSIONS IN MARKETING THE FUNDS

234.    Beginning in the late 1990s and through December 11, 2008, Defendants marketed Optimal U.S. on the basis of false and misleading representations and omissions. Investors in Optimal U.S., or their nominees, were provided copies of the Explanatory Memoranda and were required to acknowledge that they had received that document as a condition to buying shares in Optimal U.S.  In addition, Defendants issued to Plaintiffs numerous updates, performance reports, and marketing and sales materials.  These documents contained uniform misrepresentations and material omissions that induced Plaintiffs to invest and retain their investment in Optimal U.S..

235.    Defendants further misrepresented to Plaintiffs that their assets were being invested using a split-strike conversion strategy, and that assets in Optimal U.S. were earning substantial, consistent returns over time.  Defendants also falsely stated that Madoff had been subject to extensive due diligence and monitoring, and continued to be, and that they had full transparency into all of Madoff's operations.  Defendants failed to disclose to Plaintiffs that in reality no one had conducted meaningful due diligence on Madoff prior to establishing Optimal U.S. and selecting Madoff as execution agent and broker for Optimal U.S.; no one was meaningfully monitoring or independently verifying Madoff's trading activity; Defendants had

effectively no transparency into Madoff's operations; and Defendants had no independent, actual basis for stating that Madoff was executing a split-strike conversion strategy.

236.    Nevertheless, Defendants, as acknowledged in their documents and marketing materials, recognized the fundamental importance of proper due diligence and strict monitoring and oversight of Optimal U.S.'s investment manager, broker and custodian, and their obligation to perform these functions.  However, as set forth herein, Defendants grossly failed to perform due diligence that they recognized was essential and required by industry practice.  Defendants also wholly disregarded the red flags that surrounded Madoff and that should have alerted them, as experienced investment professionals, to the need for heightened scrutiny.

### 1.    Defendants' False Representations and Omissions Regarding the Funds' Track Record of Profitability

237.    Defendants uniformly represented – in the Explanatory Memoranda and other uniform sales materials – Optimal U.S.'s consistent profitability and minimal volatility.  Each month, Defendants prepared and distributed updates of Optimal U.S.'s performance.  These updates generally took the form of a one or two page statistical summary, including a chart with the monthly performance for the prior six years on a percentage basis.  There was also a chart showing the Distribution of Returns, highlighting that of the 72 monthly returns shown, virtually all were positive and showed consistent rates of return.   The "Fund Description" stated that the objective was to "minimize volatility."  A compilation of monthly updates are attached hereto as Exhibit 17.

238.     These representations of Optimal U.S.'s historical returns were false.  Madoff did not make any securities transactions in the thirteen years prior to his arrest, which included the entire existence of Optimal U.S.  There were thus no profitable months for Optimal U.S. because its assets were not, and had never been, invested.

239.    Defendants failed to disclose to Plaintiffs the material fact that the historical returns were based solely on information provided by Madoff, and that they had failed to verify independently any of the returns they represented Optimal U.S. had earned over the years.

240.    In addition to these statistical summaries, Defendants also regularly provided to Plaintiffs various other uniform reports on Optimal U.S.  The report for the third quarter of 2008, for example, stated as follows:

>    Highlights of the 3rd Quarter
>
>    Monthly Performance
>
>    • July: After exiting the market and staying in T-bills throughout June, the manager [Madoff] had initiated a partial position during the month of July.  The strategy proved beneficial as the fund capitalized on a sudden spike in volatility mid-month . . . .
>
>    • September: After getting cautiously invested at the end of July, the fund maintained the positioning through the middle of September . . . . After seeing the fundamentals deteriorate during the second week of September [Lehman declared bankruptcy on September 15], the manager [Madoff] completely exited the trade and remained in T-bills for the remainder of the month.
>
>    (Optimal U.S. 3Q'08 Report, Ex. 18 at 8).

241.    On the next page, a chart showed that Optimal U.S. had purportedly obtained a 2.39% positive return while the S&P 500 had lost 8.88% in the third quarter of 2008.  *Id.* at 9.  The "Summary of the Fund Achievements" then concluded that "the manager's market timing was impeccable."  *Id.* at 10.  The rest of the report highlighted the supposed advantages of Optimal U.S.:

>    • Optimal Strategic U.S. Equity's Performance Is Highly Uncorrelated With The U.S. Equity Market As Well As Hedge Fund Returns In General (at 12);

- The Fund Has Achieved Superior Returns With Far Lower Volatility Compared To The U.S. Equity Market And A Multi-Strategy Hedge Fund Index (at 14);

- The Fund Has Outperformed During Crisis Periods (at 15); and,

- Optimal Strategic U.S. Equity's Monthly Returns Are Positively Skewed (at 17).

242.    Similarly, the "Optimal Newsletter" for April 2004 provided a short summary of the monthly performance for Optimal U.S.  (Ex. 19 at 4) (translated from Spanish).  It reported that "Optimal Strategic U.S. Fund (Class A) [had] obtained a positive return of 0.65% in April 2004, compared with a negative 1.86% for the S&P 100.  The positive result [had been] largely due to the manager's deft execution of the call options to overcome the negative trend in the market."  *Id.*

243.    For August 2005, the "Optimal Newsletter" stated, "Optimal U.S. had a positive return of 0.15% in August 2005, while the S&P 100 lost 1.43%."  (Ex. 20 at 5) (translated from Spanish).  It then continued, "[T]he manager [Madoff] remained out of the market in the month of August avoiding a bull spread in a negative market.  As in July, the fund remained invested in short-term U.S. Treasuries, with a return of approximately 3.60%, which produced a positive result."  *Id.*

244.    These statements regarding Optimal U.S.'s performance were false because Optimal U.S.'s assets were not, and had never been, invested.  Furthermore, Defendants failed to disclose to Plaintiffs that their due diligence was grossly deficient as to the investment with Madoff, and that they had no independent basis to confirm Madoff's representations about Optimal U.S.'s performance.

## 2.     Defendants Operated As A Unitary Organization

245.     Optimal U.S. was marketed and sold indistinctly by Banco Santander's subsidiaries, including OIS and Santander U.S.  The marketing materials often highlighted that the Santander name stood behind OIS and Optimal U.S.  For example, in October 2008, OIS prepared a presentation on Optimal U.S., entitled: "Optimal Investment Services: Optimal Strategic US Equity."  (Ex. 21).  It said: "Why Optimal?  Santander & Optimal."  In other words, the reason to invest in "Optimal" was "Santander."   (Ex. 21 at 2).  These materials (including the Explanatory Memoranda) were distributed by OIS, Santander U.S., and other subsidiaries of Banco Santander, without regard for corporate structure and formalities.

246.     In fact, as set forth in more detail below, Banco Santander, OIS, and Santander U.S. formed a tight weave of connections in which each entity played an essential role with respect to Optimal U.S.  These entities were interrelated, sharing office space, management, common names, and goals.

### (a)     Santander U.S. Marketed And Sold Optimal U.S.

247.     Santander U.S.'s office on Brickell Avenue in Miami, Florida, served as the headquarters for Santander's International Private Bank in Latin America.  Santander U.S. began selling OIS's and its predecessor's funds in the late 1990s.  At that time, the funds were sold under the brand name BPI, which stood for Banca Privada Internacional – Spanish for International Private Bank.  Optimal U.S. at the time was called "BPI M.STRATEGIC."

248.     Santander U.S. mailed bank statements, explanatory memoranda, and other documents relating to Optimal U.S. regardless of whether the investor had an account at Santander U.S. or at a non-U.S.-based Santander banking affiliate.  Multiple instances are documented below.

249.     For example, the July 2001 EM was distributed to investors worldwide by Santander U.S. from Miami, Florida.  This is evidenced by a cover letter dated August 15, 2001, from Santander Central Hispano International ("BSCH International") which listed its address on Brickell Avenue in Miami, Florida, and enclosed the EM (Ex. 11).  BSCH International was the predecessor entity to Santander U.S.  A similar letter was sent on June 11, 2003 by Santander U.S. providing updated versions of the Explanatory Memoranda to its clients.  (Ex. 22).

**(b)      Santander U.S. Officers Sold Optimal U.S. In Latin America**

250.     Santander U.S. officers based in Miami, Florida marketed and sold Optimal U.S. in Latin America based on the false and misleading Explanatory Memoranda and false monthly and quarterly reports.  One of the most successful salesmen of Optimal U.S. was Patricio Waterhouse ("Waterhouse").  Waterhouse worked for Santander U.S. from 2002 until approximately March 2009, and had monthly discussions with Echeverría about Optimal U.S. during this period.  Waterhouse also participated in the monthly conference calls in which the monthly results of Optimal U.S. were discussed.  These calls typically occurred about five days after the end of the month.  Waterhouse would also regularly travel to Latin America from his U.S. office to meet with investors in Optimal U.S., and would regularly speak from his U.S. office with investors who resided in Latin America.  Upon information and belief, Waterhouse was allowed to meet Madoff, in person, as a reward for being the best Optimal U.S. salesman.

251.     Another successful Santander U.S. employee was Diego Sacerdote ("Sacerdote").  Sacerdote was a Vice President of Santander U.S. but had his offices in New York City, at 45 East 53rd Street.  Defendant Clark was based in the same office, from where he conducted due diligence on Madoff.  Sacerdote worked at the New York office from approximately the end of 2001 through 2004.

     **(c)**     **Santander U.S. Sent Communications And Information From Miami Even To Clients With Accounts Not With Santander U.S.**

252.     Santander U.S. marketed and sold Plaintiffs Galinanes and Broccoli the investment in Optimal U.S. One of Santander U.S.'s employees principally responsible for Plaintiff Galinanes' investment was Luca Majic. Plaintiff Galinanes never spoke with anyone from Santander Bahamas. Nicholas Coubrough and Ximena Goni were the Santander U.S. bankers who handled Plaintiffs Broccoli's investments.

253.     Plaintiff Galinanes also regularly received his bank statements mailed from Miami. Plaintiff Galinanes' bank account, however, is with Santander Bahamas. For example, on February 20, 2009, Santander Bahamas mailed Plaintiff Galinanes his account statement. But the mailing envelope is (i) postmarked "Miami, Florida;" (ii) stamped "February 20, 2009;" (iii) reflects metered "United States Postage" of $0.36; (iv) states "mailed from zip code 33166;" and (v) lists as a return address a Post Office Box in Miami, Florida. (Ex. 23).

     **(d)**     **Santander U.S. Opened Bank Accounts In Bahamas and Switzerland**

254.     Santander U.S. employees based in Miami would regularly offer to open bank accounts at Santander affiliates in the Bahamas or Switzerland, and invest in Optimal U.S. For example, on December 7, 2007, Marcelo Charul ("Charul"), who was a Vice President at Santander U.S., sent an email to a Latin American investor offering to open bank accounts in either Santander Bahamas or Santander (Suisse), S.A. ("Santander Switzerland"). The subject line read, "Account Openings." Charul's email said: "Attached are the documents necessary to open bank accounts in Bahamas or Switzerland (in zip files). In both cases it is necessary to add copies of the passports with a clear picture of each signator. Regards." (Ex. 24).

255.     The files attached to Charul's email included five different documents necessary to open accounts in Santander Bahamas, including an account agreement and signature card on Santander Bahamas letterhead.  (Santander Bahamas Account Agreement, Ex. 25).  The attached files also included thirteen different documents to open accounts in Santander Switzerland, including an "account opening form" on Santander Switzerland letterhead.  (Santander Switzerland Account Form, Ex. 26).

256.     The email by Charul from Miami did not offer to open an account with Santander U.S., nor did it include any recipients at Santander Bahamas or Santander Switzerland.  The only other recipient was Daniel Suárez ("Suárez") who was also an employee of Grupo Santander.  Based on the email address, Suárez appears to have been based in Uruguay at the time.

257.     In a prior email dated December 4, 2007, Charul had sent the client a thirty-one page OIS brochure of all Optimal funds, dated October 2007.  (December 4, 2007 Email, Ex. 27; Optimal brochure dated October 2007, Ex. 28).  Among the funds offered was Optimal U.S.

### (e)     Banco Santander Used Its Website To Promote OIS and Optimal U.S.

258.     Banco Santander  marketed Optimal U.S. through the platform of Santander Group's web site, and promoted reliance upon the good name of Santander since OIS was presented to the world as Santander's hedge fund arm.  To this day the OIS website (www.Optimal.biz) is accessible through Santander's web site (www.Santander.com) under the option "Websites of Group."

### (f)     Banco Santander And Its Affiliates Oversaw Risk Management At OIS

259.     Banco Santander and its affiliates in Madrid were deeply involved in risk management at OIS, especially with respect to Optimal U.S.  In an October 2008 presentation about Optimal U.S. entitled, "Optimal Investment Services: Optimal Strategic US Equity," OIS

emphasized repeatedly the pervasive role of its corporate parent, Banco Santander.  ("Optimal U.S. October 2008 Presentation," Ex. 21).

260.    The first section of the presentation asked, "Why Optimal?"  The answer relied heavily on Grupo Santander, with one slide immediately afterwards listing the advantages of the "Presence of Grupo Santander" in OIS.  These advantages included the fact that Banco Santander was the seventh largest bank in the world in terms of market capitalization, the fifth most profitable bank, had more than 132,000 employees, and earned record profits in 2007 of about $10 billion.  (*Id.* at Ex. 21 at 3).

261.    Banco Santander's role was described in even more detail with respect to risk control.  One of the critical risk-controls included "Internal Audit" at Grupo Santander.  (*Id.* at Ex. 21 at 23).  Internal Audit was an additional control layer on top of all the risk control procedures supposedly carried out by OIS.  As set forth in the presentation, risk control procedures included supervision by (i) the risk control committee at OIS; which included OIS's CEO and CIO, and the head of operational risk, among others; (ii) the non-investment, operational due diligence, and quantitative research teams; and (iii) Optimal U.S.'s outside auditors, PwC.

262.    Grupo Santander's Internal Audit functions were further specified in another slide, entitled "Operational Control: 6 Levels of Control and Audit."  (*Id.* at Ex. 21 at 26).  "The Risk Control Division at Santander Asset Management controls all risk controls and procedures at OIS."  (*Id.*).  This "control" was carried out on a "continuous" and "annual" basis.  (*Id.*).  Indeed, Grupo Santander's Internal Audit group had a team member permanently based in Geneva. (*Id.* at Ex. 21 at 26).

### 3. Santander U.S. Unjustly Profited From Optimal U.S.

263. Santander U.S. benefited economically from the sale of Optimal U.S. to Plaintiffs. Santander U.S. charged Plaintiffs a sales charge at the time of the investment in the funds that was a percentage of the amount invested. This sales charge was in addition to the annual management fee charged by OIS based on the market value of Optimal U.S. each year. Santander U.S. also benefited economically because it shared the annual management fee with OIS as compensation for Santander U.S.'s sales efforts. Santander U.S. has kept these sales charges, fees, and commissions, and has not returned the monies to Plaintiffs.

### F. CONDUCT BY THE DEFENDANTS IN 2008 INDICATES GROWING ALARM ABOUT MADOFF AND AN EFFORT TO CONCEAL DEFENDANTS' WRONGFUL CONDUCT

#### 1. Santander U.S. And Bahamas Attempted (Unsuccessfully) To Avoid Liability For Optimal U.S. By Having Investors Sign Waivers

264. In the course of 2008, Banco Santander affiliates implemented certain procedures that indicated growing concerns about Madoff. One of those procedures consisted in having private banking clients who had invested in Optimal U.S. sign a waiver in order to remain in the fund ("Waiver," Ex. 29). Nothing had changed with respect to the supposed risk parameters of Madoff to warrant the execution of this new waiver. Madoff was supposedly still executing his split strike conversion strategy. And Madoff was still the only manager for Optimal U.S. Nevertheless, the Banco Santander affiliates sought to obtain additional waivers.

265. The Waiver said, in relevant part:

> With respect to your investment in Optimal U.S., you understand and accept the following:
>
> Santander Bank & Trust Ltd. (the "Bank") [i.e., Santander Bahamas] has informed you that your investment in Optimal U.S. may exceed the concentration limits recommended by the Bank, based specifically in the investment profile you have selected for

your account with the Bank, **for investments in Hedge Funds managed by one manager**.

(Waiver, Ex. 29; emphasis supplied).

266.    The Waiver further explained that Santander Bahamas (i) had advised the client to redistribute the portfolio by investing in investments other than Optimal U.S.; (ii) provided the client the opportunity to review the clients' investments and reduce the exposure to Optimal U.S.; (iii) provided various opportunities to ask questions and receive answers concerning Optimal U.S.; and (iv) explained that the investment in Optimal U.S. was not guaranteed by the Bank, any of its affiliates, or any private or governmental entity, and could result in the total loss of investment.  (Waiver, Ex. 29).

267.    The Waiver was therefore quite clear: invest in Optimal U.S. at your own risk.

268.    While the Waiver exhibited the dry terminology of legal forms, emails from Santander U.S. bank representatives to their clients translate Santander U.S.'s concerns into plain language.  In an email from Vanessa Redmond at Santander U.S.'s offices, in Miami, Florida, dated September 30, 2008, Ms. Redmond told a client that:

> Banco Santander is recommending liquidating one of your investments.  The name is "OPTIMAL U.S. EQ IRL A USD."  The bank considers that it is highly risky and due to the volatility in the market we prefer to be conservative and liquidate the investment.
>
> Please call me to discuss this issue.

(September 30, 2008, V. Redmond Email, Ex. 30, translated from Spanish).[4]

269.    The claim that the volatility in the market was the reason Santander U.S. recommended exiting Optimal U.S. was flatly contradicted by OIS's own report for Optimal U.S. for the quarter ending September 30, 2008 ("Optimal U.S. 3Q'08 Report," Ex. 18).   OIS

---

[4]    This email has been made available in redacted form.

actually touted the volatile environment as providing opportunities for Madoff.  In a slide entitled "Summary of Fund Achievements," OIS stated:

> Review and outlook:
>
> - The manager's market timing [i.e., Madoff's] was impeccable during the recent period, as he was able to find great entry points and exit points to benefit investors
>
> - **The current volatile environment continues to provide opportunities for the strategy to outperform its equity index benchmark.**
>
> - [Optimal U.S.] navigated one of the most difficult periods in recent market history successfully, managing to produce a gain in the face of high market volatility.
>
> (Optimal U.S. 3Q'08 Report, Ex. 18 at 10; emphasis supplied).

### 2.    Echeverria Left OIS In June 2008 And Banco Santander Sent A Director To Meet With Madoff On Thanksgiving Day 2008

270.    On June 30, 2008, Echeverría left OIS after nearly a 20-year career with Banco Santander and its affiliated entities.  Echeverría had been OIS's CEO and CIO during its entire existence.  He had built the hedge fund group in Geneva that ultimately became OIS.  And, as described in the EMs, "he built Grupo Santander's expertise in the major alternative investment styles . . . and several other sub-strategies, building a US and European presence for Grupo Santander."  (October 2006 EM, Ex. 14 at 9).

271.    With Echeverría gone and unable to sell OIS, Defendants made one last-ditch effort to salvage what they could from Madoff.  In late-November 2008, Banco Santander dispatched a senior member of its Board of Directors, Rodrigo Echenique, to meet with Madoff, face-to-face, in New York.  Echenique is widely known to be one of Emilio Botín's ("Botín") most trusted advisors.  Echenique had served under Botín as President of Banco Santander between 1988 and 1994, and has remained a Director on the Board ever since.  Botín is the

Chairman and CEO of Banco Santander, has been a director since 1964, and succeeded his father and grandfather who both ran Banco Santander before him.

272.     Echenique and his team met with Madoff on Thanksgiving Day 2008.  According to a Financial Times article dated January 23, 2009, and entitled, "Santander Fund Praised Impeccable Madoff," what happened during the meeting is "disputed."  However, a banker "with knowledge of the meeting" described it as "a 'routine' inspection" that resulted in Banco Santander remaining satisfied with BMIS.  The Spanish newspaper *El Mundo* reported on December 18, 2008, meanwhile, that Echenique's visit was prompted by "rumors about the possible problems" at BMIS which had been "going around for a few months in a small number of Santander's offices," and noted the abrupt departures of several high level executives of OIS in June 2008, including Echeverría.  Regardless of the "rumors," *El Mundo* reported that Banco Santander's delegation purportedly "returned from New York with a complete report that theoretically removed any doubt about the solvency" of BMIS.

### 3.     Banco Santander Settled The Claw Back Suit Filed By The Madoff Trustee Prematurely To Prevent The Release Of Incriminating Information

273.     In early May 2009, the Madoff Trustee filed a number of lawsuits in bankruptcy court against several Madoff feeder funds.  The suits sought to claw back hundreds of millions of dollars that the feeder funds had withdrawn from their Madoff accounts (the "Claw Back Lawsuits").  The Madoff-Trustee alleged that those monies belonged to other victims of Madoff's Ponzi scheme.

274.     The Claw Back Lawsuits further alleged that the feeder funds ignored critical red flags.  For example, in a law suit filed against the Kingate feeder fund, the Madoff Trustee presented the following evidence in support of his claim:

Hedge funds and funds of funds like the Defendants were sophisticated investors that accepted fees from their customers based on purported assets under management and/or stock performance in consideration for the diligence they were expected to exercise in selecting and monitoring investment managers like Madoff. The Defendants failed to exercise reasonable due diligence of BLMIS and its auditors in connection with the Ponzi scheme. Among other things, the Defendants were on notice of the following indicia of irregularity and fraud but failed to make sufficient inquiry.

(Compl. at 13, *Irving H. Picard v. Kingate Global Fund, Ltd. et al*, No. 08-cv-01789, Adv. Pro. No. 09-1161 (Bankr. S.D.N.Y.), ("Trustee Kingate Action"), ECF No. 5).

275. The indicia of irregularity alleged by the Madoff Trustee was that Madoff repeatedly reported to the feeder funds, such as Optimal U.S., **trades that were outside of the daily trading range**. By May 2009, Mr. Picard had combed BMIS's internal records for almost six months and had been able to conduct a thorough examination. This examination culminated in the finding that Madoff had reported hundreds of trades that could never have been executed and that should have alerted the individuals controlling the feeder funds that something was terribly wrong. The Trustee Kingate Action thus alleged as follows:

At times, the Defendants' monthly statements reflected trades purchased or sold on behalf of the Defendants' accounts in certain securities that were allegedly executed at prices outside the daily range of prices for such securities traded in the market on the days in question . . . . **Defendants Kingate Global and Kingate Euro received monthly account statements that displayed 185 trades that were purportedly executed at a price outside the daily price range**.

(Compl. at 15-16, Trustee Kingate Action; emphasis supplied).

276. Despite this strong evidence against the feeder funds, the vast majority of them (if not all, except Optimal U.S.) chose to litigate with the Madoff Trustee rather than settle and return hundreds of millions of dollars. Indeed, prior to filing the lawsuits in May 2009, the Madoff Trustee sought to settle with the feeder funds for an amount close to one hundred cents

on the dollar.  Accordingly, the basic calculus that drove the feeder funds to litigate, and not

settle, was the fact that they had little to lose given the high demand made by the Madoff

Trustee.

277.     Banco Santander and OIS decided differently, however, and on May 26, 2009,

agreed to a settlement with the Madoff Trustee before a complaint had even been filed (the

"Madoff Trustee-Optimal Agreement").  The settlement had been the result of months of

negotiations after Optimal Multiadvisors had been served with a subpoena on February 27, 2009.

Optimal Multiadvisors agreed to return over $235 million.  This amount represented 85% of the

claim.

278.     No other Madoff feeder fund has agreed to settle with the Madoff Trustee prior to

initiation of a claw back lawsuit.

279.     The Madoff Trustee touted the settlement as a resounding victory.  In a press

release issued on May 26, 2009, he stated, "I am very pleased that we reached **such a favorable**

**settlement** with Optimal and that Optimal will pay more than $235 million to resolve the claims

against it." (emphasis supplied).  The press release also emphasized the high percentage of

recovery, "Optimal will pay the Trustee more than $235 million, an amount equal to 85% of the

amount of the Trustee's claims against Optimal."

280.     The investors in Optimal Multiadvisors were not consulted in connection with the

agreement with the Madoff Trustee, nor did they approve the agreement.  In fact, the entire

settlement negotiations were conducted in secret, and the investors were not even notified of the

negotiations until the agreement had been executed and publicly filed, in court, on May 26, 2009.

281.     The settlement itself was not the only revelation contained in the Madoff Trustee-

Optimal Agreement.  The agreement further revealed two critical pieces of information which

had not been disclosed to investors. First, there had been no disclosure that Optimal U.S. had more than $150 million in cash in its bank account, based on withdrawals from its BMIS account prior to its collapse. In all public disclosures concerning Optimal U.S.'s losses due to Madoff, the crux of the disclosures was that all monies had been lost. Indeed, Banco Santander negotiated releases with hundreds of investors that failed to disclose that Optimal U.S. had more than $150 million. There also was no consultation with the investors of Optimal U.S. with respect to whether the settlement agreement with the Madoff Trustee was in the best interest of the investors.

282.   Second, there had been no disclosure until then that the other sub-fund in Optimal Multiadvisors (Arbitrage) had invested with Madoff. Indeed, in a January 27, 2009 press release, OIS had announced that Arbitrage would be liquidated citing "adverse market conditions." But there was no mention that Arbitrage had invested in Madoff and had withdrawn approximately $125 million in the fall of 2008. There also was no mention that Arbitrage had lost about $14.5 million with Madoff, which was the amount that remained at BMIS as of November 30, 2008.

283.   Banco Santander and OIS thus carried out the negotiations of the agreement with the Madoff Trustee, and reached an agreement, to the detriment of, and contrary to the best interests of investors. Banco Santander and OIS forced Optimal Multiadvisors to settle with the Madoff Trustee to preempt a public lawsuit in which the Madoff Trustee would have accused Optimal Multiadvisors, and by imputation the Defendants in this action, of essentially the same wrongdoings asserted here. Most importantly, by settling with the Madoff Trustee, Banco Santander and OIS kept secret the information about the trades reported by Madoff outside of the daily trading range. Simply put, Banco Santander and OIS paid the Madoff Trustee, with monies belonging to Plaintiffs, to protect their own liability.

## VII.   CLASS ACTION ALLEGATIONS

284.   Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of all persons or entities who, (i) owned shares of Optimal U.S. on December 10, 2008, or (ii) purchased shares of Optimal U.S. from May 19, 2005, to December 10, 2008 (the "Class Period"), and were damaged thereby (the "Class"). Excluded from the Class are the Defendants, any entity in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, assigns, or immediate family members of any such individual or entity.

285.   The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that Class members number in the hundreds and perhaps thousands.

286.   Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs are members of the Class, their claims are typical of the claims of all Class members, and they do not have interests antagonistic to, or in conflict with, those of the Class. In addition, Plaintiffs have retained competent counsel experienced in complex litigation.

287.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal and common law.

288.   There are numerous questions of law and fact which are common to the Class and which predominate over any questions affecting individual members, including:

> (a)   Whether the federal securities laws were violated by Defendants' acts as alleged herein;
>
> (b)   Whether the common law was violated by Defendants' acts as alleged herein;

(c)     Whether Defendants' conduct alleged herein was intentional, reckless, or grossly negligent in violation of duties owed to Plaintiffs and the Class and, therefore, in violation of the common law;

(d)     Whether the Court has personal and subject matter jurisdiction over Defendants; and

(e)     Whether, and to what extent, Plaintiffs and the Class were damaged.

289.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since a multiplicity of actions could result in an unwarranted burden on the judicial system and could create the possibility of inconsistent judgments. Moreover, a class action will allow redress for many persons whose claims would otherwise be too small to litigate individually.  There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### COMMON LAW FRAUD
### (Purchaser Claims)

290.    The foregoing paragraphs are realleged herein.  This Count is asserted against all Defendants except Santander U.S. by Plaintiffs, which does not include Pioneer.

291.    Defendants subject to this Count falsely represented to Plaintiffs in connection with their purchase of shares in Optimal U.S. that: (i) Optimal U.S. would invest its monies into a legitimate fund with a legitimate "Broker Dealer," principally relying on the split-strike conversion strategy involving the purchase of equities and options; (ii) that by using this strategy, Optimal U.S. historically had consistent profitable returns since inception; and (iii) Defendants subject to this Count would monitor, verify, and conduct, and had conducted, due diligence into the investments made with Madoff to confirm that Madoff operated legitimately,

using the stated investment strategy, and in accordance with the required legal and regulatory requirements.

292.    Defendants subject to this Count failed to disclose the following material information, among other things, which rendered their representations false and misleading: (i) that Defendants subject to this Count were in fact not engaging in customary, or even minimal, due diligence to verify that Optimal U.S.'s assets were being properly invested and managed by Madoff and BMIS, or that the assets even existed; and (ii) the existence of numerous red flags regarding Madoff including, among others, the secrecy of Madoff's operations, the lack of segregation of duties, inadequate auditing of Madoff, and the attainability of consistently profitable returns for a fund pursuing the stated strategy.

293.    Defendants subject to this Count made false and misleading representations and omissions, knowingly and recklessly, without regard for their truth or falsity, and with the intent to induce Plaintiffs to rely upon them by investing assets in Optimal U.S.

294.    Plaintiffs justifiably relied upon the false representations made by Defendants subject to this Count by investing their assets in Optimal U.S.

295.    As a direct and proximate cause of their reliance upon the false representations and omissions by Defendants subject to this Count, Plaintiffs have suffered damages, including the loss of their investments in Optimal U.S., and Defendants subject to this Count, in turn, have wrongfully taken substantial assets belonging to the Plaintiffs in the form of improper unearned fees.

## COUNT II
## COMMON LAW FRAUD
### (Holder Claims)

296.    The foregoing paragraphs are realleged herein.  This Count is asserted against all Defendants except Santander U.S. by Plaintiffs, which does not include Pioneer.

297.    Defendants subject to this Count induced Plaintiffs to hold their positions in Optimal U.S. by falsely representing to Plaintiffs that: (i) Defendants subject to this Count had conducted thorough due diligence and exercised oversight of Madoff's operations, and had determined that those operations were legitimate, utilized the split-strike conversion strategy, and had a long track record of achieving positive investment returns; (ii) Plaintiffs' assets invested in Optimal U.S. would, in turn, be invested in legitimate funds operated by Madoff which utilized the split-strike conversion strategy; (iii) Defendants subject to this Count would monitor the investments made with Madoff to confirm that Madoff operated legitimately, used the split-strike conversion strategy, and in accordance with all legal and regulatory strictures, and further that Defendants subject to this Count would verify Madoff's transactions, including that Madoff actually made the represented trades and held the represented assets; (iv) the due diligence and oversight process employed by Defendants subject to this Count was so thorough as to allow Defendants subject to this Count to assure that the monies provided to Madoff were being actually and legitimately invested; and (v) Madoff's operations and accounts were audited by reputable independent auditors utilizing appropriate and accepted accounting and auditing procedures, which provided further assurance that Madoff's accounts actually held the represented assets and were otherwise operated lawfully.

298.    Defendants subject to this Count made the representations knowing that they were false in that: (i) Defendants subject to this Count did not, in fact, conduct thorough or appropriate due diligence of, or exercise oversight over Madoff and his operations and had not determined that Madoff actually invested assets utilizing the split-strike conversion strategy, with a long track record of achieving positive investment returns; (ii) Defendants subject to this Count did not invest Plaintiffs' assets in legitimate investment vehicles that utilized the split-strike

conversion strategy; (iii) Defendants subject to this Count did not meaningfully monitor the investments in Madoff to confirm that Madoff operated legitimately using the split-strike conversion strategy and in accordance with all legal and regulatory strictures, and did not verify Madoff's transactions, including that Madoff actually made the represented trades and that Madoff held the represented assets; (iv) the due diligence and oversight processes employed by Defendants subject to this Count were non-existent, and did not allow Defendants subject to this Count the ability to assure that the assets provided to Madoff were actually and legitimately invested; and (v) Madoff's operations and accounts were not audited by reputable, independent auditors utilizing appropriate and accepted accounting and auditing procedures, and thus did not provide any assurance that Madoff actually held the represented assets and were otherwise operated lawfully.

299.    When they made their false statements and committed their omissions, Defendants subject to this Count knew facts or had access to information suggesting that their public statements were not accurate or failed to check information they had a duty to monitor, and which would have demonstrated the falsity of their statements.

300.    Defendants subject to this Count made the false representations knowing of their falsity, or recklessly not knowing, and with the intent to induce Plaintiffs to rely upon the false representations by holding assets in Optimal U.S.

301.    Plaintiffs justifiably relied upon the false representations made by Defendants subject to this Count in holding their assets in Optimal U.S.

302.    As a direct and proximate result of their reliance upon the false representations and omissions made by Defendants subject to this Count, Plaintiffs have suffered damages, namely the loss of their investments in Optimal U.S., and Defendants subject to this Count, in

turn, have wrongfully taken substantial assets belonging to the Plaintiffs in the form of improper and unearned fees.

**COUNT III**
**NEGLIGENT MISREPRESENTATION**
**(Purchaser Claims)**

303.    The foregoing paragraphs are realleged herein.  This Count is asserted against all Defendants by Plaintiffs, which does not include Pioneer.

304.    Based on their unique or special expertise with respect to investments generally and Madoff in particular, Defendants had a special relationship of trust or confidence with Plaintiffs, which created a duty on the part of Defendants to impart full and correct information to Plaintiffs.

305.    Defendants falsely represented to Plaintiffs in connection with their purchase of shares in Optimal U.S. that: (i) Optimal U.S. would invest its monies into a legitimate fund with a legitimate "Broker Dealer," principally relying on the split-strike conversion strategy involving the purchase of equities and options; (ii) that by using this strategy, Optimal U.S. historically had consistent profitable returns since inception; and (iii) Defendants would monitor, verify, and conduct due diligence into the investments made with Madoff to confirm that Madoff operated legitimately, using the stated investment strategy, and in accordance with the required legal and regulatory requirements.

306.    Defendants failed to disclose the following material information, among other things, which rendered their representations false and misleading: (i) that Defendants were in fact not engaging in customary, or even minimal, due diligence to verify that Optimal U.S.'s assets were being properly invested and managed by Madoff and BMIS, or that the assets even existed; and (ii) the existence of numerous red flags regarding Madoff including, among others, the secrecy of Madoff's actual operations, the lack of segregation of duties, inadequate auditing of

83

Madoff, and the attainability of consistently profitable returns for a fund pursuing the stated strategy.

307.    Defendants made the false representations and material omissions knowing that Plaintiffs would use and rely upon the representations and omissions for the particular purpose of determining where and how to invest their assets and, in particular, to decide to invest their assets in Optimal U.S.

308.    Plaintiffs justifiably relied upon the false representations and material omissions made by Defendants in furtherance of that particular purpose by investing their assets in Optimal U.S.

309.    Defendants knew and understood that Plaintiffs would rely upon the false statements and material omissions for the particular purpose of investing their assets in Optimal U.S.

310.    As a result of their reliance upon the false representations and material omissions made by Defendants, Plaintiffs have suffered damages, namely the loss of their investments in Optimal U.S., and Defendants, in turn, have derived substantial profits.  Defendants' wrongful conduct was the direct and proximate cause of Plaintiffs' losses.

## COUNT IV
## NEGLIGENT MISREPRESENTATION
### (Holder Claims)

311.    The foregoing paragraphs are realleged herein.  This Count is asserted against all Defendants by Plaintiffs, which does not include Pioneer.

312.    Based on their unique or special expertise with respect to investments generally and Madoff in particular, Defendants had a special relationship of trust or confidence with Plaintiffs, which created a duty on the part of Defendants to impart full and correct information to Plaintiffs.

313.    Defendants induced purchasers to hold their positions in Optimal U.S. by falsely representing that: (i) Defendants had conducted thorough due diligence and exercised oversight of Madoff's operations and had determined that those operations were legitimate, utilized the split-strike conversion strategy, and had a long track record of achieving positive investment returns; (ii) Plaintiffs' assets invested in Optimal U.S. would, in turn, be invested in legitimate funds operated by Madoff which utilized the split-strike conversion strategy; (iii) Defendants would monitor the investments made with Madoff to confirm that Madoff operated legitimately, used the split-strike conversion strategy, and in accordance with all legal and regulatory strictures, and further that Defendants would verify Madoff's transactions, including that Madoff actually made the represented trades and held the represented assets; (iv) the due diligence and oversight process employed by Defendants was so thorough as to allow Defendants to assure that the monies provided to Madoff were being actually and legitimately invested; (v) the net asset values of Plaintiffs' investments were true and accurate reflections of the value of their investments in Optimal U.S.; and (vi) Madoff's operations and accounts were audited by reputable independent auditors utilizing appropriate and accepted accounting and auditing procedures, which provided further assurances that Madoff's accounts actually held the represented assets and were otherwise operated lawfully.

314.    Defendants made the representations knowing that they were false in that: (i) Defendants did not, in fact, conduct thorough or appropriate due diligence of, or exercise oversight over Madoff and his operations and had not determined that Madoff actually invested assets utilizing the split-strike conversion strategy, with a long track record of achieving positive investment returns; (ii) Defendants did not invest Plaintiffs' assets in legitimate investment vehicles that utilized the split-strike conversion strategy; (iii) Defendants did not meaningfully

monitor the investments in Madoff to confirm that Madoff operated legitimately using the split-strike conversion strategy and in accordance with all legal and regulatory strictures, and did not verify Madoff's transactions, including that Madoff actually made the represented trades and that Madoff held the represented assets; (iv) the due diligence and oversight processes employed by Defendants were non-existent, and did not allow Defendants the ability to assure that the assets provided to Madoff were actually and legitimately invested; (v) the purported net asset values of Plaintiffs' investments in Optimal U.S. were fictitious; and (vi) Madoff's operations and accounts were not audited by reputable, independent auditors utilizing appropriate and accepted accounting and auditing procedures, and thus did not provide any assurance that Madoff actually held the represented assets and were otherwise operated lawfully.

315.    Defendants made false representations knowing that Plaintiffs would use and rely upon the representations and omissions for the particular purpose of determining whether to hold their assets in Optimal U.S.

316.    Plaintiffs justifiably relied upon the false representations made by the Defendants in furtherance of that particular purpose by continuing to hold their assets in Optimal U.S.

317.    As a result of their reliance upon the false representations made by Defendants, Plaintiffs have suffered damages, namely the loss of their investments in Optimal U.S., and Defendants, in turn, have derived substantial profits.  Defendants' wrongful conduct was the direct and proximate cause of Plaintiffs' losses.

## COUNT V
## GROSS NEGLIGENCE

318.    The foregoing paragraphs are realleged herein.  This Count is asserted against all Defendants by Plaintiffs, which does not include Pioneer.

319.    Defendants had a special relationship with Plaintiffs that gave rise to a duty to exercise due care in the management of Plaintiffs' assets invested in Optimal U.S., and in the selection and monitoring of Optimal U.S.'s managers and custodians, such as Madoff. Defendants knew or should have known that Plaintiffs were relying on Defendants to manage the investments entrusted to Optimal U.S. with reasonable care, and Plaintiffs did reasonably and foreseeably rely on Defendants to exercise such care by entrusting their assets to Optimal U.S.

320.    Defendants grossly failed to exercise due care, and acted in reckless disregard of their duties, and thereby injured Plaintiffs.  Defendants failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional.  Defendants failed to perform adequate due diligence before selecting BMIS as Optimal U.S.'s execution agent for its split strike conversion strategy, and before allowing BMIS to serve as custodian for Optimal U.S.; failed to properly monitor Madoff and BMIS on an ongoing basis to any reasonable degree; and failed to take adequate steps to confirm BMIS's purported account statements, returns, transactions and holding of Optimal U.S.'s assets.

321.    If Defendants had not been grossly negligent with respect to Plaintiffs' assets invested in Optimal U.S., Defendants would have discovered that Madoff was running a Ponzi scheme, and would not have entrusted Plaintiffs' assets invested in Optimal U.S. to Madoff.

322.    As a direct and proximate cause of Defendants' gross negligence with respect to Plaintiffs' assets invested in Optimal U.S., Plaintiffs have lost all, or substantially all, of their investments in Optimal U.S.

323.    By reason of the foregoing, Defendants are jointly and severally liable to Plaintiffs.

324.     Because of the outrageous nature of Defendants' willful and wanton conduct, Plaintiffs are entitled to punitive damages.

## COUNT VI
## BREACH OF FIDUCIARY DUTY

325.     The foregoing paragraphs are realleged herein.  This Count is asserted against OIS and Santander U.S. by Plaintiffs, which does not include Pioneer.

326.     OIS served as the Investment Manager for Optimal U.S. and thus managed the investments of Optimal U.S.  As Investment Manager, OIS was responsible for directing the investment and trading activities of Optimal U.S. and owed fiduciary duties to Plaintiffs.  OIS had substantial discretion and control over Plaintiffs' assets in Optimal U.S. and communications with Plaintiffs.

327.     Santander U.S. marketed and sold shares in Optimal U.S.  Santander U.S. had substantial discretion and control over marketing Optimal U.S. and communications with Plaintiffs.

328.     This discretion and control gave rise to a fiduciary duty of care on the part of OIS and Santander U.S. to the Plaintiffs.

> (a)     OIS and Santander U.S. occupied a superior position over Plaintiffs with respect to their management and control of their assets in Optimal U.S., and had superior access to confidential information about the investment of the assets and about Madoff and BMIS;
>
> (b)     OIS's and Santander U.S.'s superior position necessitated that Plaintiffs repose their trust and confidence in OIS and Santander U.S. to fulfill their duties, and Plaintiffs did so by investing in Optimal U.S.;
>
> (c)     OIS and Santander U.S. held themselves out as providing superior client investment services, and evinced an understanding that they were the fiduciary of the investors.  Plaintiffs reasonably and foreseeably relied on such representations, and trusted OIS's and Santander U.S.'s purported expertise and skill.

329.     OIS and Santander U.S. breached their fiduciary duties to Plaintiffs by failing to conduct adequate due diligence and monitoring with respect to Optimal U.S.'s investments, by failing to follow-up on red flags that would have caused them to discover that Madoff was perpetrating a Ponzi scheme, and by pocketing hundreds of millions of dollars in fees based on fraudulent asset values and investment returns.

330.     Plaintiffs have been damaged as a proximate and foreseeable result of these breaches of fiduciary duty and are entitled to damages, and appropriate equitable relief, including accounting and imposition of a constructive trust.

### COUNT VII
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

331.     The foregoing paragraphs are realleged herein.  This Count is asserted against Banco Santander and Santander U.S. by Plaintiffs, which does not include Pioneer.

332.     OIS was a wholly-owned indirect subsidiary of Banco Santander.  Banco Santander was an active and integral participant in OIS's Investment Management activities of Optimal U.S. in general and, in particular, with respect to OIS's due diligence and oversight of Madoff.  Santander U.S. was an active and integral participant in marketing and selling Optimal U.S.  Banco Santander and Santander U.S. either knew, or acted with willful blindness or recklessness and are thus charged with constructive knowledge, that:

(a)     OIS had discretion and control over Optimal U.S. giving rise to a fiduciary duty and duty of care to the Plaintiffs;

(b)     OIS occupied a superior position over Plaintiffs with respect to OIS's management and control over Plaintiffs' assets in Optimal U.S., and had superior access to confidential information about the investment of the assets and about Madoff and BMIS;

(c)      OIS's superior position necessitated that Plaintiffs repose their trust and confidence in OIS to fulfill its duties, and that Plaintiffs did so by investing in Optimal U.S.; and

(d)      OIS held itself out as providing superior client investment services, and evinced an understanding that they were the fiduciaries of the investors.

333.    Banco Santander and Santander U.S. were further aware that Plaintiffs reasonably and foreseeably relied on such representations, and trusted OIS's purported expertise and skill.

334.    Banco Santander substantially assisted OIS by participating and overseeing OIS's due diligence, monitoring, and oversight of Madoff.  Santander U.S. substantially assisted OIS by marketing and selling Optimal U.S.

335.    As a direct and natural result of (a) OIS's breaches of its fiduciary duties, and (b) Banco Santander's and Santander U.S.'s aiding and abetting those breaches, the Plaintiffs have suffered substantial damages.

## COUNT VIII
## AIDING AND ABETTING FRAUD

336.    The foregoing paragraphs are realleged herein.  This Count is asserted against Banco Santander and Santander U.S. by Plaintiffs, which does not include Pioneer.

337.    As alleged above, a fraud was perpetrated on Plaintiffs by OIS.

338.    Banco Santander and Santander U.S. either knew, or acted with willful blindness or recklessness and are thus charged with constructive knowledge, that:

(a)      OIS falsely represented to Plaintiffs in connection with their purchase of shares in Optimal U.S. that: (i) Optimal U.S. would invest its monies into a legitimate investment, principally relying upon the split-strike conversion strategy involving the purchase of equities and options; (ii) that by using this strategy, Optimal U.S. historically had consistent profitable returns since inception; and (iii) OIS would conduct due diligence into, monitor, and

verify the investments made in Optimal U.S. operated by Madoff to confirm that Madoff operated legitimately, using the stated investment strategy, and in accordance with the required legal and regulatory requirements;

(b)     OIS failed to disclose the following material information, among other things, which rendered its representations false and misleading: (i) that OIS was in fact not engaging in customary, or even minimal, due diligence to verify that Optimal U.S.'s assets were being properly invested and managed by Madoff and BMIS, or that the assets even still existed; and (ii) the existence of numerous red flags regarding Madoff, including, among others, the secrecy of Madoff's actual operations, the lack of segregation of duties, inadequate auditing of Madoff, and the attainability of consistently profitable returns for a fund pursuing the stated strategy;

(c)     OIS induced purchasers to hold their positions in Optimal U.S. by falsely representing to Plaintiffs that: (i) OIS had conducted thorough due diligence and exercised oversight of Madoff's operations and had determined that those operations were legitimate and utilized the split strike conversion strategy; (ii) Plaintiffs' assets invested in Optimal U.S. by OIS would, in turn, be invested legitimately by Madoff utilizing a split-strike conversion strategy; (iii) OIS would monitor the investments made with Madoff to confirm that Madoff operated legitimately, using the split-strike conversion strategy, and in accordance with all legal and regulatory strictures, and further that OIS would verify Madoff's transactions, including that Madoff actually made the represented trades and held the represented assets; (iv) the due diligence and oversight process employed by OIS was so thorough that it allowed OIS to confirm that Optimal U.S.'s investment with Madoff was actually and legitimately being invested; and (v) Madoff's operations and accounts were audited by reputable, independent auditors utilizing

91

appropriate and accepted accounting and auditing procedures, which provided further assurance that Madoff's accounts actually held the represented assets and were otherwise operated lawfully;

(d)     OIS made representations knowing that they were false in that: (i) OIS did not, in fact, conduct thorough or appropriate due diligence of, or exercise oversight over Madoff and his operations and had not determined that Madoff actually invested assets utilizing the split-strike investment strategy, with a long track record of achieving positive investment returns; (ii) OIS did not invest Plaintiffs' assets in legitimate funds that utilized the split strike conversion strategy; (iii) OIS did not intend to monitor the investments made by Madoff to confirm that Madoff operated legitimately using the split-strike conversion strategy and in accordance with all legal and regulatory strictures, and did not intend to verify Madoff's transactions, including that Madoff actually made the represented trades and that Madoff held the represented assets; (iv) the due diligence and oversight processes employed by OIS were non-existent, and thus did not allow OIS the ability to assure that the assets provided to Madoff were actually and legitimately invested; and (v) Madoff's operations and accounts were audited by reputable, independent auditors utilizing appropriate and accepted accounting and auditing procedures, which provided further assurance that Madoff's accounts actually held the represented assets and were otherwise operated lawfully.

339.     Banco Santander substantially assisted OIS.  Banco Santander was an active and integral participant in OIS's investment management activities of Optimal U.S., in general, and in particular with respect to OIS's due diligence and oversight of Madoff.  Banco Santander also was an active and integral participant in preparing, drafting and making false representations to Plaintiffs.

340.    Santander U.S. substantially assisted OIS by marketing and selling Optimal U.S. Santander U.S. was an active and integral participant in marketing and selling Optimal U.S.

341.    As a direct and natural result of (a) OIS's fraudulent scheme, and (b) Banco Santander's and Santander U.S.'s aiding and abetting that fraudulent scheme, the Plaintiffs have suffered substantial damages.

## COUNT IX
## THIRD PARTY BENEFICIARY
## BREACH OF CONTRACT

342.    Plaintiffs repeat and reallege the foregoing paragraphs.  This Count is asserted against OIS by Plaintiffs, which does not include Pioneer.

343.    Plaintiffs are third-party beneficiaries to the Investment Management agreements entered into between OIS and Optimal U.S., which evinces a clear intent to benefit Plaintiffs. The benefits to Plaintiffs under the Investment Management agreements between OIS and Optimal U.S. were immediate, not incidental, in that Optimal U.S.'s only motivation for executing the Investment Management agreements was to provide Plaintiffs with capital appreciation and returns on their investment in Optimal U.S.

344.    OIS, and its predecessors, have been the Investment Manager of Optimal U.S. since its inception, and in that capacity controlled the assets of Optimal U.S.  Pursuant to the Investment Management agreements, OIS provided management and investment advisory services to Optimal U.S.

345.    OIS breached the Investment Management agreements by grossly failing to meet the obligations of these agreements to provide competent investment management services to Optimal U.S.  OIS also breached the contracts by receiving and holding fees based on fictitious profits and for services not properly performed.  OIS is liable to Plaintiffs as third-party beneficiaries to those contracts.

## COUNT X
## UNJUST ENRICHMENT

346.    Plaintiffs repeat and reallege the foregoing paragraphs.  This Count is asserted against all Defendants by Plaintiffs, which does not include Pioneer.

347.    Defendants all benefited from the unlawful acts and omissions and breach of fiduciary duties to Plaintiffs.  These unlawful acts and omissions and breaches of fiduciary duties caused Plaintiffs to suffer injury and monetary loss.

348.    As a result of the foregoing, it is unjust and inequitable for the Defendants to have enriched themselves through the collection of fees.

349.    Equity and good conscience require that Defendants disgorge all such unjust enrichment, and that Defendants pay the amounts by which they were unjustly enriched to Plaintiffs in an amount to be determined at trial.

350.    Plaintiffs seek restitution from these Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct and fiduciary breaches.

351.    Plaintiffs are entitled to the establishment of a constructive trust impressed upon the benefits derived by Defendants from their unjust enrichment and inequitable conduct.

## COUNT XI
## VIOLATION OF THE SECURITIES LAWS
### Section 10(b) of the Exchange Act and Rule 10b-5

352.    The foregoing allegations are repeated as if fully set forth herein.  This Count is asserted against OIS and Clark by Plaintiffs (which does not include Pioneer), and is based only pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder.

353.     The purchases and sales of the shares of Optimal U.S. by Plaintiffs and the Class took place in the United States.

354.     Defendants subject to this Count recklessly or knowingly made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading to Plaintiffs.  The purpose and effect of said false and misleading statements, was, among other things, to induce Plaintiffs to purchase shares in Optimal U.S.

355.     During the Class Period, Defendants subject to this Count sold Optimal U.S. shares based on false and misleading statements and omissions.  Investors in Optimal U.S. or their nominees were provided copies of the prospectuses, called Explanatory Memoranda, or EMs. These documents, however, contained uniform misrepresentations and material omissions and induced Plaintiffs to invest in Optimal U.S.

356.     Defendants subject to this Count, as acknowledged in their own documents, recognized the fundamental importance of proper due diligence, strict monitoring, and oversight over Madoff, and their obligation to perform these functions.  Nevertheless, Defendants subject to this Count recklessly or knowingly (i) failed to perform due diligence that they recognized was essential and required by standard-industry practice; (ii) disregarded the red flags surrounding Madoff and that should have alerted them, as experienced investment professionals, to the need for heightened scrutiny; and (iii) and failed to disclose the red flags they had uncovered to Plaintiffs.

357.     As set forth below in this Count, the Defendants subject to this Count recklessly or knowingly misrepresented to Plaintiffs that their assets were being invested using a split strike conversion strategy.  Defendants subject to this Count further misrepresented that they and their

financial services providers and auditors were conducting extensive due diligence and monitoring of Madoff's operations, which served as Optimal U.S.'s investment advisors, as well as broker, execution agent, and custodian.  The Defendants subject to this Count failed to disclose to Plaintiffs the material facts that, in reality, no one had conducted any meaningful due diligence on Madoff prior to establishing Optimal U.S.'s investments with Madoff; no one was meaningfully monitoring, verifying, or confirming Madoff's trade activity; effectively Madoff's operations were very secretive; and no one had an independent, factual basis for stating that Madoff was executing a split strike conversion strategy.

**1.      False And Misleading Statements And Omissions About the Split Strike Conversion Strategy**

358.    The EMs consistently described the investment strategy utilized by Optimal U.S. as seeking to obtain "capital appreciation" through the split strike conversion strategy.  The EMs stated that:

> The strategy utilized by the Broker-Dealer is called "split-strike conversion" and entails:
>
> (i)      purchasing a basket of thirty (30) to forty (40) large-capitalization S&P 100 stocks which together account for the greatest weight of the Index and therefore, when combined, present a high degree of correlation with the general market;
>
> (ii)     purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount;
>
> (iii)    selling out-of-the-money S&P 100 Index call options representing a dollar amount of the underlying Index equivalent to the dollar amount of the basket of shares purchased.
>
> * * *
>
> Proprietary systems continuously optimize the basket of stocks to replicate the performance of the overall market at low cost.[5]

---

[5]      October 2008 EM, Ex. 16 at 29; January 2008 EM, Ex. 15 at 28; October 2006 EM, Ex. 14 at 31; June 2004 EM, Ex. 13 at 30.

359.     These statements were false and misleading.  In reality, no such strategy was being executed because investors' assets were being funneled into Madoff's Ponzi scheme in which no legitimate securities transactions were ever conducted.  Further, the EMs failed to disclose to Plaintiffs the material fact that Defendants subject to this Count had no independent factual basis for their representations about Optimal U.S.'s investment strategy because they had never undertaken any meaningful steps to confirm that the split strike conversion strategy was actually being implemented by Madoff.

### 2.      False And Misleading Statements And Omissions About Due Diligence For Optimal U.S.

360.     The EMs falsely and misleadingly reassured investors about the care that OIS would purportedly take in selecting and monitoring the managers to whom it entrusted Optimal U.S.'s assets, including the so-called "Broker-Dealer:"

(a)      "[OIS] bases its investment decisions on a careful analysis of many investment managers;"[6]

(b)      "Custodial risk . . . . The Fund must satisfy itself to ensure that such third party [such as Madoff] has and maintains the necessary competence, standing and expertise appropriate to hold the assets concerned;"[7]

(c)      "It is the Fund's task to select and diversify among the distinctive investment techniques and strategies of each portfolio manager to achieve the Fund's investment objectives;"[8]

---

[6]      October 2008 EM, Ex. 16 at 11; January 2008 EM, Ex. 15 at 11; October 2006 EM, Ex. 14 at 12; June 2004 EM, Ex. 13 at 12.

[7]      October 2008 EM, Ex. 16 at 22; January 2008 EM, Ex. 15 at 22; October 2006 EM, Ex. 14 at 22; June 2004 EM, Ex. 13 at 22.

(d)      "[OIS] specializes in advising multi-manager and multi-strategy portfolios;"[9] and

(e)      "The Investment Manager [OIS] shall select managers with varied investment styles who have established records of success or the Investment Manager believes demonstrate the potential to become outstanding investment managers."[10]

361.    These statements were false and misleading.  Defendants subject to this Count did not conduct a careful analysis of Madoff and failed to ensure that Madoff had the necessary competence, standing, and expertise to hold Optimal U.S.'s assets.  Further, the EMs did not disclose that Defendants subject to this Count failed to conduct any meaningful due diligence of Madoff, and had never independently verified with a third-party that any of the trade confirmations provided by Madoff were true and correct, and that the assets reported by Madoff existed.

### 3.      False And Misleading Statements And Omissions About Madoff's Investments in U.S. Treasury Bills For Optimal U.S.

362.    The EMs falsely and misleadingly stated that Madoff usually invested in U.S. Treasury Bills when not executing the split strike conversion strategy, "in practice the Broker-Dealer usually invests in U.S. Treasury Bills."[11]

---

[8]      October 2008 EM, Ex. 16 at 8; January 2008 EM, Ex. 15 at 8; October 2006 EM, Ex. 14 at 8; June 2004 EM, Ex. 13 at 8.

[9]      October 2008 EM, Ex. 16 at 10; January 2008 EM, Ex. 15 at 10; October 2006 EM, Ex. 14 at 10; June 2004 EM, Ex. 13 at 10.

[10]     October 2008 EM, Ex. 16 at 11; January 2008 EM, Ex. 15 at 11; October 2006 EM, Ex. 14 at 12; June 2004 EM, Ex. 13 at 12.
[11]     October 2008, Ex. 16 at 29; January 2008 EM, Ex. 15 at 28; October 2006 EM, Ex. 14 at 31; June 2004 EM, Ex. 13 at 30.

363.     This statement was false.  Madoff never invested in U.S. Treasury Bills because he never executed a single transaction in his Investment Advisory business.  The EMs failed to disclose that the Defendants subject to this Count had no independent factual basis for their representations about the investments in U.S. Treasury Bills because they had never undertaken any meaningful steps to confirm that these government securities had actually been bought and were being held.

### 4.     False And Misleading Statements And Omissions About Optimal U.S.'s "Deposits" With Madoff for Optimal U.S.

364.     The EMs falsely and misleadingly stated that "the assets of [Optimal U.S.] are deposited with the Broker-Dealer."[12]

365.     This statement was false.  Madoff did not hold the assets of Optimal U.S. in deposit because Madoff stole the assets.  The EMs failed to disclose that the Defendants subject to this Count had no independent factual basis for their representations that the assets were deposited with Madoff because they had never undertaken any meaningful steps to confirm it.

### 5.     Misleading Statements And Omissions About The "Possibility" That Madoff Will Abscond With Optimal U.S.'s Assets

366.     The EMs misleadingly stated as follows:

> Possibility of Fraud or Misappropriation
>
> Neither [Optimal Multiadvisors], Optimal SUS nor the Custodian has actual custody of the assets.  Such actual custody rests with the Broker-Dealer and/or its affiliated broker-dealer.  Therefore, there is the risk that the Broker-Dealer could abscond with those assets.  There is always the risk that the assets with the Broker-Dealer could be misappropriated.  In addition, information supplied by the Broker-Dealer may be inaccurate or even fraudulent.  The Investment Manager and the Administrator are entitled to rely in such information (provided they do so in good faith) and are not

---

[12]     October 2008 EM, Ex. 16 at 29; January 2008 EM, Ex. 15 at 28; October 2006 EM, Ex. 14 at 31; June 2004 EM, Ex. 13 at 30.

required to undertake any due diligence to confirm the accuracy thereof.[13]

367. This statement was misleading. The Defendants subject to this Count knew, or were reckless in not knowing, based on the numerous red flags of which they were aware that fraud or misappropriation was, in fact, taking place, and not a mere possibility.

368. This statement is also misleading because it fails to disclose the long list of red flags of which the Defendants subject to this Count were aware. Specifically, this statement failed to disclose that, (i) no one had confirmed the existence of Madoff's counterparties; (ii) no one had confirmed the existence of the U.S. Treasury Bills at the end of each year; (iii) Madoff's auditing firm was unknown, clearly unequipped to audit Madoff, and had not conducted a single audit of any entity since 1993; (iv) Madoff was extremely secretive; (v) key positions at BMIS were held by Madoff's family members; (vi) Madoff only provided paper confirmations of trading records despite telling the Defendants subject to this Count that 99% of the trades were conducted electronically; (vii) Madoff's consistent returns were impossible to replicate by others and materially outside the realm of possibility based on statistical analysis; and (viii) OIS had specifically asked Madoff for the assets to be held by an external custodian, and Madoff had refused.

### 6. Defendant Clark's False Statements

369. In a telephone call on October 29, 2007, Defendant Clark made the following false and misleading statements to Pioneer: Clark stated that (i) he conducted meaningful and thorough due diligence over Madoff; (ii) Madoff provided "full transparency;" (iii) Madoff traded in a "segregated account" for Optimal U.S.; (iv) Defendants worked together with Madoff and were far from being passive investors; and (vi) Madoff's discretion over Optimal

---

[13]    October 2008 EM, Ex. 16 at 34; January 2008 EM, Ex. 15 at 33; October 2006 EM, Ex. 14 at 36; and June 2004 EM, Ex. 13 at 35.

U.S. was limited because Defendants played an active and ongoing decision-making role in the investment.  All of these statements were false and misleading for the reasons alleged herein.

370.    By reason of the foregoing, Defendants subject to this Count directly violated Section 10(b) of the Exchange Act, and Rule 10b-5(b), promulgated thereunder in that they recklessly or knowingly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

371.    Plaintiffs, in ignorance of the false and misleading statements and omissions made recklessly or knowingly by Defendants subject to this Count, relied, to their detriment, on such misleading statements and omissions in purchasing shares in Optimal U.S.  Plaintiffs have suffered an economic loss and substantial damages with respect to their investments in Optimal U.S. as a result of the wrongs alleged herein in an amount to be proven at trial.

### COUNT XII
### VIOLATION OF THE SECURITIES LAWS
#### Section 20(a) of the Exchange Act

372.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This Count is asserted against Banco Santander by Plaintiffs, which does not include Pioneer.

373.    Banco Santander acted as a controlling person of OIS within the meaning of Section 20(a) of the Exchange Act.  OIS was a wholly-owned subsidiary of Banco Santander at all relevant times.  Banco Santander had day-to-day control and exercised day-to-day control of OIS and its operations.

374.    By virtue of Banco Santander's ownership of OIS, participation in and awareness of OIS's operations, and intimate knowledge of OIS's products, sales, accounting, plans and implementation thereof (including meetings and discussions with Madoff), Banco Santander had

the power to influence and control, and did influence and control, directly or indirectly, the decision making of OIS, including the content and dissemination of the various statements that were false and misleading.  Banco Santander had the ability, power, and control to prevent the issuance of the statements or cause the statements to be corrected.

375.    By virtue of its position as a controlling person, Banco Santander is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the wrongful conduct alleged in this Count, the Plaintiffs suffered an economic loss and damages in connection with their purchases of shares in Optimal U.S. in an amount to be proven at trial.

## COUNT XIII
## COMMON LAW FRAUD
### (Alleged By Pioneer)

376.    The foregoing paragraphs are realleged herein.  This Count is asserted by Pioneer against all Defendants except Santander U.S.

377.    Defendants subject to this Count falsely represented to Pioneer that: (i) Optimal U.S. would invest its monies into a legitimate fund with a legitimate "Broker Dealer," principally relying on the split-strike conversion strategy involving the purchase of equities and options; and (ii) Defendants subject to this Count would monitor, verify, and conduct due diligence into the investments made with Madoff to confirm that Madoff operated legitimately, using the stated investment strategy, and in accordance with the required legal and regulatory requirements.

378.    Defendants subject to this Count failed to disclose the following material information, among other things, which rendered their representations false and misleading: (i) that Defendants subject to this Count were in fact not engaging in customary, or even minimal, due diligence to verify that Optimal U.S.'s assets were being properly invested and managed by Madoff and BMIS, or that the assets even existed; and (ii) the existence of numerous red flags regarding Madoff including, among others, the secrecy of Madoff's actual operations, the lack of

segregation of duties, inadequate auditing of Madoff, and the attainability of consistently profitable returns for a fund pursuing the stated strategy.

379.    Defendants subject to this Count made false and misleading representations and omissions knowingly, or with reckless disregard for their truth or falsity, and with the intent to induce reliance upon them.

380.    Pioneer justifiably relied upon the false representations made by Defendants subject to this Count.

381.    As a direct and proximate cause of its reliance upon the false representations and omissions by Defendants subject to this Count, Pioneer has suffered damages, including loss of business, reputational damage, and loss of fees that would been earned had the Pioneer Plaintiffs continued to invest in Optimal U.S.  Defendants' wrongful conduct was the direct and proximate cause of Pioneer's losses.

**COUNT XIV**
**NEGLIGENT MISREPRESENTATION**
**(Alleged by Pioneer)**

382.    The foregoing paragraphs are realleged herein.  This Count is asserted by Pioneer against all Defendants except Santander U.S.

383.    Based on their unique or special expertise with respect to investments generally and Madoff in particular, Defendants subject to this Count had a special relationship of trust or confidence with Pioneer, which created a duty on the part of Defendants to impart full and correct information to Pioneer.

384.    Defendants subject to this Count falsely represented to Pioneer that: (i) Optimal U.S. would invest its monies into a legitimate fund with a legitimate "Broker Dealer," principally relying on the split-strike conversion strategy involving the purchase of equities and options; and (ii) Defendants subject to this Count would monitor, verify, and conduct due diligence into the

103

investments made with Madoff to confirm that Madoff operated legitimately, using the stated investment strategy, and in accordance with the required legal and regulatory requirements.

385.     Defendants subject to this Count failed to disclose the following material information, among other things, which rendered their representations false and misleading: (i) that Defendants subject to this Count were in fact not engaging in customary, or even minimal, due diligence to verify that Optimal U.S.'s assets were being properly invested and managed by Madoff and BMIS, or that the assets even existed; and (ii) the existence of numerous red flags regarding Madoff including, among others, the secrecy of Madoff's actual operations, the lack of segregation of duties, inadequate auditing of Madoff, and the attainability of consistently profitable returns for a fund pursuing the stated strategy.

386.     Defendants subject to this Count made the false representations and material omissions knowing that Pioneer would use and rely upon the representations and omissions for the particular purpose of determining whether to recommend to the Pioneer Plaintiffs to invest their assets and, in particular, to decide to invest their assets in Optimal U.S.

387.     Defendants subject to this Count made false and misleading representations and omissions knowingly, or with reckless disregard for their truth or falsity, and with the intent to induce reliance upon them.

388.     As a result of Pioneer's reliance upon the false representations and material omissions made by Defendants subject to this Count, Pioneer has suffered damages, including loss of business, reputational damage, and loss of fees that would been earned had the Pioneer Plaintiffs continued to invest in Optimal U.S.  The wrongful conduct of Defendants subject to this Count was the direct and proximate cause of Pioneer's losses.

## COUNT XV
## GROSS NEGLIGENCE
### (Alleged by Pioneer)

389.    The foregoing paragraphs are realleged herein.  This Count is asserted by Pioneer against all Defendants except Santander U.S.

390.    Defendants subject to this Count had a special relationship with Pioneer that gave rise to a duty to exercise due care in the management of the Pioneer Plaintiffs' assets invested in Optimal U.S., and in the selection and monitoring of Optimal U.S.'s managers and custodians, such as Madoff.  Defendants subject to this Count knew or should have known that Pioneer was relying on Defendants to manage Optimal U.S. with reasonable care, and Pioneer did reasonably and foreseeably rely on Defendants to exercise such care.

391.    Defendants subject to this Count grossly failed to exercise due care, and acted in reckless disregard of their duties, and thereby injured Pioneer.  Defendants subject to this Count failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional.  Defendants subject to this Count failed to perform adequate due diligence before selecting BMIS as Optimal U.S.'s execution agent for its split strike conversion strategy, and before allowing BMIS to serve as custodian for Optimal U.S.; failed to properly monitor Madoff and BMIS on an ongoing basis to any reasonable degree; failed to take adequate steps to confirm BMIS's purported account statements, transactions and holding of Optimal U.S.'s assets.

392.    If Defendants subject to this Count had not been grossly negligent, they would have discovered that Madoff was a fraud, and would not have entrusted the assets of Optimal U.S. to Madoff.

393.    By reason of the foregoing, Defendants subject to this Count are jointly and severally liable to Pioneer.

394.    Because of the outrageous nature of the willful and wanton conduct of Defendants subject to this Count, Pioneer is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray for judgment and request the following:

(a)    Certification of this action as a class action proper and maintainable pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) and declaration of the proposed Plaintiffs in a to-be-filed motion for Class Certification as proper Class representatives;

(b)    Such preliminary and permanent equitable relief, including imposition of a constructive trust, as is appropriate to preserve assets wrongfully taken from Plaintiffs;

(c)    Compensatory, consequential, and general damages in an amount to be determined at trial;

(d)    Disgorgement and restitution of all earnings, profits, compensation and benefits received by Defendants as a result of their unlawful acts and practices;

(e)    Punitive damages for each claim to the maximum extent available under the law on account of the outrageous nature of Defendants' willful and wanton disregard of Plaintiffs' rights;

(f)    Costs and disbursements of the action;

(g)    Pre- and post-judgment interest;

(h)    Reasonably attorneys' fees; and

(i)    Other such relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury.

Dated:  New York, New York
        May 17, 2011

**LABATON SUCHAROW LLP**
Joel H. Bernstein (JB-0763)
Javier Bleichmar (JB-0435)
Alan I. Ellman (AE-7347)
140 Broadway
New York, New York  10005
Tel: 212-907-0700
Fax: 212-818-0477
jbernstein@labaton.com
jbleichmar@labaton.com
aellman@labaton.com

**EDWARD W. MILLER** (EM-8489)
648 Franklin Avenue, 2nd Floor
Garden City, New York  11530
Tel: (516) 280-7377
edmilleresq@aol.com

*Counsel for Lead Plaintiffs and Lead Counsel
for the Class*

**ROBBINS GELLER RUDMAN
& DOWD LLP**
Jack Reise
Michael L. Greenwald
120 E. Palmetto Park Road, Suite 500
Boca Raton, Florida 33432-4809
Tel: (561) 750-3000
Fax: (561) 750-3364
jreise@rgrdlaw.com
mgreenwald@rgrdlaw.com

*Additional Plaintiffs' Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2011, I electronically served the foregoing document on

Defendants' counsel Gustavo J. Membiela, Hunton & Williams LLP, 1111 Brickell Avenue,

Suite 2500, Miami, Florida 33131, at gmembiela@hunton.com.

JAVIER BLEICHMAR (JB-0435)

By: _____

LABATON SUCHAROW LLP
Joel H. Bernstein (JB-0763)
Javier Bleichmar (JB-0435)
Alan I. Ellman (AE-7347)
140 Broadway
New York, New York 10005
Tel: 212-907-0700
Fax: 212-818-0477

## CERTIFICATION

I, AM Pharmatec Planning and Engineering, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 30 November 2007 | Amount: | USD 100,000.01 |
| Date of Sale: | N/A | Amount: | N/A |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _____ day of October, 2010.

א.מ. פרמטק תכנון והנדסה בע"מ
ח.פ. 513046631

# CERTIFICATION

I, Ann Stroh, hereby certify as follows:

1. I have reviewed the complaint styled *Rembaum et al. v. Banco Santander, S.A. et al.* (S.D.N.Y.) 10-4095 (SAS).

2. I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

|  | Amount | Amount |
|---|---|---|
| Date of Purchase | 28 May 2008 | USD 150,049.00 |
| Date of Sale | N/A | N/A |

3. I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 22 day of October, 2010.

## CERTIFICATION

I, Anvey Zion Holdings (1999), hereby certify as follows:

1.  I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.  I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 28 November 2007 | Amount: | USD 50,000.14 |
| Date of Sale: | N/A | Amount: | N/A |

3.  I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _____ day of October, 2010.

## CERTIFICATION

I, Bayshore 11B S.A., hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 26 July 2007 | Amount: | USD 149,999.83 |
| Date of Sale: | N/A | Amount: | N/A |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _____ day of October, 2010.

## CERTIFICATION

I, Catherine Said, hereby certify as follows:

1.     I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.     I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

Date of Purchase:    1 December 2008          Amount:     USD 50,000.00
Date of Sale:        N/A                      Amount:     N/A

3.     I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action.  I have not sought to serve as a representative party on behalf of a class during the last three years.  I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.     I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 23 day of October, 2010.

_____

## CERTIFICATION

I, Dipreca, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 3 May 2008 | Amount: | USD 50,000.00 |
| Date of Sale: | N/A | Amount: | N/A |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _____ day of October, 2010.

## CERTIFICATION

I, Dov Goldwyn, hereby certify as follows:

1.      I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.      I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 28 April 2008 | Amount: | USD 50,000.00 |
| Date of Sale: | N/A | Amount: | N/A |

3.      I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.      I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 22 day of October, 2010.

_____
Dov Goldwyn

## CERTIFICATION

I, Flamenco Investments Ltd, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al. v. Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

Date of Purchase:    28 March 2007           Amount:    USD 131,054.97
Date of Sale:        N/A                     Amount:    N/A

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action.  I have not sought to serve as a representative party on behalf of a class during the last three years.  I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 22nd day of October, 2010.

R Stainsley
For and on behalf of
Flamenco Investments Limited

## CERTIFICATION

I, FTC as Trustees of the 18 Trust, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 29 January 2008 | Amount: | USD 74,920.89 |
| Date of Sale: | N/A | Amount: | N/A |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _22_ day of October, 2010.

Authorised Signatory    Authorised Signatory
For Fairbairn Trust Company Limited
A/C  FIO275               as Trustee of the
        EIGHTEEN................Trust

## CERTIFICATION

I, FTC as Trustees of the Adelaide Trust, hereby certify as follows:

    1.   I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

    2.   I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 26 June 2008 | Amount: | EUR 50,000.00 |
| Date of Sale: | N/A | Amount: | N/A |

    3.   I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

    4.   I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this **22**ᵗʰ day of October, 2010.

Authorised Signatory   Authorised Signatory
For Fairbaim Trust Company Limited
A/C  F40939    as Trustee of the
ADELAIDE...................Trust

## CERTIFICATION

I, FTC as Trustees of the Buds Trust, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| Date of Purchase: | 26 June 2008 | Amount: | USD 85,001.12 |
| Date of Sale: | 24 October 2008 | Amount: | USD 43,515.30 |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action.  I have not sought to serve as a representative party on behalf of a class during the last three years.  I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _22_ day of October, 2010.

Authorised Signatory    Authorised Signatory
For Fairbairn Trust Company Limited
A/C  F40595        as Trustee of the
BUDS...................................Trust

## CERTIFICATION

I, FTC as Trustees of the Judge Trust, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al. v. Banco Santander, S..A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 27 August 2008 | Amount: | EUR 45,000.02 |
| Date of Sale: | N/A | Amount: | N/A |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this **25**TH day of October, 2010.

SJ Cabot

Authorised Signatory    Authorised Signatory
For Fairbairn Trust Company Limited
A/C   F40619            as Trustee of the
....................JUDGE...................Trust

## CERTIFICATION

I, FTC as Trustees of the Man on the Moon Trust, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| Date of Purchase: | 27 December 2007 | Amount: | USD 51,642.56 |
| Date of Sale: | N/A | Amount: | N/A |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action.  I have not sought to serve as a representative party on behalf of a class during the last three years.  I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this __22__ day of October, 2010.

Authorised Signatory    Authorised Signatory
For Fairbairn Trust Company Limited
A/C F41462    as Trustee of the
Man On The Moon Trust

## CERTIFICATION

I, FTC as Trustees of the as Trustees of the Matilde Trust, hereby certify as follows:

    1.   I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

    2.   I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 27 July 2007 | Amount: | USD 49,999.96 |
| Date of Sale: | N/A | Amount: | N/A |

    3.   I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

    4.   I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 22 day of October, 2010.

Authorised Signatory   Authorised Signatory
For Fairbairn Trust Company Limited
A/C F17314   as Trustee of the
MATILDE .......Trust

## CERTIFICATION

I, FTC as Trustees of the Max 2 Trust, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 29 October 2007 | Amount: | USD 50,888.16 |
| Date of Purchase: | 27 February 2008 | Amount: | USD 50,000.11 |
| Date of Sale: | N/A | Amount: | N/A |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 22ᵗʰ day of October, 2010.

Authorised Signatory   Authorised Signatory
For Fairbairn Trust Company Limited
A/C F17008          as Trustee of the
Max 2 ..........................Trust

## CERTIFICATION

I, FTC as Trustees of the Mazal Trust, hereby certify as follows:

1.     I have reviewed the complaint styled *Rembaum et al. v. Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.     I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 16 April 2008 | Amount: | USD 48,943.35 |
| Date of Sale: | N/A | Amount: | N/A |

3.     I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.     I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _22__ day of October, 2010.

Authorised Signatory     Authorised Signatory
For Fairbairn Trust Company Limited
A/C  F10914            as Trustee of the
                 Mazal                  Trust

## CERTIFICATION

I, FTC as Trustees of the Mirage Trust, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

Date of Purchase:    29 October 2007              Amount:      USD 101,776.32
Date of Sale:        N/A                          Amount:      N/A

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _22ⁿᵈ_ day of October, 2010.

Authorised Signatory    Authorised Signatory
For Fairbairn Trust Company Limited
A/C   F40732          as Trustee of the
MIRAGE ....................Trust

## CERTIFICATION

I, FTC as Trustees of the Nifla Trust, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| Date of Purchase: | 29 October 2007 | Amount: | USD 50,888.16 |
| Date of Sale: | N/A | Amount: | N/A |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 22ⁿᵈ day of October, 2010.

Authorised Signatory    Authorised Signatory
For Fairbairn Trust Company Limited
A/C  F40702          as Trustee of the
.......................NIFLA.......................Trust

## CERTIFICATION

I, FTC as Trustees of the Posp Trust, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 27 December 2007 | Amount: | USD 74,999.84 |
| Date of Sale: | N/A | Amount: | N/A |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _22nd_ day of October, 2010.

Authorised Signatory    Authorised Signatory
For Fairbairn Trust Company Limited
A/C    F40613         as Trustee of the
        POSP .................Trust

## CERTIFICATION

I, FTC as Trustees of the Sonia Trust, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| Date of Purchase: | 27 March 2008 | Amount: | EUR 44,999.98 |
| Date of Sale: | N/A | Amount: | N/A |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _22_ day of October, 2010.

Authorised Signatory    Authorised Signatory
For Fairbairn Trust Company Limited
A/C fio106      as Trustee of the
................SONIA................Trust

## CERTIFICATION

I, FTC as Trustees of the Vivien Trust, hereby certify as follows:

1.   I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.   I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

Date of Purchase:    29 January 2008         Amount:    USD 75,000.05
Date of Sale:        N/A                     Amount:    N/A

3.   I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.   I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 22 day of October, 2010.

Authorised Signatory     Authorised Signatory
For Fairbairn Trust Company Limited
A/C F10107           as Trustee of the
Vivien                       Trust

## CERTIFICATION

We, Michal & Nachshon Gal, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 28 April 2008 | Amount: | USD 49,394.10 |
| Date of Sale: | N/A | Amount: | N/A |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 24 day of October, 2010.

## CERTIFICATION

I, Catherine Irit Geron, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al. v. Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 20 November 2007 | Amount: | USD 76,332.24 |
| Date of Sale: | N/A | Amount: | N/A |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 25 day of October, 2010.

## CERTIFICATION

I, Giftline Operations Inc. Ltd, hereby certify as follows:

1.   I have reviewed the complaint styled *Rambaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.   I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 30 November 2007 | Amount: | USD 100,000.01 |
| Date of Sale: | N/A | Amount: | N/A |

3.   I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.   I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _____ day of October, 2010.

## CERTIFICATION

I, Gohan Investments Ltd, hereby certify as follows:

1.      I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.      I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 27 July 2007 | Amount: | USD 150,000.14 |
| Date of Sale: | N/A | Amount: | N/A |

3.      I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.      I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this __24__ day of October, 2010.

גזחן השקעות בע״מ

## CERTIFICATION

I, Kittlebrook Ltd, hereby certify as follows:

1.     I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y.) 10-4095 (SAS).

2.     I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 27 December 2007 | Amount: | USD 200,000.00 |
| Date of Sale: | N/A | Amount: | N/A |

3.     I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.     I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 23 day of October, 2010.

## CERTIFICATION

I, Stuart and Jean Lipman, hereby certify as follows:

     1.     I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

     2.     I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 29 January 2008 | Amount: | USD 55,000.08 |
| Date of Sale: | N/A | Amount: | N/A |

     3.     I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action.  I have not sought to serve as a representative party on behalf of a class during the last three years.  I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

     4.     I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _____ day of October, 2010.

## CERTIFICATION

I, Zeev & Yafa Mark, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| Date of Purchase: | 27 August 2008 | Amount: | USD 35,000.03 |
| Date of Sale: | N/A | Amount: | N/A |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _____ day of October, 2010.

## CERTIFICATION

I, Meir Feder, hereby certify as follows:

1. I have reviewed the complaint styled *Rembaum et al. v. Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2. I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 26 September 2008 | Amount: | USD 49,999.78 |
| Date of Sale: | N/A | Amount: | N/A |

3. I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _24_ day of October, 2010.

_Meir Fed_____

## CERTIFICATION

I, Michal Tulpan, hereby certify as follows:

1. I have reviewed the complaint styled *Rembaum et al. v. Banco Santander, S. A et al.* (S.D.N.Y) 10-4095 (SAS).

2. I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows.

| Date of Purchase: | 28 July 2008 | Amount: | USD 100,000.05 |
| Date of Sale: | N/A | Amount | N/A |

3. I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this **24** day of October, 2010.

_____

<u>CERTIFICATION</u>

I, NIG Engineers Ltd, hereby certify as follows:

1.  I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.  I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 30 November 2007 | Amount: | USD 100,000.01 |
| Date of Sale: | N/A | Amount: | N/A |

3.  I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action.  I have not sought to serve as a representative party on behalf of a class during the last three years.  I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _____ day of October, 2010.

אן.איי.ג'י. מהנדסים בע"מ
ח.פ. 513046649

## CERTIFICATION

I, Nili Gold, hereby certify as follows:

1.   I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.   I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

Date of Purchase:   26 June 2008          Amount:    USD 49,783.95
Date of Sale:        N/A                  Amount:    N/A

3.   I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.   I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 26 day of October, 2010.



## CERTIFICATION

We, David and Naomi Noam, hereby certify as follows:

1.      I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.      I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 27 August 2008 | Amount: | USD 27,999.62 |
| Date of Sale: | N/A | Amount: | N/A |

3.      I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.      I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 21 _ day of October, 2010.

Naomi Noam          David Noam

## CERTIFICATION

I, Panacota, hereby certify as follows:

1.   I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.   I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 3 September 2008 | Amount: | USD 100,000.00 |
| Date of Sale: | N/A | Amount: | N/A |

3.   I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.   I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _____ day of October, 2010.

## CERTIFICATION

I, Penseys Limited, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

Date of Purchase:    26 June 2008          Amount:    USD 119,481.48
Date of Sale:        N/A                   Amount:    N/A

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 22 day of October, 2010.

FOR PENSEYS LIMITED

JM GEDDES, DIRECTOR

L M LELAI, AUTHORISED SIGNATORY

## CERTIFICATION

I, Pimos, hereby certify as follows:

1.    I have reviewed the complaint styled *Rimbaum et al. v. Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:.

| Date of Purchase: | 28 July 2008 | Amount: | EUR 65,000.00 |
| Date of Sale: | N/A | Amount: | N/A |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 2.5 day of October, 2010.

## CERTIFICATION

I, Rami & Yael Lipman, hereby certify as follows:

1.     I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.     I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 27 July 2007 | Amount: | USD 149,999.87 |
| Date of Purchase: | 26 June 2008 | Amount: | USD 99,999.36 |
| Date of Sale: | N/A | Amount: | N/A |

3.     I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action.  I have not sought to serve as a representative party on behalf of a class during the last three years.  I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.     I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 22 day of October, 2010.

**CERTIFICATION**

I, Abraham & Mina Rembaum, hereby certify as follows:

1.  I have reviewed the complaint styled *Rembaum et al. v. Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.  I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 23 July 2008 | Amount: | USD 49,783.95 |
| Date of Sale: | N/A | Amount: | N/A |

3.  I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _____ day of October, 2010.

## CERTIFICATION

I, Robin Sand, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 24 December 2007 | Amount: | USD 61,325.54 |
| Date of Sale: | N/A | Amount: | N/A |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _20_ day of October, 2010.

## CERTIFICATION

I, Rosslina Properties, hereby certify as follows:

1.   I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.   I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

Date of Purchase:   26 April 2007          Amount:   USD 150,000.03
Date of Sale:       N/A                    Amount:   N/A

3.   I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action.  I have not sought to serve as a representative party on behalf of a class during the last three years.  I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.   I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _22nd_ day of October, 2010.

AUTHORISED SIGNATORY
For FRT DIRECTORS LIMITED
Corporate Director

AUTHORISED SIGNATORY
For FRT SECRETARIAL LIMITEI
Corporate Secretary

## CERTIFICATION

I, Ruth Tamir, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y.) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 13 August 2008 | Amount: | USD 107,694.16 |
| Date of Sale: | N/A | Amount: | N/A |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this __22__ day of October, 2010.

## CERTIFICATION

I, Moshe Scheuer, hereby certify as follows:

1.     I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.     I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 25 July 2008 | Amount: | USD 39,999.82 |
| Date of Sale: | N/A | Amount: | N/A |

3.     I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.     I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _____ day of October, 2010.

## **CERTIFICATION**

We, Yair and Channa Sharef, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 27 August 2008 | Amount: | EUR 40,000.05 |
| Date of Sale: | N/A | Amount: | N/A |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this **24** day of October, 2010.

## CERTIFICATION

I, Turtle Creek, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al. v. Banco Santander, S.A. et al.* (S.D.N.Y.) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 27 August 2008 | Amount: | USD 99,999.90 |
| Date of Sale: | N/A | Amount: | N/A |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 22 day of October, 2010.

## CERTIFICATION

I, Wine Divine C.V., hereby certify as follows:

1. I have reviewed the complaint styled *Rembaum et al. v. Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2. I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| Date of Purchase: | 27 August 2008 | Amount: | USD 60,000.01 |
| Date of Sale: | N/A | Amount: | N/A |

3. I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 24 day of October, 2010.

**CERTIFICATION**

I, Jacqueline Taub, hereby certify as follows:

1.     I have reviewed the complaint styled *Rembaum et al. v. Banco Santander, S./l. et al.* (S.D.N.Y) 10-4095 (SAS).

2.     I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| Date of Purchase: | 27 August 2008 | Amount: | USD 50,000.62 |
| Date of Sale: | N/A | Amount: | N/A |

3.     I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.     I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 2nd day of October, 2010.

## CERTIFICATION

I , Solange Broccoli, hereby certify as follows:

1.    I have reviewed a complaint and authorized its filing.

2.    I did not invest in Optimal Multiadvisors Ltd. and its sub fund, Optimal Strategic US Equity Ltd., which are the subject of this action at the direction of counsel or in order to participate in any private action arising under the Private Securities Litigation Reform Act (the "PSLRA").

3.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., which is the subject of this litigation as follows:

Purchase of 13.395 shares of Optimal SUS on March 17, 2008 at a price per share of $3,258.61

5.    I have not sought to serve as a representative party on behalf of a class during the last three years.

6.    I will not accept any payment for serving as a representative party, except to receive its pro rata share of any recovery or as ordered or approved by the Court or any award to it by the Court of reasonable costs and expenses (including lost wages) directly relating to its representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of October, 2010.

_____
Solange Broccoli

## CERTIFICATION

I , Gastón Broccoli, hereby certify as follows:

1.    I have reviewed a complaint and authorized its filing.

2.    I did not invest in Optimal Multiadvisors Ltd. and its sub fund, Optimal Strategic US Equity Ltd., which are the subject of this action at the direction of counsel or in order to participate in any private action arising under the Private Securities Litigation Reform Act (the "PSLRA").

3.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., which is the subject of this litigation as follows:

Purchase of 7.765 shares of Optimal SUS on March 18, 2008 at a price of $3,258.61

5.    I have not sought to serve as a representative party on behalf of a class during the last three years.

6.    I will not accept any payment for serving as a representative party, except to receive its pro rata share of any recovery or as ordered or approved by the Court or any award to it by the Court of reasonable costs and expenses (including lost wages) directly relating to its representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of October, 2010.

Gastón Broccoli

## CERTIFICATION

I, Gloria Arredondo, hereby certify as follows:

1.    I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| | | | |
|---|---|---|---|
| Date of Purchase: | 28 April 2008 | Amount: | USD 599,999.88 |
| Date of Sale: | N/A | Amount: | N/A |

3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _____ day of October, 2010.

## CERTIFICATION

I, Alberto & Angela Bello, hereby certify as follows:

    1.    I have reviewed the complaint styled *Rembaum et al.* v. *Banco Santander, S.A. et al.* (S.D.N.Y) 10-4095 (SAS).

    2.    I invested in Optimal Multiadvisors Ltd. and its subfund, Optimal Strategic US Equity Ltd., and which is the subject of this litigation as follows:

| Date of Purchase: | 29 January 2008 | Amount: | USD 99,999.84 |
| Date of Sale: | N/A | Amount: | N/A |

    3.    I did not make the above investment which is the subject of this action at the direction of a lawyer or in order to participate in a class action. I have not sought to serve as a representative party on behalf of a class during the last three years. I will not accept any payment for serving as a representative party beyond that to which I am entitled by order of the Court.

    4.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _____ day of October, 2010.

## CERTIFICATION

I, Hector A. Tobia, hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of Silvana Worldwide Corp. ("Silvana"). I have reviewed a complaint styled *In re Optimal U.S. Litigation*, No. 10-cv-4095 (S.D.N.Y.);

2.    Silvana did not invest in Optimal Multiadvisors Ltd. ("Optimal Multiadvisors") and its subfund, Optimal Strategic US Equity Ltd. ("Optimal SUS"), at the direction of counsel or in order to participate in any private action arising under the Private Securities Litigation Reform Act of 1995;

3.    Silvana is willing to serve as a representative party on behalf of the Class and will testify at deposition and trial, if necessary;

4.    Silvana invested in Optimal Multiadvisors and its subfund Optimal SUS, which is the subject of this litigation, as follows:

Purchased 46.032 shares of Optimal SUS on March 12, 2008 at a price per share of $3,258.61

5.    Silvana has sought to serve as a representative party on behalf of a class during the last three years in:

*In re Kingate Mgmt. Ltd. Litig.*, No. 09-cv-5386 (S.D.N.Y.)

6.    Silvana is currently serving as a named plaintiff in:

*In re Kingate Mgmt. Ltd. Litig.*, No. 09-cv-5386 (S.D.N.Y.)

7.    Beyond its pro rata share of any recovery, Silvana will not accept payment for serving as a representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 5th day of May, 2011.

_____
Hector A. Tobia, on behalf of Silvana Worldwide Corp.