## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE OPTIMAL U.S. LITIGATION | No. 10-cv-4095 (SAS)<br>ECF CASE |

## COMPENDIUM OF EXHIBITS TO THE
## THIRD AMENDED CLASS ACTION COMPLAINT

EDWARD W. MILLER
648 Franklin Avenue, 2nd Floor
Garden City, New York 11530
Tel: (516) 280-7377

LABATON SUCHAROW LLP
Joel H. Bernstein (JB-0763)
Javier Bleichmar (JB-0435)
Alan I. Ellman (AE-7347)
140 Broadway
New York, New York 10005
Tel: 212-907-0700
Fax: 212-818-0477

*Counsel for Lead Plaintiffs*
*and Lead Counsel for the Class*

ROBBINS GELLER RUDMAN
DOWD LLP
Jack Reise
Michael L. Greenwald
120 E. Palmetto Park Road, Suite 500
Boca Raton, Florida 33432-4809
Tel: (561) 750-3000
Fax: (561) 750-3364

*Additional Plaintiffs' Counsel*

# Exhibit 1



**Memo**

| To | Manuel Echeverría |
|---|---|
| From | Karine Courvoisier |
| Re | Issues related to Optimal Strategic US Equity Ltd and Optimal Arbitrage Ltd |

<u>**Introduction**</u>

Optimal Multiadvisors Limited (the "**Optimal Fund**") is an open ended umbrella investment company with limited liability, incorporated under the laws of the Commonwealth of the Bahamas on August 15, 1995 under the provisions of the International Business Companies Act 1989 (No. 2 of 1990).

The authorised share capital of the Optimal Fund consists of US$1,000,000 participating shares, par value US$0.01 per share ("**shares**") and 1,000 ordinary shares, par value US$1 per share. Optimal Investment Management Limited, the investment manager of the Optimal Fund, has purchased all of its ordinary shares. The investment manager is wholly owned by Santander Central Hispano Bank & Trust (Bahamas) Ltd.

The assets of each sub-fund of the Optimal Fund are traded through a separate trading company and each of these trading companies is a subsidiary of the Optimal Fund.

The trading companies are as follows:

- Optimal Arbitrage Ltd (hereafter "**Optimal Arbitrage**")
- Optimal Global Trading Ltd
- Optimal European Opportunities Ltd and
- Optimal Strategic US Equity Ltd (hereafter "**Optimal SUS**").

In reviewing the legal documentation related specifically to the management of Optimal Strategic US Equity Ltd and Optimal Arbitrage Ltd (specifically "Infiltrator") (together "the **Funds**"), the Santander Central Hispano Group (hereafter "**SCH**") has detected a number of issues that may involve legal risks for the Group. These issues need to be analysed and resolved.

The legal relationship with the entity managing the assets of the Funds is described here below.

<u>**Optimal SUS and Optimal Arbitrage**</u>

The contractual documentation related to the Funds has been signed on January 31, 1996 between Bernard L. Madoff Investment Securities (hereafter "**Madoff**") and the Optimal Fund (formerly BPI Multiadvisors Limited).

Madoff is a New York based NASD ("U.S. National Association of Securities Dealers, Inc.") registered broker-dealer acting primarily as a market maker in listed and unlisted stocks and convertible securities. As part of its investment management activity for the Funds, Madoff utilises a "split strike conversion" options strategy (described on page 4, see text proposed for the "Investment Policies" of Optimal SUS).

It should be noted that Madoff is very secretive and has a policy requiring its clients of not disclosing its name in any documents such as Prospectus, audited financial statements, marketing reports,…

The agreements entered between the parties above-mentioned are the following:

1. **Opening Account Document** whereas the Optimal Fund has established a brokerage account for the Funds at Madoff.
2. **Customer Agreement** relating to the opening or maintaining of the accounts opened with Madoff. This Agreement should be considered as a Custody Agreement;

Optimal Investment Services S.A.
5-7, rue Ami-Lévrier, CP 1824, ch-1211 Geneva 1
Tel (41 22) 909 74 74 . Fax (41 22) 909 62 22





INVESTMENT SERVICES

3. **Trading Authorization Limited to Purchases and Sales of Securities** whereby the Optimal Fund authorizes Madoff as his agent and attorney in fact to buy, sell and trade in stocks, bonds and any other securities for its account. This Agreement should be considered as a general power of attorney (discretionary);

**Option Agreement** which states the terms and conditions and risks of transactions in option contracts**Issues to be discussed:**

In reviewing the Agreements, it is noted that the contractual documentation and specifically the power of attorney given to Madoff has probably to be limited and to describe its management activity for the Funds.

In order to protect more efficiently the interests of the investors and indirectly those of SCH and the legal entities of the Optimal Fund, the following issues are to be discussed and resolved:

According to the Customer Agreement, we understand that the assets of the Funds are held by Madoff itself. In this regard, when asked why a client could not custody securities elsewhere, i.e. outside the Madoff organisation, Madoff offers two reasons:

A) Unforeseen operational issues such as trade settlement could compromise the strategy. For example, if the 30 or so stocks that compose the basket fail to settle at the same time then the basket's correlation to the S&P 100 may be jeopardized.

B) If the securities were to be delivered to an external custodian a client could conceivably sell out any leg of a trade, which would compromise the strategy.

In our process of improving the contractual relationship with Madoff, we have achieved part of the disclosure above-mentioned by the text our auditors of the Optimal Fund (PricewaterhouseCoopers Bahamas) have included in their audit, clearly stating that the assets of the Funds are held by Madoff.

The text reads as follows:

**"BROKER-DEALER AND CUSTODIAN AGREEMENT:**

Pursuant to an agreement dated January 31, 1996, Bernard L. Madoff Investment Securities LLC (Madoff), a New York based financial institution, is authorized to act as the Series' broker-dealer for all US equity, US Treasury and option transactions, these transactions being executed with Madoff as the principal. For the services provided, Madoff receives the principal spread on all security transactions executed for the Series. Madoff also acts as custodian for investment assets of the Series. For the year ended December 31, 2001, Madoff executed transactions of approximately $7.1 billion for the Series."

2) To ask for a legal opinion regarding the legal status of Madoff as a Broker-Dealer, Custodian and "investment manager" of the Optimal Fund under the laws of New York.

4) To disclose in the Prospectus of the Optimal Fund, in particular under the section related to the Funds that their assets of are held by Madoff and not by SCHTo change the contractual party of the Agreements and have separate agreements between Madoff and the Funds.

5) To prepare an "Investment Manager/Adviser Agreement" construed and governed in accordance with the laws of New York and submit it to Madoff for his consideration in order to clarify and limit the power of attorney to this entity. We expect that Madoff will not agree with the above.

6) To discuss the possibility of signing a sub-advisory agreement between Madoff and Optimal Investment Services S.A. or a delegation of Madoff's duties in relation to the Funds with the prior consent of Optimal Multiadvisors Ltd and the Investment Manager.

7) To prepare a revised text describing the Investment Strategy applied to the Funds included in the Prospectus of the Optimal Fund. It is decided to then send it to Madoff for any comments and/or written approval.

Optimal Investment Services S.A.
5-7, rue Ami-Lévrier, CP 1824, ch-1211 Geneva 1
Tel (41 22) 909 74 74 . Fax (41 22) 909 62 22





INVESTMENT SERVICES

The current text for Optimal SUS reads as follows:

"**STRATEGY:**

Optimal Strategic US Equity Series (hereafter "Optimal SUS") invests its assets with a single fund manager. The manager invests primarily in a basket of S&P 100 stocks. The manager also employs an index option overlay as a hedge against adverse market movements and to preserve existing investor capital. The strategy is quantitative in nature and seeks to achieve consistent mid-teen returns over a long-term horizon."

The proposed text should disclose the name of Madoff and should state the following:

"<u>**Investment Policies**</u>

Optimal Strategic US Equity Series (hereafter "Optimal SUS") seeks to obtain long-term capital appreciation of its assets through the utilization of non-traditional options trading strategies. In attempting to achieve its objective, Optimal SUS has established a discretionary account at Bernard L. Madoff Investment Securities ("BLM"), a registered broker-dealer in New York, who utilizes a strategy described as "split strike conversion"(generally consisting of the purchasing of equity shares, the selling of related options representing a number of underlying shares equal to the number of shares

purchased, and the buying of related put options representing the same number of underlying shares, see description below). All investment decisions in the account at BLM are effected by persons associated with BLM. The firm, which employs approximately 200 people, acts primarily as a market maker in stocks and convertible securities. Most of the stocks for which it acts as a market maker are also listed on the New York Stock Exchange. All investments involve investment risk and may result in losses instead of gains, as the achievement of Optimal SUS' investment objective cannot be assured. See "Risk Factors".

The strategy utilized by BLM is called "split-strike conversion" and entails:

(i)purchasing a basket of thirty (30) to forty (40) large-capitalization S&P 100 stocks which together account for the greatest weight of the Index and therefore, when combined, present a high degree of correlation with the general market;

(ii)selling out-of-the-money S&P 100 Index call options representing a dollar amount of the underlying Index equivalent to the dollar amount of the basket of shares purchased;

(iii)purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount.

The strategy aims to limit losses when stock prices decline while still affording an upside potential that is capped to the strike price of the short call when stock prices rise. The long put/short call position constitutes a "synthetic" short of the market, which provides a hedge against the long stock positions. Proprietary systems continuously optimize the basket of stocks to replicate the performance of the overall market at low cost. Put and call option positions are actively managed as strike prices and maturities are adjusted in response to relative valuations and general market movements.

**Temporary Investments**

Pending investment of capital of Optimal SUS in accordance with Optimal SUS' Investment Policies and permitted by this Explanatory Memorandum, Madoff may decide to hold cash or invest in cash equivalents. Among the cash equivalents are: obligations of the United States Government, its agencies or instrumentalities, commercial paper, and certificates of deposit and bankers' acceptances issues by the United States banks that are members of the Federal Deposit Insurance Corporation. Optimal SUS may also enter into repurchase agreements and may purchase

Optimal Investment Services S.A.
5-7, rue Ami-Lévrier, CP 1824, ch-1211 Geneva 1
Tel (41 22) 909 74 74 . Fax (41 22) 909 62 22

Santander Central Hispano



shares of money market mutual funds in accordance with applicable legal restrictions. However, in practice Madoff usually invests in US Treasury Bills.

**Transaction Executions**

BLM acts as a principal in connection with its sale of securities to Optimal SUS and the purchase of securities from Optimal SUS. BLM acts as a market maker in the stocks purchased and sold by Optimal SUS. These market making activities enable BLM to trade with Optimal SUS as principal. The options transactions executed for the benefit of Optimal SUS are effected, primarily, in the over-the-counter market, not on a registered options exchange. BLM is not a market maker in options. See below "Potential Conflicts of Interest".

**Potential Conflicts of Interest**

The Investment Manager, its principal, and BLM and its principals, may form and manage other investment entities (including without limitation investment partnerships, investment companies, mutual funds and offshore funds) in the future with substantially the same or different objectives as those of Optimal SUS. They may also make investments in securities for their own accounts. Such activities could detract from the time they allocate to the affairs of Optimal SUS and BLM, as the case may be. Similarly, Mr. Anthony Inder Rieden and Ms. Dawn Davies, the non-affiliated directors of Optimal Multiadvisors Ltd, have other business interests and will not devote their entire time to Optimal SUS' affairs."

The lawyers will determine if the above description of the Investment Strategy of Optimal SUS is adequate or if we need to elaborate more in this respect.

**<u>Conclusion</u>**

In consideration of the above, we propose to meet with the lawyers in New York to seek for legal opinion in relation to the issues above described. It is then intended to revise all the contractual documentation with Madoff and redraft its Investment Strategy applied to the Funds.

_____

The proposed NY lawyers are the following:

1. Seward and Kissel, John Tavss and Steve Nadel, tavss@sewkis.com, 212-574-1261, assistant: griffiths@sewkis.com.
2. Shulthe, Roth, Stewart Friedman, 212-758-0404, stewart.freedman@srz.com

Karine Courvoisier

Optimal Investment Services S.A.
5-7, rue Ami-Lévrier, CP 1824, ch-1211 Geneva 1
Tel (41 22) 909 74 74 . Fax (41 22) 909 62 22

Santander Central Hispano

# Exhibit 2



**Memo**

| To | Manuel Echeverría |
|---|---|
| **From** | Karine Courvoisier |
| **Re** | Meetings with Bernard Madoff and lawyers in New York – September 18-19, 2002 – |

### Introduction

The purpose of the meetings was to discuss the actual contractual arrangements between Bernard L. Madoff Investment Securities ("MIS") and Optimal Strategic US Equities Ltd and Optimal Arbitrage Ltd (together the "Funds") as they would appear to be extremely broad and may need to be revised for a number of reasons including:

(a)    To reduce the current potential discretion which MIS has in respect to the assets of the Funds;

(b)    To reduce any potential exposure of Optimal Investment Management Limited, Optimal Multiadvisors Ltd, the Funds, Optimal Investment Services S.A. and the reputation of the Santander Group generally;

(c)    To ensure that in the event that the Funds and related funds are redomiciled to Ireland as funds of Optimal Multiadvisors Ireland Plc, the contractual arrangements between MIS and Optimal Multiadvisors Ireland Plc and the documentation relating thereto would be similar to the documentation for the revised arrangements for Optimal Multiadvisors Ltd (specifically the Funds) with MIS.

### Madoff and his Regulatory Status

MIS is a registered US broker-dealer regulated by the Securities and Exchanges Commission ("SEC") and the National Association of Securities Dealers ("NASD"). The Funds invest their assets with MIS, which operates to a defined investment strategy. He is not paid any kind of advisory, management or performance fee. The brokerage charges appear very small, and we assume he makes his income on these fees or a spread. Madoff insists he does not act as an investment adviser and therefore he/MIS is not a registered investment adviser with the SEC.

One of the more frequently relied upon - and more complex - exclusions from the investment adviser definition is for broker-dealers (Advisers Act § 202 (a)(11)(C)). It excludes from the investment adviser definition any broker-dealer registered as such under the Securities Exchange Act of 1934 (1934 Act), provided that it: (1) gives investment advice "solely incidental" to its brokerage business, *and* (2) receives no "special compensation" for this investment advice. Note that a broker-dealer must satisfy *both* elements to rely on the exclusion.

Optimal Investment Services S.A.
5-7, rue Ami-Lévrier, CP 1824, ch-1211 Geneva 1
Tel (41 22) 909 74 74 . Fax (41 22) 909 62 22

Santander Central Hispano



INVESTMENT SERVICES

The exception in Section 202 (a)(11)(C) was included in the Advisers Act because broker-dealers routinely give investment advice as part of their brokerage activities, yet are already subject to extensive regulation under the 1934 Act and possibly state law. As a consequence, Congress determined that if a broker-dealer did not give investment advice other than in the ordinary course of its brokerage business (determined by the "solely incidental" and "special compensation" elements), the additional regulation of the Advisers Act was unnecessary.

According to the above described exclusion, Madoff confirms that he/MIS is exempt from registering as investment adviser as its activity is incidental to its broker dealer activity. The focus of the "solely incidental" element is on the nature and amount of the investment advice the broker-dealer provides to clients in its brokerage capacity. While the requirements of this element have not been specifically defined, the SEC has indicated generally that investment advice offered as part of an overall financial plan for the client is not considered "solely incidental" to brokerage, whereas investment advice on individual securities transactions is.

He also confirms that he is not charging any "special compensation" which could be defined as any compensation to a broker-dealer for investment advice *other than* brokerage commissions. He is not receiving any compensation as a result of issuing or promulgating analyses or reports concerning securities.

As a preliminary comment from the lawyers' analysis, MIS is acting according to the law even if its activity as investment adviser being broker-dealer is less strict than if it were to be registered as investment adviser.

## Contractual Agreement with Madoff/MIS

In reviewing the Information Memorandum of Fairfield Sentry Ltd, Madoff explains that it is not correct to say that Fairfield has a "discretionary account" at MIS, as stated under the "Investment Policies" of this document. If this was the case, Madoff/MIS would choose what security to buy (as an investment adviser would do). However, if he only chooses the time when he trades, then he has no "discretion". The only decision/discretion he makes/has is on the timing and the price. In other words, Madoff/MIS only executes the investment strategy that the investment adviser gives him to implement.

Madoff then points out that we are aware of the investment strategy he uses, and which securities he can trade or not. He then says that by mandate he cannot do something different than what we have agreed with him and that it would constitute a breach of the agreement if he were to deviate from his strategy (ie buying/selling other securities than those stated).

The "Trading Authorization Limited to Purchases and Sales of Securities" (the "Trading Authorization") between Madoff/MIS and BPI Multiadvisors Ltd (now Optimal Multiadvisors Ltd) is a standard document he usually has with his customers.

Optimal Investment Services S.A.
5-7, rue Ami-Lévrier, CP 1824, ch-1211 Geneva 1
Tel (41 22) 909 74 74 . Fax (41 22) 909 62 22

Santander Central Hispano



The document states the following: "The undersigned hereby authorizes <u>Bernard L. Madoff</u> (whose signature appears below) (*and not Bernard L. Madoff Investment Securities*) as his agent, and attorney in fact to buy, sell and trade in stocks, bonds and any other securities <u>in accordance with your terms and conditions</u> for the undersigned's account and risk and in the undersigned's name, or number on your books (…)".

According to Madoff, "your terms and conditions" mentioned above relates to the investment strategy he uses and that we know for many years. However, as his investment strategy is not in written form, he offered (after we suggested it would be helpful for us to have it) that the fund issues an "additional letter" attached to the Trading Authorization that describes the investment strategy he follows as a broker-dealer with a detailed list of the securities he can buy with ratios/weightings, ie only buying S&P 100, 30-35 largest caps, stocks,… (see attachment A).

This document will give substance to the Trading Authorization and will describe and limit his discretion as to what to buy. The document will give him latitude only for the <u>execution</u> of the strategy on a timely and pricing basis. He then promised to send us a model of such letter he has with Thema International Fund plc and agreed to sign it with the fund.

This document would constitute a great improvement in the contractual relationship we have with Madoff as it would reduce the current potential latitude which Madoff/MIS has in respect to the assets of Optimal SUS and the potential exposure of Optimal Investment Management Ltd, the Funds, Optimal Investment Services S.A. and the reputation of the Santander Central Hispano Group generally.

## <u>Disclosure Issue</u>

Our primary main concern was that Madoff did not permit any customer, including us, to disclose his/MIS's name in the Prospectus, financial statements, both as broker-dealer and as custodian of the assets.

According to the lawyers, under US law, we need to disclose all facts that are material to investors, such as who is making the decision of buying and selling. If it would be offered to US investors, not mentioning this fact would be seen as an omission.

However, as we have now clarified that Madoff only executes the investment strategy he is given, which is detailed in the letter above described - and as we do not have US investors -, we believe that it is not necessary to disclose his name in the fund documentation.

## <u>Custody / Segregation of Assets</u>

As mentioned above, Madoff "manages" the portfolio and controls it at the same time as he/MIS has the custody of the assets. It has to be noted that broker dealers can have custody of assets as opposed to investment advisers.

Optimal Investment Services S.A.
5-7, rue Ami-Lévrier, CP 1824, ch-1211 Geneva 1
Tel (41 22) 909 74 74 . Fax (41 22) 909 62 22

Santander Central Hispano



Madoff confirmed that there is no margin agreement with the Funds and that the assets of these funds under the control of MIS are segregated and held in the DTC ("Depository Trust Co") in the name of the Funds.

When asked why we could not custody the securities with an external custodian, Madoff replies that logistically it would be impossible for him to ensure errorless delivery. In executing sell orders he would need to have physical control of the assets, and if the assets were somewhere else, there could be delays (as he actively trades) and additional costs.

Another reason for being his own custodian is that he does not want anybody to know when he is in the market and to be able to copy his investment strategy. The fact that people would have this information could jeopardize the strategy.

As mentioned above, Madoff is regulated by the NASD. Under NASD rules, MIS as broker-dealer has to segregate his clients' assets, in a customer account likely to be in the client's name. As a broker-dealer having the custody of assets, MIS has a fiduciary duty. He has a capital obligation, filing obligations and gets examined much more frequently than a registered investment adviser would do. With $400 million in firm capital -which according to our lawyers is extremely high for a broker dealer- Madoff/MIS currently ranks among the top 1% of US Broker-Dealer Securities firms. His financial and regulatory standing is good. Madoff has been chairman of the board of directors of the NASDAQ Stock Market as well as a member of the board of governors of the NASD and a member of numerous NASD committees.

It has to be noted that the custody of Optimal Multiadvisors Ltd (including the Funds) is in the process of being changed to Bermuda Trust (Dublin) Ltd (from the Bank of Bermuda Group). This entity has agreed to appear in the Prospectus as the official custodian of the fund above mentioned. This entity will then delegate its duties to MIS and appoint it as sub-custodian. The new custodian will keep all the exposure/responsibility in case of liquidation of the fund as neither Madoff nor any of the Santander entities will be disclosed in the Prospectus as custodian.

**<u>Suggestions from the lawyers:</u>**

<u>Seward & Kissel (Steve Nadel)</u>

- Check the filings for Madoff by the NASD and the SEC;
- Review the called "Bad Boy Provision";
- Request from Madoff's lawyers a certificate that he/MIS complies with the regulations;

<u>Shearman & Sterling (Paul Schreiber, Richard Metsch)</u>

- Request a legal opinion from Madoff's lawyers confirming that he/MIS is not required to be a registered investment adviser and that he/MIS meets all the requirements set by the law as a broker-dealer;
- Review SPIC insurance coverage;
- Review BD form from NASD;

Optimal Investment Services S.A.
5-7, rue Ami-Lévrier, CP 1824, ch-1211 Geneva 1
Tel (41 22) 909 74 74 . Fax (41 22) 909 62 22





I N V E S T M E N T   S E R V I C E S

- Review Focus Reports from the SEC;
- Review OTC options status, counterparty risk would be eliminated if option transactions are "crossed" through the exchange.

KMZ Rosenman (Fred Santo, Jonathan P. Hughes, Howard Schneider)

- Clarify if the Funds are held in a segregated omnibus account and if they are commingled with securities held for others;
- Review a transaction confirmation (ticket) for option transactions regarding the counterparty risk issue (see attachment B).

## **Conclusions**

The following are the principal issues we achieved as a result of our meetings in New York and the work we have done the last months as well as the principal queries for which we require US legal advice:

1. Madoff has sent us a draft of the "Trading Authorization Directive" described above and which will be attached to the Trading Authorization (see attachment A). We need to review it and have it signed by the Funds as soon as possible;

2. We have chosen KMZ Rosenman as the law firm to work with. We will work with them on the following issues:

   1) Legal opinion on the precise regulatory status of MIS/Madoff under US State and federal laws;
   2) Legal opinion on the compatibility of such regulatory status with the existing contractual arrangements between the Funds and MIS;
   3) Clarify the segregation of assets issue;
   4) Legal assistance on some of the lawyers' suggestions mentioned above such as reviewing the BD form from NASD, the Focus Reports from the SEC, the OTC options status and transaction confirmation;
   5) Legal assistance on some general issues such as redrafting the Offering Memorandum of Optimal Multiadvisors Ltd and,
   6) Any future issue related to our new business in New York.

3. We have decided to appoint Bermuda Trust (Dublin) Ltd (Bank of Bermuda Group) as custodian of Optimal Multiadvisors Ltd (the "Company"). Bermuda Trust is already the custodian of Optimal Multiadvisors Ireland plc since its inception. The Company will now have an independent custodian (including for the Funds) and the change will be effective as of 1st of December 2002. The name of the custodian will be disclosed in the Offering Memorandum and Madoff/MIS will be appointed as sub-custodian.

Optimal Investment Services S.A.
5-7, rue Ami-Lévrier, CP 1824, ch-1211 Geneva 1
Tel (41 22) 909 74 74 . Fax (41 22) 909 62 22

Santander Central Hispano

# Exhibit 3



July 2006
Jonathan Clark
+1 212 350 3500
ois@schny.com

INVESTMENT SERVICES

# Madoff Securities

## S&P 100 Equity Options Arbitrage

| Lead manager: | Bernard Madoff | Firm assets: | Estimated at $15 billion |
|---|---|---|---|
| Address: | 885 Third Avenue, New York, NY 10022 | Open/closed: | Selectively open |
| Tel: | (212) 230-2424 | Headcount: | 320 |
| Fax: | (212) 838-4061 | Firm incpn: | 1960 |

| Summary | The following report collects work done over the last two years researching Madoff Securities and its counterparties on organizational aspects. Madoff Securities currently manages $2.2 billion for Optimal SUS. Madoff Securities' setup for trading client assets is different than that of a regular hedge fund and thus poses several questions which we address in this report. In the following sections we identify and review various aspects of organizational risk and propose risk monitoring steps to address them. |
|---|---|

Summary areas of potential risk:

- Privately owned family business shrouded in secrecy
- Counterparty risk in the options trading
- No independent custody of client assets (Madoff is the custodian)
- Lack of transparency into client accounts, through either clearing or banking accounts (although this is standard brokerage firm procedure)
- No independent verification of trading activity (unlike a standard hedge fund that has a primer broker)
- Not regulated as an investment advisor
- Lack of realistically independent auditor – Friehling & Horowitz is a very small firm with Madoff as its only major client

Mitigants to the above risks:

- Fully SEC, NASD, and FSA registered, controlled, and reviewed as a broker-dealer
- Strong financial standing with over $550 million in equity supporting a $900 million balance sheet
- Trade clearing through the DTC provides third party verification at an aggregate level, though not at the segregated level nor transparent to the ultimate client (Optimal SUS)
- Independent audit firms have reviewed positively (HSBC, PWC)
- Transparency of trading activity on timely basis (T+2)
- Madoff participation and visibility in dealer and regulator activity (board memberships, committee participations)

In addition to this Investment team report, the Operational due diligence team is in the process of performing a review of Madoff Securities as part of their ongoing coverage.

**INTERNAL USE ONLY**

Optimal Investment Services                                                    2

| | |
|---|---|

| | |
|---|---|
| **Organization** | **Organization observations:** Madoff Securities is a privately owned family business which enhances control, but on the other hand, also increases the possibility of collusion. |
| | **View:** Despite the above, we believe the organization is efficiently and professionally managed. |
| | **Risk monitoring steps:** We review the risk of irregularities under Regulation below. |
| | Madoff Securities is a leading international market maker in all of the S&P 500 stocks, over 200 NASDAQ issues, bonds, and other securities. The firm has been providing services to broker-dealers, banks, and financial institutions (with some 600 major brokerage clients currently) since 1960 and is a leader in the U.S. "third market," which trades US listed equities away from the exchange floor. The firm is led by founder Bernie Madoff and his brother Peter Madoff, who is the senior managing director and head of trading. |
| | Madoff Securities is a registered U.S. broker-dealer regulated by the SEC and the NASD. Madoff Securities International is regulated by the FSA and is a member of the London Stock Exchange and NASDAQ Europe. Madoff Securities is not registered as an investment advisor. We explain in greater detail these aspects under Regulation below. |
| | The business is divided into the broker-dealer business and the **client managed accounts**. The broker-dealer business consists of two components, **prop trading** and **market making**, which are each headed by one of Bernie's two sons, who started at the firm after college and are currently 38 and 40. Six managers report to them, each of whom has been at the firm for at least 25 years. Volumes in the broker-dealer business remain steady at 250 thousand transactions per day (according to Madoff, this information is not available from the SEC or DTC). |
| | Bernie Madoff personally maintains tight **controls** at the firm; he has told us that "it's my money" and so he checks balances on a daily basis himself. The firm's controls include formal monitoring of all communications (mail, fax, email). Outgoing email and instant messaging are not available for traders. In addition to these precautions, the firm owns a fidelity bond underwritten by Chubb which reimburses the firm in the case of internal fraud. Madoff has not made any claims against this policy and the firm has not suffered any cases of internal fraud. |
| | Other internal controls include the firm's internal audits, performed monthly by a seven person team, and the firm's high automation and inbuilt risk limits. For example, although the firm's Compliance department checks for best execution and allocation to client accounts, this is all systems driven in the first place. Computer systems run on Stratus hardware and are all internally developed as they have found other products to be unsatisfactory. In the past, they have used their systems expertise to participate on a consulting basis in the development of the Nasdaq exchange and numerous international exchanges. |
| **Internal trade processing and execution** | **Trade processing observations:** 1) Stock transactions are processed in standard manner, with the exception of time stamping, 2) As the options trading is done OTC it has counterparty risk. |

**INTERNAL USE ONLY**

| | |
|---|---|
| | **View:** Further transparency into the stock transactions would give them more specificity and thus a better audit trail, but we understand why this is not practical and in any case a change in the format of their reporting is not an option from Madoff's perspective (we have broached the subject in the past). With regard to the options trading, considering that in a worse case scenario one is left with a basket of highly liquid stocks, we consider the level of counterparty risk taken acceptable.<br><br>**Risk monitoring steps:** 1) Continue to monitor trading activity at the individual trade level for consistency with market levels, 2) Continue to attempt to independently confirm Madoff trading activity with an options counterparty.<br><br>In trading activity for the managed accounts, positions are accumulated through multiple transactions with multiple counterparties over a period of days in order to minimize market impact. Stocks are initially bought into Madoff's prop trading account and then sold on a pro-rata basis to the various managed accounts at the average purchase price plus a four cent per share commission. This explains why there are no time stamps or counterparties listed on trade tickets. The trade tickets are received on average two days after the trade date and report an average execution price (from the multiple trades in each name) and are written manually with system generated information. We recently caught a reporting error in the trade tickets (see Appendix 1 for details), but this is a rarity which has not happened before, to our knowledge.<br><br>As is consistent with the mandated Chinese Wall between market making and client accounts, Madoff does not **internalize** trades (i.e. the market making side of Madoff never serves as the counterparty for managed account transactions). Although most trading is conducted in New York, the account is traded around the clock with some of the execution carried out through Madoff's London affiliate.<br><br>The **options trading** employed by the strategy is exposed to counterparty risk. Although Madoff buys options with exchange-traded terms (standardized strike price, maturity, etc), he trades them in the OTC market with major dealers. Bernie Madoff was chairman of the National Securities Clearing Corporation (and was closely involved in its formation in the 1970s) and therefore has a very clear understanding of counterparty risk. The fund diversifies risk with twelve trading counterparties, with whom 'performance assurance' contracts are in place. This diversification also serves the purpose of concealing positioning.<br><br>We have not yet found a source at the major dealers with whom to confirm Madoff options trading activity (neither has Fairfield). In any case, the worst case scenario for a counterparty failure would be worthlessness of the long put positions (short options exposure does not give rise to counterparty risk), making the portfolio a long-only portfolio of highly liquid stocks. |
| **Trade clearing and custody** | **Trade clearing observations:** 1) Clearing and custody of our managed account is conducted according to industry standards, 2) Independent third party verification at the sub-account, or beneficial owner, level is not possible without Madoff's involvement.<br><br>**View:** Further transparency and control of the assets has been discussed in the past, and although certainly desirable, remains a non-starter from Madoff's perspective. Our view is that since the current custody arrangement is standard industry practice for managed accounts with broker-dealers, this is acceptable. In addition to this, PWC and Fairfield's past checks provide some measure of comfort regarding this point.<br><br>**Risk monitoring steps:** Continue verifying Madoff Securities' continued participation |

**INTERNAL USE ONLY**

with independent clearing firms and good standing with the regulatory authorities.

Madoff Securities is a full clearing firm and a member of all US clearing corporations and depositories. The firm's systems also interface fully with the systems of all major global custodians and clearing and settlement systems. The DTC is the primary clearinghouse for equities. Equities traded through the London affiliate are cleared through foreign agencies and treasury bills are cleared through the GSCC.

The Depository Trust & Clearing Corporation's (DTCC) subsidiaries provide the infrastructure for clearing, settlement, and custody of most US securities transactions. DTCC was created in 1999 when its subsidiary operating companies The Depository Trust Company (DTC) and the National Securities Clearing Corporation (NSCC) - both of which were founded in the 1970s -- were combined under a single holding structure. DTC is the world's largest securities depository and a clearinghouse for trading settlement; NSCC processes most broker-to-broker equity, corporate, and municipal bond trades in the US.

Client assets (ie shares) are held at the DTC in **segregated accounts** designated as Madoff Client Accounts in accordance with SEC Rule 15(c)(3)(3). Thus, although not specific to a particular client, they are not commingled with Madoff assets (since they are a cash, not a margin, account) and are not available to general creditors of the firm. A further point to note is that this segregation effectively eliminates the ability to use client assets to finance proprietary activities, such as market making. Likewise there is no separation by client in the brokerage firm's bank accounts.

We spoke with **DTC** account executive Chris Breen on May 8th. He confirmed that Madoff Securities is a "direct participant", ie one of the dealers or banks that uses its clearing services for trade settlement, but limited further comment given that Madoff is a client. The DTC is owned by a number of direct participants, members of several national securities clearing corporations, the NYSE, Amex, and NASD. In turn, direct participants clear securities for "indirect participants" of the DTC. Indirect participants are also dealers, banks, trust companies, and other clearing corporations, not customers (or "beneficial owners"). Chris also confirmed that the DTC does not have transparency or responsibility to the beneficial owners of the securities it clears on behalf of its direct participants. This is also the case for auditors, who make their information requests through the direct participants.

Therefore, we can summarize the clearing and custody status of our managed account as being according to industry standards, which does not allow for independent third party verification at the sub-account, or beneficial owner, level. Madoff is opposed to any alteration of the standard brokerage custodial arrangement (such as, for example, putting the assets in a client controlled account). He has stated that any other kind of arrangement would diminish his control over the stocks, which he considers essential given the options positions used. The manager requires custody of the stock in order to write options against it and not risk being unable to deliver stock into a call contract. Moreover the manager would face significant logistics issues with a separate custodian.

In our conversations with Fairfield's analyst Amit Wijaywergiya last year and June 28th we learned that Fairfield partner Jeffrey Tucker was given access by Madoff some ten years ago to compare trade tickets against Madoff's internal blotter (log of all transactions) and to confirm trade activity with the DTC. This check successfully confirmed internal consistency as well as with the DTC. It is highly unlikely that Madoff would agree to a background check as extensive as this again and Fairfield has not repeated the exercise. The fact that it has been done with one of the major Madoff

| | |
|---|---|
| | accounts at some point in the past, however, does offer some level of comfort. |
| | In addition, PWC, auditor for several of Madoff's managed account clients, has conducted spot checks to ensure that pro-rata allocations across accounts are appropriate. In turn these pro-rata allocation calculations have matched DTC records for Madoff client accounts. We have reviewed PWC notes covering other operational aspects at Madoff Securities. |
| | The above points provide a measure of independent verification of Madoff's trading activity, albeit from indirect sources to us. |
| **Regulation** | **Regulation observations:** 1) Madoff Securities has a clean regulatory record going back over 45 years except for three very minor infractions, 2) Its financial standing is strong, 3) Regulation cannot guarantee there will not be improprieties, 4) The extent and nature of publicly available reports makes their review, though necessary, unlikely to uncover irregularities. |
| | **View:** Madoff Securities suffering or committing an irregularity is possible but remote. |
| | **Risk monitoring steps:** Continue to cultivate our relationship with Bernie Madoff and others in his organization to allow us to assess any potential change in motivation that would lead to improprieties. Given the importance of this account, this should continue to be pursued by the various levels within Optimal (CIO, ICM members, analyst). |
| | Our research in the regulatory area has focused on assessing Madoff Securities' compliance with regulations and its ability to sidestep the authorities' scrutiny. Madoff Securities is regulated as a broker-dealer but not as an investment advisor, which would require additional disclosure (Form ADV and its extensions) and complexity (eg fund audits). This is intentional on Madoff's part and is an integral part of how the managed account is set up (see Appendix 2). |
| | The SEC's **Division of Market Regulation** regulates broker-dealers to ensure fair dealing and best execution, among other principles. This is done by requiring certain levels of minimum capital (the Net Capital rule), the safeguarding of customer securities (Customer Balances and Customer Protection rules), and the maintenance of accurate records (Required Books, Records, and Reports rule). In addition there are Risk Assessment requirements (see Appendix 3 for more detail on each of these). |
| | These requirements are checked by SROs ("self-regulatory organizations") such as the NASD and major exchanges) on behalf of the SEC and by the SEC itself through inspections and required member filings. The NASD conducts biannual "Trading and Market Audits", which include random spot checks of client accounts for internal reporting and consistency with clearing accounts. The SEC's audits are typically every two years. Although these audit reports are not available to us, we have been told by Bernie Madoff and his auditor that both the SEC and NASD performed audits on the firm in 2005, without any actions or qualified opinions. |
| | Broker-dealers are required to periodically update their registration status in **Form BD**, where the dealer certifies its status with regards to any affiliations and arrangements with other firms, criminal activity, regulatory actions, civil judicial actions, and solvent financial standing. The firm has never been sued nor does it have any pending litigation. |
| | We recently examined NASD BD reports for the last eight years. The 1963 and 1974 |

| | |
|---|---|
| | censures and fines in the amount of $500 and $25, respectively, are regulatory items disclosed in the forms. A more recent censure and fine ($7000) occurred in July, 2005 when the firm failed to immediately display customer limit orders on Nasdaq securities. At the beginning of 2001, the firm changed from a sole proprietorship to a limited liability company with no change in ownership (ie Bernard Madoff 100% owner). The reports also show partial registration withdrawals from the states of Nebraska, California, Texas, and Hawaii in 2001 (no reasons given). |
| | We also examined **financial statements** from 2000 through 2005 (part III of the Focus report, or form X-17A-5). The most recent balance sheet (October 2005) shows $918 million in assets funded by $554 million in equity. There are no other particularly noteworthy items. |
| | The above reports comprise the publicly available reports. Parts I and II of the Focus report and Risk assessment reports (form 17-H) are not made available to the public. Part I of the Focus report is monthly and deals with the financial results and condition of the broker-dealer (with line items such as Net Profit/Loss, Net Capital, and Clearing Agency Balances). Part II of the Focus report covers both operational and financial aspects in greater detail and is prepared at the same time as the firm's annual report. Some sample topics of coverage are: Segregation Requirements, Stock Breaks, and Capital Withdrawals. Part III of the Focus report, as mentioned above, are the standard annual financial statements. The Risk assessment report (form 17-H) is quarterly and details the firm's organizational chart, risk management policies, any legal proceedings, and financial statements. Sample topics of coverage are: Off-Balance Sheet Risk, Credit Risk, and Real Estate. |
| | In summary, oversight of broker-dealers is detailed and multi-layered but works through a **self-regulating system**. The system is thorough but also seems to depend more on the penalizing of infractions than on their prevention. Greater transparency into the SEC and NASD's required reports would be helpful. |
| **Financial reporting** | **Financial reporting observations:** 1) The external auditor cannot be considered realistically independent, 2) The PWC audit of the SUS fund does not provide independent verification of account activity, 3) No auditor's work can ensure 100% integrity of the information. |
| | **View:** Despite Friehling & Horowitz's dependence on Madoff Securities, F&H in fact is a dedicated firm that likely conducts quality work. However, it remains vulnerable to influence by Madoff Securities. Regarding Optimal SUS's audit, we have considered the possibility of PWC conducting deeper audits, but believe that these would not in fact be that useful. |
| | **Risk monitoring steps:** Continue to seek separate and independent sources of information on Madoff Securities' financial standing. |
| | **Madoff Audit**<br>Friehling & Horowitz (F&H) of New City, NY is Madoff Securities' **external auditor**. We spoke with David Friehling on November 18th, 2005 and on July 11th at Madoff's offices as Bernie Madoff requested the meeting include him. This is a small firm of three to four professionals with two hundred clients consisting of primarily small businesses – Madoff is its only large account. Friehling mentioned Comad as being a broker-dealer client in addition to Madoff Securities; we have not been able to find information on this company. Madoff became a client 21 years ago as one of the |

| | |
|---|---|
| | Friehling partners had worked for Bernie previously (we note that Madoff Securities dates to 1960, so there would be a prior auditor to Friehling). Friehling is a father / son - in-law partnership.<br><br>David describes the annual audit at Madoff as compliance focused and taking 250 hours in a year-long process. Assets, liabilities, and income are 100% verified and expenses are sampled, per US GAAP audit standards. F&H's work includes the managed accounts, but as auditors they are not aware of any distinctions between types of client accounts. The audit includes verifying balances with the DTC and other brokers and checking internal statements against customer statements. F&H has not worked with PWC on any audit work.<br><br>When we spoke in November, David seemed surprised to hear Madoff Securities described as a secretive organization – he seemed unaware of that reputation and does not encounter any hurdles in his work there. They have never issued a qualified opinion nor seen Madoff suffer any sanctions from any of the regulators, except for the three minor censures in 1963, 1974, and earlier in 2005.<br><br>We examined F&H's last five audits of Madoff as mentioned earlier.<br><br>**Optimal SUS Audit**<br>We verified in 2004 in conversations with Mark Hourigan and Ken Owens of PWC Dublin that PWC's audit for Optimal SUS relies entirely on Madoff produced documentation. PWC compares Madoff's monthly client statement with the administrator's (HSBC) statement. This means that nothing is really independently verified as both are sourced from the same place. As noted earlier, however, PWC does conduct more involved on site checks with internal audit for other Madoff clients (such as Fairfield), although these do not seem to have yielded much additional information. |
| **Appendix 1: May 2006 reporting error** | Madoff's trade tickets for the May 595 Puts traded May 17th were mistakenly stamped with trade date May 19th (settlement May 22nd). This was easy to see as the activity was faxed to me yesterday (May 18th) and the trade price of $9 does not match the most recent range of prices. A call to Madoff cleared the confusion (and the price does fit with trading activity on the 17th). Trade tickets are written manually with information generated by their systems - so it was basically a typo although the systems are correct. They have also recently changed to three day settlement for options from one day before, which led to some confusion. Frank was pleased that we saw it - says we're the only ones from seven clients he faxes to that called him on it. |
| **Appendix 2: Investment advisor triggers** | Madoff Securities avoids regulation as an investment advisor for the following reasons under the Investment Advisors Act of 1940:<br><br>Exemption under section 202(a)(11)(C):<br>   1.  The Trading Authorization Directive signed by Optimal and other managed account clients strictly limits the scope of Madoff's investments. Because the agreement clearly defines specific parameters governing securities eligible for purchase/sale and the brokerage relationship is not part of a larger financial planning service, Madoff's "investment advice" is considered "solely incidental".<br>   2.  The lack of a management fee for the managed accounts avoids "special compensation" for the investment advisory activities. Any compensation that is clearly defined as a charge for advice would be considered "special compensation". This excludes brokerage commissions. |

**INTERNAL USE ONLY**

| | |
|---|---|
| | Exemption under section 203(b)(3):<br>   1.  The firm's limiting to fifteen its advisory relationships would also exempt it from registration requirements. |
| **Appendix 3: SEC rules for broker-dealers** | **Examinations and Inspections (Rules 15b2-2 and 17d-1)**<br><br>Broker-dealers are subject to examination by the SEC and the SROs. The appropriate SRO generally inspects newly-registered broker-dealers for compliance with applicable financial responsibility rules within six months of registration, and for compliance with all other regulatory requirements within twelve months of registration. A broker-dealer must permit the SEC to inspect its books and records at any reasonable time.<br><br>**Net Capital Rule (Rule 15c3-1)**<br><br>The purpose of this rule is to require a broker-dealer to have at all times enough liquid assets to promptly satisfy the claims of customers if the broker-dealer goes out of business. Under this rule, broker-dealers must maintain minimum net capital levels based upon the type of securities activities they conduct and based on certain financial ratios. For example, broker-dealers that clear and carry customer accounts generally must maintain net capital equal to the greater of $250,000 or two percent of aggregate debit items. Broker-dealers that do not clear and carry customer accounts can operate with lower levels of net capital.<br><br>**Use of Customer Balances (Rule 15c3-2)**<br>Broker-dealers that use customers' free credit balances in their business must establish procedures to provide specified information to those customers, including:<br><br>  •  the amount due to those customers;<br><br>  •  the fact that such funds are not segregated and may be used by the broker-dealer in its business; and<br><br>  •  the fact that such funds are payable on demand of the customer.<br><br>**Customer Protection Rule (Rule 15c3-3)**<br><br>This rule protects customer funds and securities held by broker-dealers. Under the rule, a broker-dealer must have possession or control of all fully-paid or excess margin securities held for the account of customers, and determine daily that it is in compliance with this requirement. The broker-dealer must also make periodic computations to determine how much money it is holding that is either customer money or obtained from the use of customer securities. If this amount exceeds the amount that it is owed by customers or by other broker-dealers relating to customer transactions, the broker-dealer must deposit the excess into a special reserve bank account for the exclusive benefit of customers. This rule thus prevents a broker-dealer from using customer funds to finance its business.<br><br>**Required Books, Records and Reports (Rules 17a-3, 17a-4, 17a-5, 17a-11)**<br><br>Broker-dealers must make and keep current books and records detailing, among other things, securities transactions, money balances, and securities positions. They also must keep records for required periods and furnish copies of those records to the SEC on request. These records include e-mail. Broker-dealers also must file with the SEC periodic reports, including quarterly and annual financial statements. The annual statements generally must be certified by an independent public accountant. In addition, broker-dealers must notify the SEC and the appropriate SRO15 regarding net capital, recordkeeping, and other operational problems, and in some cases file reports regarding those problems, within certain time periods. This gives us and the SROs early warning |

of these problems.

**Risk Assessment Requirements (Rules 17h-1T and 17h-2T)**

Certain broker-dealers must maintain and preserve certain information regarding those affiliates, subsidiaries and holding companies whose business activities are reasonably likely to have a material impact on their own financial and operating condition (including the broker-dealer's net capital, liquidity, or ability to conduct or finance operations). Broker-dealers must also file a quarterly summary of this information. This information is designed to permit the SEC to assess the impact these entities may have on the broker-dealer.

Source: SEC (http://www.sec.gov/divisions/marketreg/bdguide.htm#V)

# Exhibit 4

# OPTIMAL

INVESTMENT SERVICES

### Manager Visit in respect of Non Investment Due Diligence Issues

A

| | |
|---|---|
| **Name of Fund Manager:** | Bernard L. Madoff Investment Securities LLC |
| **Address of location visited:** | 885 Third Avenue<br>New York, NY 10022 |
| **Date and Time of Visit:** | 1 February 2006.  4:00 pm |
| **Names of Funds managed by the Manager in which OIS will invest/is invested:** | SUS and Arbitrage Holding through Infiltrator |
| **Value of Total OIS Exposure to Manager:** | $1.8 Bn |
| **Value of Total Assets managed by the Manager:** | Unknown but estimated at circa $15 Bn |
| **Number of Funds and Accounts managed by the Manager with assets under management in each Fund/Account** | **2**   SUS and Infiltrator managed as managed accounts<br>However Madoff does run a number of similarly structured accounts such as Kingate, Fairfield Sentry, Thema Hedged |
| **Names of Personnel from the Manager met at the site visit:** | Bernie Madoff |
| **Names of OIS Personnel present during the site visit:** | RJ/HBA/JC |

| Summary of Issues & Action Points: | The structures of the two accounts we have with Madoff are on the basis of stipulated trading on a defined basket of securities on an execution only basis with time and price discretion vesting in Madoff. Accordingly Madoff determines for the pool of cash provided to him when to enter or exit the market and the price at which the OTC options are exercised on behalf of his clients. The purchase and sale of underlying securities that form the basket of any securities and any hedging is done on the basis of a proprietary model referred to as time slicing (see description below) which results in a single trade based on an average price being allocated to the client. Option trades are also then entered into with reference to the basket of securities. The allocation process to clients for the trades executed although done electronically is reported through a manual reporting mechanism to each client as a single trade and consequently does not show who the counterparty to the trade was as it is based on an average fill allocation. We also do not know who the counterparties are to the OTC Options entered into. |
|---|---|

Consequently the issues that arise from an operational perspective in relation to the maintenance of these accounts following this visit and subsequent review of the documents available in Optimals files are as follows:

1. **Integrity and Enforceability of contractual arrangements with the Broker Dealer:** Currently the Optimal Accounts do not have a complete set of documentation in relation to each account (i.e. Inflitrator for Optimal Arbitrage and SUS) and therefore whilst the arrangements are understood in broad terms and in terms of specific documents that reflect part of the arrangements – there is no comprehensive documentation set that sets out the precise relationship – for some of the issues see the email at the end of this review setting out issues following a preliminary review of the available documentation within Optimal. E.g. if you look at the trading authorisation under which our accounts are managed it is not clear who the agreement is with – whether it is Madoff the individual or Madoff the Corporation. If it is the individual then there is a significant risk to this investment and reliance cannot be place on the balance sheet of the Madoff corporation. In addition we should confirm whether the trading strategy has changed since the original trading authorisations which were entered into state they trade no less than 35 equities in the S&P 100 whereas Bernie Madoff stated in the meeting that they

deal in the top 45 equities – this may have been a
generalisation however this should be followed up as
part of the review of the contracts.

2. **Traceability and recovery of assets in the event of a
   failure of the Broker Dealer or a counter party:**
   Whilst we have no contraindications – nothing in the
   documentation reviewed to-date indicates that properly
   segregated client accounts have been set up for the
   receipt of cash and from which the transactions on an
   execution only basis will be managed.  We are relying
   here on the existence of Broker Dealer rules requiring
   client accounts to be segregated and on the basis that
   we are not aware of any regulatory infringements in
   this regard.  With regard to problems at the DTC level
   – this is an area of risk we have to be prepared to
   accept in view of the type of trading being done –
   although even here we understand but are not in a
   position to verify that the trades are held in an account
   which is described as being a Madoff Client Account –
   i.e. commingling only client assets.  In relation to the
   Options strategy – the OTC counterparty risk is an area
   where we have to rely on the investment judgement of
   Madoff  because there is the risk that even though you
   may be left with liquid stocks if the option is a long
   put – in the event of a default you will be left with a
   basket of securities with falling values and have lost
   the premium paid to buy the downside protection.
   It seems sensible at the very least to try and
   incorporate some representation in relation to
   segregation in our contractual agreements with Madoff
   and then monitor the regulatory reporting to see if
   anything to the contrary is reported.  In addition we
   should consider the extent to which we should seek to
   have either Madoffs auditor or indeed the Optimal
   Funds auditor to carry out certain restricted procedures
   to confirm that segregated accounts have been properly
   set up and are in place and are capable of identifying
   our assets as belonging to us, verify their counterparty
   assessment procedures for the Options strategy.
   However any report on this would require to be
   addressed to us directly so that we are in a position to
   rely upon it.

3. **Monitoring compliance with the given mandate:**
   We receive confirmations of all trades entered into on
   our behalf post event.  This is prepared and sent on a
   manual basis.  We should verify on a regular basis (a)
   that all trades are in accordance with the mandate and

(b) that we receive an adequate rate of interest for the periods when the positions have been exited and the holdings are in cash. I understand that generally Madoff is authorised to buy Treasuries but there must still be periods prior to cash being swept where interest would be earned and hence be payable.

4. **Risk of Fraud and misrepresentation of process:** One of the difficulties with this account is the current inability to verify actual trading activity in the market through counterparty and other market user intelligence. To a large extent we are reliant on the integrity of the market system and the use of the DTC clearing system to highlight any weaknesses in this area. The NASD has fined the Broker Dealer on three occasions in 1963, 1974 and 2005 - the details of these fines can be found at the end of this report. We should seriously consider the performance of agreed upon procedures in relation to our accounts where either the auditors to Madoff or our auditors as described review the broker dealers procedures with the specific purpose of reporting to us as their client on the integrity of the systems used by the Broker Dealer. We should also establish whether a SAS 70 report has been prepared by auditors on their behalf – as it is likely that this would have been done given that they are a registered broker dealer. A major issue is that the key controls are all in the hands of family members and consequently the usual reliance that might be placed on the existence of a high number of employees would not necessarily be appropriate in this situation although Bernie Madoff himself appears to have a high profile in the US securities industry. In view of the size of our account any fraud would not be covered to any meaningful extent by any insurance or fidelity bond arrangements.

5. **Reliance on a single person** – Keyman risk: Whilst not uncommon in hedge fund situations the keyman risk here is of particular note because there is a considerable reliance being placed on one person in relation to the decision making process and although he is supported by a broader organisation – the Client side activities do not have the formal documentation and external service providers that one would expect with a normal hedge fund and hence some of the safeguards that those structures might provide.

6. **Errors in processing and execution that result in losses in excess of the Broker Dealers insurance arrangements or ability to compensate us in view of the size of our account:** Since the visit one error in the reporting of a trade was identified – this incorrectly stated the transaction date on the confirmation. We are reliant here on the authorisation given by the NASD and the SEC that the processing and reporting procedures have mechanisms for identifying mistakes. The review of a report by an independent party such as a SAS 70 report may go some way in providing assurance that procedures and controls exist. At the next visit we should attempt to review the manner in which trades are executed and allocated to us as a client – failing which we should seek to include this as part of the mandate of agreed upon procedures that the nominated auditor performs and reports upon to us.

**Action Points**

**1.** Update legal documentation for the Optimal accounts and confirm items in the email below including the number of equities forming part of the trading mandate. We should also consider incorporating some of the confirmations such as in relation to segregation of assets as a representation term with the Madoff corporation;

**2.** Raise the issue with Madoff of getting a regular agreed upon procedures report from either Madoff's auditors or our auditors for the SUS Fund – PWC. We should also consider incorporating into this a review as to how price transparency is managed for the trading done. We should be prepared to consider bearing the cost of this report given the level of comfort this is likely to provide;

**3.** Request a copy of any SAS 70 report at the next follow up contact with Madoff;

**4.** Follow up on conducting a review of transactions done for us at Madoff's offices at the next visit performed by operational risk;

**5.** Follow up on who receives interest on the cash balances held by Madoff on our behalf and how this is accounted for;

**6.** Establish exactly what charges we incur for the services provided by Madoff;

**7.** Confirm at each visit done to Madoff that no margining activity is being entered into on the client accounts – i.e. no financing risks being incurred. Also establish at each visit whether the number of counterparties being used for Options trading have changed and if possible establish who the counterparties are; and

**8.** At the next visit follow up on the procedures used by them

| | |
|---|---|
| | to exit option strategies – (the disclosure for which is provided for in the Options agreement) -  and how they monitor counterparty risk. |

**B**

| | |
|---|---|
| **Office Location and Organisation**<br><br>Number of Offices and their locations<br>Number of Staff at each location<br>*(Include an organisation chart where possible)*<br><br>Analysis of Staff by:<br>Investment Team<br>Trade Execution<br>Middle Office<br>Back Office<br>Reconciliation teams<br>Back Office Settlement Teams<br>Investor Relations<br>Risk<br>Compliance and Legal | They have 2 offices – In New York and in London.<br><br>They have circa 225 people in New York and 25-30 people in London.<br><br>The Third Avenue offices have been occupied since 1990. They have 7 more years on the lease which they are renegotiating . They have enough space – they have an option on floor space on the 5th floor – they share the building with a law firm – Latham & Watkins – who would like to have the whole building – but Bernie was not sure they would be able to get it.<br><br>They considered buying some space and sub letting it together with a real estate developer.  Not sure what they will do but they have some time to plan this.<br><br>Bernie described the business as being split into 2 business lines:<br><br>    1.  The Broker – Dealer business<br>    2.  The Client side business<br><br>The Broker Dealer business includes the proprietary line of Market Trading.<br><br>Bernie Madoff's brother Peter is below him and Bernie's two sons look after the trading.  One son runs the proprietary side of the room and the other son runs the market making part of the room.  As we saw later when we walked around the office – the two brothers sit next to each other.  Bernie Madoff argues that although they are on the same floor – Chinese walls separate the profit centres with different supervisors and a separate group of managers.  He says it is effectively the same business but |

different regulatory requirements. Each son (ages 40 and 38) have 3 managers each reporting into them – all 6 managers have been with them for 25 years each and they are all senior traders. Does this create any issues from a business continuity point of view?

Both Bernie and Peter are lawyers by training. Peter is in charge of the business. Peter who is 7 years Bernies junior is also the Head of Compliance.

The Client side of the business is 'walled off' from the rest of the business. Bernie heads this area. Bernie says there are only about a dozen people involved in this side of the business although the Operations side of the business supports both business areas. Bernie states that the Operations side of the business is his pet area outside money management – he makes a point of his being a founder member of the DTC Clearing Corporation.

Bernie's wife remains his bookkeeper for the business and she comes in 3 days a week.

Of the 200 people in New York – there are some 75 people in trading, 75 people in technology including programming for the trading room and 75 people in operations and settlement.

99% of trades are electronic

Bernie notes that he originally started out as a convertible arbitrageur but he didn't want to clutter his back office so they exited years ago even though at one point they were the largest convertibles trader.

The Operations team has a Head of Operations and a Controller.

On the Client side of the business they have a Purchase and Sales Department – this comprises three people who are responsible for balancing out the blotters and confirms. They compare trades for all clients – they sign the QSR agreements and they submit and affirm trades with the clearing corporation.

They also have a department that looks after Dividends/Reorganisations and Corporate Actions – Also 3 people.

They have an accounts payable and receivables

department of 4 people

Operations 8-10 people – covering administrative issues

Cashiering Department comprises 10 people – they are responsible for tying up with the clearing houses – the area where they work is referred to as the cage – still has bars on the window because they deal with negotiable certificates. This department is also responsible for reconciling cash positions.

They don't do any exotic products and there is no physical delivery

They have 20 systems people on the operations side.

Peter's daughter is General Counsel and they have one other inhouse lawyer.

2 people work on just compliance – and they cover both trading and client sides of the business.

7 Internal audit staff who report to Peter Madoff.

Access to the trading floor is by pass.

There are some 100 desks on the floor occupied by Market Making teams, Support Groups, Proprietary desks and Trading. Bernie's two sons sit on an elevated platform area from where they can oversee the trading process. The General Counsel also sits in the trading room.

There is a lower office floor which we were taken to see. The technology people who oversee and monitor the systems are based here.

The Stratus Computers are based in a room which can be viewed through a glass wall. The computers have the capacity to put through 600,000 trades a day – they are currently operating at about 250,000 trades a day. The unit has its own air conditioning unit, Sprinkler systems and they have their own telephony switch.

Back up is done both to servers offline and to tapes daily.

We were not taken to the 17th Floor. This floor also has a mini trading floor plus an IBM computer system. The cage is also located on the 17th floor and there is also a mail room and the back office systems are located there.

| | |
|---|---|
| | |

**C**

| | |
|---|---|
| **Changes in the last 12 months to:** | |
| • **Systems** | The systems are geared to generate account statements, broker confirmations, generate blotters and daily reports.<br><br>Their mainframe system is a Stratus Computer. IBM drives their office systems. All the reporting packages they have are internally generated and there are no service bureaus. They have their own Ticker Plant – they buy the raw data and build the reporting themselves.<br><br>In London they use a system called BRASS which is their front end and back end system. Apparently Bear Stearn use this system too. They looked at using this in NY but the system was not geared up for foreign securities. They tried to use it for 8 years but it could not deliver what they wanted and so they gave up about 4 years ago and built their own systems.<br><br>Madoff holds the code for all the systems and models they have developed.<br><br>5 people at Madoff spent a year looking at coming up with improvements on the models they use. A part of this project was reflected in Q4 2005. The improvement and tweaking of the models for signal generation is in the control of Bernie's sons. Any technical changes must be approved by his two sons. He values their common sense. |
| • **Personnel** | Although they have some 260 personnel spread through their two offices – the key controls are exercised by members of the Madoff Family. Bernie controls the client side operations, His 2 sons control trading and changes to the trading systems and models, General counsel is Bernie's niece, his wife is the bookkeeper to the business and his brother is in-charge of the running of the business |
| • **Documents** | See results of review of documents below – there is a serious need to review these and ensure these reflect the current position for the Optimal funds – on the basis that all trading on behalf of Optimal is done on an execution only basis. |
| • **Investment Objectives** | They do not do single stock strategies anymore. They do look at them and they have models covering Europe but they don't have the liquidity and they don't have the |

| | |
|---|---|
| | expertise for Japan so they don't do that but they do trade US stocks in Japan. |
| • **Organisation** | See comments on Personnel above |
| • **Service Providers to the Fund and Manager** | None – the Manager as broker – dealer handles these. |
| • **Fund entities and assets under management** | No information available apart from estimate above |
| • **Investor base - Significant Subscriptions/R edemptions in the last 12 months** | No information available except for similar accounts carried by other houses |
| • **Regulatory regime** | NASD and SEC |
| • **Ownership of management company** | Bernie Madoff |
| • **Offices opened or closed** | None |
| • **New Funds or accounts launched** | No information available |

**D**

| | |
|---|---|
| **Trade Execution** *(Including Best Execution, Slippage and* ***allocation procedure)*** Make a note here of the walkthrough test conducted on the trade to verify execution process. | They don't write trade tickets – order generation is done automatically – Bernie says they are trying to achieve a paperless trading room.

We spoke about the problems that might arise from 'fat finger' mistakes. Bernie said that 'fat finger' issues did crop up but they had not happened here.....systems have been built into the technology and he believes that the trader cannot press enter twice – there are size parameters by trader before the system will post an alert. Bernie said they helped to build systems for some of the major exchanges and NASDAQ. He noted that they do some 250,000 transactions per day.

They have a 'joint venture' with Merrill Lynch, and others as they are concerned about price converging by the exchanges so they review these. They have inbuilt price alerts on their trades

In the trading room on the proprietary side they have allocated capital by share size and by dollar size – these are not large but |

based on seniority, profitability etc. If a trader has a $50m book the positions can never be more than that. There are parameters on the positions that they cannot change over a certain percent in a day so no trader can create a big issue – the commitment of a trade has to be done via keyboard entry only – if a trade breaks the parameters then an alert goes off on the screen and the supervisors screen and the risk management screen monitored by one of the sons.

The system override can only be done by a supervisor and if the trade is over a certain limit then a son will approve the change.

Traders have discretion over their books . The positions of the traders are hedged by a group of hedgers at Madoff.

The systems on which they trade are run on 2 platforms simultaneously.

When they buy shares – an average price is calculated and allocated across the accounts.

On the Client side Bernie makes the decision to enter and exit the market with one other person – we did not establish whom. But their model drives the order which is fixed. They use momentum models. The loading up of orders on to the execution platform is monitored by:

6 people who monitor the baskets and another 6 people who assist them on monitoring the baskets. They programme the trades on the basis that they have time and price discretion. They trade the client side strategy about a dozen times a year but they are watching the market every day and their model is running all the time even though the 'black box' guys may just be sitting there. The constraints that have been built into the model are the liquidity of the market place and the price levels. Otherwise there is no discretion. The model generates limit orders.

Bernie stated that he had always had an issue about getting into a plane with autopilot without someone watching it. He was frightened of black box computer trading. He has people with responsibility to review and report to Bernie on the monitoring of the systems signals and looking at the groups of orders.

When asked about how they could vary the model – he said that they had a process with 2 people required to sign off on varying the model. As we established these were his two sons.

They also use an allocation model for the allocation process between clients.

Bernie stated that the client accounts were segregated accounts and the money was placed in T Bills. On the cash accounts – when the stock comes in it is allocated across the board- and the

|  | accounts are credited with the shares. In Madoff's books the accounts are all segregated in accordance with the Broker – Dealer rules. In DTC's books the account is held in the name of Madoff. Bernie confirmed that the holdings are not mixed with those of Madoff Securities. They are held by DTC as Madoff Client Accounts as opposed to Madoff Proprietary accounts – but the clients are not identified. Bernie said that if they held margin accounts then the assets would have been commingled but they don't carry margin.<br><br>The OTC options that the dealers are prepared to deal with cover the 45 most liquid stocks and they are making a market in some 1000 securities<br><br>In relation to pricing and reporting – they send out confirmation statements to their clients. We know these are prepared manually and JC asked if these could be sent out electronically to Optimal – Bernie said he was not prepared to do this.<br><br>Note that according to the Options agreement entered into we have the right to request further information regarding the procedure used to assign exercise notices  - This should be followed up with the Manager. |
|---|---|

**E**

| **Trade Reconciliation**<br>*(Including Trade Breaks, DK Trades and Settlement Fails and reasons for them)* | There are three people reconciling on a daily basis. They get break sheets daily between the client accounts. The reconciliations are signed off by two people everyday. There is also a weekly and monthly reconciliation. Bernie reviews the monthly reconciliations as well<br><br>Bernie says he can tell what his cash numbers are every day – he signs off monthly on everything in relation to the operations – and his brother would cover for him in the event that he is absent – but Bernie would still want to get all the information. Bernie signs off on the reconciliations |
|---|---|

**F**

| **Segregation of duties**<br>*(In particular between front and back office* | Although there are some 250 personnel – the key functions are all held by members of the Madoff Family therefore true segregation is questionable in this environment. The |
|---|---|

| | |
|---|---|
| *staff. Also Trade Execution and Risk staff should not be the same)* | only mitigants on segregation issues are the existence of an internal audit team and regular NASD and SEC examinations |

**G**

| | |
|---|---|
| **Net Asset Value Calculation**<br><br>- **Cut off for valuations and accounting**<br>- **Pricing Policy** *(Include information on the use of bid and ask prices, pricing of illiquids, OTC securities/derivatives and use of pricing models)*<br>- **Primary Pricing Sources**<br>- **Secondary (Back Up) Pricing Sources**<br>- **Extent to which the Manager can override prices**<br>- **Number of times NAVs have required restatement**<br>- **Number of occasions the Manager and the Administrator have disagreed on the price used**<br>- **Proportion of the Portfolio that cannot be independently priced**<br>- | Given that this is not a hedge fund but relates to the trading of options on baskets of securities the valuation issues are different. The trades and their financial impact are reported to us given that these are executed on an execution basis with time and price discretion – these are then entered on to a spreadsheet and monitored by us.<br><br>Further questions that need to be addressed are the extent to which the prices on which the trades are executed have true price transparency – to be followed up at the next visit. |

**Given the apparent sensitivity of the relationship with this manager no request was made to review how a trade is made and allocated to a client – however I note that the investment team has recorded that a Fairfield Partner has previously been given such access and there is absolutely no reason why we should not make a similar request.**

**H**

| | |
|---|---|
| **Authorisation of Fund Expenses** *(Note that there should be a dual authorisation process by the Manager with execution of payments by the administrator.* | This is not applicable as the Broker Dealer charges fees for the trades on a 4c per share commission basis – Note however that this charge is not documented in any agreement. We should follow this up notwithstanding that this |

| *Manager authorising payments through the Prime Broker is NOT desirable for anything other than trade execution on a DVP basis)* | may be an industry standard charge. |
|---|---|

**I**

| **Payment of Management and Performance Fees** *(These should be calculated and paid on the instructions of the Administrator and not the Investment Manager)* | None payable |
|---|---|

**J**

| **Cash Management Procedures and Treasury Management** | The Broker Dealer does have cash management procedures as the accounts can hold cash. We need to establish to what extent we receive the interest on these accounts |
|---|---|

**K**

| **Types of Reports generated for internal control and frequency of generation and recipients/circulation  (Risk Reporting e.g. VAR  reporting and stress testing)** | Proprietary reports are generated for internal monitoring purposes – but we have no colour on the nature of these reports. |
|---|---|

**L**

| **Account Opening Procedures - Bank accounts and Brokerage Accounts** *(Note that although the Manager may initiate the opening of these accounts the documents that execute the opening of these accounts should be authorised/signed off by the directors of the Fund in that capacity)* | In view of the counterparty risks involved in the trading of the OTC options we need to consider the basis on which a counterparty is authorised by them as being an acceptable counterparty and what limits they set in relation to each counterparty to manage counterparty risk. |
|---|---|

**M**

| **Asset movement procedures – including signature hierarchies** | Dual signature process operates – but we have no real sense of what hierarchies are in place.  Trading is controlled by Bernie Madoff's sons |
|---|---|

**N**

| Custody of Assets | Within the Broker Dealer the accounts are required to be segregated – whilst we have no evidence that this is being done we have not noted any   regulatory actions reported on any failure to segregate the client assets

At DTC where the trades are being cleared – the assets are held as client assets of the Broker Dealer and are not individually identified as belonging to any particular client. |
| --- | --- |

O

| Prime Brokers and Financing arrangements  (Collateral Risk, Counterparty risk and haircuts) | We are not aware of what financing arrangements if any exist.  Bernie Madoff has stated that they do no margining and on that basis there is unlikely to be any risk of commingling of assets for collateralisation.  This should be reconfirmed at each visit made to them. |
| --- | --- |

P

| Information Technology & Systems
*(Record the different systems used for front and back office and for accounting purposes. You should record where the servers are located, whether there is controlled access to the servers, Whether there are UPS services for the system, the number of T1 lines, airconditioning, smoke alarms and fire protection systems)* | See note on Systems changes above |
| --- | --- |

Q

| Disaster Recovery & Business Continuity Procedures:

- Disaster Recovery Site and contractual arrangements for the site
- Daily Back up procedures.  *(Check the tape rotation cycle and the number of tapes onsite/offsite)*
- Has there been testing of the DR and recovery from back up procedures
- What business continuity arrangements are there in the form of staff cover | They have a Disaster Recovery site at the Bullova Corporate Centre near La Guardia Airport where BA used to have their reservations operations.  The Bullova Corporate Centre is owned by Bernie Madoff.  They have as much space there as they do in New York.  They have a complete back up site there where all the information is replicated.  Every month they do a DR test and everyone is required to spend a week a month at the DR site and some staff are permanently located at the DR site.  They have had cause to use it twice.  Each desk is linked |
| --- | --- |

| | |
|---|---|
| • What succession planning arrangements have been made | live in to the DR site. Bernie said that NASDAQ also used the centre as a back up site. |

**R**

| | |
|---|---|
| **Legal and Regulatory issues** *(Ensure that there are no specific issues that the Manager needs to be cognisant of. The Manager should specifically confirm whether there are, or have been in the previous 6 years, any criminal, civil, administrative or regulatory proceedings whether pending, threatened or in progress against (i) the Investment Manager or any of its principals or officers or (ii) any of the Funds that the Investment Manager is or has been responsible for advising; and whether the Investment Manager has any disputes or proceedings (whether legal or otherwise) instituted by or against an owner or employee of the Investment Manager or a Service Provider to the Investment Manager or the Fund and whether there have been any in the previous 6 years)* | They are not the subject of any legal actions and have not had any legal actions in the last 6 years.<br><br>**However see the regulatory action list at the end of this report.**<br><br>Madoff Securities International Limited is registered with the FSA in the UK – no disciplinary actions noted on the register.<br><br>Bernard L Madoff Investment Securities LLC is registered with the NASD and the broker check report showing the three fines is attached to the end of this report. It is also registered with the SEC – list of standard filings are on the main due diligence file |

**S**

| | |
|---|---|
| **Internal Compliance Procedures**<br>• **Compliance sign off by employees**<br>• **PA Dealing**<br>• **Existence of Compliance Manuals**<br>• **Appointment of Compliance Officer** | Peter Madoff is the firm's compliance officer. His daughter is General Counsel<br><br>Compliance are responsible for reviewing best execution for client orders, allocations, reviewing Options to ensure they were done properly and the exercise of an Option was done properly, that each clients block of stock was allocated properly. Apparently this is all systems driven and all the trading is computer driven.<br><br>7 people form an internal audit group – and they perform a review every month – the client side is reviewed covering custody, account statements (which are spot checked), best execution and they also look at the money transfers.<br><br>The last Regulatory visits that they were subject to were by the NASD in June 2005 and by the SEC in February 2005. No issues were raised and no action |

|  | letters have been received However note that the last NASD fine was in June 2005 – was this linked to the visit?). They also have term examinations by the SEC and no issues have been raised . |

**T**

| **Soft Dollar Arrangements** *(Check that arrangements are either within the equivalent of the S28(e) safe harbour provisions or list the arrangements that are outside the safe harbour)* | They have no soft dollar arrangements |

**U**

| **Insurance Arrangements**<br>• **Keyman**<br>• **E&O**<br>• **D&O**<br>• **Fire and Theft**<br>• **Public Liability and Employee** *(Check the extent to which the Fund has insurance and the extent to which the Manager has insurance and for whose benefit the insurance cover is for)* | They have standard bonding arrangements – they have a fidelity bond and they have a $10m policy which covers them for fraud – this is standard single loss insurance |

**V**

| **Side letter agreements** | On the client side they have separate agreements – however note that the documentation on our accounts appears deficient and does not cover matters such as fees and there are other drafting issues – see email note below. |

**W**

| **Anti Money Laundering and Know your investor procedures (including exposure to structured products)** | They perform client reviews – which are headed by their General Counsel however they are dealing mostly with institutional clients. |

**X**

| Other Issues arising | See summary of issues above |

Extracted from their Web Site:

## Business Continuity Plan Disclosure

Bernard L. Madoff Investment Securities LLC ("Madoff") has created a Business Continuity Plan ("BCP") designed to enable a rapid recovery and timely resumption of critical operations following a significant business disruption ("SBD").

Provisions have been made for the continuation of all aspects of the firm's business in the event of a SBD at the firm's primary location, provided that such SBD does not also have a material adverse effect on our firm's disaster recovery site. The Madoff BCP sets forth the firm's emergency procedures to be followed to best assure recovery and resumption of business in an expedited and orderly basis as well as the management teams responsible therefore. The BCP also details how Madoff intends to meet its obligations to its clients in the case of a SBD. No guarantee can be given however when Madoff will be able in the case of an SBD to recover and resume business and/or meet its obligations to its clients.

Madoff's BCP is intended to safeguard employees' lives, and to the extent possible, firm property; protect the firm's books and records; make a financial and operational assessment; and recover and resume operations as soon as practical so that the firm may continue to provide quality services to its clients. The BCP anticipates two kinds of SBDs, internal and external. Internal SBDs (e.g. a fire in our building) affect Madoff's ability to communicate with clients, banks, core clearing entities, vendors, and regulators, or to otherwise conduct its business. External SBDs (e.g. a terrorist attack, a city flood, or a wide-scale, regional disruption) prevent the operation of the securities markets and/or other financial institutions necessary for the orderly operation of the firm's business.

Madoff's principal office is designed, where possible, to provide a high degree of redundancy to best protect against SBD's. The office has emergency capabilities which are designed to enable the firm to respond to an emergency in a manner which may allow it to recover and resume business operations in an expedited period. Madoff also maintains its own fully operational hot back-up facility outside Manhattan in order to minimize disruptions in case of a SBD. It is designed to provide a high level of flexibility and continuity with minimal disruption to clients and employees. The facility is redundant to Madoff's primary computers, communications and business systems at the firm's principal office in New York City. All Madoff's books and records and banking and securities depositories are connected and fully supported at this site. The facility may be utilized for a short, or if necessary, extended period of time. It has multiple redundancies including its own proprietary electrical generation capabilities.

Madoff's BCP is designed to work in many different emergency situations, but these events are, by their nature, unpredictable and it is impossible to anticipate every scenario that could cause an SBD. Our continuously operational hot back-up facility enables us to regularly test and monitor the efficacy of our BCP but such tests may not be able to replicate the actual conditions we experience in a real emergency. We have outlined the aforementioned measures to make you aware of our efforts to try to ensure that our business operations will continue so that we may fully protect and serve our clients and employees in good times and bad.

# MADOFF'S GUIDE TO ORDER HANDLING- Nasdaq Securities

**Jump to specific categories:**

**Introduction**
**Price**
**Liquidity**
**Speed**
**Limit Order Exposure**
**Special Situations**
**SEC Order Handling Rules**

## INTRODUCTION

### A PRIMER FOR EXECUTION QUALITY

Bernard L. Madoff Investment Securities LLC has been providing quality executions for broker-dealers, banks, and financial institutions since the firm's inception in 1960. During this time, Madoff has compiled an uninterrupted record of growth, which has enabled us to continually build financial resources. With more than $500 million in firm capital, Madoff currently ranks among the top 1% of U.S. Securities firms. Our sophisticated proprietary automation and unparalleled client service delivers an enhanced execution that is virtually unmatched in our industry.

The hallmarks of our system are price improvement, speed, and enhanced liquidity delivered with a level of client service that sets us apart from our competitors. Madoff utilizes a market based, algorithmic approach to defining price improvement and enhanced liquidity.

Discussions with many of our clients have brought to light several key concerns with the decimal-pricing environment: The difficulty of defining "meaningful" price improvement when stocks trade in pennies, the possibility of significantly reduced liquidity at the quoted national best bid/offer (NBBO), and the prospect of an increased number of "split tickets" or multiple-piece fills even on their smaller sized orders. We have designed our system to address all of these concerns.

To help you fully understand the services we offer, we have developed this guide to illustrate how our execution system works. The cornerstones of a quality execution -- Price, Liquidity, Speed, and Limit Order Protection -- are highlighted below.

Return to Table of Contents...

## PRICE

### MARKET ORDER PRICE IMPROVEMENT

Madoff has been a market innovator in providing quality executions for its clients. Our clients can confidently state that their clients' orders will have one of the highest rates of price improvement available in the industry today. In addition, we also offer an on-line audit trail documentation system. This will provide you with additional information to assist you in your obligation under the SEC's Order Handling Rules to "...regularly and rigorously examine execution quality likely to be obtained from different markets or market makers trading a security."

## Automatic Price Improvement for all Nasdaq Securities

Madoff provides automated price improvement opportunities for all Nasdaq securities in which we make a market. Our systems automatically price improve all eligible market and marketable limit orders by 20% of the NBBO spread. Eligible orders will include immediately executable market and marketable limit orders that are greater than 99 shares and are within the liquidity threshold for that stock where the NBBO is greater then two cents ($0.02). The amount of improvement will be based on the NBBO spread at the time we receive your order and will be rounded to the nearest penny. The improvement will be no less than a penny per share. Orders larger than the liquidity guarantee will not be eligible for automatic price improvement.

## Single Price Opening

Madoff's systems provide an automated, single-price opening for all Nasdaq issues in which we maintain a market.

Madoff has adopted the Nasdaq Official Opening Price (NOOP) that results from Nasdaq's Opening Cross process. All market (MKT) and market on open (OPG) orders that are received by Madoff before 9:27:00 am EST will qualify to receive the official Nasdaq opening price. Orders received after 9:27:00 may also receive the NOOP, but are not guaranteed to do so. For orders that are eligible to receive the NOOP, requests to cancel that are received by Madoff between 9:27:00 and 9:30:00 am may be rejected or handled manually.

To the extent that the Nasdaq cross process does not result in a market clearing price (whether the result of system failure, trading halt, or order imbalance), Madoff will execute all pre-open orders on a manual basis. In the event that there is no Nasdaq cross as the result of no eligible orders received by Nasdaq, Madoff will reference the first official Nasdaq print after 9:30:00.

Clients do not need to affix the OPG indicator in order to receive the opening price.

Return to Table of Contents...

## LIQUIDITY

### MADOFF'S ENHANCED LIQUIDITY

Madoff offers immediate liquidity for eligible orders under normal market conditions at the displayed price available in the marketplace as defined by the national best bid and offer (NBBO) at the time of receipt of your order and

enhanced by our price improvement mechanisms. In Nasdaq securities, immediately executable market and marketable limit orders up to 2,000 shares will be automatically executed in their entirety immediately upon receipt regardless of the size at the NBBO. Orders from 2,000 up to 10,000 shares will receive an automated execution that is based on a predetermined combination of Madoff's own capital and use of our smart router to efficiently access multiple points of liquidity. Orders 10,000 shares and greater will be handled manually. In certain less liquid securities, the guarantee for automatic execution may be less than 1,999 shares, at management's discretion. During periods of unusual market conditions, we reserve the right to adjust our execution parameters to appropriate levels. During periods when the NBBO is locked or crossed, our liquidity guarantee is reduced automatically. Madoff's liquidity guarantee is intended for regular and continuous, two-sided, non-momentum based business. Orders that do not meet this description may be subject to lower liquidity guarantees. In addition, our liquidity guarantee is intended to cover individual orders. Multiple orders that are the result of a single investment decision may be treated as a single order to the extent that the aggregate size of these orders exceeds our guaranteed liquidity threshold. Madoff reserves the right to adjust liquidity guarantees on a client by client basis.

Return to Table of Contents...

## SPEED

### AUTOMATION DELIVERS FASTER EXECUTIONS

By incorporating an algorithmic approach to defining price improvement, Madoff is able to reduce overall execution speeds for market and marketable limit orders. Madoff's clients do not sacrifice speed in their efforts to achieve a quality execution .

Return to Table of Contents...

## LIMIT ORDER EXPOSURE

### SUPERIOR LIMIT ORDER HANDLING

Madoff offers its clients superior limit order protection. The SEC has mandated that all market centers and their participants reflect their clients' interest in their quote. Our automated systems automatically execute or display all held limit orders less than block size (10,000 shares or $200,000) that are priced equal to or better than Madoff's quote or that will add to the size associated with such quote unless an express request is made by our client not to display the order. Our systems also guarantee client limit orders priority over any Madoff proprietary trader interest, in compliance with our Manning obligations. As a result, many of your clients' limit orders will be executed with greater speed by our system than by our competitors. This occurs not only because your order is exposed in the Intermarket Trading System (ITS) and NASDAQ quotes where it can interact with other NMS

interest, but also because your order will interact with our other clients' orders if there is a matching interest or activity at the limit price.

Return to Table of Contents...

## SPECIAL SITUATIONS

Under certain circumstances orders will be subjected to automated or manual verification. This may be done through the use of orders sent to other market centers. An example of when this may happen would be locked and crossed markets, actively moving markets, and widely spread markets. In addition, orders may be subjected to clarification of the terms of the order (ie. limit price, special instructions, etc.). In these instances the price at execution time may be different (favorable or unfavorable) from the price at receipt time. Madoff also employs the following policies for special situations:

### UNUSUAL MARKET CONDITIONS POLICY

During periods of unusual market conditions, often characterized by inordinate volumes and volatility, Madoff will attempt to continue providing our clients with the enhanced service benefits which are generally offered during normal market conditions. These enhanced service benefits include, but are not limited to, automatic execution, automated display of eligible client limit orders, automated limit order protection, automated price improvement opportunities and acceptance of stop orders. During unusual market conditions, however, it is possible that some or all of these features may be temporarily modified or suspended. The following are examples of some of the measures which Madoff may take with respect to client orders in either all or certain securities in an effort to efficiently and effectively address such unusual market conditions:

• The order size eligible for automatic execution may be temporarily reduced. Automatic execution levels can only be changed by senior management. Traders of individual securities are not authorized to make such changes. Madoff will attempt to notify you of such action as soon as reasonably possible under the circumstances. Currently, Madoff sends you administrative messages if your order routing interface so permits. Notification by E-mail or fax is also available upon request.

• Madoff may temporarily decline to accept stop orders. We will continue to honor existing stop and stop limit orders but may decline to accept new ones. Please bear in mind that stop orders are handled manually under all market conditions and are not subject to any liquidity guarantee.

Madoff carefully considers the potential effect of such decisions on your clients' orders. Some of the factors evaluated by senior management prior to adjusting Madoff's execution parameters are:

• The price volatility of a particular security;
• The number of client orders received by Madoff in a particular security;
• The total number of client orders received by Madoff;

- The availability of routing service providers which you may use to send your orders to Madoff.

These factors are continually reviewed by senior management throughout the trading day. Madoff's goal is to achieve the highest level of client service given the prevailing characteristics of individual securities and the overall market conditions. Nevertheless, client expectations should reflect the unusual market conditions that may be present in the current marketplace. These are some of the potential consequences arising from unusual market conditions with respect to client orders:

- Potential delays in execution reports;
- Potential multiple execution prices and times for market orders accepted by Madoff which are greater than our current eligible order size. These orders are handled in their entirety on a "best efforts" basis.

### STOP ORDER POLICY

Although stop orders are not an eligible order type within the Nasdaq Super Montage System, Madoff will accept stop orders in all Nasdaq stocks in which we maintain a market as an accommodation to our clients.

Order Eligibility: For orders received prior to the market opening, Madoff considers any "sell stop" to be eligible for acceptance by our system if the "stop" price is lower than the Nasdaq Official Closing Price (NOCP) from the prior trading day. A "buy stop" order would be eligible for acceptance by our system if the "stop" price is greater than the NOCP from the prior trading day.

For orders received during normal trading hours, Madoff considers any "sell stop" to be eligible for acceptance by our system if the "stop" price is lower than the Nasdaq Level 1 inside offering at the time we receive the order. A "buy stop" order would be eligible for acceptance by our system if the "stop" price is greater than the Nasdaq Level 1 inside bid at the time we receive the order.

If supported by your service bureau, orders that do not meet these criteria will be rejected back to the firm sending the order with a "no order taken" message.

Order Election: Once accepted by our system, "pre-opening sell stop" orders and "pre-opening buy stop" orders will be elected by the Nasdaq Official Opening Price (NOOP). Once elected, Madoff will attempt to execute these orders at the NOOP whenever possible.

Intra-day, a "sell stop" order will be elected when the Nasdaq Level 1 bid is equal to or lower than the order's "stop" price. A "buy stop" order is elected when the Nasdaq Level 1 offering is equal to or higher than the order's "stop" price. At the end of a trading session, the Nasdaq Official Closing Price (NOCP) will be referenced to elect "buy stop" and "sell stop" orders. Such orders will be executed at the NOCP to the extent liquidity is available. If sufficient liquidity is not available, the orders will remain on Madoff's book and will be eligible for election starting with the next day's NOOP.

Stop orders are not eligible for Madoff's liquidity guarantees, and will be handled in all cases manually. There is no guarantee that a "stop" order, once elected, will receive an execution at its "stop" price, the NOOP, or the NOCP.

TRADING HALT POLICY

In NASDAQ securities, when trading is suspended due to a regulatory halt no executions can occur based on SEC rules. All orders received during the halt will be executed manually immediately following the resumption of trading in the security.

## NOT HELD ORDER POLICY

By placing a "not held/working" order with us, you are directing that we handle your order on a "not held" basis, which means you are giving us discretion to properly exercise our brokerage judgment to seek to obtain a quality execution of your order. This means that we are relieved of our normal responsibilities for the time of execution and the price or prices of execution of such an order, provided that we otherwise exercise proper brokerage judgment. Specifically, we are not required to execute the order at the time of receipt or at the current market price at the time of receipt.

In addition, such discretion means that we may trade for our own account at prices equal to or better than those received by the "not held/working" orders. Therefore, there will be no protections afforded these orders pursuant to NASD IM-2110-2 (the so-called Manning Rule). Nevertheless, any purchases or sales executed on behalf of a "not-held/working" order by us shall be consistent with our efforts to seek to obtain a quality execution of such orders, considering all of the terms agreed to with you and the market conditions surrounding the order.

When handling your order, it shall be on a "net" basis unless otherwise instructed. This means that the reported price may reflect our compensation, including an imputed markup or markdown. When multiple executions are employed consistent with a client's "not held/working order" specification, the final price to you may reflect an "average price" plus or minus an imputed markup. Accordingly, we may act in the capacity of principal, riskless principal, or, in the event of multiple executions, more than one capacity. Of course, you may request detail on the individual executions at any time.

## MARKET ON CLOSE ORDER POLICY

Madoff only accepts electronically delivered Listed and Nasdaq Market on Close (MOC) orders until 3:40:00 p.m. EST. After 3:40:00 p.m. EST, we will reject such orders as "not within eligible hours". Furthermore, any electronic cancellation requests for MOC orders received after 3:40:00 p.m. EST will be rejected as "not within eligible hours". Orders in Nasdaq securities will be priced based on the Nasdaq Official Closing Price (NOCP).

## SPECIAL SETTLEMENT POLICY

The execution price for special settlement orders will automatically include a 3 cents per share markup for client buys and a 3 cents per share markdown for client sells.

## SUB-PENNY ORDER POLICY

Rule 612 of Regulation NMS (effective January 31, 2006) prohibits market participants from displaying, ranking, or accepting quotations, orders or indications of interest in any NMS stock priced in an increment smaller than $0.01 if the quotation, order or indication of interest is priced greater than or equal to $1.00 per share.

In accordance with this rule, Madoff will reject all client orders priced in sub-pennies if the order price is greater than $1.00 per share. Madoff will accept orders priced in sub-pennies if the order price is less than $1, but such orders will be rounded to a penny increment for display purposes (client buy orders will be rounded down to the nearest penny, client sell orders will be rounded up to the nearest penny.)

## AFFIRMATIVE DETERMINATION

In accordance with NASD Rule 3370, Madoff requires that all short sale client orders from firms that are not Nasdaq members must be accompanied by an indication that the non-member firm has performed the affirmative determination (confirmed that the security is available for delivery by settlement date, or confirmed that the security can be borrowed for delivery by the settlement date). Orders that are not accompanied by such an indication will be rejected. The indication that an affirmative determination has been made can be either electronic or verbal.

Return to Table of Contents...

## SEC ORDER HANDLING RULES

Madoff's systems and its procedures are designed to search out and provide a quality execution for all its clients' orders. Madoff considers a quality execution to include opportunities for price improvement beyond the inside quote (National Best Bid and Offer). Madoff employs its own proprietary automation, the Madoff Integrated Support System (MISS), when seeking a quality execution. MISS considers all quotation information from National Market System (NMS) participants as well as readily accessible quotation information from qualified electronic communication networks (ECNs) that may be disseminated in the NMS.

Madoff's automated systems have been designed and are continually enhanced to automatically provide the highest level of regulatory compliance and execution quality available. While Madoff's automation provides a level of quality and consistency that would not otherwise be available in a manual environment, Madoff's employees remain the cornerstone of our execution service.

Senior management, as well as trading, systems, and operations personnel are all aware of the significance of the SEC's Order Handling Rules. Management meetings are held regularly to ensure that the firm is meeting its regulatory and competitive goals. Quality and consistency are rigorously monitored through Madoff's on-line supervisory systems, which allow management to review each trade for its execution quality on a regular and continuous basis.

Under certain circumstances orders will be subjected to manual verification (i.e. locked and crossed markets), or clarification of the terms of the order (i.e. limit price, special instructions, etc.). In these instances the price at execution time may be different (favorable or unfavorable) from the price at receipt time.

<u>Return to Table of Contents...</u>

Bernard L. Madoff Investment Securities LLC, a leading market maker of exchange listed and Nasdaq securities, introduces Time Slicing®. Designed for both individual orders and baskets, Time Slicing® will execute your orders across the span of an entire day or a specified period, lessening your vulnerability to significant price swings. Time Slicing® ensures active participation throughout the day with significantly less market impact. Executions are reported to you as a single trade upon their completion.

---

**Time Slicing®** is an automated methodology for delivering average price executions. For those clients looking for an effective way to "work" an order (typically a few thousand to a few hundred thousand shares) over part or all of the day, our execution program is designed to reduce trading costs and eliminate the exposure to daily "market timing" risk. There are four Time Slicing® products to choose from.

Time Slicing® divides your order or basket of orders into smaller executions, spread throughout the day. You choose the amount of time between executions (every 15 minutes is standard) and the start and end time of your trade. Upon acceptance of your order (delivered to us via the Internet, phone or fax), our proprietary system executes each "slice" of your order at the specified intervals. When completed, you receive a single report for your entire order priced at the average of all the individual executions. Madoff automatically submits the trade to NSCC or DTC for regular way settlement.

**The benefits of Time Slicing® are clear:**

**Reduce your trading costs.** Each slice has an opportunity for price improvement. In addition, since you receive a single report, the expenses associated with multiple tickets are eliminated.

**Eliminate your exposure to "market timing" risk.** At a time of increased volatility, Time Slicing® offers a complete fill at an average price without having to predict the direction of the market. Time Slicing® will dramatically lessen your vulnerability to adverse intra-day price swings.

**Reduce the market impact of your orders.** Time Slicing® works your order(s) over the course of the day. Most orders are divided into more than 25 pieces, virtually eliminating the market impact of walking into the marketplace with a large order.

**Technological Superiority.** Time Slicing® is available over the Internet. Our proprietary web technology allows you to monitor the progress of your Time Slices® online. Of course, you can enter large lists or single orders in a few quick and easy steps.

**Differentiate your sales force.** Time Slicing® is a unique average price trading tool that will answer your concerns about trading costs and market volatility. Time Slicing® is a product that is simple to understand while yielding tremendous results.

## 4 Choices for Order Handing in the Time Slicing® Family

**a. Standard Time Slice®** - we will work your order from the time of receipt until the close, breaking it into equal segments and executing one piece every 15 minutes.

**b. Custom Time Slice®** - the client can define a start time, end time, and interval time, we will then work an equal segment on each interval within the defined time frame.

**c. IntelliSlice**[SM] - the client can define a start time, end time, and interval time, we will then weight the number of shares to be executed at each interval based on the historical volume pattern of the particular stock (usually resulting in a heavier weighting near the open and close)

**d. Dollar Slice** — similar to the CUSTOM TIME SLICE® (the client can define a start time, end time, and interval time), but client selects a dollar amount of stock rather than a shares amount. We will then work an equal segment on each interval within the defined time frame, adjusting the order size at the end to achieve the specified dollar amount.

---

Minimum order size: The total order for Time Slicing® must be at least 100 shares. In addition, individual pieces of Time Slice® orders will be executed in minimum lots of 100 shares. This may result in an order being completed sooner than the requested end time. Total orders that are less then 5,000 shares will automatically default to 15 minute intervals.

All Time Slice® orders are treated as "not held", unless the client specifically instructs us otherwise. For complete terms and conditions, please see our "Guide to Best Execution" or use the following links:

Listed Order Handling:

Nasdaq Order Handling:

### Unusual Market Conditions Policy

Bernard L. Madoff Investment Securities LLC ("Madoff") would like to reiterate its policies and procedures whei client orders in Listed and Nasdaq securities during periods of high volume and volatility ("unusual market conc National Market System ("NMS"). During the past few months we have seen unprecedented levels of volume a movement in a number of securities, both at the opening and throughout the day. It is important to us that you u Madoff executes orders in these unique situations and what your clients may reasonably expect in terms of pric timing of reports.

During periods of unusual market conditions, we will attempt to continue to provide you with the enhanced serv which are generally offered during normal market conditions, e.g. automatic execution, automated display of el orders, automated limit order protection, automated price improvement opportunities and acceptance of stop oi during unusual market conditions, it is possible that some or all of these features may be temporarily modified accommodate inordinate volume and volatility. The following are examples of some of the measures which Ma with respect to client orders in either all or certain securities in an effort to efficiently and effectively address su market conditions:

> The order size eligible for automatic execution may be temporarily reduced. **Automatic execu only be changed by senior management.** Traders of individual securities are not authorized changes. Madoff will attempt to notify you of such action as soon as reasonably possible unde circumstances. Currently, Madoff sends you administrative messages if your order routing inte Notification by E-mail or fax is also available upon request.

> Madoff may temporarily decline to accept stop orders. We will continue to honor existing stop a orders but may decline to accept new ones. Please bear in mind that stop orders are handled i basis under all market conditions and are not subject to any liquidity guarantee.

Madoff carefully considers the potential effect of such decisions on your client orders. Some of the factors eval management prior to adjusting Madoff's execution parameters are:

> The price volatility of a particular security;

> The number of client orders received by Madoff in a particular security;

> The total number of client orders received by Madoff;

> The availability of the Intermarket Trading System ("ITS") and other Nasdaq/NMS systems suc Workstation and Selectnet;

> The availability of routing service providers which you may use to send your orders to Madoff.

These factors are continually reviewed by senior management throughout the trading day. Madoff's goal is to a highest level of client service given the prevailing characteristics of individual securities and the overall market Nevertheless, client expectations should reflect the unusual market conditions that may be present in the curre These are some of the potential consequences arising from unusual market conditions with respect to client or

> Potential delays in execution reports;

> Potential multiple execution prices and times for market orders accepted by Madoff which are ; current eligible order size. These orders are handled in their entirety on a "best efforts" basis.

We hope this letter articulates Madoff's order execution procedures during unusual market conditions. As alwa appreciate your business and look forward to continuing to provide you and your clients with quality executions client service during all market conditions. Please feel free to contact us with any questions.

### *Regulation SHO Pilot Notice*

The Securities and Exchange Commission (SEC) has issued a no-action letter regarding the Regulation SHO obligation to mark a short sale order "short exempt" if the seller is relying on an exception from a price test. The letter states that a broker-dealer may mark "short" rather than "short exempt" a short sale that is effected in any security included in the Regulation SHO pilot program.

As a result of this no action letter, Bernard L. Madoff Investment Securities LLC will accept sell short orders from our broker dealer clients in Pilot stocks in which we maintain a market. These orders can be marked short or short exempt. We will execute sell short orders in Pilot stocks without doing a price test (bid test for NASDAQ issues, tick test for listed issues).

In order to meet the conditions required of the no action letter, Madoff will:

a) make programming changes to "mask" price test restrictions for short sale orders in pilot securities

b) regularly monitor and re-institute a price test for any security that ceases to be included in the pilot

c) keep books and records of these activities

National Association of
Securities Dealers
9509 Key West Avenue
Rockville, MD 20850
(800) 289-9999

March 30, 2006

Rajiv Jaitly
100 Ludgate Hill
London, London EC4M 7NJ UK

NASD BROKERCHECK
RESPONSE TO REQUEST FOR INFORMATION

The Board of Governors of the National Association of Securities Dealers, Inc. (NASD) has adopted a public disclosure policy which permits certain types of disciplinary information on NASD member firms and their associated persons to be available to the general public. Section 15A(i) of the Securities Exchange Act

of 1934, as amended, requires registered securities associations to respond to inquiries regarding disciplinary actions involving its members and their associated persons. NASD believes that the general public should have access to information which will help them in their determination whether to conduct or continue to conduct business with an NASD member or any of the member's associated persons.

In that regard, enclosed please find the information that you have requested.

A list of the terms and conditions of NASD BrokerCheck is as follows:

NASD BrokerCheck
Terms and Conditions

1. NASD collects, compiles, organizes, indexes, digitally converts and maintains regulatory information from registered persons, member firms, government agencies and other sources and maintains information in the proprietary Central Registration Depository ("CRD(r)") database and system. NASD releases such information through NASD BrokerCheck, which provides information from CRD system to the investing public. Your access to NASD BrokerCheck information provided through NASD's CRD database and system does not transfer any rights in CRD, NASD BrokerCheck or related technologies to you.

2. Your use of NASD BrokerCheck information is conditioned upon your acceptance, without modification, of all terms and conditions of this Agreement. Any information accessed, requested or provided through NASD BrokerCheck must be accessed, requested and used in accordance with the terms and conditions specified in this Agreement. NASD reserves any rights not expressly granted under these terms and conditions. Additionally, NASD reserves the right, at its sole discretion, to modify the terms and conditions for use of NASD BrokerCheck information at any time by changing this Agreement, and any changes are effective immediately. Such changes will be posted on the NASD BrokerCheck web site.

3. CRD and NASD BrokerCheck are proprietary databases and employ proprietary software, but NASD makes no exclusive proprietary claim to the information in the NASD BrokerCheck system that is not created by NASD. You are neither restricted nor prohibited by NASD from obtaining a copy of any original filing or information from a non-NASD source.

4. The information provided through NASD BrokerCheck shall be used ONLY for your own personal or professional use, and in accordance with all other terms and conditions of this Agreement:
   a. to assist you, your clients or your organization in determining whether to conduct or continue to conduct securities or commodities business with NASD member firms or their associated persons;
   b. to assist you, your clients or your organization in judicial proceedings or arbitration proceedings relating to securities or commodities transactions; or

    c. for non-commercial purposes consistent with the promotion of just and equitable principles of trade and the protection of investors and the public interest.

5. The information provided to you through NASD BrokerCheck is provided to you ONLY for your own personal or professional use. All other uses are prohibited. You agree that you will not duplicate, download, publish, publicly display, modify or otherwise distribute the information retrieved from NASD BrokerCheck for any purpose other than as expressly permitted by this Agreement. In no event may you offer to others any information retrieved from NASD BrokerCheck for commercial purposes, or as part of a subscription service or similar arrangement. You agree that you will not use the information retrieved from NASD BrokerCheck to develop or create a database of information to be sold, licensed or made otherwise commercially available. You agree that you will not use any process to monitor or copy NASD BrokerCheck information in bulk, or to make voluminous, excessive or repetitive requests for information. You further agree that you will not use any device, software or routine to bypass any software or hardware that prohibits volume requests for information, you will not interfere with or attempt to interfere with the proper working of NASD BrokerCheck, and you will not take any action that imposes an unreasonable or disproportionately large load on NASD BrokerCheck or NASD.

6. All requests for permission to access or use NASD BrokerCheck for uses other than those described in Paragraphs 4 or 5 of this Agreement must be made in writing to NASD clearly stating the purpose and manner in which NASD BrokerCheck is proposed to be used. Requests may be submitted to NASD, NASD BrokerCheck, 9509 Key West Avenue, Rockville, Maryland, 20850. NASD, in its sole discretion, may approve or reject any request that is inconsistent with the terms and conditions of use of NASD BrokerCheck.

7. Provision of information by NASD pursuant to NASD BrokerCheck does not constitute a waiver of any of NASD's rights, privileges, or immunities with respect to the furnishing of disciplinary or registration information.

8. NASD does not charge for this service, which is offered pursuant to NASD's responsibilities as a self-regulatory organization, and, in particular, pursuant to Section 15A(i) of the Securities Exchange Act of 1934. In the provision of this service, NASD makes no warranties of any kind, and disclaims liability to any person for any actions taken or omitted in good faith with respect to this NASD BrokerCheck. NASD is not responsible for and cannot verify information from sources other than NASD, and does not warrant or guarantee the accuracy or completeness of the information requested. Neither NASD nor any affiliate or supplier shall be liable for any cause of action in contract, tort, or otherwise, for more than the incremental telecommunications cost incurred to connect to the service. Notwithstanding the above, neither NASD nor any affiliate or supplier shall be liable for any loss of income, trading loss, or consequential, incidental, or indirect damages, regardless of whether NASD has been informed of the possibility of such damages.

9. Member firms, registered persons, government agencies, and other sources file disclosure information with NASD. Consistent with its responsibilities as a self-regulatory organization, NASD performs a regulatory review of the

disclosure information filed before it makes the information available through NASD BrokerCheck. Most disclosure information is available through NASD BrokerCheck within two business days of being filed. In certain limited circumstances, disclosure information may not be available through NASD BrokerCheck within the usual timeframe, but will be made available as soon as practicable.

10. Consistent with policies and procedures approved by the Securities and Exchange Commission (SEC), NASD will disclose information on individuals and brokerage firms, through NASD BrokerCheck, for two years after the termination of the individual's or brokerage firm's NASD registration. Disclosure information reported to NASD after an individual or brokerage firm has terminated may not have been reviewed by the brokerage firm or individual; in addition, brokerage firms and individuals who are no longer registered are not required to independently report such information.

11. NASD BrokerCheck includes only information provided to CRD. In substantially all cases, the information provided through NASD BrokerCheck represents the verbatim record as it was reported to NASD. However, in certain limited circumstances, NASD combined information about a single event that was reported by different sources (e.g., a record reporting information on an event that was submitted by a brokerage firm may contain information reported on the same event that was submitted by a regulator). This condition occurred when the data in the Legacy CRD system was converted (i.e., reformatted and transferred) to Web CRD, the Internet-based Central Registration Depository. This condition affects a small percentage of records reported to NASD prior to August 1999. These converted records contain information that was reported to NASD in accordance with appropriate reporting protocols applicable to the source filers (e.g., brokerage firms and regulators); however, because of the combination of information from different reporting sources, a record disclosed through NASD BrokerCheck may not reflect the actual filing submitted to NASD.

12. The "Individual Broker comments," "Brokerage Firm comments" and "Regulator comments" appear verbatim as they were provided to CRD via Forms U-4, U-5, and U-6. These comments were not written by NASD and have not been edited by NASD in any way.  NASD reserves the right to redact customer names, confidential customer information, or offensive or potentially defamatory language from an NASD BrokerCheck Report consistent with policies and procedures approved by the SEC.

TC 02.1

General Information About this Report

This report has been generated because you have requested information about an NASD Member Firm through NASD BrokerCheck.  The information contained within this report has been provided by NASD brokerage firm and  securities regulators

as part of the securities industry's registration and licensing process.

An NASD BrokerCheck report for a Brokerage Firm consists of: 1) a Report Summary; 2) General Administrative Information, which includes the Types of Business the Brokerage Firm is engaged in, the Brokerage Firm's Legal Status, and the Brokerage Firm's Approved Registrations. The report also includes the Brokerage Firm's Disclosure Event information, if any.

NASD BrokerCheck discloses the following information on brokerage firms:

* the brokerage firm's name, CRD number, SEC identification number, "applicant name" or legal name, NASD district office which oversees the brokerage firm, and the brokerage firm's main and mailing addresses
* the types of business in which the brokerage firm is currently engaged
* details of the brokerage firm's legal status (i.e, corporation, partnership, etc.), state or country and date of formation, and its fiscal year end
* all approved registrations
* disclosure matters involving certain criminal charges and convictions, regulatory actions, civil judicial actions, and certain financial actions (e.g., bankruptcies, unsatisfied judgment/liens.)

When evaluating this report, please keep in mind that a number of items may involve pending actions or allegations that may be contested and have not been resolved or proven. The items may, in the end, be withdrawn or dismissed, or resolved in favor of the brokerage firm, or concluded through a negotiated settlement with no admission or conclusion of wrongdoing.

Also remember that the information in this report is not the only resource you should consult. It is recommended that you learn as much as possible about the brokerage firm from other sources. Ask for references. Ask family members or friends who already have established investment business relationships. Get in touch with local consumer and investors groups.

Should you have any questions concerning information contained within this report, call (800) 289-9999 - a toll-free NASD BrokerCheck hot-line operated by NASD - or visit NASD Web Site at www.nasd.com. When calling or visiting the NASD Web Site, the information you will need includes the brokerage firm's name or CRD number.

For definition of terms contained within this report or answers to Frequently Asked Questions, visit the Glossary or FAQs sections of NASD BrokerCheck at www.nasd.com.

NASD BrokerCheck Report Printing Instructions

The report contained below can be printed as is. However, unless the following

Optimal Investment Services (Suisse) S.A.
CP 1824, 5-7 rue Ami-Lévrier, 1201 Geneva, Switzerland

steps are taken, the report may not print with the headers aligned or the text may run off the page. For the following report to be printed correctly, the following formatting steps must be completed:

1) Copy the text of the report into a text editor.
2) Delete these instructions down to and including the first dashed line.
3) Set the Font for the entire report to Courier, 8 point.
4) Set the left and right margins to 0.
5) Set the top and bottom margins to 0. Because every printer allows a different number of lines per page, the margins may have to be adjusted differently to get the headers to line up at the top of each page. The document is formatted to print 90 lines per page at the specified font.
6) Print the report.

--------------------------------------------------------------------------------

NASD BrokerCheck            March 30, 2006         Page 1
This information is current as of: 03/30/2006

_____

NASD Member Firm: BERNARD L. MADOFF INVESTMENT SECURITIES LLC
CRD Number: 2625

**********************************************************************
*****
                        REPORT SUMMARY

**********************************************************************
*****

        *********************************************************
Administrative Information:
        *********************************************************

Admin Information:  Information that is required to be reported to NASD by
                    brokerage firms via Form BD (Uniform Application for
                    Broker-Dealer Registration). The administrative information
                    contained in this report includes: (a) types of business the
                    brokerage firm is engaged in; (b) legal status (e.g.,
                    corporation, partnership, sole proprietorship, limited
                    liability company, etc.), state/country of formation unless

                    Optimal Investment Services (Suisse) S.A.
            CP 1824, 5-7 rue Ami-Lévrier, 1201 Geneva, Switzerland

legal status is sole proprietorship, date of formation, and
month in which the brokerage firm's fiscal year ends; and (c)
all approved registrations with the SEC, NASD and state
securities commissions.


Types of Business:     3
Legal Status:          1
Registrations:         53


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Disclosure Events:     Yes
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Disclosure Event:   Information that is required to be reported to NASD by
individual brokers via Form U-4 (Uniform Application for
Securities Industry Registration or Transfer) and brokerage
firms via Form BD (Uniform Application for Broker-Dealer
Registration). Some disclosure events may have multiple
reporting sources. For example, some information required to
be reported by an individual broker via Form U-4 may also be
reported on the individual broker's record by a brokerage firm
via Form U-5 (Uniform Termination Notice for Securities
Industry Registration) and/or by a regulator via Form U-6
(Uniform Disciplinary Action Reporting Form). If a disclosure
event is reported by multiple sources, all versions of the
reported event will be disclosed on the individual broker's
NASD BrokerCheck report. Similarly, some information required
to be reported by a brokerage firm via Form BD may also be
reported on the brokerage firm's record via Form U-6. If a
disclosure event is reported by multiple sources, all versions
of the reported event will be disclosed on the brokerage
firm's NASD BrokerCheck report.


Criminal Actions:        0
Regulatory Actions:      3
Civil Judicial Actions:  0
Arbitrations:        0
Bonds:               0
Bankruptcies:          0
Judgment/Liens:        0

NASD BrokerCheck                March 30, 2006        Page 2
This information is current as of: 03/30/2006

_____

NASD Member Firm: BERNARD L. MADOFF INVESTMENT SECURITIES LLC
CRD Number: 2625

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*
                    ADDRESS/GENERAL INFORMATION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*


This section provides the brokerage firm's name, CRD number, SEC number,
Applicant Name on Form BD, NASD District where the brokerage firm is located,
and the brokerage firm's main and mailing addresses.

Applicant Name on Form BD: BERNARD L. MADOFF INVESTMENT
SECURITIES LLC
    SEC Number: 8-008132

Prior Business Names:    BERNARD L. MADOFF
MADOFF, BERNARD LAWRENCE

Business Phone Number:    212-230-2424

Main Office Address    Located in NASD District: 10-New York
885 THIRD AVENUE
                    Optimal Investment Services (Suisse) S.A.
                CP 1824, 5-7 rue Ami-Lévrier, 1201 Geneva, Switzerland

NEW YORK, NY 10022

Mailing Address
885 THIRD AVENUE
NEW YORK, NY 10022


**************************************************************************
*****
TYPES OF BUSINESS

**************************************************************************
*****

This section lists the type(s) of business that the brokerage firm is currently
engaged in as reported on the Form BD.

Broker or dealer making inter-dealer markets in corporate securities
over-the-counter
Trading securities for own account
BERNARD L. MADOFF IS A MEMBER OF THE CINCINNATI STOCK
EXCHANGE AND IS A
DESIGNATED MARKET-MAKER ON THAT EXCHANGE, ENGAGED IN
INTER-DEALER MARKET-MAKING
ACTIVITIES.


**************************************************************************
*****
LEGAL STATUS

**************************************************************************
*****

This section details the brokerage firm's legal status (i.e, corporation,
limited partnership, etc.), state or country where formed, date of formation,
and the month the brokerage firm's fiscal year ends.

Legal Status: LIMITED
State/Country of Formation: NY, UNITED STATES
Date of Formation: 01/01/2001
Fiscal Year End: OCT


**************************************************************************
*****
REGISTRATIONS


Optimal Investment Services (Suisse) S.A.
CP 1824, 5-7 rue Ami-Lévrier, 1201 Geneva, Switzerland

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*

This section provides the jurisdictions in which the brokerage firm is
registered or licensed to do business, the category of each registration, and
the date on which the registration was granted.

| Jurisdiction/SRO | Category | Status | As Of Date |
|---|---|---|---|
| AK | Broker Dealer | Approved | 02/04/1997 |
| AL | Broker Dealer | Approved | 03/25/1997 |
| AR | Broker Dealer | Approved | 06/17/1997 |
| AZ | Broker Dealer | Approved | 04/08/1997 |
| CA | Broker Dealer | Approved | 01/22/2001 |
| CO | Broker Dealer | Approved | 01/17/1997 |
| CT | Broker Dealer | Approved | 03/13/1997 |
| DC | Broker Dealer | Approved | 05/20/1997 |
| DE | Broker Dealer | Approved | 01/29/1997 |
| FL | Broker Dealer | Approved | 01/19/1993 |
| GA | Broker Dealer | Approved | 04/21/1997 |
| IA | Broker Dealer | Approved | 02/21/1997 |
| ID | Broker Dealer | Approved | 01/07/1997 |
| IL | Broker Dealer | Approved | 03/13/1997 |
| IN | Broker Dealer | Approved | 06/20/1997 |
| KS | Broker Dealer | Approved | 05/27/1997 |
| KY | Broker Dealer | Approved | 01/02/1997 |
| LA | Broker Dealer | Approved | 03/05/1997 |
| MA | Broker Dealer | Approved | 03/18/1997 |
| MD | Broker Dealer | Approved | 02/27/1997 |
| ME | Broker Dealer | Approved | 06/10/1997 |
| MI | Broker Dealer | Approved | 02/25/1997 |
| MN | Broker Dealer | Approved | 07/08/1997 |

NASD BrokerCheck          March 30, 2006          Page 3
This information is current as of: 03/30/2006

NASD Member Firm: BERNARD L. MADOFF INVESTMENT SECURITIES LLC
CRD Number: 2625

REGISTRATIONS(cont.)

| Jurisdiction/SRO | Category | Status | As Of Date |
|---|---|---|---|
| MO | Broker Dealer | Approved | 07/25/1997 |
| MS | Broker Dealer | Approved | 04/08/1997 |
| MT | Broker Dealer | Approved | 01/14/1997 |
| NASD | Broker Dealer | Approved | 03/25/1960 |
| NC | Broker Dealer | Limited | 03/18/1997 |
| ND | Broker Dealer | Approved | 06/16/1997 |
| NH | Broker Dealer | Approved | 07/01/1997 |

Optimal Investment Services (Suisse) S.A.
CP 1824, 5-7 rue Ami-Lévrier, 1201 Geneva, Switzerland

| | | | |
|---|---|---|---|
| NJ | Broker Dealer | Approved | 08/11/1997 |
| NM | Broker Dealer | Approved | 03/14/1997 |
| NSX | Broker Dealer | Approved | 11/17/1981 |
| NV | Broker Dealer | Approved | 05/14/1997 |
| NY | Broker Dealer | Approved | 03/30/1984 |
| OH | Broker Dealer | Approved | 05/11/1998 |
| OK | Broker Dealer | Approved | 05/05/1997 |
| OR | Broker Dealer | Limited | 02/27/1997 |
| PA | Broker Dealer | Approved | 03/20/1997 |
| PCX | Broker Dealer | Approved | 02/03/2003 |
| RI | Broker Dealer | Approved | 03/13/1997 |
| SC | Broker Dealer | Approved | 02/28/1997 |
| SD | Broker Dealer | Approved | 07/02/1997 |
| SEC | Broker Dealer | Approved | 01/19/1960 |
| TN | Broker Dealer | Approved | 01/21/1997 |
| TX | Broker Dealer | Approved | 01/26/2001 |
| UT | Broker Dealer | Approved | 01/15/1997 |
| VA | Broker Dealer | Approved | 01/24/2001 |
| VT | Broker Dealer | Approved | 03/21/1997 |
| WA | Broker Dealer | Approved | 01/15/1997 |
| WI | Broker Dealer | Approved | 03/20/1997 |
| WV | Broker Dealer | Approved | 01/08/1997 |
| WY | Broker Dealer | Approved | 01/14/1997 |

NASD BrokerCheck              March 30, 2006          Page 4
This information is current as of: 03/30/2006

---

NASD Member Firm: BERNARD L. MADOFF INVESTMENT SECURITIES LLC
CRD Number: 2625

*****************************************************************************
*****
REGULATORY ACTIONS

*****************************************************************************
*****
DISCLOSURE INFORMATION

This section lists regulatory actions that were reported to CRD and are
disclosable through NASD BrokerCheck. Disclosable regulatory actions include
formal proceedings initiated by a regulatory authority (i.e., a state
securities agency, NASD, New York Stock Exchange, foreign regulatory body,
etc.) for a violation of investment-related rules or regulations. In addition,
revocations or suspensions of an individual broker's authority to act as an

attorney, accountant or federal contractor will appear here.

Some of the fields in this section of the report may be blank if the information was not provided to CRD.

** OCCURRENCE COUNTS **  3 Record(s)

*************************************************************************
*****

** FIELD DEFINITIONS **

* Reporting Source:        The form through which details of the regulatory
                           action was reported to CRD.

* Date Reported:           The date the regulatory action was reported to
                           CRD.

* Initiated By:            The name of the securities regulator that
                           initiated the regulatory action (e.g.,
                           regulator, foreign financial regulatory
                           authority, self-regulatory organization, federal
                           agency such as SEC, state, etc.).

* Date Initiated:          Date the regulatory action was initiated.

* Docket/Case Number:      Docket or case number of the regulatory action.

* Employing Brokerage Firm: Brokerage Firm where individual broker was
                           employed when activity occurred that led to the
                           regulatory action.

* Allegations:             Allegations made against the individual broker
                           leading to the regulatory action.

* Current Status:          The current status of the regulatory action
                           (i.e., pending, on appeal or final).

* Resolution:              The resolution of the regulatory action (e.g.,
                           acceptance, waiver and consent; decision;
                           decision and order of offer of settlement;
                           order; settled; etc.).

* Resolution Date:         The date the regulatory action was resolved.

* Sanction Details:        Additional details regarding any sanctions
                           ordered.

* Summary:                 A summary of the details related to the
                           regulatory action.

Optimal Investment Services (Suisse) S.A.
CP 1824, 5-7 rue Ami-Lévrier, 1201 Geneva, Switzerland

```
******************************************************************
*****
```

******** REGULATORY ACTION (1 of 3) ********

Reporting Source: Regulator (Form U-6)

Date Reported:   07/20/2005

Initiated By:   NASD

Date initiated:   07/06/2005

Docket/
Case Number:   CLG050081


Allegations:   SEC RULE 11AC1-4 - MEMBER FIRM FAILED TO DISPLAY IMMEDIATELY
          CUSTOMER LIMIT ORDERS IN NASDAQ SECURITIES IN ITS PUBLIC
          QUOTATION, WHEN EACH SUCH ORDER WAS AT A PRICE THAT WOULD HAVE
          IMPROVED FIRM'S BID OR OFFER IN EACH SUCH SECURITY; OR WHEN
          THE ORDER WAS PRICED EQUAL TO FIRM'S BID OR OFFER AND THE
          NATIONAL BEST BID OR OFFER FOR EACH SUCH SECURITY, AND THE
          SIZE OF THE ORDER REPRESENTED MORE THAN A DE MINIMIS CHANGE IN
          RELATION TO THE SIZE ASSOCIATED WITH FIRM'S BID OR OFFER IN
          EACH SUCH SECURITY.

Current Status:   Final

NASD BrokerCheck          March 30, 2006          Page 5
This information is current as of: 03/30/2006

---

NASD Member Firm: BERNARD L. MADOFF INVESTMENT SECURITIES LLC
CRD Number: 2625

REGULATORY ACTIONS(cont.)


Resolution:   Acceptance, Waiver & Consent(AWC)

Resolution Date:  07/06/2005

Optimal Investment Services (Suisse) S.A.
CP 1824, 5-7 rue Ami-Lévrier, 1201 Geneva, Switzerland

Sanctions
Ordered:        Monetary/Fine, Censure

Monetary Amount:  $7,000.00

Resolution
Details:        WITHOUT ADMITTING OR DENYING THE ALLEGATIONS,
MADF, CONSENTED
                TO THE DESCRIBED SANCTIONS AND TO THE ENTRY OF
FINDINGS,
                THEREFORE THE FIRM IS CENSURED AND FINED $7,000.

Summary:


*********************************
Reporting Source: Brokerage Firm (Form BD)

Date Reported:   09/26/2005

Initiated By:   NASD

Date initiated:  07/06/2005

Docket/
Case Number:     CLG050081


Allegations:     SEC RULE 11AC1-4 - THE FIRM FAILED TO DISPLAY
IMMEDIATELY
                 CUSTOMER LIMIT ORDERS IN NASDAQ SECURITIES IN ITS
PUBLIC
                 QUOTATION, WHEN EACH SUCH ORDER WAS AT A PRICE THAT
WOULD HAVE
                 IMPROVED THE FIRM'S BID OR OFFER IN EACH SUCH SECURITY;
OR
                 WHEN THE ORDER WAS PRICED EQUAL TO THE FIRM'S BID OR
OFFER AND
                 THE NATIONAL BEST BID OR OFFER FOR EACH SECURITY, AND
THE SIZE
                 OF THE ORDER REPRESENTED MORE THAN A DE MINIMUS
CHANGE IN
                 RELATION TO THE SIZE ASSOCIATED WITH THE FIRM'S BID OR
OFFER
                 IN EACH SECURITY

Current Status:  Final

Resolution:     Acceptance, Waiver & Consent(AWC)

Resolution Date: 07/06/2005

Sanctions

Optimal Investment Services (Suisse) S.A.
CP 1824, 5-7 rue Ami-Lévrier, 1201 Geneva, Switzerland

Ordered:    Monetary/Fine, Censure

Monetary Amount:  $7,000.00

Resolution
Details:    WITHOUT ADMITTING OR DENYING THE ALLEGATIONS, THE FIRM
CONSENTED TO THE DESCRIBED SANCTIONS AND TO THE ENTRY OF
FINDINGS, THEREFORE THE FIRM IS CENSURED AND FINED $7,000.00.

Summary:


******** REGULATORY ACTION (2 of 3) ********


Reporting Source: Regulator (Form U-6)

Date Reported:    12/08/1963

Initiated By:    NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

Date initiated:  07/01/1963

Docket/
Case Number:    NY-802


Allegations:

Current Status:  Final

Resolution:    Decision

Resolution Date: 12/08/1963

Sanctions
Ordered:    Monetary/Fine, Censure

Monetary Amount:  $500.00

Resolution

NASD BrokerCheck            March 30, 2006        Page 6
This information is current as of: 03/30/2006

---

NASD Member Firm: BERNARD L. MADOFF INVESTMENT SECURITIES LLC
CRD Number: 2625

Optimal Investment Services (Suisse) S.A.
CP 1824, 5-7 rue Ami-Lévrier, 1201 Geneva, Switzerland

REGULATORY ACTIONS(cont.)

Details:

Summary:      COMP. NY-802 FILED 07/01/63. DECISION RENDERED 11/08/63;
              CENSURED, FINED $500.00 PLUS COSTS OF $60.50. COMPLAINT
FINAL
              12/08/63. FINES & COSTS PAID 11/20/63.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Reporting Source: Brokerage Firm (Form BD)

Date Reported:

Initiated By:    NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

Date initiated:  07/01/1963

Docket/
Case Number:     COMPLAINT NO. NY-802


Allegations:    VIOLATION OF NASD RULES 2230 AND 2110

Current Status:  Final

Resolution:     Decision

Resolution Date: 11/08/1963

Sanctions
Ordered:        Monetary/Fine, Censure

Monetary Amount: $500.00

Resolution
Details:        FINED IN THE AMOUNT OF $500 AND ASSESSED COSTS OF THE
                PROCEEDING IN THE AMOUNT OF $60.65.  THE FINE AND COSTS
OF THE
                PROCEEDINGS WERE PAID IN FULL IN NOVEMBER 1963.

    Summary:     THE FINDING OF A VIOLATION OF NASD RULE 2230 WAS
LIMITED TO A
                TECHNICAL INFRACTION.


\*\*\*\*\*\*\*\* REGULATORY ACTION (3 of 3) \*\*\*\*\*\*\*\*


Reporting Source: Regulator (Form U-6)

Date Reported:   01/02/1975
                 Optimal Investment Services (Suisse) S.A.
            CP 1824, 5-7 rue Ami-Lévrier, 1201 Geneva, Switzerland

Initiated By:    NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

Date initiated:  11/22/1974

Docket/
Case Number:    N-VS-86

Allegations:

Current Status:  Final

Resolution:    Decision

Resolution Date: 01/02/1975

Sanctions
Ordered:

Resolution
Details:

Summary:        NASDAQ COMPLAINT N-VS-86 FILED: 11-22-74 ACCEPTED:
12-4-74,

PAID $25.00 FINAL: 1-2-75

************************************
Reporting Source: Brokerage Firm (Form BD)

Date Reported:

Initiated By:    NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

Date initiated:  11/22/1974

Docket/
Case Number:    N-NV-86

Allegations:     INFORMATION NO LONGER AVAILABLE DUE TO AGE OF
THE COMPLAINT.

NASD BrokerCheck              March 30, 2006         Page 7
This information is current as of: 03/30/2006

_____

_____
NASD Member Firm: BERNARD L. MADOFF INVESTMENT SECURITIES LLC
CRD Number: 2625

REGULATORY ACTIONS(cont.)

Optimal Investment Services (Suisse) S.A.
CP 1824, 5-7 rue Ami-Lévrier, 1201 Geneva, Switzerland

Current Status:  Final

Resolution:    Decision

Resolution Date: 11/19/1974

Sanctions
Ordered:    Monetary/Fine

Monetary Amount:  $25.00

Resolution
Details:     FINE IN THE AMOUNT OF $25.00.  NO OTHER INFORMATION IS
            AVAILABLE DUE TO THE AGE OF THE COMPLAINT.

Summary:


************ END OF REPORT ************


---

**From:** Jaitly Rajiv
**Sent:** 20 July 2006 14:16
**To:** Hugh Burnaby-Atkins; Jonathan Clark; Calvo Jaime; Danos Adriani
**Cc:** Echeverria, Manuel
**Subject:** Madoff
**Importance:** High


I have now had an opportunity to look at the paperwork that we appear
to have on Madoff and I would be grateful if we could sort out a
couple of things here:

Some of this may already have been addressed but we just need to make
sure that everything is in order given the size of this account and
its significance in our portfolio.  Some of this may not be
negotiable but we should set down why we will not pursue a change on
these issues if that is the case.

    1.  We hold a Customer agreement between Bernard L Madoff
        Securities and BPI MultiAdvisors Ltd (the old Optimal Multi
        Advisors Bahamas name).  However this is not the correct
        entity to be signing this agreement - both SUS and Arbitrage
        (the Infiltrator account) are legal entities in their own
        right and unless it is made clear that Multi Advisors has
        signed on their behalf the agreement is with the wrong
        entities.  If it has been signed on their behalf it needs to
        say so otherwise in my view this agreement is invalid. However
        a review of the agreement raises a few further issues in my
        mind apart from this fundamental point:

        a) applicable rules and regulations - should this not include

Optimal Investment Services (Suisse) S.A.
CP 1824, 5-7 rue Ami-Lévrier, 1201 Geneva, Switzerland

the NASD regulations – as the protections from dealing with a broker dealer arise from these rules in relation to segregation and identification of client accounts.

b) Entire agreement clause does not refer to the Options agreement, the trading authorisation directive or the terms and conditions referred to in the authorisation directive

c) There is no reference to the obligation to custody assets on our behalf – we are relying on the implicit procedures of Madoff as a broker dealer here to ensure proper segregation and custody of accounts. Given the size of our account we should be asking for some comfort here.

d) Choice of laws applicable to the agreement have been left blank. These should be completed. We should either have New York law or Bahamian law apply to the agreement.

e) This agreement contemplates an individual signing in terms of the warranties given and that no one other than the customer has an interest in the account – I think this is ok but we need to consider the implications of any security given to HSBC for credit lines etc as the warranty may not be correct

f) Given that there are 2 subfunds with an interest in Madoff does it make sense to make clear that Optimal Multi Advisors is signing this on behalf of its 2 sub funds SUS and Infiltrator?

2. The Option Agreement appears to have been signed by the wrong legal entity. It is essential we get this right. In addition it refers to a number of risk disclosure documents – we should obtain these as part of the complete set of documents on Madoff

Also have we requested information on the procedure used to exercise notices on Options – as this is only provided at our request – so for completeness we should do so.

3. Reviewing the Trading Authorisation directive. Firstly this has been signed by MultiAdvisors on behalf of SUS and Arbitrage – I am not sure on what basis as Multi Advisors is simply the owner of these two companies and has no management rights. Adriani is going to check whether at the time Multi Advisors was actually a director and therefore signing in that capacity or whether there was a board resolution authorising it to sign. Do we monitor compliance with the parameters set out? I know Jonathan receives the trade information and inputs this into a spreadsheet – but does this include looking at the paramenters set out in the trading authorisation? This is an area where we should request Madoff that he makes a specific declaration on the statements sent to us that he has complied with these or that he gets his auditor to report compliance.
The authorisation refers to the terms and conditions that apply to this account – we should ask to be provided with a copy of these. Generally the authorisation is drafted very poorly and it is not clear in instances whether certain duties refer to us or to them. We should clarify these.

I think we need to ensure that there is a complete set of documentation here as that will be the basis of any protection that we can rely upon.  Essentially this relationship is simply that of a broker with a client who is executing under defined parameters so we need to ensure that we can demonstrate our role in this.


What is crucial to remember is that if we don't have the right entity signing – it is going to be very difficult for us to enforce any right – should a problem arise because of privity of contract issues.  It may be that this has infact already been addressed – but if that is the case this needs to be documented so that we are not reliant on any one individuals knowledge on this subject.



**TRADING AUTHORIZATION DIRECTIVE**

Bernard L. Madoff, acting as the undersigned's agent and attorney in fact has not been granted, nor shall he exercise any investment discretion as to the selection of securities or other property purchased or sold by or for the account. Bernard L. Madoff will determine only the time at which a specified order shall be executed. The purchase or sale of securities is limited as to issuer and quantity, and shall include only executions that are in accordance with the following:

With respect to the establishment of the investment:

- The Account may purchase a portfolio consisting of no less than thirty-five (35) U.S. Equities, all of which must be resident within the Standard and Poors 100 Index at the time of execution.

- The sum total of the combined market capitalization of the equities purchased must, at the time of completion, be in excess of seventy-five percent (75%) of the total market capitalization, as measured by Standard and Poors, of the entire Standard and Poors 100 Index components.

- The resulting portfolio, when measured against the Standard and Poors 100 Index, shall at the time of execution completion reflect an overall correlation in excess of ninety-five percent (95%).

- Each equity security holding within the portfolio shall be dollar weighted proportionately to the market capitalization of that particular issue in the Standard and Poors 100 Index at the time of execution.

- The contemporaneous purchase of Standard and Poors 100 Index Put options shall be made. The underlying value of these contacts shall correspond to the market value of equities in the portfolio at the time of purchase.

- The strike price of the put options shall not be greater than five percent (5%) below the prevailing Standard and Poors 100 Index at the time of purchase.

- Upon establishing the equities portfolio and Standard and Poors 100 Index Put Options as outlined above, the sale of Standard and Poors Index Call Options will be made. The underlying value of these contracts shall not exceed the market value of the portfolio.

With respect to the liquidation of the investment:

- Upon sale of equity securities, a contemporaneous repurchase of Standard and Poors 100 Index Call options shall be made.

- The Standard and Poors 100 Index Put options previously purchased shall be sold only after the portfolio of equity securities has been liquidated.

- U.S. Treasury Bills shall be purchased whenever the account has completed the liquidation of the above outlined investment strategy.   The maturities of said U.S. Treasury Bills shall not exceed nine (9) months.

_____          _____
(Client Signature)                              (Date)

Agreed to by: _____
                    Bernard L. Madoff, Authorized Agent

# Exhibit 5



# AIMA'S ILLUSTRATIVE QUESTIONNAIRE FOR DUE DILIGENCE OF

# MULTIMANAGERS FUND MANAGERS

Published by

## The Alternative Investment Management Association Limited (AIMA)

## IMPORTANT NOTE

All/any reference to AIMA should be removed from this document once any amendment is made of any question or information added - including details of a company/fund.

Only AIMA can distribute this questionnaire in its current form to its member companies and institutional investors on its confidential database.

# AIMA's Illustrative Questionnaire for Due Diligence Review of

# MULTIMANAGERS FUND MANAGERS

The purpose of this document is to serve as a guide to investors in their relations with multimanagers fund managers.   This due diligence questionnaire is an unavoidable process that investors must follow in order to choose a manager.  Not all of the following questions are applicable to all managers but we recommend that you ask as many questions as possible before making a decision.

## IMPORTANT

The copyright in this questionnaire belongs to AIMA.  You may copy the questionnaire for your own company's use and may distribute it (unamended or amended) for the purposes of a due diligence review, but you may not distribute or copy it for any other purpose or to any other person, including any representative of the media, without the prior written consent of AIMA which will only be given in exceptional circumstances.  If you amend the questionnaire, all references to AIMA must be removed.  If you wish to share the questionnaire with others, please provide their details to AIMA.

## DISCLAIMER

Whilst AIMA has used all reasonable efforts to produce a questionnaire of general application in connection with a due diligence appraiS.A.I of multimanagers fund managers, in any particular case an investor is likely to have its own individual requirements and each multimanagers fund manager its own characteristics.  As a result, prior to any individual investor sending out the questionnaire, it is strongly recommended that the questions are reviewed and, where necesS.A.ry, amended to suit its own requirements and its state of knowledge of the multimanagers fund manager's operations.

In addition, responses to the questionnaire should not be relied upon without review and, where considered appropriate, further investigation and are unlikely to have contractual force.  The contractual terms of an investment in any multimanagers fund will normally be confined to the terms of the application or subscription documents, private placement memorandum or other offering document and the constitutional documents of the multimanagers fund. [Funds of hedge funds and funds of hedge funds managers are discouraged from providing to investors side letters or other forms of collateral agreement]. In order to obtain the best possible information on any specific multimanagers fund manager, additional questions should be raised to clarify any point of uncertainty, and where practicable verbal examination should be undertaken.  In particular, AIMA recommends that in respect of special areas of concern, such as fund performance or risk profile, independent third party data should, if possible, be obtained in order to verify these facts. Accordingly, none of AIMA, its officers, employees or agents make any representation or warranty, express or implied, as to the adequacy, completeness or correctness of the questionnaire.  No liability whatsoever is accepted by AIMA, its officers, employees or agents for any loss howsoever arising from any use of this questionnaire or its contents or otherwise arising in connection therewith.

Other AIMA questionnaires available for selection of:
Hedge Fund Managers
Managed Futures Managers
Hedge Fund Administration for Managers
Hedge Fund Administration for Investors
Prime Brokers

## AIMA's Illustrative Questionnaire for Due Diligence Review of

## FUND OF HEDGE FUND MANAGERS

# CONTENTS

| Sections | Page no. |
|---|---|
| Background Information | 4 |
| Contact Information | 4 |
| Company Structure | 5 |
| Staff Information | 6 |
| Asset Management Activities | 11 |
| Investment Philosophy | 12 |
| Investment Process | 12 |
| Strategy And Style Allocation | 12 |
| Due Diligence / Manager | 12 |
| Visit | 12 |
| Operational Due Diligence | 12 |
| Capacity | 12 |
| Portfolio Construction | 12 |
| Research | 12 |
| Risk Management | 12 |
| Administration / Operations | 12 |
| Administration | 12 |
| Service Providers | 12 |
| Compliance / Regulation | 12 |
| Conflict Of Interest | 12 |
| Anti-Money Laundering | 12 |
| Business Continuity/DiS.A.ster Recovery | 12 |
| Insurance | 12 |
| Product Information | 12 |
| Performance | 12 |
| Client Information/Reporting | 12 |

Published by
Alternative Investment Management Association (AIMA)
Lower Ground Floor, 10 Stanhope Gate, Mayfair, London W1K 1AL
Tel +44 (0)20 7659 9920            Fax +44 (0)20 7659 9921
www.aima.org

AIMA's Illustrative Questionnaire for Due Diligence Review of Fund of Hedge Funds Managers

© The Alternative Investment Management Association Limited (AIMA), 2004

NB: THE INFORMATION GIVEN HEREIN IS CORRECT AS AT MONDAY, 06 JUNE 2005

| | |
|---|---|
| NAVIGATING THIS DOCUMENT | Please use tab-key or point mouse to the beginning of the input field |
| INPUTTING DATA | The size of the fields will automatically adjust to the length of your input |
| UPDATING PAGE NUMBERS | As this questionnaire is completed (thus grows), page numbers on the index page will NOT be updated automatically.  To update the index page (which is a table), click to the left of the table (at any point) then press F9 on your keyboard.  Select the first option: to update page numbers only |

## BACKGROUND INFORMATION

### CONTACT INFORMATION

| | |
|---|---|
| Company name: | Optimal Investment Services S.A. |
| Address: | Rue Ami-Lévrier 5-7, 1201 Geneva, Switzerland |
| Telephone: | +41.(0)22.909.74.74 |
| Fax: | +41.(0)22.909.62.22 |
| E-mail: | |
| Website: | www.optimal.biz |
| Name of contacts: | James Woodyatt<br>Senior Sales Officer<br>+41 22 909 74 05<br>james.woodyatt@ois-gruposantander.com<br><br>Carlos Garcia Bello<br>Sales/Managed accounts Officer<br>+ 34 91 289 08 91<br>carjgarcia@gruposantander.com<br><br>Alberto Manchado<br>Sales/Advisory Officer<br>+ 34 91 289 06 87<br>amanchado@gruposantander.com<br><br>Rosalinda Vazquez Garibay<br>Sales Support Officer<br>+ 41 22 909 74 08<br>rosalinda.vazquez-garibay@ois-gruposantander.com<br><br>Alexia Besomi<br>Sales Support  Officer<br>+41 22 909 74 99<br>alexia-besomi@ois- gruposantander.com<br><br>Amélie Fontvieille<br>Sales Support Officer<br>+41 22 909 74 20<br>amelie.fontvieille@ois- gruposantander.com |
| Title of contacts: | See above |
| Telephone of contacts: | See above |
| E-mail of contacts: | See above |

AIMA's Illustrative Questionnaire for Due Diligence Review of Fund of Hedge Funds Managers

© The Alternative Investment Management Association Limited (AIMA), 2004

| COMPANY STRUCTURE | |
|---|---|
| What is the legal structure of your company? | *"Société Anonyme", a Swiss Corporation* |
| Provide a chart of the legal structure of the company and list all branch or affiliate offices: | *See chart below* |

© The Alternative Investment Management Association Limited (AIMA), 2004



| | |
|---|---|
| Provide details of the company's current ownership structure: | *Optimal Investment Services S.A. is 100% owned by Santander Asset Management S.L., a Spanish corporation member of the Santander Group.* |
| Detail any changes in the last 3 years: | *There have been no changes in the company since the last three years.* |
| Are there any plans for further ownership changes? | *There are no changes planned.* |
| Provide a short history of the company with the most important milestones: | *In 1989, Manuel Echeverria began investing for clients of Banco Santander in the alternative asset class. This activity was developed in order to address the growing demand stemming from clients of its International Private Banking division. Providing hedge fund solutions to the Bank's clients was additionally viewed as a compelling way to enhance the diversification benefits of their traditional portfolios and also helped enhance risk adjusted metrics.*<br><br>*Between 1990 and 2002, we were co-invested with Notz Stucki & Cie, a well-known Swiss based investment group with a primary focus on hedge funds. This joint venture has allowed both groups to share resources and achieve economies of scale in terms of purchasing power with investment managers, among other things. In 2002, we decided to end the collaboration with Notz Stucki, taking over the management of all our funds.*<br><br>*In 1995 we established a presence in New York to perform analysis and due diligence on managers and to complement the already existing effort of the Geneva analysts team. In August 1995, we launched our first Optimal Multi-advisors fund in Bahamas, Optimal Arbitrage and later in 1995 Optimal Global Trading. In 1997, Optimal Strategic US Equity was launched, and in 1998, Optimal European Opportunities.*<br><br>*OIS has one of the longest track records in the industry, which extends over a period of 15 years. Thanks to our expertise we have manoeuvred efficiently through periods of crisis such as 1990 (Iraq's invasion of Kuwait), 1994 (Tequila crisis), 1998 (Russia and LTCM), and 2000 (Nasdaq bubble). We feel this experience distinguishes us from the numerous organizations entering the alternative multimanagers fund business and we have learned substantially from these periods of "market dislocations".*<br><br>*In June 2001 Optimal Investment Services S.A. was created from the spin-off of the hedge fund unit of the International Private Bank of Banco Santander with the objective to participate in the growing demand for alternative investment products. The creation of an independent structure with its own brand equity has been undertaken in order get access and serve more efficiently our new client base, encompassing institutional clients, pension funds, family offices, independent asset managers as well as High Net Worth Individuals.* |

**STAFF INFORMATION**

| | |
|---|---|
| Number of permanent staff | *29   employees* |
| State the number of employees in your company as at year end for the last 5 years: | *End 2004: 26 employees*<br>*End 2003: 24 employees*<br>*End 2002: 20 employees*<br>*End 2001: 15 employees*<br>*End 2000: not applicable (the company was created in June 2001)* |
| Provide an organisation chart including the different departments and the number of | *See attached document "A4 OIS Organigramme".* |

AIMA's Illustrative Questionnaire for Due Diligence Review of Fund of Hedge Funds Managers

© The Alternative Investment Management Association Limited (AIMA), 2004

| | |
|---|---|
| permanent employees for each: | |
| Explain any significant employee turnover: | Since Optimal Investment Services S.A. was spun out of the group, the number of employees has almost tripled. 3 more persons have been contracted since the beginning of year 2005. Additionally, our Head of Research left the company in January 2005 to pursue other interests in line with his personal objectives. While we were disappointed to see him leave, his departure has not affected by any means our research abilities and we are continuously interviewing promising candidates to continue to add analysts to our team. |
| How does the company attract new people? | By using executive search firms, manager recommendations, client recommendations, other competitors' recommendations, business schools, university recruitment, industry contacts. |
| Explain the compensation scheme for key people: | For all employees, the compensation system is based on salary plus discretionary bonus based on the company's financial results, fund performance and other criteria. Bonus is paid annually. A long term incentive plan is also in place for senior management that includes a deferral pool that gets invested in the funds we manage, with a 3 years lock-up. |
| Provide a brief background of key personnel (education, professional background): | Manuel Echeverría<br><br>Present responsibility:<br>Chief Executive Officer and Chief Investment Officer.<br>Manuel Echeverría is responsible for the management of Optimal Investment Services S.A., which includes supervising the Sales team, the analysis and due diligence, operations, administrative and legal teams. He is also a Director of the Optimal Multiadvisors and Multiselect funds, both in Bahamas and Ireland and of the Elite Multimanager Fund Ltd.<br><br>History at present firm:<br>Executive Vice President<br>Manuel Echeverría has worked for the Santander Group for the past 14 years. He was responsible for creating the alternative investment fund of fund business for the Santander Group and leading the creation in 2001 of Optimal Investment Services S.A. as an independent company. Mr. Echeverría also developed the portfolio management activity for the private bank of SCH from 1990, including hedge funds as an asset class from the onset.<br><br>Specific hedge fund related experience:<br>In addition to developing and managing the business at Optimal Investment Services S.A. and Santander Group for the past 10 years. He held co-management responsibility of Columbus Holdings Limited and Asian Selection Holdings (co-managed funds with Notz Stucki & Cie). Mr. Echeverría is responsible for creating and managing the Optimal multimanagers fund.<br><br>Previous employments:<br>Prior to SCH, Mr. Echeverría worked for J. P. Morgan in the Securities and Foreign Exchange Group in Geneva with responsibilities for investment management and trading. He worked previously with Morgan Guaranty Trust Company in New York in the International Private Banking Group. Mr. Echeverría attended the CBMP |

*(Commercial Bank Management Program) training program, number 52, after joining Morgan.*

*Education:*
*Mr. Echeverría holds a Master of Management degree from the J.L. Kellogg Graduate School of Management (Northwestern University) and a Bachelor of Science in Management from Babson College.*

**Caron Bastianpillai**
*Present responsibility:*
*Caron Bastianpillai is our Senior Research Analyst and Product Specialist. He is responsible for the management and risk control of a number of multimanager funds. Mr. Bastianpillai monitors alternative investment managers focusing on long/short strategies and also develops investment fund database tools.*

*History at present firm:*
*Mr. Bastianpillai has worked for the Santander Group for the past 10 years. He has been in charge of research and due diligence for a number of hedge fund strategies. He was also responsible for developing an internal database for evaluating managers.*

*Specific hedge fund related experience:*
*For the past 10 years Mr. Bastianpillai has been involved in analysing hedge funds, developing and managing alternative multimanager funds.*

*Previous employments:*
*Mr. Bastianpillai worked for Valorinform S.A., part of Thomson Financial services, as a product supervisor and finally as a product manager from 1991 to 1995.*

*Education:*
*Mr. Bastianpillai holds an MBA in International Management, Magna Cum Laude (European University Geneva) and a BBA in Marketing, Cum Laude (University of Houston).*

**Hugh Burnaby-Atkins**
*Present responsibility:*
*Mr. Burnaby-Atkins is based in New York and responsible for research, due diligence, fund monitoring and selection of a full range of hedge fund strategies. He also performs portfolio management for a number of Optimal products.*

*History at present firm:*
*Mr. Burnaby joined the Optimal team in March 2003. He was promoted to Senior Vice President in December 2004 and has become a member of the management committee since January 2005*

AIMA's Illustrative Questionnaire for Due Diligence Review of Fund of Hedge Funds Managers

© The Alternative Investment Management Association Limited (AIMA), 2004

*Specific Hedge Fund related experience:*

When Mr. Burnaby-Atkins was director of the Alternative Investment Research at Bank of Bermuda, he was instrumental in establishing the bank's alternative investment program.

When employed at the Bank of Bermuda, Mr. Burnaby-Atkins was a fund analyst.

*Previous employments:*

Prior to joining Optimal Investment Services S.A., Mr. Burnaby was an Alternative Investment Manager at Pavilion Capital from Jan 2002. Previously, he was Director of Alternative Investment Research at Bank of Bermuda. He began his investment career at Bank of Bermuda in the Private Client Wealth Management Division in 1998. He previously worked as a management consultant in the defense industry and was a Captain in the British Army.

*Education:*

Mr. Burnaby holds a Bachelor of Commerce from Edinburgh University. He holds the following professional certifications: CFA Charterholder. FRM (Financial Risk Manager). SFA – Registered Representative. IMC (Investment Management Certificate).

Vincent Gattone

*Present responsibility:*

Mr. Gattone is a Research Analyst. He participates in original research and analysis of European based traditional and alternative equity managers. On-going due diligence of funds for which Mr. Gattone has direct responsibility. Regular and periodical preparation of reports for due diligence, managers meetings, and Optimal products. Participates as member of Investment Committee for Optimal Multiadvisors funds.

*History at present firm:*

Mr. Gattone joined Optimal Investment Services S.A. in November 2001 as a Research Analyst focusing on European-based equity managers.

*Specific hedge fund related experience:*

Mr. Gattone was promoting funds of hedge funds as well as constructing tailored made portfolios of Funds of Hedge Funds at Republic National Bank of New York. Prior to that he was employed by Geforin S.A. in Geneva, being responsible for alternative and traditional investments, including selection of both individual hedge funds and multimanager funds for a group of high net worth individuals.

*Previous employments:*

Mr. Gattone started his work experience in 1995 as Junior Portfolio Manager with Geforin S.A., an independent asset management company.

He joined Republic National Bank of New York (today part of the HSBC group) in 1997 as Sales officer for the Republic Funds Department, promoting RNBNY traditional and alternative fund range, then returned to Geforin S.A. in 1999 as Portfolio Manager (Vice President) for a group of high net worth individuals. He

worked at Geforin S.A. until September 2001.

*Education:*
Mr. Gattone graduated from University of Geneva in 1995 specializing in Economics.
He holds a master's degree in Finance from Hautes Etudes Commerciales, Geneva,
Switzerland (1997).

**Cecilia Alvarez-Santullano**
*Present responsibility:*
Ms. Cecilia Alvarez-Santullano is a Research Analyst, providing quantitative research
and analytical support to the research team. She is responsible for manager reviews
and the due diligence process for European based relative value/arbitrage
managers. In addition, Ms. Alvarez-Santullano produces monthly risk and analytical
reports on Optimal Multiadvisors fund products.

*History at present firm:*
Joined the firm in February 2003.

*Previous employments:*
From December 1999 to January 2003, Ms Alvarez-Santullano worked for Morgan
Stanley Capital International (MSCI), as a research analyst at the Corporate Actions
department focusing on M & A activity in Europe. She was also a member of the
MSCI Index Committee.

*Education:*
Masters Degree in Political Science and Administration at the College of Europe in
Brugge, Belgium.
License in International Relations at the Graduate Institute of International Studies,
Geneva, Switzerland (four-year university degree). Ms Alvarez-Santullano is a CFA
charterholder.

**Jonathan C. Clark**
*Present responsibility:*
Mr. Clark is a Research Analyst in New York responsible for research, due diligence,
and fund monitoring of US-based managers, focusing on relative value and event-
driven strategies.

*History at present firm:*
Mr. Clark joined Optimal Investment Services in March 2003.

*Previous employments:*
Previously, Jonathan was an Associate in the Corporate Finance group at Deutsche
Bank in New York and Buenos Aires, where he worked on bond and loan offerings,
merger transactions, and corporate restructurings for Latin American corporations.

| | |
|---|---|
| | *Education:* |
| | *Mr. Clark holds an MBA in Finance from Columbia Business School and a BS in Business Administration, Summa Cum Laude from John Brown University. Series 7 licensed. CFA level I candidate.* |
| | |
| | *Sebastien Poiret* |
| | *Present Responsibility* |
| | *Mr. Poiret is a Research Analyst in Geneva and is responsible for research, due diligence, fund monitoring and selection of managers focusing on European based macro strategies and to a lesser extent relative value, arbitrage and long/short strategies.* |
| | *History at present firm* |
| | *Mr. Poiret joined Optimal Investment Services in June 2004.* |
| | *Specific hedge fund related experience* |
| | *Mr. Poiret has been involved in hedge fund analysis since 1998.* |
| | *When working at Resolution Capital Management LLC, Mr. Poiret was Head of Manager Research. In Chaparral Advisors LP, Mr. Poiret was Senior Analyst and Assistant Portfolio Manager, and in Cygnus Capital he was Senior Analyst/Trader and Assistant Portfolio Manager.* |
| | *Previous employments* |
| | *Mr. Poiret was employed between July 2002 and May 2004 at Resolution Capital Management LLC, a fund of hedge funds in New York.* |
| | *In parallel Mr. Poiret worked 30% of his time at Chaparral Advisors LP (between February 2003 and May 2004).* |
| | *Mr. Poiret previously worked from July 1998 to June 2002 at Cygnus Capital LLC, a global Emerging Markets hedge fund in New York/San Francisco.* |
| | *Education* |
| | *Mr. Poiret graduated from the Espeme School of Business (Edhec Group, 1996) in Nice, France with a degree in corporate finance.  He received a Master of Business Administration from State University of Nice with majors in finance and international private banking (1997).* |
| **Please discuss possible retirement of key individuals with succession plans:** | *There are no plans for anyone to retire, as the company is only four years old and the oldest person is 45 years old.* |

## ASSET MANAGEMENT ACTIVITIES

| | |
|---|---|
| **Total AUM in FoHF?** | *Approximately USD 4'665'000'000 as of March 31ˢᵗ 2005* |
| **Show the growth of assets under management over the last 5 years:** | *See chart below* |

**Firmwide**

**Optimal Funds**



Year-by-year AUM (in millions):

| 1995 | 75 |
|------|------|
| 1996 | 154 |
| 1997 | 505 |
| 1998 | 696 |
| 1999 | 797 |
| 2000 | 1'068 |
| 2001 | 1'371 |
| 2002 | 1'908 |
| 2003 | 2'791 |
| 2004 | 4'015 |
| Q1 2005 | 4'360 |

| | |
|---|---|
| Does the company conduct any business other than asset management? If so, please state the nature of those businesses: | *No other business conducted.* |
| Apart from FoHF, does the company manage other products? If yes, provide the breakdown of assets (USD/%) for each product family (traditional, FoHF, HF, etc.): | *The company primarily manages multimanagers fund.*<br>*As of the end of 2004, 5.6% of our Asset Under Management are managed in discretionary and managed accounts mandates with tailor made solutions for large mandates with specific requirements.*<br>*Of the 11 multimanagers funds managed, 9 are in the alternative universe and 2 are long only absolute return funds: Optimal North America and Optimal Europe. The investment objective of these two funds is to achieve above average capital appreciation by concentrating on absolute return vs. relative returns.*<br><br>*Optimal Europe seeks to achieve capital appreciation by investing in long-only strategies focused on Pan European markets. The fund invests in collective investment schemes using a multi-manager approach. Selection of asset managers is based on the ability to preserve capital over the long term and consistently outperform their peers within their style universe. The fund's return objective is to outperform the MSCI Europe Index.*<br><br>*Optimal North America seeks to achieve capital appreciation by investing in long-only strategies focused on North American markets. The fund will invest in collective investment schemes using a multi-manager approach. Selection of asset managers is based on the ability to preserve capital over the long term and consistently outperform their peers within their style universe. The fund's return objective is to outperform their peers within their style universe. The fund's return objective is to outperform the MSCI North America Index.*<br><br>*Breakdown of assets for each product family (all data as of March 31st 2005)*<br>*Multimanagers fund (in thousands USD): 4'360'000*<br>*Optimal Arbitrage: 968'000*<br>*Optimal Strategic US Equity: 1'603'000*<br>*Optimal European Opportunities: 368'000*<br>*Optimal Japan Opportunities: 82'000*<br>*Optimal US Opportunities Ireland: 228'000*<br>*Optimal Global Trading: 312'000*<br>*Optimal Multistrategy Ireland: 382'000*<br>*Elite Multimanager Fund: 416'000*<br>*Optimal Global Opportunities: TBD* |

AIMA's Illustrative Questionnaire for Due Diligence Review of Fund of Hedge Funds Managers

© The Alternative Investment Management Association Limited (AIMA), 2004

| | |
|---|---|
| | *Long only funds (in thousands USD): 38'000*<br>*Optimal Europe: 21'000*<br>*Optimal North America: 17'000*<br><br>*Managed Accounts (in thousands USD): 266'000* |
| Does the company manage any direct hedge funds? If so, please describe. Does your FoHF invest in them? | *No* |
| Does the company sponsor or have any ownership interest in hedge fund managers who are not employees of the company? If so, does the FoHF invest in these managers? | *No* |
| Which investor group does the company primarily target? | *Institutional clients*<br>*Pension funds*<br>*Independent asset managers*<br>*Independent financial advisors*<br>*Ultra high net worth individuals*<br>*Private banking clients of Santander Group* |
| Provide a breakdown of assets under management by:<br>• Client group:<br>• Country:<br>• Strategy: | *Breakdown by client group*<br><br>*Private clients of Santander Group          75%*<br>*Banks                                                       8%*<br>*Independent asset managers                5%*<br>*Private clients (others)                          4%*<br>*Pension Funds                                       8%*<br><br>*Geographic breakdown of clients*<br>*Latin America and Europe                     90%*<br>*Rest of world                                        10%*<br><br>*Breakdown by strategy*<br><br>*Equity Option Hedge                           37%*<br>*Relative Value                                      35%*<br>*Global Traders                                     10%*<br>*European Equity Hedge                        7%*<br>*U.S. Equity Hedge                                6%*<br>*Japan Equity Hedge                             2%*<br>*Distressed and High Yield                     2%*<br>*Global Equity Hedge                             TBD*<br><br>*Please note that the allocation between strategies is given on an informational basis and that allocations might change in the future.* |
| What is the percentage of assets under management represented by your largest client, and by your 5 largest clients? | *75% of total assets come from private clients of the Santander Group. No single client represents more than 3% of total assets under management.* |
| Provide a list of the 5 main clients (incl. size of assets, duration of client relationship): | *We are willing to disclose a list of our clients provided we sign a non-disclosure agreement and that we seek their agreement.* |

## INVESTMENT PHILOSOPHY

| | |
|---|---|
| Describe your investment philosophy: | *Our investment philosophy is to find outstanding investment talent and skill and create a diversified portfolio of these managers in the form of a multimanager fund, or a managed/managed accounts account. The investment objective is to* |

AIMA's Illustrative Questionnaire for Due Diligence Review of Fund of Hedge Funds Managers

© The Alternative Investment Management Association Limited (AIMA), 2004

|  | *generate positive absolute returns with a strong goal of preservation of capital. This will be achieved through diversification, strict risk control rules and combination of manager styles. In building a portfolio of managers we also aim to reduce correlation between the managers, trying to maximise the sharp ratio.*<br><br>*The fund selection indeed follows an ongoing dynamic process led by the research team, which uses both top-down and bottom-up approaches. Every investment decision is analyzed from a risk-return perspective and is integrated within our funds based on intrinsic merits and diversification benefits.* |
|---|---|

## INVESTMENT PROCESS

|  |  |
|---|---|
| Describe your investment process: | *We define a universe of funds by using a top-down approach (to determine the relevant sub-universe), a bottom-up approach (to select the appropriate fund for a given portfolio) and studying client's needs and sourcing ideas.*<br>*We determine the sub-universe by using quantitative and qualitative analysis which covers data analysis, background check and strategy evaluation.*<br>*From the sub-universe we keep a short list that we obtain after gathering data from quantitative analysis (returns analysis, volatility analysis, drawdown analysis, benchmark analysis, asset evolution), qualitative analysis (manager experience, investment style analysis, evaluation of investment strategy, consistency in management style, business terms and structure) and analyst report on the funds. This way we propose a selection of funds that then go to our investment committee and investment decisions are made by the investment committee.* |

## STRATEGY AND STYLE ALLOCATION

| | |
|---|---|
| Which strategies do you use? | *Directional Trading*<br>*Macro discretionary*<br>*Macro diversified*<br>*Systematic non trend*<br>*Systematic trend following*<br>*FX trading*<br><br>*Relative value*<br>*Convertible arbitrage*<br>*Event driven (merger arbitrage, special situations)*<br>*Distressed debt/High yield*<br>*Credit*<br>*ABS (mortgage, CDO)*<br>*Fixed income arbitrage*<br>*Equity arbitrage*<br>*Capital structure arbitrage*<br>*Relative value plus*<br>*Multistrategy*<br>*PIPES*<br><br>*Equity*<br>*Long short*<br>*Market neutral*<br>*Statistical arbitrage*<br>*Long only absolute return*<br>*Long only*<br>*Long biased*<br>*Short only*<br>*Short biased*<br>*Investment style*<br>*GARP*<br>*Growth*<br>*Blend*<br>*Value*<br>*Trading*<br>*Value event driven*<br>*Market cap focus*<br>*Small cap*<br>*Small cap and mid cap*<br>*Mid and large cap*<br>*Large cap*<br>*All cap*<br><br>*Private equity* |
| Which strategies do you avoid? | *We avoid managers fully dedicated to Emerging Markets fixed income relative value strategies, and most illiquid strategies that invest in private equity and real estate* |

| | |
|---|---|
| Describe the company's asset/style allocation process: | *The asset allocation process is decided and reviewed regularly by the Investment Committee. It is based on a thorough top down macro assessment of each individual strategy and sub-strategy in light of our view of market conditions and investment opportunities. Furthermore, all tactical asset allocation decisions are based on the investment objectives of each fund or managed accounts / managed accounts. This is the first element of our dynamic investment process, which is built at its core around risk management, portfolio construction and bottom-up fundamental evaluation of inherent qualities of underlying mangers.*<br><br>*Investments are allocated according to client needs or in-line with the stated objectives of the multimanagers fund. Both managed accounts and multimanagers fund' asset allocation is articulated around the economic and market valuation of the investment committee.* |
| What is the company's competitive edge in the strategy and style allocation process? | *The main factor is an experienced and stable team of professionals with strong and established knowledge, the capacity to innovate, a vast network of resources and the ability to attract top talent to support our growth.*<br><br>*We furthermore feel that our longstanding track record distinguishes us from many of our competitors, who publish pro-forma returns for their newly launched products. We have survived and prospered through different market cycles and through major crisis. We can document correct investment decisions as well as occasional mistakes. We have proven we have learned from these mistakes.*<br><br>*We stress the importance of performing thorough due diligence – on an ongoing basis - on the managers with whom we invest. We want to know how the manager makes money and how he or she is able to protect capital in difficult times. We want to challenge the manager in face-to-face meetings, to see how he would react in a given situation. Our careful attention in this area has allowed us to avoid the well-publicized cases of manager fraud*<br><br>*Our portfolios offer diversification (25 to 40 managers), however when we have conviction in a manager, we will increase our investment in the manager to what we consider "core positions" in other words about 7 to 8 % of the fund. Typically, the 10 largest positions in our funds will account for around 50% of the total assets.* |
| On what basis and when does the company define and change the asset allocation of the portfolios? | *Changes in the asset allocation of the portfolios and funds occur upon the decision of the Investment Committee and upon its assessment of the evolution of risk / reward opportunities of each strategy. Changes in the asset allocation will usually be the result of a changing market environment, in which certain strategies will be less effective due to a lack of opportunities, liquidity, volatility or other factors. The review is formally conducted on a monthly basis in the Investment Committee. Portfolios are however constantly examined, discussed and reviewed between all involved members of the Analyst team in New York and in Geneva* |
| Do investment guidelines exist for all products? If so, please provide sample: | *Each product has an investment policy, together with investment guidelines, which is specified in the respective offering memorandum.*<br>*Please see the attached sample of investment guidelines.* |

AIMA's Illustrative Questionnaire for Due Diligence Review of Fund of Hedge Funds Managers

© The Alternative Investment Management Association Limited (AIMA), 2004

| | |
|---|---|
| How can the guidelines be altered? | *Any alteration of guidelines has to go through a product committee for approval. Investors must also be informed prior to any change so as to enable them to exit if they so wish.* |
| For non-standard products, to what extent can the investor be involved in the asset allocation process? | *For our managed accounts and white-labelled business, the investors can request whether they would like to be involved or not in the decision making process and if so at what level.* |

## DUE DILIGENCE / MANAGER  SELECTION

| | |
|---|---|
| Summarise your manager selection process: | *The minimum criteria a manager has to meet to enter the process is:*<br>o   *Proven experience in the investment field*<br>o   *Superior risk control*<br>o   *Alignment of manager's and investors' interest (managers that are invested in their own funds)*<br>o   *Performance*<br>o   *Risk / reward profile*<br>o   *Reputation* |
| Where does your due diligence process differ from that of others in the marketplace? | *Our due diligence follows a specific process:*<br>o   *Capital appreciation: we seek selective opportunities in confirmed and consistent absolute returns generators*<br>o   *Wealth preservation: we focus on proven ability of managers to dynamically control for downside risk*<br>o   *Sustainable Business Structure: we seek firms with a robust business model and seamless operating infrastructure with focus on continuity* |

AIMA's Illustrative Questionnaire for Due Diligence Review of Fund of Hedge Funds Managers

© The Alternative Investment Management Association Limited (AIMA), 2004

| | |
|---|---|
| Please describe, in detail, the company's due diligence process including the investment, legal and compliance and operational due diligence procedures.  Provide examples of reports and working papers, where available: | *Optimal Investment Services S.A. uses an intensive and thorough due diligence process that has been developed and "fine tuned" through our many years of experience over the last decade. The first step includes screening as dictated by a mandate or strategy (since our multimanagers fund tens to be strategy specific). We have developed our network to allow us to build an evolving universe, which includes new managers and existing managers that are introduced to us through prime brokers, current hedge fund managers, investors, as well as sifting through industry literature for other ideas, etc. Screening also comprises a review of on-line or marketed databases (such as, TASS, Altvest, HFRI, Hedgefunds.net and others). However, these are not our primary sources for new ideas, as hedge funds tend to work in a less transparent environment and the most successful managers tend to avoid any publicity. We maintain an internal proprietary database, which includes both existing and potential investments.*<br><br>*Once a universe has been identified, we screen for managers who have managed to avoid large drawdowns and have consistently surpassed returns of their respective strategies. A universe then forms the base for comparing existing managers and funds against a peer group, which is monitored on an on-going basis.*<br><br>*Monthly analyst meetings and a formal Investment Committee also guides the process of which strategies and managers to focus on. Once managers are identified based on strategy, returns, experience, etc a more comprehensive due diligence ensues and usually comprises background checks, business structure and terms analysis, return / volatility / draw-down / benchmark analysis and an evaluation of the managers' business plan and operational infrastructure.*<br><br>*Our risk manager and in-house legal counsel will ensure all non-investment due diligence (operational and legal) and risk control for all new/existing investments. They will provide an opinion on all managers from an operational/legal risk perspective at the Investment Committee prior to investment decisions are made.* |

**VISIT**

| | |
|---|---|
| How many managers are you currently invested with? | *140 managers.* |
| How many new managers do you analyse per year? | *We see over 450 managers a year in both our offices and at capital introduction events organized by the prime brokers and follow-up with about 300 managers by visiting them in their offices.* |
| How many managers are approved per year? | *Around 25 new managers each year. However, we have increased this number as we have recently created new funds.* |
| What is the average time scale of the manager selection process? | *Before initial investment it takes on average at least two months.* |
| Do you conduct on-site visits with the managers? | *Yes.* |
| How many visits to a manager will you make prior to making an investment? | *We will meet at their offices at least once.* |
| How much time is spent with each manager during the due diligence process:<br>    • Before initial investment?<br>    • After initial investment? | *The due diligence process before initial investment takes approximately 2 months. After initial investment, we have three to five meetings on-site, and regular phone calls and others means of communication.* |

AIMA's Illustrative Questionnaire for Due Diligence Review of Fund of Hedge Funds Managers

© The Alternative Investment Management Association Limited (AIMA), 2004

| OPERATIONAL DUE DILIGENCE | |
|---|---|
| Do you have a dedicated operational due diligence team? | *We are in the process of hiring an experienced person to build the non-investment due diligence which includes risk management, operational and legal due diligence. The person in charge will ensure we are able to create a more thorough procedure, will perform an ongoing update to make sure all procedures are maintained and enhanced. In addition, this person will ensure pro-active risk management.* |
| Do you perform reference checks on the manager? | *Yes. Reference checks are performed on ex-colleagues and superiors, related people in the industry, other hedge funds, prime brokers. In case we cannot gather enough information on the manager, we contract services on specialised companies such as Back Track.* |
| Do you perform operational due diligence on the middle and back office operations? | *Yes, both on middle and back office.* |
| Do you perform due diligence checks on the administrator or any other service provider to the targeted funds? If so, please describe: | *Yes, we do carry due diligence on the fund's administrator to see how they price the portfolio and where they obtain the prices from. We also talk to the prime brokers the fund uses as well as any other third party providers.* |
| Do you contact the outside audit company prior to approval? | *The analysis of audit reports is integrated in the due diligence process. We may contact the outside audit company, but it is not a condition sine qua non for approval.* |

| CAPACITY | |
|---|---|
| How many managers are currently on your approved list? | *We are currently invested in 140 managers.* |
| How much capacity is available from managers on the approved list / you are invested with? Please provide breakdown by strategy: | *Capacity is negotiated on an on-going basis and Optimal enjoys favourable terms thanks to its capacity to be initial investor with top tier hedge fund managers.* |
| How does the company secure and expand capacity with underlying hedge fund managers? | *Thanks to a good relationship with managers originated through our status as initial day one investor in many of the top tier hedge funds, we have not yet had capacity problems. We believe this to be a recurring event that usually does not last long. The last market capacity problem was in March 2004. We execute capacity agreements.* |

## PORTFOLIO CONSTRUCTION

| | |
|---|---|
| Describe the portfolio construction? | *Diversification benefits are thoroughly studied and when a manager is selected, we make sure that the correlation level with existing holdings is low or negative. A plain vanilla long-short manager may add little value to the portfolio, even if the track record is good. A manager with higher volatility may have a place in our multimanagers fund (within prudent constraints) if the manager's results exhibit low correlation to other managers. We also look for managers with an edge, i.e. special knowledge of a sector or special techniques. We focus on low downside deviation. A first-rate investment team (including synergy between analysts and traders) is desired. In that vein, a hedge fund is a business. We want to see proven risk management skills. We additionally insist that the managers take a financial stake (co-investment) in the fund to ensure alignment of interest with investors.* |
| Is there an investment committee to approve portfolio allocation? If applicable, please describe its set up and authority: | *Yes, there is an investment committee. The committee is composed of three permanent members: Caron Bastianpillai, Hugh Burnaby-Atkins, and Manuel Echeverria, chief investment officer. The committee is held every month, usually at the end of the month. The analysts, after completing the due diligence process,* |

|  | *sit in the committee with proposals. The 3 permanent members have decision making power, in case of diverging opinions; Manuel Echeverria has the final authority.* |
|---|---|
| How often are portfolios rebalanced? | *At least once a month during the Investment Committee.* |
| State the average turnover of managers within the portfolios: | *On average we hold 25-40 managers in each portfolio and between 3 to 5 managers are removed and added in each fund every year.* |
| Does the turnover of managers in different portfolios vary substantially? | *Even if our main philosophy is to build a long-term relation with our managers the turnover may vary depending on the strategy and on the flows of each fund* |
| What are the main reasons for the exclusion of managers from a portfolio? | *Reducing or removing a manager will occur when:*<br>• *Performance is inferior to others and/or has negative absolute performance over an extended period (usually 12 months).*<br>• *Changes in key personnel occur that may affect the ability to deliver consistent returns.*<br>• *The style and strategy diverge from their stated objective.*<br>• *Changes in level of assets make it difficult to operate the investment style or strategies.*<br>• *Changes in the macro view of the Investment Committee that favour one or another type of investment style* |
| Does the company apply leverage to some or all of its products?  If so, please explain: | *We do not employ leverage at the multimanagers fund level. We do closely monitor the leverage employed by the underlying hedge fund managers. One of our products, Elite Multimanager, has a leveraged share class (with specific segregation of assets), which shall target a leverage ratio of 50% loan to asset or 2X" in USD to investors pursuant to a credit facility with an affiliate of Bank of America. Will also have the benefit of a Liquidity Facility provided by Bank of America that allows Elite shareholders to redeem on a quarterly basis with no lock-up.* |
| **RESEARCH** | |
| In which areas does the company use external research and which sources do you employ? | *External research is used in all areas related to investment. There are various sources used: brokers, industry commentaries, dedicated papers.* |
| Does the company publish regularly in the press or commission any research / academic papers? Provide samples: | *Yes, we report on a monthly basis to Altvest, Hedgefund.net, Investhedge, Bloomberg and Reuters. The NAV of the Optimal Japan Opportunities is published on a daily basis in two Swiss newspapers (pursuant to the Swiss Federal Act on Investment Funds).*<br>*Various members of the team have had their academic research and market analysis published in the domestic and international press.* |

## RISK MANAGEMENT

| | |
|---|---|
| Describe your risk management philosophy: | *Optimal Investment Services Risk Management Philosophy is to monitor the Optimal fund's risk parameters in accordance to the rules set forth in the "Policies and Procedures". The goal is to analyse a set of risk management rules on a monthly basis based on a pre-set process.* |
| Describe how risk management is structured within your organisation: | *Risk management is an integral part of Optimal's business and investment philosophy. Scrupulous attention is paid to all risk factors as mentioned above and a team of 2 investment professionals makes sure that risk guidelines and parameters are strictly followed. We are currently employing a highly experienced individual to lead this risk management aspect for Optimal Investment Services.  As reinforcement to the current risk control mechanisms in place, Santander Asset Management S.L. has assigned a full time risk manager who operates independently to supervise that Optimal Investment Services S.A. complies with both internal and Santander Group's risk management policies and procedures.* |

| | |
|---|---|
| What risk management concepts does the company apply to its underlying managers? | *The Optimal Fund of Funds (FoFs) are monitored on a monthly basis against pre-set risk parameters and risk rules. Those parameters have been created by our senior management in coordination with the Risk Monitoring Division of Banco Santander. They are part of Optimal's "Policies and Procedures" code.*<br>*The risk monitoring concentrates on three different types of risks:*<br><br>*1/ Credit / Diversification Risks*<br>*The goal is to check that the Optimal FoFs are well diversified in terms of the number of underlying funds they can invest in as well as in terms of the size of one particular sub fund in the Optimal FoF. The same analysis is undertaken for investment management companies in order to monitor Optimal fund's exposure to hedge fund management firms as a whole. Thresholds are also set as to how much Optimal can hold in a particular sub fund or investment management company.*<br><br>*2/ Liquidity Risks*<br>*The risk monitoring process insures that Optimal FoFs have sufficient monthly liquidity to face potential redemptions, that they have enough liquidity available in terms of cash and credit lines and that sub funds with low liquidity do no represent a large part of the portfolio.*<br><br>*3/ Market Risks*<br>*Market risks, such as negative performances and draw downs, are analyzed in order to constantly flag potential sources of negative returns and volatile performances.*<br><br><br>*A comprehensive database helps monitor the risk parameters on a monthly basis. The fund administration team as well as the research team provide and update the required information for the risk reports to be run.*<br>*Potential breaches of the above mentioned risks are presented at the monthly Investment Committee Meeting, documented and sent to the Bank's Risk Monitoring Division in Madrid. A Risk Summary Report is written and signed of by both Optimal and the Risk Monitoring Division of Banco Santander on a monthly basis.* |
| Does the company maintain a written risk management policy?  If yes, provide a copy: | *The company maintains a policy and procedure manual, which includes risk management. This document is proprietary.* |

| | |
|---|---|
| Does the company maintain a risk management system including operational, legal, reputational and business risks?  If so, please describe: | *Yes, risk at the fund level is monitored using in-house database and monitoring various risk metrics. Optimal Investment Services S.A. undertakes risk management at the multimanagers fund level through an in-house proprietary risk management model that focuses primarily on credit, liquidity, concentration and market risk (we have described this model before).  In addition, all of Optimal Investment Services S.A.'s investment decisions and adherence to investment policies and guidelines are independently monitored by the Central Bank of Ireland (IFSRA) and by the internal audit and risk control units of the Santander Group. As reinforcement to the current risk manager who operates independently to supervise that Optimal Investment Services S.A. complies with both internal and Santander Group's risk management policies and procedures.*<br><br>*Legal, reputational and business risk is monitored by our Legal Counsel and our Chief Operating Officer within guidelines set out by the risk and internal audit of the Santander Group which enforces strict adherence to internal guidelines as well as by external auditors.* |
| Do the underlying hedge fund managers provide portfolio transparency?  Please describe the extent and frequency of this: | *Transparency varies from one manager to another. Also, some strategies are more transparent than others; i.e. Equity Long/Short strategies are more transparent than Arbitrage ones.* |
| Describe the company's quantitative risk management tools: | *Risk at the fund level is monitored using our in-house database and by monitoring various risk metrics.*<br>*We use a number of statistical measures to calculate risk, such as volatility (as measured by standard deviation and downside deviation, Sharpe ratio, Sortino ratio), maximum drawdowns, months to recover and correlations. However, there are some restrictions to quantitative tools like "lock ups".*<br><br>*In addition to the statistical ratios measured above, there are certain criteria that are applicable to specific strategies. For long-short equity managers, we track net exposure on an ongoing basis (gross exposure, long, short and net exposure). For arbitrage managers, we track leverage and the use of excess capital.*<br>*However, there are some limitations to the use of quantitative tools as they are "backward looking". In addition, lock-ups prevent implementation of risk control rules in many instances.* |
| How are liquidity provisions monitored and controlled? | *Liquidity at the underlying fund level is monitored and controlled on a monthly basis by the analysts, who maintain a permanent contact with the managers. Liquidity at the multimanager fund level is also controlled monthly by the COO and risk manager.* |
| Has a manager included in one of the company's portfolios ever gone out of business ("blow ups")?  If yes, please describe and explain what are the lessons learnt from that experience and how have they been applied to your business. | *In August 1998, we were invested with the III High Risk Opportunities Fund. This fund was partly invested in Russian debt. They had contracted a "Non Deliverable Forward" (Dollar/Rouble) as their hedge with two reputable financial institutions. As the Russian crisis unfolded, the two institutions refused to honour the NDFs and the fund collapsed. This issue is still in litigation today. However, the result of the collapse of the III High Risk Opportunities Fund cost our Optimal Arbitrage Fund a drawdown of 6% in August of that year. After the 1998 Russian and LTCM crises, we decided to stop investing in emerging market fixed income strategies and reviewed our entire portfolio allocation by favouring those managers that preserved capital and performed during those months of strong market dislocation and redeem those that failed to do so. This experience led us to implement changes that have resulted in more consistent performance with reduced volatility. Since October 1998 and* |

AIMA's Illustrative Questionnaire for Due Diligence Review of Fund of Hedge Funds Managers

© The Alternative Investment Management Association Limited (AIMA), 2004

| | |
|---|---|
| | *until December 2004, the Optimal Arbitrage Fund has only had eight negative months.* |

## ADMINISTRATION / OPERATIONS

### ADMINISTRATION

| | |
|---|---|
| How often is the NAV calculated/estimated? | *Monthly for NAVs and fortnightly for estimates* |
| Is the fund administration performed in-house? If performed in-house:<br>• What are the tasks of the fund administration?<br>• Does an independent party review these calculations?<br>• What systems are used for fund administration?<br>Are the computer systems developed in-house or does the company use standard products? | *The fund administration is performed independently by external service providers. However, we have an operational team that verifies the work executed by these service providers.*<br>*The role of the Fund Admin department is to conduct in parallel to our designated external administrators the calculation of monthly NAVs, shareholder registry control, pricing of all underlyings as well as all relevant information flow. Discrepancies are highlighted and reconcile in order to insure accuracy and integrity of data.*<br><br>*The funds' administrator is HSBC Securities Services (Ireland) Limited; it is the custody in charge of reviewing the NAV calculations.*<br><br>*We use a fully integrated front/ middle / back office system with extensive specifications to conduct checks and balances and reconciliation tasks.*<br><br>*The database is developed by a specialized firm.* |
| If services are outsourced:<br>• Which tasks are fulfilled by external service providers (include names of companies)?<br>• Detail the duration of the relationship: | *Accounting services are outsourced in order to support our full time accountant in book keeping activities.*<br>*H/R payroll services are managed by the Group Santander.*<br><br>*The fund administration and custody is performed by HSBC Institutional Trust Services and by HSBC Securities Services (Ireland) Limited respectively. Both entities form part of the HSBC Group.*<br><br>*The relationship with the administrator exists since 2002.*<br><br>*A team of 5 administrators spends 100% of their time insuring the integrity of all data from the administrator by working in parallel in all tasks.*<br>*The auditors are Deloitte and Touche for Optimal Investment Services S.A. and Price Waterhouse Coopers for the Optimal funds.* |

### SERVICE PROVIDERS

| | |
|---|---|
| Provide a list of professional counterparts the company maintains a business relationship with:<br>• Legal advisors:<br>• Auditors:<br>• Banks:<br>• External marketers:<br>• Other: | <u>Custodian:</u><br>*HSBC Institutional Trust Services (Ireland) Limited*<br>*JP Morgan Tranaut*<br><u>Administrator:</u><br>*HSBC Securities Services (Ireland) Limited*<br><u>Legal advisors:</u><br>*Lenz and Staehelin  (Geneva)*<br>*William Fry (Dublin)*<br>*Simmons & Simmons (London)* |

AIMA's Illustrative Questionnaire for Due Diligence Review of Fund of Hedge Funds Managers

© The Alternative Investment Management Association Limited (AIMA), 2004

|  | Lennox Paton (Bahamas) |
|  | Conyers Dill & Pearman (Bermuda) |
|  | Maples and Cadler (Cayman Islands) |
|  | _Auditors:_ |
|  | PriceWaterhouseCoopers (Dublin) |
|  | Deloitte & Touche (Geneva) |
|  | Santander Group(Madrid  Internal Auditors) |
|  | _Bank:_ |
|  | UBS S.A. |
|  | _Financial institutions:_ |
|  | HSBC (Suisse) S.A. |
|  | Santander Central Hispano Group |
|  | Merrill Lynch Financial Products |
|  | Banc of America Securities |
|  | Commerzbank |
|  | BNP Paribas |
|  | Société Générale |
| Has the company ever terminated a contract with any service providers (including auditors)?  If so, explain the circumstances: | Yes. Prior to HSBC, we used Fortis Fund Services Bahamas as administrator and custodian. We terminated our relationship because of inefficient fund administration services and the time zone difference. |

## COMPLIANCE / REGULATION

| Does the company have a full-time compliance officer? | Yes. |
| Describe how compliance is structured within your organisation: | The Legal and Compliance Department is composed of two full time legal counsels. The head of the Legal and Compliance Department is also the Compliance Officer of the Company. |
| Does the company have a written compliance manual? If yes, please provide a copy: | Yes: General Code of Conduct, Code of Conduct in Securities Markets, Swiss Association of Assets Managers Code of Conduct, Swiss Funds Association Code of Conduct, Directives on Funds Distribution. |
| Is the company registered with any regulatory and/or supervisory bodies? | Self-regulatory body, Swiss Association of Asset Managers (S.A.AM) and the Swiss Fund Association (an application has been filed. Membership will be confirmed during the month of June). Admitted as an investment adviser in Luxembourg and in Ireland. |
| When was the last inspection of these bodies? | December 2004 |
| Are there any lawsuits pending against the company? | None |
| Is your company a member of AIMA or any other relevant trade association? | The company is member of AIMA and of the Swiss Association of Asset Managers. |

## CONFLICT OF INTEREST

| How does the company ensure an alignment of interests between the company, as fund manager and the investor? | We have comprehensive bonus plans, which are built around multiple factors such as individual performance, quality of service towards clients, firm's growth and performance, all of which contribute to optimally align interests between the firm, its individuals and our investors. In addition, all Optimal's employees are subject to the Swiss Fund Association Code of Conduct, the General Code of Conduct, and the Code of Conduct in Securities Market of Santander Group. |

AIMA's Illustrative Questionnaire for Due Diligence Review of Fund of Hedge Funds Managers

© The Alternative Investment Management Association Limited (AIMA), 2004

| | |
|---|---|
| Are key people invested in the funds? | Yes. Part of senior management's deferred compensation is invested in Optimal funds. |
| Are there any conflicts of interests the investor should be aware of? | There is no conflict of interest. |

## ANTI-MONEY LAUNDERING

| | |
|---|---|
| Confirm that the company has established Anti-money Laundering (AML) procedures: | Please refer to the attached document AML Directives |
| Please advise which jurisdiction's regulations you comply with: | Switzerland (member of GAFI). Admitted as an investment adviser in Luxembourg and in Ireland. |
| Please advise who your MLRO (Money Laundering Reporting Officer) is: | Our Money Laundering Officer is our head of compliance, Jaime Calvo. Money Laundering Reporting is also addressed by our external LBA audit entity, Deloitte and Touche. |
| Elaborate on the procedure to ensure compliance with AML policies: | Prior to opening an account with a new client, full due diligence is conducted with the client. This due diligence is summarised in the "Know Your Customer" form which is signed off by the account officer, the head of compliance and the supervisory officer. |

## BUSINESS CONTINUITY/DIS.A.STER RECOVERY

| | |
|---|---|
| Does the company have a formal disaster recovery plan?  Please describe the basic provisions: | A seamless disaster recovery capabilities is hosted by Grupo Santander. We follow the Group's procedures. Please see attached contingency plan. |
| What contingency plans do you have in terms of:<br>• Computer system fault?<br>• Incapacitated investment decision makers?<br>• Technical failure at Prime Broker's location?<br>• Presence of in-house computer technician?<br>• Back-up systems? | Computer system default: we have the same contingency plan as Grupo Santander, we have a back-up system hosted by the group. |
| | Incapacitated decision maker: senior analysts and product managers can take over the responsibility of key decision makers in case those are incapacitated. |
| | Failure at Prime Broker's location: not applicable to our business. |
| | Presence of in-house computer technician: yes we have a full-time IT responsible. |
| | Back-up system: back-up is performed daily. The back-up system is hosted by Grupo Santander. |

## INSURANCE

| | |
|---|---|
| Do you currently hold insurance for the following:<br>• Director & Officers Liability?<br>• Professional Indemnity?<br>• Crime (Employee fidelity/third party fraud)?<br>• Key Person Insurance?<br>• Other?<br>N.B.: if you are not restricted from disclosing such information under your policy(ies) | Restricted from disclosure. |
| | |
| | |
| | |

AIMA's Illustrative Questionnaire for Due Diligence Review of Fund of Hedge Funds Managers

© The Alternative Investment Management Association Limited (AIMA), 2004

## PRODUCT INFORMATION

| | |
|---|---|
| Provide a short description of your flagship products or most representative products, including:<br>• Investment objective, return, risk:<br>• Target investors:<br>• Legal structure:<br>• Asset allocation:<br>• Number of funds in the portfolio:<br>• Current size:<br>• Date of inception:<br>• Total standard fee structure:<br>• Conditions for Subscriptions and Redemptions:<br>• Minimum investment:<br>Alternatively, provide offering memoranda for your flagship products. | *Please refer to the attached Fund Booklet for detailed information on each of our product, which covers:*<br>   o  *Optimal Arbitrage Ltd.*<br>   o  *Optimal Strategic US Equity Ltd.*<br>   o  *Optimal European Opportunities Ltd.*<br>   o  *Optimal US Opportunities Ireland Fund*<br>   o  *Optimal Japan Opportunities Ltd.*<br>   o  *Optimal Multistrategy Ireland Fund*<br>   o  *Optimal Global Trading Ltd.*<br>   o  *Optimal Global Opportunities*<br>   o  *Elite Multimanager Fund Ltd.*<br>   o  *Optimal North America Fund (long only)*<br>   o  *Optimal Europe Fund (long only)*<br><br>*The minimum subscription size varies between USD 50,000 and USD 1,000,000. However, for the managed account side of our business, we recommend a minimum-starting amount of USD 10 millions in the first year.* |
| Does the company specialise in any product or group of products? If so, please elaborate: | *Optimal Investment Services S.A. does not have a specific speciality in the hedge fund universe, but we offer our clients access to all the main hedge fund investment styles.* |
| List your other funds with their key characteristics: | *We have listed all our funds.* |

## PERFORMANCE

| | |
|---|---|
| Provide historical performance for all your products (actual only) since inception net of standard fees (in electronic form) including:<br>• Monthly returns:<br>• Standard deviation (annualised):<br>• Three largest drawdowns and recovery periods:<br>• Percentage of positive / negative months: | *Please see table below and refer to the attached Booklet for more details* |

| Risk Table Annualized | Annualized ROR | Maximum Drawdown | Valley Drawdown | Length Drawdown | Recovery Period | Standard Deviation | Sharpe -3% |
|---|---|---|---|---|---|---|---|
| Elite Multimanager Fund Unleveraged Class A Shares | 2.80% | -2.83% | Sep-04 | 5 | 3 | 2.74% | -0.06 |
| Optimal Arbitrage Class A Series | 8.94% | -16.00% | Jul-98 | 3 | 15 | 4.63% | 1.24 |
| Optimal European Opportunity Class A Series | 10.20% | -10.94% | Oct-98 | 3 | 8 | 10.30% | 0.71 |
| Optimal Global Trading Class A Series | 9.43% | -5.43% | Sep-04 | 7 | 2 | 6.25% | 1 |
| Optimal Japan Opportunities Ireland Fund Class A | 12.01% | -5.26% | Oct-04 | 4 | - | 8.40% | 0.93 |
| Optimal Multi-Strategy Ireland Fund Class A | 6.95% | -0.77% | Sep-04 | 5 | 1 | 2.54% | 1.5 |
| Optimal Strategic US Equity Class A Series | 12.21% | -0.64% | Feb-03 | 3 | 1 | 2.97% | 2.91 |
| Optimal US Opportunities Ireland Fund Class A | 8.86% | -2.80% | May-04 | 3 | 6 | 4.30% | 1.31 |
| Optimal Europe Class A | 6.89% | -19.91% | Mar-03 | 9 | 9 | 11.12% | 0.39 |
| Optimal North America Class A | 10.05% | -7.58% | Sep-02 | 3 | 8 | 10.15% | 0.71 |

*Since inception of the fund till Jan 2005*

| | |
|---|---|
| Has this track record been audited? By who? When? | *There is a yearly audit performed on all our funds by Price Waterhouse Coopers.* |
| Is the company compliant with the Association of Investment Management and Research Performance Presentation Standards or the Global Investment Performance Standards? If so, please provide a copy of the compliance | *The standards imposed by this association are very similar to those imposed by the Swiss Federal Banking Commission (actually, the Swiss Federal Banking Commission is an associate) and we are subject to the standards imposed by the Swiss Federal Banking Commission. The guidelines are stated in the two documents "Guidelines on the calculation and disclosure of TER" and "Guidelines on calculation and* |

AIMA's Illustrative Questionnaire for Due Diligence Review of Fund of Hedge Funds Managers

© The Alternative Investment Management Association Limited (AIMA), 2004

| presentation.<br>Have these presentations been verified by a third party?<br>Please provide a copy of the verification report. | *publication of fund performance data".* |
|---|---|

## CLIENT INFORMATION/REPORTING

| What is your client reporting policy? Address topics such as level of transparency and frequency: | *Reporting is available on weekly basis for estimates / monthly for newsletters and portfolio reviews / quarterly for in-depth portfolio analysis and also yearly.* |
|---|---|
| What is the normal method of communication with your clients: | *Relationship with client is maintained through phone calls, conference calls, e-mails, fax, business visits.* |
| Provide sample reports that are sent to investors. | *Please see the attached documents.*<br>*We provide to clients 3 types of standardized reports:*<br>*Quantitative information on monthly facsheet for each fund*<br>*Qualitative commentary of each Optimal fund on our monthly newsletter*<br>*Quarterly analysis of the fund performance on the quarterly presentations* |
| Can investors receive customised reports? | *Yes* |
| Are audited reports available to the investor? Please provide sample. | *Yes see attached document* |
| How often will you review a portfolio with a client? | *Monthly or quarterly* |
| Do you provide client training? | *Yes, we have done so in the past.* |

Please attach your most recent disclosure document, information memorandum, and marketing literature.

In the event of amendments to the aforementioned documents, notably the memorandum, please ensure that we will receive those directly from you within reasonable time, as well as copies of proxy's and notification of the Annual General Meeting (the latter only for information purposes).

Please state the name and title of the officer at your company who has prepared and reviewed this questionnaire.

| Name: | *Amélie Fontvieille* |
|---|---|
| Date: | *06/06/2005* |
| Position: | *Sales support officer* |

# Exhibit 6

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*



# AIMA'S ILLUSTRATIVE QUESTIONNAIRE FOR DUE DILIGENCE OF

# FUND OF HEDGE FUNDS MANAGERS

**Published by**
**The Alternative Investment Management Association Limited (AIMA)**

## IMPORTANT NOTE

- All/any reference to AIMA <u>must</u> be removed from this document once any question is amended or information is added, including details of a company/fund - with the exception of one phrase: "This questionnaire is based on AIMA's Illustrative Questionnaire for the Due Diligence of [name]".
- AIMA is distributing this Questionnaire in its current form to its member companies and institutional investors on a confidential basis as a service to the hedge fund industry. <u>This Questionnaire may not be distributed by any other party without AIMA's permission.</u>
- The copyright in this questionnaire belongs to AIMA.  You may copy the questionnaire for your own company's use and may distribute it for the purpose of a due diligence review, by you may not distribute nor copy it for any other purpose without the prior written consent of AIMA.

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

# AIMA's Illustrative Questionnaire for Due Diligence of FUND OF HEDGE FUNDS MANAGERS

**The purpose of this document is to serve as a guide to investors in their relations with fund of hedge funds managers. This due diligence questionnaire is an unavoidable process that investors must follow in order to choose a manager. Not all of the following questions are applicable to all managers but we recommend that you ask as many questions as possible before making a decision.**

## *DISCLAIMER*

Whilst AIMA has used all reasonable efforts to produce a questionnaire of general application in connection with a due diligence appraisal of fund of hedge funds managers, in any particular case an investor is likely to have its own individual requirements and each fund of hedge funds manager its own characteristics. As a result, prior to any individual investor sending out the questionnaire, it is strongly recommended that the questions are reviewed and, where necessary, amended to suit its own requirements and its state of knowledge of the fund of hedge funds manager's operations.

In addition, you should review with your legal counsel and other advisors the value of the responses and to what extent, if any, you may rely upon such responses. The contractual terms of an investment in any fund of hedge funds will normally be confined to the terms of the application or subscription documents, prospectus, private placement memorandum or other offering document and the constitutional documents of the fund of hedge funds. In order to obtain the best possible information on any specific fund of hedge funds manager, additional questions should be raised to clarify any point of uncertainty, and where practicable verbal examination should be undertaken. In particular, AIMA recommends that in respect of special areas of concern, such as fund performance or risk profile, independent third party data should, if possible, be obtained in order to verify these facts.

None of AIMA, its officers, employees or agents makes any representation or warranty, express or implied, as to the adequacy, completeness or correctness of the questionnaire. No liability whatsoever is accepted by AIMA, its officers, employees or agents for any loss howsoever arising from any use of this questionnaire or its contents or otherwise arising in connection therewith. For the avoidance of doubt, note that by providing this questionnaire, AIMA does not act as legal counsel in any jurisdiction.

*Other AIMA questionnaires available in this series are for the selection of:*
- *Hedge Fund Managers*
- *Managed Futures Managers*
- *Fund Administration (for Managers)*
- *Fund Administration( for Investors)*
- *Prime Brokers*

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

# AIMA's Illustrative Questionnaire for Due Diligence of FUND OF HEDGE FUNDS MANAGERS

# CONTENTS

**Items**                                                                 **Page No.**

Contents ................................................................................................................. 3
1    BACKGROUND INFORMATION ..................................................................... 4
     1.1    Contact Information ............................................................ 4
     1.2    Company ............................................................................ 5
     1.3    Corporate Governance ....................................................... 6
     1.4    Staff Information ................................................................ 6
     1.5    Asset Management Activities .......................................... 10
2    INVESTMENT PHILOSOPHY ........................................................................11
3    INVESTMENT PROCESS .............................................................................. 12
4    STRATEGY AND STYLE ALLOCATION ........................................................ 12
5    DUE DILIGENCE / MANAGER SELECTION .................................................. 14
     5.2    Operational Due Diligence ............................................... 15
     5.3    Capacity ........................................................................... 17
6    PORTFOLIO CONSTRUCTION ..................................................................... 17
7    RESEARCH .................................................................................................. 18
8    RISK MANAGEMENT ................................................................................. 18
9    OPERATIONAL RISK ................................................................................... 22
10   OPERATIONAL RISK FOR OUTSOURCED FUNCTIONS ............................... 22
11   ADMINISTRATION / OPERATIONS ............................................................ 23
     11.1   Administration ................................................................. 23
     11.2   Service Providers ............................................................. 23
     11.3   Compliance / Regulation ................................................. 24
     11.4   Conflict Of Interest .......................................................... 25
12   ANTI-MONEY LAUNDERING ..................................................................... 25
13   BUSINESS CONTINUITY / DISASTER RECOVERY ......................................... 25
14   INSURANCE ............................................................................................... 26
15   PRODUCT INFORMATION .......................................................................... 26
16   PERFORMANCE .......................................................................................... 28
17   CLIENT INFORMATION/REPORTING .......................................................... 29
18   TAXATION .................................................................................................. 29

© The Alternative Investment Management Association Ltd (AIMA)
Meadows House, 20-22 Queen Street, Mayfair, London W1J 5PR
Tel +44 (0)20 7659 9920        Fax +44 (0)20 7659 9921
www.aima.org

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| NAVIGATING THIS DOCUMENT | Please use tab-key or point mouse to the beginning of the input field |
|---|---|
| INPUTTING DATA | The size of the fields will automatically adjust to the length of your input |
| UPDATING PAGE NUMBERS | As this questionnaire is completed (thus grows), page numbers on the index page will NOT be updated automatically.  To update the index page (which is a table), click to the left of the table (at any point) then press F9 on your keyboard.   Select the first option: to update page numbers only |

# 1   BACKGROUND INFORMATION

## 1.1   CONTACT INFORMATION

| 1.1.1 | Company name: | *Optimal Investment Services SA ("Optimal")* |
|---|---|---|
| 1.1.2 | Address: | *2-4 place des Alpes, 1201 Geneva, Switzerland* |
| 1.1.3 | Telephone: | *+41 22 909 74 74* |
| 1.1.4 | Fax: | *+41 22 909 62 22* |
| 1.1.5 | E-mail: | *ois-clients@ois-gruposantander.com* |
| 1.1.6 | Website: | *www.optimal.biz* |
| 1.1.7 | Name of contacts: | *Toby Gauvain*<br>*Head of Global Business Development / Geneva*<br>*Optimal Investment Services SA*<br>*+41 22 909 74 05*<br>*toby.gauvain@ois-gruposantander.com*<br><br>*Esteban Estevez*<br>*Deputy Chief Executive Officer / Geneva*<br>*Optimal Investment Services SA*<br>*+41 22 909 74 15*<br>*esteban.estevez@ois-gruposantander.com*<br><br>*Ayça Pars*<br>*Senior Institutional Business Development Officer / Geneva*<br>*Optimal Investment Services SA*<br>*+41 22 909 74 24*<br>*ayca.pars@ois-gruposantander.com*<br><br>*Dara Bahadori*<br>*Senior Institutional Business Development Officer / Geneva*<br>*Optimal Investment Services SA*<br>*+41 22 909 74 34*<br>*dara.bahadori@ois-gruposantander.com*<br><br>*Carlos Garcia Bello*<br>*Senior Institutional Business Development Officer / Madrid*<br>*Optimal Alternative Investments SGIIC S.A.*<br>*+34 91 289 08 91*<br>*carlgarcia@gruposantander.com*<br><br>*Alberto Manchado*<br>*Senior Institutional Business Development Officer / Madrid*<br>*Optimal Alternative Investments SGIIC S.A.*<br>*+34 91 289 06 87*<br>*amanchado@gruposantander.com*<br><br>*Kazuhiro Tanase*<br>*Representative* |

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| | | |
|---|---|---|
| | | *Optimal Investment Services SA, Representative Office*<br>*+813 3211 0362*<br>*kaz.tanase@ois-gruposantander.co.jp*<br><br>*Ben Whitfield*<br>*Senior Institutional Business Development Officer/London*<br>*Banco Santander S.A., London Branch*<br>*+44 207 332 69 16*<br>*ben.whitfield@ois-gruposantander.com*<br><br>*Camilla Crowe*<br>*Senior Institutional Business Development Officer/London*<br>*Banco Santander S.A., London Branch*<br>*+44 207 332 69 16*<br>*camilla.crowe@ois-gruposantander.com*<br><br>*Haijme Takahashi*<br>*Consultant*<br>*Optimal Investment Services (Asia) Pte Ltd*<br>*+65 (68) 23 13 88*<br>*taka@ois-gruposantander.sg* |
| **1.1.8** | Title of contacts: | *Please see above* |
| **1.1.9** | Telephone of contacts: | *Please see above* |
| **1.1.10** | E-mail of contacts: | *Please see above* |
| **1.2** | **COMPANY** | |
| **1.2.1** | Please give a brief history of the company and, if applicable, group structure: | *In 1989, Manuel Echeverria began investing for clients of Banco Santander in the alternative asset class. This activity was developed in order to address the growing demand stemming from clients of its International Private Banking division. Providing hedge fund solutions to the Bank's clients was additionally viewed as a compelling way to enhance the diversification benefits of their traditional portfolios and also helped enhance risk adjusted metrics.*<br><br>*Between 1990 and 2002, we were co-invested with Notz Stucki & Cie, a well-known Swiss based investment group with a primary focus on hedge funds.*<br><br>*In 1995 we established a presence in New York to perform analysis and due diligence on managers and to complement the already existing effort of the Geneva analysts team. In August 1995, we launched our first Optimal Multi-advisors fund in Bahamas, Optimal Arbitrage and later in 1995 Optimal Global Trading. In 1997, Optimal Strategic US Equity was launched, and in 1998, Optimal European Opportunities.*<br><br>*OIS has one of the longest track records in the industry, which extends over a period of 15 years. Thanks to our expertise we have manoeuvred efficiently through periods of crisis such as 1990 (Iraq's invasion of Kuwait), 1994 (Tequila crisis), 1998 (Russia and LTCM), and 2000 (Nasdaq bubble). We feel this experience distinguishes us from the numerous organizations entering the alternative multimanagers fund business and we have learnt substantially from these periods of "market dislocations".*<br><br>*In June 2001 Optimal Investment Services S.A. was created by a spin-off of the hedge fund unit of the International Private Bank of Banco Santander with the objective of delivering products to meet the growing demand for alternative investment products. The creation of an independent structure with its own unique brand has been undertaken in order to get access and serve more efficiently our client base, which encompasses institutional clients, pension funds, family offices, independent asset managers as well as High Net Worth Individuals.* |

**This questionnaire is based on AIMA's Illustrative Questionnaire for the Due Diligence of Fund of Hedge Funds Managers (2008)**

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| | | |
|---|---|---|
| | | *The objective is to generate positive absolute returns with a strong goal of preservation of capital.* |
| 1.2.2 | What type of legal entity is your company? | *"Société Anonyme", a Swiss Corporation* |
| 1.2.3 | Provide a chart of the legal structure of the company and list all branch or affiliate offices: | *See attached document "Ownership Chart"* |
| 1.2.4 | Provide details of the company's current ownership structure: | *Optimal Investment Services SA is 100% owned by Santander AM Holding, S.L., a Spanish corporation member of the Santander Group.* |
| 1.2.5 | Detail any changes in the last 3 years: | *There have been no changes in the ownership of the company since the last three years.* |
| 1.2.6 | Are there any plans for further ownership changes? | *There are no changes planned.* |
| 1.2.7 | Provide a short history of the company with the most important milestones: | *Please refer to the above comments in section 1.2.1* |
| **1.3** | **CORPORATE GOVERNANCE** | |
| 1.3.1 | Who are the Directors?  Please provide details of relationship to the firm. | *Manuel Echeverria Falla, CEO*<br>*Paul Saurel, Vice-Chairman*<br>*Joan David Grima Terre, Chairman* |
| 1.3.2 | Are there Independent Directors?  Please provide details. | *Yes, Paul Saurel.* |
| 1.3.3 | How often does the Board meet? | *On a quarterly basis.* |
| **1.4** | **STAFF INFORMATION** | |
| 1.4.1 | Number of permanent staff: | *73 employees as of April 30th,  2008* |
| 1.4.2 | Number of investment professionals: | *21 employees as of April 30th, 2008* |
| 1.4.3 | State the number of employees in your company as at year end for the last 5 years: | *End 2007: 72 employees*<br>*End 2006: 51 employees*<br>*End 2005: 36 employees*<br>*End 2004: 26 employees*<br>*End 2003: 24 employees*<br>*End 2002: 20 employees*<br>*End 2001: 15 employees* |
| 1.4.4 | Provide an organisation chart including the different departments and the number of permanent employees for each: | *Please refer to the attached document Optimal Organizational Chart.* |
| 1.4.5 | Explain any significant employee turnover including listing joiners/leavers of key staff over last (two) years: | *There is no significant employee turnover to be notified. Our Head of Research left the company in January 2005 to create his own business. One member of the marketing team left in early 2006 to dedicate himself to family business. In 2007, the Chief Risk Officer left to join another company. We have hired 15 persons in 2006 and 21 in 2007.* |
| 1.4.6 | How does the company attract new people? | *By using executive search firms, manager recommendations, client recommendations, other competitors' recommendations, business schools, university recruitment, industry contacts.* |
| 1.4.7 | Explain the compensation scheme for key people (particularly the bonus structure and the manager's share of the performance | *A long term incentive plan is in place for senior management that includes a deferral pool that gets invested into one of our funds, Optimal Multistrategy Ireland Fund.* |

**This questionnaire is based on AIMA's Illustrative Questionnaire for the Due Diligence of Fund of Hedge Funds Managers (2008)**

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| | fee): | |
|---|---|---|
| **1.4.8** | | *Please find below the biography of the members of the Management Committee:* |
| | | |
| | | *Manuel Echeverría - Chief Executive Officer & Chief Investment Officer* |
| | | *Mr. Echeverria is responsible for the management of Optimal Investment Services, which encompasses the supervision of the sales, analysts, operations, and legal teams. As part of his responsibilities, he is also a Director of the Optimal Multiadvisors funds, both in Bahamas and Ireland and of the Optimal Elite Multi-Manager Fund Ltd. For the past 10 years he has held co-management responsibility of Columbus Holdings Limited (co-managed fund with Notz Stucki & Cie), member of the New Manager Committee of Haussmann Holdings for 5 years, responsible for creating and managing the Optimal fund of funds. Previously he was Executive Vice President of Banco Santander S.A. and served as manager of the Portfolio Management and Fund Management Group for the International Private Banking Division of the Santander Central Hispano Group from 1989 to July 2001. During these twelve years, he built the Group's expertise in the major alternative investment styles: Relative Value / Arbitrage, Equity long / short, Global Trading and several other sub-strategies. He also helped establishing a US and European presence for the Group.  Between June 1987 and May 1989, Mr. Echeverria was an investment manager and trader of the Securities and Foreign Exchange Group of JP Morgan (Suisse) S.A.  Prior to this, he was an Associate at Morgan Guaranty Trust Company in New York. Mr. Echeverria holds a Master of Management from the J.L. Kellogg Graduate School of Management and a Bachelor of Science in Management from Babson College.* |
| | Provide a brief background of key personnel (education, professional background): | *Caron Bastianpillai - Lead Portfolio Director*<br>*Mr. Bastianpillai is responsible for the development and management of all our equity multimanager funds. He is in charge of the research and analysis team for equity hedge style strategies which performs due diligence on external managers specialising in equities across all geographic regions. He has been involved in hedge fund research and analysis since 1994 and was also involved in the development of database tools for analyzing hedge funds. Prior to joining Optimal Investment Services, he spent four years at Thomson Financial Services in global equity research.*<br>*Mr. Bastianpillai holds a Master of Business Administration in International Management, Magna Cum Laude (European University Geneva, Switzerland) and a Bachelor of Business Administration in Marketing, Cum Laude (University of Houston).* |
| | | *Hugh Burnaby-Atkins – Lead Portfolio Director*<br>*Mr. Burnaby-Atkins is based in New York where he heads up Optimal's North American research team. He is responsible for research, due diligence, fund monitoring and selection for Relative Value and Macro trading strategies. He is portfolio manager for the Optimal Elite Multimanager, Optimal Arbitrage and Optimal Global Trading funds. He has been involved in hedge fund analysis since 1998. Prior to joining Optimal in May 2003, Mr Burnaby-Atkins worked for Pavilion Capital in London, as a Portfolio Manager. From 1998 to 2002 he worked at Bank of Bermuda where he was Director of Alternative Investment Research. He was instrumental in establishing the bank's alternative investment program and represented the bank as a founder member of the Centre for Hedge Fund Research and Education at London Business School. Mr. Burnaby-Atkins holds a Bachelor of Commerce degree from Edinburgh University with concentrations in finance and economics. He holds the Chartered Financial Analyst (CFA) and Financial Risk Manager (FRM) designations and the UK FSA's SFA and IMC qualifications.* |
| | | *Balkir Zihnali - Senior Portfolio Advisor, Head of Managed and Advisory Portfolio Services Department*<br>*Mr. Zihnali is based in New York. He is the Head of the Managed & Advisory* |

Portfolio Services department (MAPS) at Optimal. He is responsible for the construction, management and monitoring of advisory and discretionary accounts such as private labels and tailor-made solutions for selected institutional investors. Previously, he was responsible for research, due diligence, fund monitoring and selection of US-based managers focusing on Equity strategies. He was co-portfolio manager for the Optimal US Opportunities, Optimal Global Opportunities, Optimal Structural Opportunities and Optimal Latin America funds. He has been involved in hedge funds and hedge fund analysis since 1997. From June 1997 to May 2005, Mr. Zihnali worked for Archery Capital as Director of Portfolio Management responsible for overseeing the investment process, and for co-managing the firm's equity long/short portfolio. Mr. Zihnali started in the investment side of the hedge fund operations and he was intimately involved with trading, risk-reporting and back-office operations. Prior to joining Archery Capital, Mr. Zihnali was employed by Coopers & Lybrand as a senior associate of the Corporate Finance and Audit divisions. Mr. Zihnali participated and led due diligence reviews and valuation of companies in cross-border merger and acquisition transactions.  Mr. Zihnali holds a Master of Business Administration with concentration in Finance from the New York University Stern School of Business and an undergraduate degree in Business Administration from Bosphorous University, Istanbul. Mr. Zihnali holds the Chartered Financial Analyst (CFA) designation and is a member of New York Society of Securities Analysts.

**_Louay Mikdashi -_**  *Senior Portfolio Advisor – Deputy Head of Managed and Advisory Portfolio Services Department*
Mr. Mikdashi heads the Managed Accounts & Portfolio Services department (MAPS) at Optimal. He is responsible for the construction, management and monitoring of advisory and discretionary accounts such as private labels and tailor-made solutions for selected institutional investors. He joined Optimal in New York in May of 2004 and was transferred subsequently to the Geneva offices. Mr. Mikdashi worked for six years in the traditional asset management and the private banking field at Citibank and ABN AMRO. He completed an MBA with honours at Babson College and was a Babson Fellow. He additionally holds a Master of Science in Finance at Boston College in Quantitative
Finance and was a Dean Fellow. Mr. Mikdashi graduated from HEC Lausanne with a degree in Economics and a concentration in Applied Macro and Microeconomics.

**_Gilles Prince_** *– Chief Risk Officer*
Mr. Prince is heading the team of quantitative analysts. He is responsible for the development of Optimal's quantitative analysis effort. He performs quantitative analysis on Optimal's investment products and underlying hedge funds. Before joining Optimal in October 2007, Mr. Prince was responsible of hedge fund advisory services at bank Lombard Odier Darier Hentsch & Cie, where in particular he set up the risk management organisation for alternative investments. Before that, he acquired extensive knowledge in hedge fund product structuring and risk management by working as a senior financial engineer at RMF, and consultant for PricewaterhouseCoopers' financial risk management unit.
Mr. Prince started his carrier at UBS in 1996 in the structured products unit after graduating at the University of HEC Lausannne with a Master degree (MBF) in Financial Mathematics. He also earned the right to use the Chartered Alternative Investment Analyst (CAIA) and Financial Risk Manager (GARP) designations.

**_Tasneem Jeevanjee_** *– Chief Operating Officer*
Ms. Jeevanjee is the Chief Operating Officer of the Optimal Group.
She has worked for the Santander group for the past 13 years, specialising in fund administration and operations.
Ms. Jeevanjee holds a Master degree in Marketing/Finance/Economics/Human Resources and a Bachelor degree in Spanish/Latin American studies.

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| | | |
|---|---|---|
| | | **Jaime Calvo - General Counsel and Compliance Officer** |
| | | *Mr. Calvo is our in-house General Counsel and is the Compliance Officer of Optimal Investment Services SA.* |
| | | *Mr. Calvo has been with the Santander Group for the last seven years; his previous position within the bank was Vice President Legal and Compliance at the New York Office.  Mr. Calvo started his legal career as Lawyer at Freshfields, Bruckhaus Deringer in Madrid.* |
| | | *Mr. Calvo holds a J.D. Degree in Law from the Universidad Autónoma of Madrid, and a LL .M. Degree in e-Law and Telecom Law from Instituto de Empresa Business School in Madrid. Mr. Calvo has also graduated from the Financial Management Programme at Instituto de Empresa Business School in Madrid and from the Program of Instruction for Lawyers at Harvard Law School in Boston.* |
| | | **Toby Gauvain - Global Distribution** |
| | | *Mr. Gauvain joined Optimal in March 2006 and sits on the Management Committee. He is responsible for global business development for Optimal's offices in Geneva, London, New York, Tokyo and Singapore. He joined Newton Investment Management in London in 1993 and has extensive sales and strategic management experience having created and led Newton's international business with institutional clients throughout Europe, Latin America and the Middle East. In 2000 he moved to Mellon Global Investments to head up offshore sales and distribution for the Americas based in New York. In 2002 he left the financial sector to finance and establish a travel business in serving the corporate and UHNW sector in Spain and Latin America and served as its CEO before returning to the financial sector early 2006. Mr. Gauvain read Modern Languages in Bristol, UK.* |
| | | **Esteban Estevez - Deputy Chief Executive Office; Head of Santander Group Business Development** |
| | | *Mr. Estevez is based in Geneva and is responsible for the following areas within Optimal: sales and marketing, legal and compliance, financial control, and the Asset Management Company based in Spain, Optimal Alternative Investment, where he is a member of the Board of Directors. Mr. Estevez has been working in Santander Group for the past 13 years with different management responsibilities. First, he was Senior Private Banker for UHNWI in Santander Investment in Madrid and later he was appointed Head of Marketing for International Private Banking. Prior to Santander, Mr. Estevez worked three years as a lawyer for Garrigues Andersen in the tax Division and as consultant for Accenture, Strategic Division. Mr. Estevez holds a  Bachelor Degree in Business Administration and a bachelor degree in Law (E3) from University of Comillas - ICADE - Madrid.  He also holds a Banking Programme Degree from INSEAD School of Management and a Executive Management Program from IESE Business School, (PDD).* |
| | | **Mario Diaz - Director of Optimal Alternative Investments** |
| | | *Mr. Diaz joined Optimal in July 2006 and was appointed Director of Optimal Alternative Investments. Mr. Diaz brings a wealth of expertise to Optimal with over eleven years of experience in the financial sector. In 2004 and 2005 he was the Portfolio Manager for Banco Santander's CTA offering (systematic trend followers adapted to the requirements of the Spanish regulator). Prior to that, he was a director at the Treasury Department of BBVA Finanzia/Uno-e with responsibilities of setting up and implementing investment models and trading across asset classes. Mr. Diaz also acted as a market maker in treasury bonds, and has extensive experience as an options and derivatives trader throughout his career. He graduated from the Universidad Complutense with a degree in Business Administration and holds a Master in Finance from the C.U.N.E.F. and a IESE P.D.D.* |
| 1.4.9 | Please discuss possible retirement of key individuals with succession plans: | NA. |

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| 1.5 | ASSET MANAGEMENT ACTIVITIES | |
|---|---|---|
| 1.5.1 | Total AUM in the FoHF (unleveraged) | *USD 10'358'163'141 as of April 30th 2008* |
| 1.5.2 | Total AUM in the FoHF (leveraged) | *See chart below* |
| 1.5.3 | Show the growth of assets under management over the last 5 years: | *See chart below* |



**Optimal AUM (in Million USD)**

| Year | Value |
|---|---|
| 2002 | 1'943 |
| 2003 | 2'874 |
| 2004 | 4'206 |
| 2005 | 5'492 |
| 2006 | 7'935 |
| Q2 2007 | 9'161 |
| Q4 2007 | 9'973 |
| Q1 2008 | 10'402 |
| Apr. 08 | 10'358 |

*Source: OIS Financial Control*

| 1.5.4 | Does the company conduct any business other than asset management? If so, please state the nature of those businesses: | *No other business conducted. The company is a specialist asset management company within Santander Group.* |
|---|---|---|
| 1.5.5 | Apart from FoHF, does the company manage other products? If yes, provide the breakdown of assets (USD/%) for each product family (traditional, FoHF, HF, etc.): | *The company primary focus is the management of multimanager fund.*<br>*As of April 30th, 6.1% of our assets under management comprised discretionary and managed account mandates. Tailor made solutions are provided for large mandates with specific requirements.*<br>*Of the 15 multimanager funds, 2 are long only absolute return funds and 3 are single manager funds. The investment objective of the two long only absolute return funds is to achieve above average capital appreciation by concentrating on absolute vs. relative returns.*<br><br>*As of April 30th, 2008*<br>*Single manager fund (in USD):*<br>*Optimal Strategic US Equity: 2'921'500'897*<br>*Optimal Renaissance Institutional Equities Feeder Fund: 114'653'282*<br>*Optimal Renaissance Institutional Futures Feeder : 32'080'409*<br><br>*Long only funds (in USD):*<br>*Optimal Europe: 25'065'078* |

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| | | |
|---|---|---|
| | | *Optimal North America: 19'640'641* |
| | | *Managed Accounts (in USD): 635'387'181* |
| 1.5.6 | Does the company manage any direct hedge funds?  If so, please describe.  Does your FoHF invest in them? | *No* |
| 1.5.7 | Does the company sponsor or have any ownership interest in hedge fund managers who are not employees of the company?  If so, does the FoHF invest in these managers? | *No* |
| 1.5.8 | Which investor group does the company primarily target? | *Private banking clients of Santander Group*<br>*Banks*<br>*Asset Management Companies*<br>*Family Office*<br>*Governmental Institutions*<br>*Pension Funds*<br>*Fund of Funds*<br>*Structured Products*<br>*Private Clients* |
| 1.5.9 | Provide a breakdown of assets under management by:<br>• Strategy:<br>• Country:<br>• Client group: | *Breakdown by strategy as of April 30th:*<br>*Relative value: 14.3%*<br>*Equity long/short: 26.5%*<br>*Global macro: 6.9%*<br>*Equity non-hedge: 0.5 %*<br>*Multistrategy: 21.8%*<br>*Equity Option Arbitrage: 30 %*<br><br>*Breakdown by client group as of April 30th:*<br>*Private clients of Santander Group: 76.6%*<br>*External (institutional) clients: 17.3%*<br>*Managed Accounts: 6.1%*<br><br>*Geographic breakdown clients as of April 30th  (excludes managed accounts)*<br>*Iberia/Latin America: 83.4%*<br>*Middle East: 10%*<br>*Europe:  6.5%*<br>*Japan: 0.03%*<br>*USA: 0.05%* |
| 1.5.10 | What is the percentage of assets under management represented by your largest client, and by your 5 largest clients?<br>Provide a list of the 5 main clients (incl. size of assets, duration of client relationship): | *76.6%  of our total assets come from private clients of the Santander Group.*<br>*We do not disclose our client list and we would only disclose client information where the client had specifically authorised us to make such disclosure.* |
| **2** | **INVESTMENT PHILOSOPHY** | |
| 2.1 | Describe your investment philosophy: | *Our investment philosophy is to find outstanding investment talent and skill and create a diversified portfolio account. The investment objective is to generate positive absolute returns with a strong goal of preservation of capital. This will be achieved through diversification, strict risk control rules and combination of* |

**This questionnaire is based on AIMA's Illustrative Questionnaire for the Due Diligence of Fund of Hedge Funds Managers (2008)**

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| | | |
|---|---|---|
| | | *manager styles. In building a portfolio of managers we also aim to reduce correlation between the managers, trying to maximise the sharpe ratio.* *The fund selection follows an ongoing dynamic process led by the research team, which uses both top-down and bottom-up approaches.* |
| 2.2 | Is leverage applied to the FoHF? If so, please provide details: | *One of our products, Optimal Elite Multimanager, has a leveraged share class (with specific segregation of assets), which shall target a leverage ratio of 50% loan to asset or 2X\* in USD to investors pursuant to a credit facility with an affiliate of Société Générale.* |
| **3** | **INVESTMENT PROCESS** | |
| 3.1 | Describe your investment approach: | *We define a universe of funds by using a top-down approach (to determine a relevant sub-universe), a bottom-up approach (to select the appropriate fund for a given portfolio) and balancing this with the client's needs and available sourcing ideas.* *We determine the sub-universe by using quantitative and qualitative analysis which covers data analysis, background checks and strategy evaluation.* *From the sub-universe we draw up a short list data from quantitative analysis (returns analysis, volatility analysis, drawdown analysis, benchmark analysis, asset evolution), qualitative analysis (manager experience, investment style analysis, evaluation of investment strategy, consistency in management style, business terms and structure) and analyst reports on the funds.* *A selection of funds is then proposed to our investment committee and investment decisions are made by the investment committee.* |
| **4** | **STRATEGY AND STYLE ALLOCATION** | |
| 4.1 | Describe your asset/style allocation process: | *The asset allocation process is determined and reviewed regularly by the Investment Committee. It is based on a thorough top down macro assessment of each individual strategy and sub-strategy in light of their view of market conditions and investment opportunities. Furthermore, all tactical asset allocation decisions are based on the investment objectives of each fund or managed accounts. Our dynamic investment process is built at its core around risk management, portfolio construction and bottom-up fundamental evaluation of inherent qualities of underlying mangers.* *Investments are allocated according to agreed client objectives or in-line with the stated objectives of the relevant fund. Discretionary asset allocation by the investment committee takes into account views on global markets and economic conditions.* |
| 4.2 | Which strategies do you invest in? | *Directional Trading* Macro discretionary Macro diversified Systematic non trend Systematic trend following FX trading *Relative value* Convertible arbitrage Event driven (merger arbitrage, special situations) Distressed debt/High yield Credit ABS (mortgage, CDO) Fixed income arbitrage Equity arbitrage Capital structure arbitrage Relative value plus Multistrategy PIPES *Equity* Long short |

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

|  |  | |
|---|---|---|
|  |  | *Market neutral*<br>*Statistical arbitrage*<br>*Long only absolute return*<br>*Long only*<br>*Long biased*<br>*Short only*<br>*Short biased*<br><br>***Investment style***<br>*GARP*<br>*Growth*<br>*Blend*<br>*Value*<br>*Trading*<br>*Value event driven*<br><br>***Market cap focus***<br>*Small cap*<br>*Small cap and mid cap*<br>*Mid and large cap*<br>*Large cap*<br>*All cap*<br><br>***Private equity*** |
| 4.3 | Which strategies do you avoid? (And why?) | *We do not entirely exclude any strategy. However, variables such as leverage, liquidity and uncertain valuations are examples of areas where we proceed with caution. For instance, we may have managers operating in fixed income basis trading or structured credit, but as these imply the use of leverage, we would closely monitor these managers and size them accordingly in the different portfolios.* |
| 4.4 | What is the company's competitive edge in the strategy and style allocation process? | *Optimal's strength is an experienced and stable team of professionals with strong and established knowledge, the capacity to innovate, a vast network of resources and the ability to attract top talent to support our growth combined with our longstanding track record which distinguishes us from many of our competitors. We have experience of different market cycles and successfully avoided major crises.*<br><br>*We have the resources, processes and experience to conduct thorough due diligence on target funds.*<br><br>*Our portfolios can include 20 to 45 managers. Core positions will typically be 7-8% of a fund. The top 10 positions in a portfolio will typically account for 50% or more of the total assets.* |
| 4.5 | On what basis and when does the company define and change the asset allocation of the portfolios? | *Changes in the asset allocation of the portfolios and funds occur upon the decision of the Investment Committee and upon its assessment of the evolution of risk / reward opportunities of each strategy. Changes in the asset allocation will usually be the result of a changing market environment, in which certain strategies will be less effective due to a lack of opportunities, liquidity, volatility or other factors. The review is formally conducted on a monthly basis in the Investment Committee. Portfolios are however regularly examined, discussed and reviewed between all the relevant members of the Analyst team in New York and in Geneva.* |
| 4.6 | Do investment guidelines/limits exist for all products? If so, please provide sample: | *The offering memorandum for each Optimal fund sets out an investment policy.* |
| 4.7 | Can the guidelines be altered? If so, how? | *Any alteration of guidelines has to go through shareholders' approval.* |
| 4.8 | For non-standard products, to | *This varies depending on whether the mandate provided to Optimal is fully* |

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| | what extent can the investor be involved in the asset allocation process? | *discretionary or advisory. In any event, Optimal is committed to keeping its investors informed of developments through the provision of regular reports to its clients.* |
|---|---|---|

## 5    DUE DILIGENCE / MANAGER SELECTION

| | | |
|---|---|---|
| **5.1.1** | Summarise your manager selection process: | *The typical criteria a manager should meet to qualify for selection is:*<br>• *Proven experience in the investment field*<br>• *Risk controls*<br>• *Alignment of manager's and investors' interest (managers that are invested in their own funds)*<br>• *Performance potential*<br>• *Risk / reward profile*<br>• *Reputation* |
| **5.1.2** | Please describe, in detail, the company's due diligence process including the investment, legal and compliance, and operational due diligence procedures. Provide examples of reports and working papers, where available: | *The due diligence process is split into investment and non-investment processes.*<br><br>*Investment processes include:*<br>• *Screening as dictated by a mandate or strategy both new and existing managers. We maintain an internal proprietary database, which includes both existing and targeted potential investments.*<br>• *Once a sub-universe has been identified, we screen for managers based on their records or risk controls and performance in their respective strategies. The sub-universe is monitored on an on-going basis for manager selection purposes.*<br>• *Monthly analysts meetings and the Investment Committee are used to focus on strategies and managers. Once managers are short listed, further due diligence ensues and may include: performance analysis, review by the Optimal Risk Team (which may include input from our in-house legal counsel).*<br>• *Due diligence is performed on both middle and back office operations.*<br><br>*Non-investment processes include:*<br>• *Background checks*<br>• *Review of business structures and terms*<br>• *Evaluation of the managers' business plans and operational infrastructure* |
| **5.1.3** | Please list the fund documentation that you review: | *We review where possible the funds prospectus and constitutional documents and contracts that the fund has with service providers (primarily the administrator and the Investment Manager)* |
| **5.1.4** | What level of transparency do you require from the managers/funds in the portfolio? | *This varies from Manager to Manager and depends to some extent on the strategy and the willingness of the manager to provide risk and other information on the portfolio.* |
| **5.1.5** | Where does your due diligence process differ from that of others in the marketplace? | o *We have a proven track record with a stable investment management team*<br>o *We have a defined investment and risk control process that can be replicated for any review done on a manager*<br>o *We have the resources, market intelligence and procedures and controls of a world class financial institution / recognised bank which is in the global top 10* |
| **5.1.6** | How many managers/funds are you currently invested with? If there is a separate approved list, how many funds are on the approved list? | *Optimal funds are invested in 224 managers as of April 30th, 2008 (including managed accounts).* |
| **5.1.7** | How many new | *Approximately, we see over 2'000 managers a year and follow-up with a further* |

**This questionnaire is based on AIMA's Illustrative Questionnaire for the Due Diligence of Fund of Hedge Funds Managers (2008)**

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| | | |
|---|---|---|
| | managers/funds do you analyse per year? | *600 managers.* |
| **5.1.8** | How many managers/funds are approved per year? | *Historically between 20 to 35 new managers have been added each year. This will vary from time to time.* |
| **5.1.9** | What is the average time scale of the manager selection process? | *The length of time depends on the amount of time the analysts require to understand the investment process and structures. It would not be unusual for the process to take at least 2 months.* |
| **5.1.10** | Do you conduct on-site visits with the managers? | *Yes* |
| **5.1.11** | Are all visits written up in structured reports? | *Manager visits are reflected in a manager log and if appropriate in manager reports.* |
| **5.1.12** | How many visits to a manager will you make prior to making an investment? | *We will meet at their offices at least once.* |
| **5.1.13** | How much time is spent with each manager during the due diligence process:<br>• Before initial investment?<br>• After initial investment? | *In relation to the initial Due Diligence process, please see above. In relation to the post investment Due Diligence that is conducted, this is done regularly on the underlying managers.* |
| **5.2** | **OPERATIONAL DUE DILIGENCE (ODD)** | |
| **5.2.1** | Do you have a dedicated operational due diligence team? | *Yes. Optimal is committed to building a dedicated independent operational risk management team which will deal with operational risk and due diligence. It is one of a handful of asset managers in the alternative asset space with dedicated resource in this area.* |

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| 5.2.2 | | |
|---|---|---|
| | What is the size and qualifications of the team? Provide a sample ODD checklist if used. | *The Operational Risk Management team consists of 4 people, of which the 2 senior persons are:* <br><br> <u>**Gilles Prince – Chief Risk Officer**</u> <br> *Mr. Prince is heading the team of quantitative analysts. He is responsible for the development of Optimal's quantitative analysis effort. He performs quantitative analysis on Optimal's investment products and underlying hedge funds. Before joining Optimal in October 2007, Mr. Prince was responsible of hedge fund advisory services at bank Lombard Odier Darier Hentsch & Cie, where in particular he set up the risk management organisation for alternative investments. Before that, he acquired extensive knowledge in hedge fund product structuring and risk management by working as a senior financial engineer at RMF, and consultant for PricewaterhouseCoopers' financial risk management unit.* <br> *Mr. Prince started his carrier at UBS in 1996 in the structured products unit after graduating at the University of HEC Lausannne with a Master degree (MBF) in Financial Mathematics. He also earned the right to use the Chartered Alternative Investment Analyst (CAIA) and Financial Risk Manager (GARP) designations.* <br><br> <u>**Michelle Perry – Operational Risk Analyst**</u> <br> *Ms. Perry is an Operational Risk Analyst and works with the Operational Risk Management team within Optimal to perform non-investment due diligence on Optimal's funds and their respective investment managers. Ms. Perry joined the team in January 2007 after five year with Deloitte where she worked in Financial Services Audit and Transaction Services divisions in the Cape Town, Sydney, New York and London offices. Ms. Perry qualified as a chartered accountant in 2004 in South Africa, and has a Bachelor of Business Science with a second division Honours in both Finance and Accounting from the University of Cape Town.* <br><br> <u>**Kearstin Meadows – Operational Risk Lawyer**</u> <br> *Ms. Meadows is a dual qualified lawyer in the US (California) and UK and joined Optimal in 2007. Her experience includes international securities, corporate law and litigation. She was most recently within a specialist Corporate Securities group of Linklaters in London. Mrs. Meadows began her law career in California focusing on securities and business litigation before moving to London in 2003 where her experience included mergers and acquisitions and advising corporations entering emerging markets. Other relevant experiences include working as a graduate analyst with Dean Witter Reynolds and as a ski instructor in Lake Tahoe, California. Kearstin holds a Bachelor of Fine Arts (1993), a Bachelor of Arts in Public Administration from San Diego State University (1998), and a Juris Doctorate in Law from California Western School of Law (2001) where she was a member of the Honours Society.* <br><br> <u>**Jocelyn Bean – Operational Risk Analyst**</u> <br> *Jocelyn Bean joined Optimal in March 2007 as Operational Risk Analyst. Jocelyn is a member of Optimal's dedicated Operational Due Diligence Team and is responsible for performing non-investment due diligence on current and new hedge fund investments. As such, her responsibilities include conducting onsite visits to appraise the business execution (operations, trading, systems and support agencies) of Optimal's hedge fund managers and reviewing their funds' financial and legal documentation. Jocelyn graduated from the University of Edinburgh in 2006 with a BSc (Hons) in Psychology and is currently studying for the Investment Management Certificate.* <br><br> <u>**Alicia Garrido – Operational Risk Analyst**</u> <br> *Ms. Garrido joined Optimal in February 2008 as a Research Analyst based in Madrid with responsibilities in Operational Due Diligence work in Spain. She brings a 6 years of experience in the Global Operations Area team of Santander Asset Management where she was involved in the following areas and functions: Discretionary Portfolios, monitoring the portfolio set up process and control of the daily transactions; Supervision, with responsibilities with the "Special entities" out of the Ordinary processes (high volumes or tailore Client relationship; with responsibilities in the SLA Agreements, clients support and new project development where she was involved in the operational design and set-up process of the Hedge Funds in Spain. Ms. Garrido is graduated from the Universidad Complutense with a degree in Business Administration specialized in financial side.* |

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| 5.2.3 | Do you perform reference checks on the manager? If so, how are these done? | *Yes. Reference checks are performed through contact with ex-colleagues and superiors, related people in the industry, such as other hedge funds, or service providers as prime brokers. Where we cannot gather enough information on the manager, we use specialised companies such as Back Track.* |
|---|---|---|
| 5.2.4 | Do you perform ODD on the middle and back office operations? If so, please describe: | *Yes.* |
| 5.2.5 | Explain both the ODD prior to investment and the ongoing ODD after investment (if any). Are all visits written up in structured reports? | *Prior to investment, control reviews of the managers operations are performed. On an ongoing basis, manager visits are performed. The frequency of the visits is based on an assessment of the risks presented by the Managers operations. Reports are prepared on these visits.* |
| 5.2.6 | Do you perform due diligence checks on the administrator or any other service provider to the targeted funds?  If so, please describe: | *Yes, we have a programme of reviews for service providers to targeted funds such as the funds administrators, lawyers and auditors.* |
| 5.2.7 | Do you contact the outside audit company prior to approval? | *An attempt to make contact with the auditors to the fund will always be made.* |
| **5.3** | **CAPACITY** | |
| 5.3.1 | How many managers are currently on your approved list? | *Optimal funds are invested in 224 managers as of April 30th, 2008 (including managed accounts).* |
| 5.3.2 | How much capacity is available from managers on the approved list / you are invested with?  Please provide breakdown by strategy: | *Capacity is negotiated on an on-going basis and Optimal has good relationships with the funds it invests with and we believe that top tier hedge fund managers regard Optimal as a preferred model investor.* |
| 5.3.3 | How does the company secure and expand capacity with underlying hedge fund managers? | *We maintain a good relationship with managers often based on our status as initial day one investor in many of the top tier hedge funds.* |

| 6 | PORTFOLIO CONSTRUCTION | |
|---|---|---|
| 6.1 | Describe the portfolio construction. | *Diversification benefits are thoroughly studied and when a manager is selected, we try and ensure that the correlation level with existing holdings is low or negative. For example, a plain vanilla long-short manager may add little value to the portfolio, even if the track record is good. Yet, a manager with higher volatility may have a place in our multimanagers fund (within prudent constraints) if the manager's results exhibit low correlation to other managers. We also look for managers with an edge, i.e. specialist knowledge of a sector or special techniques. We focus on low downside deviation. We seek first-rate investment teams which have synergy between analysts and traders. We seek evidence of risk management skills. We seek that managers take financial stakes (co-investment) in the funds to ensure alignment of their interests with those of investors.* |
| 6.2 | Is there an investment committee that approves portfolio allocations?  If applicable, please describe its set up and authority: | *Yes, there is an investment committee.*<br>*The committee is composed of 4 permanent investment members: Caron Bastianpillai, Hugh Burnaby-Atkins, Manuel Echeverria, and Michelle Perry. The committee is held every month, usually at the end of the month. The analysts, after completing the due diligence process, form part of the committee with respect to their proposals.*<br>*The 4 permanent members have decision making power, in the case of diverging opinions; Manuel Echeverria has the final authority. Being a permanent member, the Operational Risk Analyst participates in these meetings.* |

**This questionnaire is based on AIMA's Illustrative Questionnaire for the Due Diligence of Fund of Hedge Funds Managers (2008)**

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| 6.3 | How often are portfolios rebalanced? | *At least once a month during the Investment Committee.* |
|---|---|---|
| 6.4 | State the average turnover of managers within the portfolios: | *The range of number of managers held in each portfolio is between 20 and 45. The average turnover rate in terms of names held in the portfolio is approximately 15-20%.* |
| 6.5 | Does the turnover of managers in different portfolios vary substantially? | *Even if our main philosophy is to build a long-term relation with our managers the turnover may vary depending on the strategy and on the capital flows of each fund.* |
| 6.6 | What are the main reasons for the exclusion of particular managers from a portfolio? | *Reducing or removing a manager will occur when:*<br>• *There is evidence of deterioration in the investment processes of the manager or change in the investment objectives*<br>• *There is evidence of deteriorating risk controls*<br>• *There are key personnel changes*<br>• *There are changes in the investment managers business model*<br>• *There are changes on the view on asset allocation*<br>• *Performance does not meet Optimal's tolerance range criteria* |

| **7** | **RESEARCH** | |
|---|---|---|
| 7.1 | In which areas does the company use external research and which sources do you employ? | *External research is used in all areas related to investment. There are various sources used: brokers, industry commentaries, dedicated papers.* |
| 7.2 | Does the company publish regularly in the press or commission any research / academic papers? Provide samples: | *Yes, we report performance on a monthly basis to Altvest, Hedgefund.net, Investhedge, Bloomberg, Lipper, Morningstar and Reuters. The monthly NAV of the Optimal Asian Opportunities (Ireland) Fund; Optimal European Opportunities (Ireland) Fund, Optimal US Opportunities (Ireland) Fund,  Optimal Global Opportunities (Ireland) Fund, Optimal Latin America (Ireland) Fund and Optimal Global Trading (Ireland) Fund are published on a daily basis in two Swiss newspapers (pursuant to the Swiss Federal Act on Investment Funds).* |

| **8** | **RISK MANAGEMENT** | |
|---|---|---|
| 8.1 | Describe your risk management philosophy: | *Risk management is an integral part of Optimal's business and investment philosophy. Having recognised early on that risk management is a central aspect of fund selection, Optimal Investment Services has organised itself around this concept. Risk management is performed alongside each step of our investment process, from fund screen to performance reporting. As a natural consequence of this, Optimal Investment Services has set up adequate control functions within each team dealing with hedge funds and funds of hedge funds. A Risk Committee including senior professionals representing different areas of the company has the duty to have risks identified, measured, controlled and managed.* |

**This questionnaire is based on AIMA's Illustrative Questionnaire for the Due Diligence of Fund of Hedge Funds Managers (2008)**

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| 8.2 | Describe how risk management is structured within your organisation: | *We have a distinctive approach to Risk Management as we organize these functions along two dimensions. First, risks are mapped by category such as investment, non-investment, operations and compliance, legal & regulatory risks. Second, risks are identified for hedge funds, portfolios of hedge funds, legal structures and operations. Clear parameters are set for each of the elements in the form of exposure reports, automatised controls and risk limits.* |
|---|---|---|
| | | *Risks are dealt across various departments as it lies at the heart of our investment process. Our thorough due diligence process ensures that the highest standards of quality are met when selecting hedge funds. The application of our investment process is controlled by our legal & compliance unit. This unit is also responsible for checking the compliance of Optimal funds with their prospectus, investment philosophy and regulators. Investment risks are dealt by our dedicated quantitative analysis & investment risk management team. They focus their analysis on market risk, control of risk limits and analysis of the underlying hedge fund risk management organization. The third category or risk is operational risks at the level of hedge funds. As this is not a rewarding risk for our investors, our operational risk analysis analyze in details the business structure of each hedge fund in the portfolio, their legal setup, documentation, or counterparties. Finally, risks from Optimal operations are controlled so that we ensure that NAVs are calculated according to the highest standards, dealing is done in a timely manner and data organized in and adequate and secured way.* |
| | | *Optimal Risk Committee is central in our risk management organization as it represents all the points mentioned in the above paragraph. Members are senior key and experienced professionals heading and representing Quantitative Research & Investment Risk, Operational Risk, Legal & Compliance and Operations teams. It is Chaired by Gilles Prince, our Chief Risk Officer.* |
| | | *The primary objective of the risk committee is to enhance the process by which risks are identified, measured, controlled and managed. The creation of the risk committee aims at separating risk control from the investment committee activities, so that it can address investment management more effectively and more efficiently. The risk committee also has the secondary objective to raise the risk awareness of Optimal employees and strengthen the company risk culture.* |
| 8.3 | What risk management concepts does the company apply to its underlying managers/funds? | *The Optimal Fund of Funds (FoFs) are monitored on a regular basis against pre-set risk parameters and risk rules. Those parameters have been created by the investment committee and the risk committee  in coordination with the Risk Monitoring Division of Santander Group. The policies form a part of Optimal's "Policies and Procedures". In addition, we report on set parameters for the purposes of risk monitoring at group level.* |
| | | *Investment guidelines:*<br>*The Optimal Fund of Funds (FoFs) are monitored on a regular basis against pre-set risk parameters and risk rules. Those parameters have been created by the investment committee and the risk team in coordination with the Risk Monitoring Unit of Santander Group.*<br>*The risk rules include limits on market risks such as drawdowns or monthly losses, impose minimal levels of diversification by fund or manager, imposes limits on liquidity and deals with instruments that are prohibited for investments.*<br>*Breaches are reported and addressed at the Risk Committee, presented at the* |

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| | | |
|---|---|---|
| | | *Investment Committee Meeting and reported to the Group's Risk Monitoring Division in Madrid.*<br><br>*Qualitative risk analysis:*<br>*Three main risks are being analyzed: investment risk management and operational risk at the level of hedge funds. Operational risk covers, among others, the constituent documents of the fund, prospectus, contracts, agreements, counterparties, business organisation, reference checks, corporate actions, regulatory filings, NAV calculation process, pricing policies… The objective is to understand which liabilities may the fund have and may imply risks. The analysis of risk management specifically focus on how hedge funds have organised their risk management, how they measure risks, control them, and how they deal with market crises, losses and traders limits. These risk analyses are performed with detailed desk analysis, conference calls with managers, CFOs, COOs, CROs and on-site visits.*<br><br>*Quantitative risk analysis:*<br>*Hedge funds are analysed quantitatively by our dedicated team. State-of-the-art statistics are calculated so that we can assess if the hedge fund possesses the desired characteristics that we seek, like for example capital protection, participation in the upside performance of markets, low correlation, liquidity,… This analysis is completed by a complex statistical non-linear style analysis with our FOFIX tool. Risk profiles are calculated for each hedge fund in order to estimate the systematic factors influencing the returns of the fund. These are then compared with the qualitative analysis of our research analyst and deviation from expected risk profiles need to be explained. In addition to risk profiles, we perform stress tests on market variables (e.g. -20% equity index, +100bps yield curve,…) and historical crises scenarios (e.g. LTCM, 1987 crash,…) using the current fund risk profiles. Value-at-risk figures are also calculated for each hedge funds and funds of hedge funds using a Gaussian Monte Carlo engine.*<br><br>*Regular reports are prepared on different types of risks, including:*<br>• *The number of underlying funds in a portfolio*<br>• *The size of each sub fund within the portfolio*<br>• *Exposure to underlying investment managers across all Optimal portfolios*<br>• *Nature of investments*<br>• *Changes in liquidity profiles of the investments*<br>• *Performance reports*<br><br>*The fund administration team as well as the research team also support the risk and reporting functions.*<br>*Potential breaches of the risk parameters would be immediately notified to the Chief Operating Officer and if appropriate to the Chief Executive Officer. Breaches would be reported and presented at the Investment Committee Meeting and reported to the Group's Risk Monitoring Division in Madrid. Resolution of issues is agreed between the Optimal and the Group's risk reporting functions.* |
| 8.4 | Does the company maintain a written risk management policy? If yes, provide a copy: | *The company maintains a policy and procedure manual, which includes risk management policies. This document is proprietary in nature and confidential.* |
| 8.5 | Does the company use any formal risk limits? Or informal risk guidelines? If so, please describe how they are used. | *The Company agrees risk control criteria on the portfolio with Santander Asset Management Central Risk Control unit based in Madrid.* |

**This questionnaire is based on AIMA's Illustrative Questionnaire for the Due Diligence of Fund of Hedge Funds Managers (2008)**

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| 8.6 | Are stop-loss policies used? If so, please describe: | *No stop-loss policies are used but drawdowns require to be flagged for review at investment committee meetings and for reporting to the Risk Control unit.* |
|---|---|---|
| 8.7 | Does the company maintain a risk management system including operational, legal, reputational and business risks? If so, please describe: | *The company operates a risk management system which includes risk control procedures, reporting and review of resolution of issues.* |
| 8.8 | Do the underlying hedge fund managers provide portfolio transparency? Please describe the extent, timeliness and frequency of this: | *Transparency varies from one manager to another. We review the information that will be provided to us to assess the acceptability of the information.* |
| 8.9 | Describe the company's quantitative risk management tools: | *Data is downloaded from our central database (Webfolio) or from Pertrac as needed for quantitative analysis. A proprietary function library has been developed in Excel to compute statistical reports. In addition, we use S-Plus to run more sophisticated analyses. Style analyses are made with Risk Data's Fofix software.*<br><br>*However, there are some limitations to the use of quantitative tools as they are "backward looking". In addition, lock-ups may prevent implementation of risk control rules in certain instances.* |
| 8.10 | How are liquidity provisions monitored and controlled? | *Liquidity at the underlying fund level is monitored and controlled on a monthly basis by the risk committee, who maintains regular contact with the managers through the investment committee. Liquidity is also reviewed regularly by the COO and the risk teams.* |
| 8.11 | Has a manager included in one of the company's portfolios ever gone out of business ("blow ups") or suffered significant drawdown? If yes, please describe and explain what are the lessons learnt from that experience and how they have been applied to your business. | *In August 1998, we were invested with the III High Risk Opportunities Fund. This fund was partly invested in Russian debt. They had entered into a "Non Deliverable Forward" (Dollar/Rouble) as their hedge with two reputable financial institutions. As the Russian crisis unfolded, the two institutions refused to honour the NDFs and the fund collapsed. This issue is still being litigated. The collapse of the III High Risk Opportunities Fund cost the Optimal Arbitrage Fund a drawdown of 6% in August of that year. Our experience in these crises led us to implement changes that have resulted in more consistent performance with reduced volatility with a shift in emphasis to reduce exposure to emerging markets fixed income strategies.*<br><br>*Optimal was an early investor in the Amaranth International Ltd. Fund, a multi-strategy fund. For five years Amaranth posted strong, risk-adjusted returns derived from a range of relative value strategies. In 2006 the fund increased its exposure to the natural gas futures and options markets which boosted performance. However it became apparent that the positions were concentrated and volatility increased to a level that was out-of-character with Amaranth's historical track record. Optimal responded immediately by meeting management and were assured that exposure would be cut to lock in profit. In September 2006 the natural gas market experienced a series of violent moves which went against them. It transpired that Amaranth had not in fact cut risk as they said they would, and the fund was unable to exit or hedge out its positions. The fund sustained a 35% loss; it suffered a further 35% as market liquidity dried up and they were forced to sell the Energy portfolio at a discount. This drawdown effectively put them out of business.*<br><br>*This demonstrates that even managers who have historically demonstrated careful risk management over many years can suffer lapses of judgement. We also learned* |

**The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development**

| | | |
|---|---|---|
| | | *that even when managers are personally invested and their incentives are apparently aligned with investors, they can behave irrationally. In the future we are more likely to take action to cut risk where we believe positions have become too concentrated rather than trusting management to take this action.* |
| **9** | **OPERATIONAL RISK** | |
| **9.1** | How does the company define operational risk? | *This is defined as being non investment business risk pertaining to the operations of a managers business.* |
| **9.2** | Does the company have an operational risk management framework?  Does the framework consider how the company identifies, assesses, monitors and controls operational risks? | *Yes it does.* |
| **9.3** | Are the employees responsible for the operational risk framework adequately independent from the business and appropriately trained? (For example, does the company have a risk or internal audit function that is responsible for the framework?) | *Yes.* |
| **9.4** | Does the board of directors approve and regularly review the operational risk management framework? | *Yes.* |
| **9.5** | Who is responsible for implementing the operational risk framework?  Are there clear lines of responsibility across senior management? | *These responsibilities are carried out by the Chief risk officer who reports directly to the CEO of the Company.* |
| **9.6** | How does the company ensure that employees understand their responsibilities for implementing the operational risk framework? | *This is done through the Operational Risk and Compliance teams.* |
| **9.7** | What on going assurance does the firm provide to clients over the effectiveness of its operational risk framework?  If a SAS70 or FRAG 21 (being replaced by AAF 01/06) has been completed please list the key weaknesses identified in the last 5 years. | *The Company does not prepare SAS 70 or FRAG 21 reports, but is subject to regular review by the Santander Group Internal Audit and is also subject to the Group's Compliance policies and procedures and Risk Framework.* |
| **10** | **OPERATIONAL RISK FOR OUTSOURCED FUNCTIONS** | |
| **10.1** | What due diligence process does the company perform prior to the appointment of an outsource service provider? Please specify if this process differs for different service providers e.g. custodian and | *Reviews of service providers are performed.* |

**This questionnaire is based on AIMA's Illustrative Questionnaire for the Due Diligence of Fund of Hedge Funds Managers (2008)**

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| | | administrator. |
|---|---|---|
| 10.2 | Are service level agreements in place between the company and its outsource service providers?  If so, how does the company monitor services against the prescribed standards? | *These are the subject of regular reviews where these are in places.* |
| 10.3 | Does the company perform periodic reviews of the outsource service providers? | *Yes it does.* |
| 10.4 | What ongoing assurance does the firm perform over the effectiveness of the controls at outsourced service providers? | *The effectiveness of service providers is assessed against the delivery of services provided by them.* |

## 11   ADMINISTRATION / OPERATIONS

### 11.1   ADMINISTRATION

| 11.1.1 | How often is the NAV calculated/estimated? | *Final NAVs are published monthly and estimated NAVs (not reviewed by the Administrator) are calculated at mid-month and end of month.* |
|---|---|---|
| 11.1.2 | Is the fund administration performed in-house? If performed in-house:<br>• What are the tasks of the fund administration?<br>• Does an independent party review these calculations?<br>• What systems are used for fund administration? | *The fund administration of the Optimal funds is performed independently by external service providers. However, for risk control purposes, we have an operational team that reconciles and reviews the work of the independent administrator in order to verify the work executed by these service providers.*<br>*The role of the operational team is to conduct in parallel to our designated external administrators the calculation of monthly NAVs, shareholder registry control as well as all relevant information flow. Discrepancies are highlighted and reconciled.*<br>*The funds' administrator is HSBC Securities Services (Ireland) Limited. The administrator also acts as custodian to the funds and has a regulatory responsibility to review the NAV calculations.* |
| 11.1.3 | Are the computer systems developed in-house or does the company use standard products? | *We use a fully integrated front/ middle / back office system with extensive specifications with the ability to conduct checks and balances and reconciliation tasks.*<br>*The database which is an integral part of Optimal's systems has been developed by a specialist firm who support any required changes as the systems evolve.* |
| 11.1.4 | If services are outsourced:<br>• Which tasks are fulfilled by external service providers (include names of companies)?<br>• Detail the duration of the relationship:<br>• Which services does your administrator provide (e.g. direct reporting to investors)? | *H/R payroll services for the Optimal group are managed by the Santander Group. The fund custody and administration is performed by HSBC Institutional Trust Services and by HSBC Securities Services (Ireland) Limited respectively. Both entities form part of the HSBC Group.*<br>*The administrator has acted for the Optimal funds since 2002.*<br>*A team of 7 administrators from the Optimal operational team who work on reviewing the data from the administrator by working in parallel in all tasks.*<br>*The auditors are Deloitte and Touche for Optimal and Price Waterhouse Coopers for the Optimal funds.* |
| 11.1.5 | Please provide contact names, telephone and email for the following functions:<br>• Financial Reporting<br>• Valuations / Fund Accounting | *Financial and Analytical Control is performed internally. Optimal is audited by Deloitte & Touche and the funds are audited by PriceWaterhouseCoopers.* |

### 11.2   SERVICE PROVIDERS

**This questionnaire is based on AIMA's Illustrative Questionnaire for the Due Diligence of Fund of Hedge Funds Managers (2008)**

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| 11.2.1 | Provide a list of professional counterparts the company maintains a business relationship with:<br>• Legal advisors:<br>• Auditors:<br>• Banks:<br>• External marketers:<br>• Other: | *Custodian:*<br>*HSBC Institutional Trust Services (Ireland) Limited*<br>*Administrator:*<br>*HSBC Securities Services (Ireland) Limited*<br>*Legal advisors:*<br>*Lenz and Staehelin  (Geneva)*<br>*William Fry (Dublin)*<br>*Simmons & Simmons (London)*<br>*Lennox Paton (Bahamas)*<br>*Conyers Dill & Pearman (Bermuda)*<br>*Maples and Cadler (Cayman Islands)*<br>*Auditors:*<br>*PriceWaterhouseCoopers (Dublin)*<br>*Deloitte & Touche (Geneva)*<br>*Santander Group*<br>*Bank:*<br>*UBS S.A.*<br>*Financial institutions:*<br>*HSBC (Suisse) S.A.*<br>*Santander Central Hispano*<br>*Merrill Lynch Financial Products*<br>*Commerzbank*<br>*BNP Paribas*<br>*Société Générale*<br>*Fortis* |
|---|---|---|
| 11.2.2 | Do all the funds run by the Company have the same service providers? If not, why? | *Yes.*<br>*Only one white label fund has a different service provider (which is in that case JP Morgan).* |
| 11.2.3 | Have there been any changes in service provider's (including administrators) to the FoHF in the last 5 year? If so, why? | *Yes. Prior to HSBC, we used Fortis Fund Services Bahamas as administrator and custodian. We terminated our relationship because of inefficient fund administration services and the time zone difference.* |
| **11.3** | **COMPLIANCE / REGULATION** | |
| 11.3.1 | Does the company have a full-time compliance officer? | *Yes.* |
| 11.3.2 | Describe how compliance is structured within your organisation: | *The Legal and Compliance Department is composed of three full time legal counsels. The head of the Legal and Compliance Department is also the Compliance Officer of the Company.* |
| 11.3.3 | Does a dedicated compliance team exist?  Does the company maintain a written compliance manual?  If yes, please provide details: | *Yes, we have a dedicated compliance team.*<br>*Yes: OIS Directives on AML, Securities Markets Code of Conduct, Directives on Fund Distribution. In addition, Optimal is subject to the codes of conduct imposed by the Swiss Association of Assets Managers (Swiss Association of Assets Managers Code of Conduct), and by the Swiss Fund Association (Swiss Funds Association Code of Conduct).* |
| 11.3.4 | When was the manual last updated? | *2006.* |
| 11.3.5 | Is the company registered with any regulatory and/or supervisory bodies? | *Optimal is a member of a self-regulatory body, the Swiss Association of Asset Managers (SAAM) and the Swiss Fund Administration (SFA).*<br>*Optimal is approved as investment manager by the regulatory authorities of Ireland and Luxembourg. Optimal is supervised by the Swiss Federal Banking Commission as Swiss Representative of a Foreign Fund.* |

**This questionnaire is based on AIMA's Illustrative Questionnaire for the Due Diligence of Fund of Hedge Funds Managers (2008)**

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| | | *We are currently seeking registration in Switzerland as asset manager.* |
|---|---|---|
| 11.3.6 | Please specify the date of the most recent regulatory inspection, if any: | *2007* |
| 11.3.7 | Are there any lawsuits pending against the company? | *None.* |
| 11.3.8 | Is your company a member of AIMA or any other relevant trade association? | *The company is member of AIMA.* |
| **11.4** | **CONFLICT OF INTEREST** | |
| 11.4.1 | How does the company ensure an alignment of interests between the company as fund manager and the investor? | *Optimal has comprehensive bonus plans for its employees, which are built around multiple factors such as individual performance, quality of service towards clients, firm's growth and performance, all of which contribute to optimally align interests between the firm, its employees and our investors. In addition, all Optimal employees are subject to the Swiss Fund Association Code of Conduct, the General Code of Conduct, and the Code of Conduct in Securities Market of Santander Group.* |
| 11.4.2 | Are key people invested in the funds? | *Yes. Part of senior management's deferred compensation is invested in Optimal Multistrategy fund, which invests in all our range of funds (Fund of funds of funds").* |
| 11.4.3 | Are there any potential conflicts of interests the investor should be aware of? | *There is no conflict of interest that we are aware of.* |

## 12   ANTI-MONEY LAUNDERING

| 12.1 | Confirm that the company has established Anti-money Laundering (AML) procedures: | *Please refer to the attached document OIS AML Directives and Santander Group AML policies.* |
|---|---|---|
| 12.2 | Please advise which jurisdiction's regulations you comply with: | *Switzerland (member of GAFI). The funds are also subject to Irish Anti Money-Laundering laws.* |
| 12.3 | Please advise who your AML Officer is: | *For Optimal Investment Services, our Anti Money Laundering reporting Officer Jaime Calvo.*<br>*For the Optimal fund, our Anti Money Laundering reporting Officer is HSBC Ireland Head of Compliance. Our head of compliance also reviews and monitors Optimal funds' compliance with Swiss regulations and Santander Group AML policies.* |
| 12.4 | Elaborate on the procedure to ensure compliance with AML policies: | *See OIS AML Directives and Santander Group AML policy. HSBC policy is confidential.* |
| 12.5 | Please provide a summary of your AML procedures. | *Please refer to the attached document OIS AML Directives.* |

## 13   BUSINESS CONTINUITY/DISASTER RECOVERY

| 13.1 | Does the company have a formal business continuity management plan?  Please describe the basic provisions: | *There is a formal disaster recovery plan which forms part of Santander Group Business Recovery Plan.  Please see attached document which summarises the key features of the plan.* |
|---|---|---|
| 13.2 | What contingency plans do you have in terms of:<br>• Computer system fault?<br>• Incapacitated investment decision makers?<br>• Presence of in-house computer technician?<br>• Back-up systems? | • *Computer system default: we have the same contingency plan as Santander Group, and we have a back-up system hosted by the group.*<br>• *Incapacitated decision maker: senior analysts and product managers can take over the responsibility of key decision makers in case a problem arises.*<br>• *The custodian to the Optimal funds has disaster recovery procedures.*<br>• *We have a full-time IT technician.*<br>• *Back-up system: back-up is performed daily. The back-up system is hosted by Santander Group.* |

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| 14 | INSURANCE | |
|----|-----------|---|
| 14.1 | Do you currently hold insurance for the following:<br><br>1. Directors' & Officers' Liability?<br>  a) For the funds<br>  b) For the management companies<br>2. Professional Indemnity or Errors and Omissions?<br>3. Crime (Employee fidelity/third party fraud)?<br>4. Key Person Insurance?<br><br>*N.B.: if you are not restricted from disclosing such information under your policy(ies)* | *This information is confidential.* |

| 15 | PRODUCT INFORMATION | |
|----|---------------------|---|
| | **(if necessary please complete one sheet for each of your fund products)** | |
| 15.1 | Provide a short description of your flagship products or most representative products, including:<br>• Investment objective, return, risk:<br>• Target investors:<br>• Breakdown of current investor base:<br>• Legal structure:<br>• Domicile of Fund:<br>• Currency share classes:<br>• Asset allocation:<br>• Number of funds in the portfolio:<br>• Current size:<br>• Date of inception:<br>• Total standard fee structure:<br>• Liquidity:<br>• Conditions for Subscriptions and Redemptions:<br>• Minimum investment:<br>Please provide this information for each of your products.<br>Alternatively, provide offering memoranda for your flagship products. | *Please refer to the attached Fund Booklet for detailed information on each of our product:*<br>  o   *Optimal Arbitrage Ltd.*<br>  o   *Optimal Strategic US Equity Ltd.*<br>  o   *Optimal Global Trading (Ireland) Fund*<br>  o   *Optimal European Opportunities (Ireland) Fund*<br>  o   *Optimal US Opportunities (Ireland) Fund*<br>  o   *Optimal Asian Opportunities (Ireland) Fund*<br>  o   *Optimal Global Opportunities (Ireland) Fund*<br>  o   *Optimal Structural Opportunities (Ireland) Fund*<br>  o   *Optimal Latin America (Ireland) Fund*<br>  o   *Optimal Elite Multimanager Fund Ltd.*<br>  o   *Optimal Multistrategy Ireland Fund*<br>  o   *Optimal North America Fund (long only)*<br>  o   *Optimal Europe Fund (long only)*<br>  o   *Optimal Renaissance Institutional Equities Feeder Fund*<br>  o   *Optimal Renaissance Institutional Futures Feeder Fund*<br><br>*The minimum subscription size varies between USD 50,000 and EUR 1,000,000/USD equivalent. However, for the managed account side of our business, a minimum of USD 20 million is required in the first year.* |
| 15.2 | Does the company specialise in any product or group of products? If so, please describe: | *Optimal is a specialist fund of hedge funds manager providing access to all the main hedge fund styles.* |
| 15.3 | List your other funds with | *We have listed all our funds.* |

| | | their key characteristics (e.g. strategy)? | |
|---|---|---|---|
| **15.4** | Are there any independent fund directors?  Please provide details: | | *Independent directors of Optimal Bahamian funds (Optimal Multiadvisors Limited):*<br>*Mr. Anthony L.M. InderRieden*<br>*Mr. Brian Wilkinson*<br><br>*Independent directors of Optimal Irish funds (Optimal Multiadvisors Ireland Plc):*<br>*Mr. Frank Ennis*<br>*Mr. Paul Saurel*<br>*Mr. John Donohoe*<br><br>*Independent directors of Optimal Irish funds (Optimal Multiselect ( Ireland) Plc):*<br>*Mr. Frank Ennis*<br>*Mr. Paul Saurel*<br>*Mr. John Donohoe*<br><br>*Independent directors  of Optimal Irish funds (Optimal Elite Multimanager Fund):*<br>*Mr. John C.R. Collis*<br>*Mr. Brian Wilkinson* |
| **15.5** | How often does the Board meet? | | *At least four times a year.* |
| **15.6** | Please provide roles and responsibilities of the Directors. | | *Their role is to ensure proper governance of the fund and exercise control over the different service providers.*<br>*Mr. Frank Ennis and Mr. John Donohoe are also members of the Supervisory Committee of Optimal Multiselect Ireland Plc. The Board of Directors has delegated to the Supervisory Committee the responsibility for monitoring compliance by the Company of its regulatory and contractual obligations as regards investment management activities.*<br>*The Supervisory Committee shall have the duty of reviewing compliance by the Investment Manager of its contractual obligations to the Company under the Investment Management Agreement, the Company's Memorandum and Articles of Association, and the Prospectus as regards to the management of the assets of the Funds.*<br>*In particular, the Supervisory Committee shall meet on a regular basis to review the investment decisions taken by the Investment Manager.* |

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| 16 | PERFORMANCE | |
|---|---|---|
| **16.1** | Provide historical performance for all your products (actual only) since inception net of standard fees (in electronic form) including:<br>• Monthly returns:<br>• Standard deviation (annualised):<br>• Three largest drawdowns and recovery periods:<br>• Percentage of positive / negative months: | *Please refer to the attached factsheets for more details.* |

**This questionnaire is based on AIMA's Illustrative Questionnaire for the Due Diligence of Fund of Hedge Funds Managers (2008)**

**- 28 -**

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

| 16.2 | Has this track record been audited? By whom? When? | *Accounts are prepared annually in accordance with IFRS and are subject to an independent audit by Price Waterhouse Coopers.* |
|------|---|---|
| 16.3 | Is the company AIMR/GIPS compliant? If so, please provide a copy of the compliance presentation. Have these presentations been verified by a third party? Please provide a copy of the verification report. | *The standards imposed by this association are very similar to those imposed by the Swiss Fund Association and we are subject to the standards imposed by the Swiss Fund Association. The guidelines are set out in the two documents "Guidelines on the calculation and disclosure of TER" and "Guidelines on calculation and publication of fund performance data".* |

## 17 CLIENT INFORMATION/REPORTING

| 17.1 | What is your client reporting policy? Address topics such as level of transparency, frequency and timeliness: | *Reporting can be tailored to a clients specific requirements and typically reporting is provided on a monthly basis.* |
|------|---|---|
| 17.2 | What is the normal method of communication with your clients: | *Relationship with our clients is maintained through regular reporting and contact (via telephone, fax and email) to ensure that our clients' requirements are being met.* |
| 17.3 | Provide sample reports that are sent to investors. | *Please see the attached documents.*<br>*We typically provide to clients 3 types of standardized reports:*<br>  • *Quantitative information on a monthly factsheet for each fund with a one page qualitative commentary of each Optimal strategy*<br>  • *Quarterly analysis of fund performance*<br>  • *Monthly peer group analysis* |
| 17.4 | Can investors receive customised reports? | *Yes.* |
| 17.5 | Are audited reports available to the investor? Please provide sample. | *Yes, see attached document.* |
| 17.6 | How often will you review a portfolio with a client? | *This will depend on clients' requirements but is typically quarterly.* |
| 17.7 | Do you provide formal client training? | *Yes, we can provide specific training to meet clients' requirements.* |

## 18 TAXATION

| 18.1 | On what basis does the fund maintain that it is managed and controlled, and therefore tax resident, outside the UK? | *Legal advice was taken on the structure and setting of the funds which in addition is reviewed by our own in-house counsel and by the auditors to the entities.* |
|------|---|---|
| 18.2 | How has the company satisfied itself that the conditions on the Investment Manager Exemption have been met or that it is not the Permanent Establishment of the fund? | *Based on legal advice where applicable.* |

Please attach your most recent disclosure document, information memorandum, and marketing literature.

*The information given herein is correct as at April 30th 2008 and has been completed by Amélie Fontvieille and reviewed by Toby Gauvain, Head of Global Business Development*

**In the event of amendments to the aforementioned documents, notably the memorandum, please ensure that we will receive those directly from you within reasonable time, as well as copies of proxies and notification of the Annual General Meeting (the latter only for information purposes).**

Please state the name and title of the officer at your company who has prepared and reviewed this questionnaire.

| Name: | *Prepared by Amélie Fontvieille, reviewed by Toby Gauvain* |
|---|---|
| Date: | *April 30th, 2008* |
| Position: | *Business Development /Head of Global Business Development* |