UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
IN RE OPTIMAL U.S. LITIGATION          :     **OPINION AND ORDER**
                                                            :
                                                            :       **10 Civ. 4095 (SAS)**
                                                            :
                                                            :
------------------------------------------------------------X

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

This putative class action arises out of plaintiffs' investment in the

Optimal Strategic U.S. Equity fund ("Optimal U.S." or the "Fund"), which in turn

invested one-hundred percent of its assets with Bernard L. Madoff and his firm,

Bernard L. Madoff Investment Securities LLC ("BMIS").  Plaintiffs allege that

defendants failed to conduct adequate diligence regarding Madoff, ignored "red

flags" that should have alerted them to Madoff's fraud, and made misstatements

and omissions in connection with the sale of Optimal U.S. shares, causing

plaintiffs to lose their investments and allowing defendants wrongfully to collect

management fees.[1]

---

[1]     Defendants include (1) Optimal U.S.'s investment manager, Optimal
Investment Management Services, S.A. ("OIS"); (2) an employee thereof, Jonathan
Clark; and (3) OIS's corporate parent, Banco Santander, S.A. ("Banco Santander").
Plaintiffs include (1) Pioneer International Ltd. ("Pioneer"), an investment
advisory firm incorporated in the British Virgin Islands; (2) the "Pioneer
Plaintiffs," fifty-six non-U.S. persons and entities who invested in Optimal U.S.
based on advice provided by Pioneer (whose advice was in turn based on

On May 2, 2011, I granted in part defendants' motion to dismiss plaintiffs' Second Amended Complaint ("SAC") for improper forum, lack of standing, and failure to state certain claims.[2]  *First*, I dismissed the Santander Plaintiffs from this action on the grounds that a forum selection clause contained in the Terms and Conditions governing their accounts with SBT ("SBT Terms & Conditions") required them to litigate all of their claims, against all defendants, in the Bahamas.  *Second*, I dismissed the common law claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, gross negligence, third party breach of contract, and unjust enrichment brought by the Pioneer Plaintiffs and Santander Plaintiffs against OIS, Clark, and Banco Santander (Counts V-VII and IX-X) because any harm arising from such conduct was sustained by Optimal U.S.,

---

Defendants' misrepresentations); (3) the "Santander Plaintiffs," three foreign citizens/non-U.S. residents to whom Banco Santander International ("Santander U.S.") marketed and sold Optimal U.S., and who held their Optimal U.S. investments in accounts with non-party Santander Bank & Trust, Ltd. in the Bahamas ("SBT Bahamas" or "SBT"); and (4) Silvana Worldwide Corp. ("Silvana"), a newly-added Plaintiff who invested in Optimal U.S. from a non-Santander-affiliated bank account.  *See In re Optimal U.S. Litig.*, — F. Supp. 2d —, No. 10 Civ. 4095, 2011 WL 1676067, at *1-2 (S.D.N.Y. May 2, 2011) ("May 2 Opinion"); Fourth Amended Complaint ("FAC") ¶ 64.

[2]      *See In re Optimal U.S. Litig.*, 2011 WL 1676067, at *6-17. Defendants' motion to dismiss Plaintiffs' claims under the Securities Exchange Act of 1934 ("Exchange Act") was denied at a conference held on May 10, 2011.  *See* Transcript of 5/10/11 Conference ("5/10/11 Tr.") [Docket No. 36].  This Opinion assumes familiarity with the background and applicable law of this case, as stated in the May 2 Opinion and the May 10 bench ruling.

the only entity that could bring suit directly.

On August 26, 2011, I granted in part plaintiffs' motion for reconsideration of the May 2, 2011 Opinion and Order.[3]  I reinstated the Santander Plaintiffs' claims against OIS, Clark, and Banco Santander, but not against Santander U.S.  In addition, I held that the "Wagoner Rule does not imbue Plaintiffs with standing to bring Counts V-VII and IX-X, thereby again dismissing those Counts."[4]

This opinion addresses defendants' renewed motion to dismiss federal securities fraud claims based on allegedly materially misleading statements and omissions in Explanatory Memoranda ("EMs") issued by Optimal Multiadvisors, Ltd. ("Multiadvisors") in light of the Supreme Court's recent decision in *Janus Capital Group v. First Derivative Traders*.[5]  Defendants contend that these claims must be dismissed because, under *Janus*, the allegedly materially misleading statements and omissions were only made by Multiadvisors, not OIS.  For the following reasons, defendants' motion is granted in part and denied in part.

## II.   APPLICABLE LAW

---

[3]      *See In re Optimal U.S. Litig.*, — F. Supp. 2d —, No. 10 Civ. 4095, 2011 WL 3809909 (S.D.N.Y. Aug. 26, 2011).

[4]      *Id.* at *1.

[5]      — U.S. —, 131 S. Ct. 2296 (2011).

A.      *Janus Capital Group*

In *Janus*, plaintiffs brought federal securities law claims against Janus Capital Group, Inc. ("JCG") and Janus Capital Management LLC ("JCM") based on alleged false statements in mutual fund prospectuses.  JCG "is a publicly-traded company that created the Janus family of mutual funds," which are organized "in a Massachusetts business trust, the Janus Investment Fund."[6]  Janus Investment Fund, an independent legal entity owned by mutual fund investors, retained JCM as its investment adviser and administrator.[7]  Janus Investment Fund issued prospectuses "describing the investment strategy and operations of its mutual funds" pursuant to federal securities laws.[8]  Plaintiffs alleged

> that JCG and JCM 'caused mutual fund prospectuses to be issued for Janus mutual funds and made them available to the investing public, which created the misleading impression that [JCG and JCM] would implement measures to curb market timing in the Janus [mutual funds].'[9]

The Supreme Court granted certiorari "to address whether JCM can be held liable in a private action under Rule 10b-5 for false statements included in

---

[6]      *Id.* at 2299.

[7]      *See id.*

[8]      *Id.* at 2300.

[9]      *Id.* (quoting App. to Pet. for Cert. 60a).

Janus Investment Fund's prospectuses."[10]  It held that JCM could not be liable because it had not "made" the material misstatements in the prospectuses.[11]

Under Section 10(b) of the Exchange Act[12] and Securities and Exchange Commission Rule 10b-5,[13]

> the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.  Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker.  And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed.[14]

This rule is in accordance with the narrow scope given to the implied private right of action under Rule 10b-5.[15]  The Court also rejected an argument by plaintiffs that the "'well-recognized and uniquely close relationship between a mutual fund

---

[10]    *Id.* at 2301.

[11]    *See id.*

[12]    15 U.S.C. § 78j(b).

[13]    17 C.F.R. § 240.10b-5.

[14]    *Janus*, 131 S. Ct. at 2302.

[15]    *See id.* at 2303 (citing *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 167 (2008)).

and its investment advisor'" required a different result.[16]  The Court declined to

carve out an exception to the "ultimate authority" test based on the relationship of a

mutual fund and its investment advisor because, in this instance, corporate

formalities were observed – JCM and Janus Investment Fund were legally separate

entities and Janus Investment Fund's board was independent, even more so than

required by statute.[17]

The Court held that Janus Investment Fund "made" the allegedly

materially misleading statements for purposes of Rule 10b-5 for several reasons.

Janus Investment Fund had the statutory obligation to file the prospectuses, and it

did so.  The prospectuses did not give the appearance that JCM made the

statements, nor was there any allegation that JCM actually filed the prospectuses.[18]

JCM's involvement in preparing the prospectuses was more like a "speechwriter,"

assisting "Janus Investment Fund with crafting what Janus Investment Fund said in

the prospectuses," which is insufficient as a matter of law to establish that JCM

"made" the allegedly false statements under Rule 10b-5.[19]

---

[16]     *Id.* at 2304 (quoting Brief for Respondent at 21).

[17]     *See id.*

[18]     *See id.* at 2304-05.

[19]     *Id.* at 2305.

### B.    Piercing the Corporate Veil

#### 1.    Choice of Law

In diversity actions, federal courts follow the choice-of-law rules of the forum state to determine the controlling substantive law.[20]  Under New York choice-of-law rules, courts first determine whether there is a substantive conflict between the laws of the relevant choices.[21]  "In the absence of substantive difference . . . a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it."[22]  Where there is a conflict, New York choice-of-law principles dictate that "'[t]he law of the state of incorporation determines when the corporate form will be disregarded and liability imposed on shareholders.'"[23]

#### 2.    New York Law

---

[20]    *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *GlobalNet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006).

[21]    *See GlobalNet Financial.com*, 449 F.3d at 382 ("The New York Court of Appeals has held that 'the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'") (quoting *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993)).

[22]    *International Bus. Mach. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004).

[23]    *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (quoting *Kalb, Voorhis & Co. v. American Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993)).

Courts in this district have described determining the proper pleading standard for piercing the corporate veil as a "knotty question."[24]  Piercing the corporate veil is a "narrow exception to the doctrine of limited liability for corporate entities, and . . . courts should permit veil-piercing only under 'extraordinary circumstances.'"[25]  New York courts will pierce the corporate veil only "when the [corporate] form has been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation . . . that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego."[26]

In New York, a party seeking to pierce the corporate veil must generally establish "that '(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was

---

[24]     *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 425 (S.D.N.Y. 2003).  *Accord Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 240 (S.D.N.Y. 2006); *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 222-23 (S.D.N.Y. 2002).

[25]     *EED Holdings v. Palmer Johnson Acquisition Corp.*, 228 F.R.D. 508, 512 (S.D.N.Y. 2005) (quoting *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996)).

[26]     *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979).  *Accord Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991) ("Liability therefore may be predicated either upon a showing of fraud or upon complete control by the dominating corporation that leads to a wrong against third parties.").

used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury.'"[27]  "To avoid dismissal, a party . . . must come forward with factual allegations as to both elements of the veil-piercing claim."[28]

> Factors to be considered include the disregard of corporate formalities; inadequate capitalization; intermingling of funds; overlap in ownership, officers, directors and personnel; common office space or telephone numbers; the degree of discretion demonstrated by the allegedly dominated corporation; whether dealings between the entities are at arm's length; whether the corporations are treated as independent profit centers; and the payment or guaranty of the corporation's debts by the dominating entity.[29]

### 3.    Bahamian Law

Bahamian courts generally follow the decisions of English courts in the absence of contrary Bahamian authority.[30]  Although "ownership and control are not of themselves sufficient to justify piercing the corporate veil," English

---

[27]    *Trust v. Kummerfeld*, 153 Fed. App'x 761, 763 (2d Cir. 2005) (quoting *Matter of Joseph Morris v. New York State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141 (1993)).

[28]    *EED Holdings*, 228 F.R.D. at 512.

[29]    *Fantazia Int'l Corp. v. CPL Furs N.Y., Inc.*, 889 N.Y.S.2d 28, 29 (1st Dep't 2009).

[30]    *See* 12/22/10 Declaration of Robert Hildyard, defendants' Bahamian law expert, ¶ 5 [Docket No. 17].

courts "will pierce the corporate veil in limited circumstances."[31]  English veil-piercing law can be distilled into three principles:

> "First, . . . the fact that a person engages in the carrying on of a business using a duly incorporated, yet seemingly artificial, entity is not sufficient to justify piercing that entity's veil. . . .  Legal formalisms must be respected even at the risk of abiding a seeming injustice. . . . Accordingly, veil piercing is quite rare under English law.
>
> Second, courts may pierce the corporate veil only where special circumstances exist indicating that it is a mere façade concealing the true facts."  Evidence of impropriety is a necessary condition to justify veil-piercing, but impropriety on its own is insufficient; the impropriety must be linked to the use of the company structure to avoid or conceal liability.
>
> "Third, where a corporate structure is interposed for the purpose of shielding a defendant from liability . . ., the plaintiff's ability to recover from the defendant on a veil-piercing theory turns on whether the defendant had already incurred some liability to the plaintiff at the time he interposed the corporate structure."  The distinction in this principle is one between a defendant using a corporate structure to evade rights of relief others already possess against him and a defendant who uses a corporate structure to evade rights of relief others may possess against him in the future.[32]

## C.    Section 20(a)

---

[31]    *FR 8 Sing. Pte. Ltd. v. Albacore Mar. Inc.*, Nos. 10 Civ. 1862, 10 Civ. 8083, — F. Supp. 2d —, 2011 WL 1465765, at *9 (S.D.N.Y. Apr. 15, 2011).

[32]    *Id.* at *9-10 (quoting *In re Tyson*, 433 B.R. 68, 86-88 (S.D.N.Y. 2010)).

Section 20(a) of the Exchange Act[33] provides that

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

There is no liability under section 20(a) without a primary violation by the controlled person.[34]

## III.   DISCUSSION

### A.   Multiadvisors "Made" the Statements in EMs

Defendants argue that the facts of this case are directly analogous to those in *Janus* – (1) the EMs, Bahamian equivalents of prospectuses, "state on their face that they were issued by Multiadvisors," (2) Multiadvisors has no assets "apart from those owned by its investors," and (3) only one director of Multiadvisors was affiliated with OIS, Manual Echeverria.[35]  Moreover, defendants contend that plaintiffs' new allegations in the Fourth Amended Complaint ("FAC"), primarily

---

[33]   15 U.S.C. § 78t(a).

[34]   *See ATSI Commc'ns v. Shaar Fund*, 493 F.3d 87, 108 (2d Cir. 2007).

[35]   Defendants' Memorandum of Law in Support of Their Motion to Dismiss Certain Federal Securities Fraud Claims in Fourth Amended Class Action Complaint ("Def. Mem.") at 2.

concerning the control OIS exercised over Multiadvisors, are insufficient to overcome *Janus*.[36]

Plaintiffs respond that OIS "made" the actionable statements under *Janus*. *First*, they contend that OIS had "ultimate authority" over the statements in the EMs for the reasons stated in the May 10 bench ruling – (1) OIS owned one-hundred percent of the voting shares of Multiadvisors; (2) OIS could appoint and remove Multiadvisor's directors at will; and (3) OIS's CEO, Echeverria, was a director of Multiadvisors.[37]  Plaintiffs also point to other evidence demonstrating OIS's control of Multiadvisors – (1) "Echeverria signed the Investment Management Agreement ("IMA") between OIS and [Multiadvisors] on behalf of both parties"; (2) "the indemnification clause in the IMA in favor of OIS is unconscionable"; (3) Multadvisors "attempted to force investors to release their claims against OIS for no consideration"; and (4) "OIS also had [Multiadvisors] reach an agreement with the Madoff Bankruptcy Trustee contrary to the best interests of investors."[38]  Plaintiffs argue that *Janus* does not effect the May 10

---

[36]     *See id.* at 3-4.

[37]     *See* Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss Certain Federal Securities Fraud Claims in the Fourth Amended Class Action Complaint ("Opp. Mem.") at 2-3 (citing 5/10/11 Tr. at 4:22-5:5).

[38]     *Id.* at 4-5.

bench ruling because there was no evidence that JCM controlled Janus Investment Fund. *Second*, plaintiffs argue that OIS actually exercised "ultimate authority" with respect to the statements at issue here. Karine Courvoisier, OIS's in-house counsel, proposed adding a new disclosure to the EMs concerning Madoff's trading strategy, and the EMs included this disclosure verbatim, except for Madoff's name.[39]

Plaintiffs also contend that the relevant statements are attributable to OIS. Plaintiffs also ground this argument in the reasoning of the May 10 bench ruling – (1) the EMs list the Multiadvisors as well as OIS on the cover page and disclose facts pointing to OIS's control of Multiadvisors; (2) "the underlying information being communicated that constituted the false statements and material omissions [is] identified to plaintiffs as OIS's responsibility";[40] and (3) the statements were "statements by the CEO of OIS given that the CEO explicitly assumed responsibility for the statements in his capacity as director of [Multiadvisors] and because statements by the CEO are attributable to the corporate entity, which is OIS here."[41]

---

[39]     *See id.* at 4.

[40]     *Id.* at 8 (quoting 5/10/11 Tr. at 5:10-13).

[41]     *Id.* (quoting 5/10/11 Tr. at 6:5-11).

Plaintiffs' attempt to avoid *Janus* by conflating shareholder control with "ultimate authority" is unavailing. *Janus* emphasizes the narrow scope of the private right of action under Rule 10b-5 and a formalistic approach to Rule 10b-5 liability. Under this precedent, Multiadvisors had "ultimate authority" over the contents of the EMs and the decision to issue the EMs. Accordingly, Multiadvisors, not OIS, "made" the statements in the EMs for purposes of Rule 10b-5.

Plaintiffs make much of the fact that OIS owned one-hundred percent of Multiadvisors. However, it was the board of directors of Multiadvisors, not the shareholders, which had "ultimate authority" to issue the EMs. The board "manages the business and affairs" of Multiadvisors.[42] The board has the authority to alter the EMs without consulting shareholders.[43] The board may "change the investment management, maintenance or other fees payable to [OIS]."[44] Although OIS had the authority to select the board of Multiadvisors, plaintiffs have not alleged that OIS directly issued the EMs or had the "ultimate authority" to do so.[45]

---

[42]     5/02 EM at 8, Ex. 12 to FAC.

[43]     *See* 1/08 EM at 8, Ex. 15 to FAC.

[44]     *Id.*

[45]     *See Janus*, 131 S. Ct. at 2305 ("There is no allegation that JCM in fact filed the prospectuses and falsely attributed them to Janus Investment Fund.").

To the contrary, plaintiffs acknowledge that OIS's in-house counsel, Courvoisier, suggested changes to the EMs, which Multiadvisors adopted. *Janus* held that a statement is "made" not by the entity that drafted it – here OIS – but rather by the entity that delivers it – here Multiadvisors.[46]

Plaintiffs' argument that OIS should be liable based on its one-hundred percent ownership of Multiadvisors also fails because *Janus* refused to extend Rule 10b-5 liability where Congress had created a separate statutory remedy. The Court noted that Congress enacted section 20(a) as a means to hold liable entities that control any person who violates a securities law:

> Congress also has established liability in § 20(a) for '[e]very person who, directly or indirectly, controls any person liable' for violations of the securities laws. First Derivative's theory of liability based on a relationship of influence resembles the liability imposed by Congress for control. To adopt First Derivative's theory would read into Rule 10b-5 a theory of liability similar to—but broader in application than—what Congress has already

---

[46] *See id.* at 2302 ("Even when a speech-writer drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said."); *id.* at 2305 ("First Derivative suggests that both JCM and Janus Investment Fund might have 'made' the misleading statements within the meaning of Rule 10b-5 because JCM was significantly involved in preparing the prospectuses. But this assistance, subject to the ultimate control of Janus Investment Fund, does not mean that JCM 'made' any statements in the prospectuses. Although JCM, like a speechwriter, may have assisted Janus Investment Fund with crafting what Janus Investment Fund said in the prospectuses, JCM itself did not 'make' those statements for purposes of Rule 10b-5.").

created expressly elsewhere.  We decline to do so.[47]

Although *Janus* did not involve a defendant that owned a one-hundred percent

stake in the issuer of the alleged misstatements, the Court cautions against

expanding the narrow private right of action under Rule 10b-5 to impose liability

where Congress already imposed liability under other statutory provisions, such as

those found in section 20.

Plaintiffs' argument that the statements in the EMs can be attributed to

OIS is equally unavailing. Although the extent to which there is Rule 10b-5

liability solely on the basis of attribution is not clear,[48] this issue need not be

---

[47]     *Id.* at 2304 (quoting 15 U.S.C. § 78t(a)).

[48]     *See id.* at 2305 n.11 ("In this case, we need not define precisely what it means to communicate a 'made' statement indirectly because none of the statements in the prospectuses were attributed, explicitly or implicitly, to JCM. Without attribution, there is no indication that Janus Investment Fund was quoting or otherwise repeating a statement originally 'made' by JCM."); *In re Merck & Co. Sec., Derivative, & ERISA Litig.*, Nos. 05 Civ. 1151, 05 Civ. 2367, 2011 WL 3444199, at *25 (D.N.J. Aug. 8, 2011) ("According to [defendant], *Janus* makes clear that while attribution is necessary, by itself it is not enough to give rise to a Rule 10b-5 claim against a person or entity. [Defendant], however, takes the *Janus* holding out of context. There, the Court addressed a situation in which one legal entity, Janus Capital Management, served as investment adviser and administrator for another entity, Janus Investment Fund, owned entirely by mutual fund investors. The plaintiff had alleged that the investment adviser Janus Capital Management had been significantly involved in preparing misleading statements contained in prospectuses filed with the SEC by mutual fund Janus Investment Fund. On this basis, the plaintiff maintained that Janus Capital Management 'made' the statements for purposes of Rule 10b-5. The Supreme Court rejected this expansive interpretation of Rule 10b-5 as being at odds with its reasoning that Rule

-16-

resolved in the context of this case because the facts are so closely analogous to

*Janus*.  The rationale in the May 10 bench ruling for attributing the statements in

the EMs to OIS cannot justify Rule 10b-5 liability following *Janus*.

    *First*, I reasoned that OIS's control of Multiadvisors and the reference

to OIS on the EMs' cover pages were a basis for attributing statements to OIS.   I

noted that the EMs "essentially state[d] that OIS owned, ran and controlled"

Multiadvisors.[49]  As explained above, it follows from *Janus* that Rule 10b-5

liability for a one-hundred percent shareholder of an entity "making" a misleading

statement is inappropriate; rather, section 20(a) is the appropriate source of

liability.[50]

---

10b-5 does not support a private right of action against aiders and abettors . . . .
[Defendant's] role in the statements attributed to him is in no way analogous to
Janus Capital Management's relationship to the statements issued by Janus
Investment Fund. [Defendant] was at the time of each attributed statement an
officer of Merck. . . .  He made the statements pursuant to his responsibility and
authority to act as an agent of Merck, not as in *Janus*, on behalf of some separate
and independent entity.").

  [49]  5/10/11 Tr. at 4:19-5:9.

  [50]  *See Janus*, 131 S. Ct. at 2304. Although I recognize that the opposite
result was reached in *City of Roseville Emps'. Retirement Sys. v. EnergySolutions,
Inc.*, No. 09 Civ. 8633, 2011 WL 4527328, at *17-18 (S.D.N.Y. Sept. 30, 2011)
("Here, where the Registration Statements contain so many indicia of control, the
lack of an explicit statement that ENV was speaking through the Registration
Statements does not control the answer to the question of whether it made those
statements."), that case is distinguishable because the indicia of control here are not
so overwhelming as to justify disregarding which corporate entity issued the

The EMs' designation of OIS on the cover page is also insufficient to establish liability under *Janus*.  The formatting of the EMs' cover pages indicate that Multiadvisors is the issuer.  In contrast, OIS is listed alongside several other support professionals – including auditors, lawyers and custodians – specifically in its capacity as investment advisor.[51]  *Janus* rejected an argument that the "uniquely close relationship" of an investment advisor is adequate to impose liability under

---

statements.  In *Roseville*, there were explicit statements in registration statements indicating that the defendant had "direct control over all corporate transactions, and . . . authority to determine when and whether to sell the shares being sold."  *Id.* at *18.  Accordingly, the court found that plaintiffs adequately pled that defendant "had control over the content of the message, the underlying subject matter of the message, and the ultimate decision of whether to communicate the message."  *Id.* In contrast, here the EMs indicated that Multiadvisors' Articles of Association authorized the board to issue the Participating Shares and "increase the number of Participating Shares offered."  1/08 EM at 6, Ex. 15 to FAC.  Moreover, the Multiadvisors board had the "sole discretion to reject subscriptions in whole or in part."  *Id.* at 7.  Also unlike *Roseville*, here Multiadvisors' board expressly retained the ability to amend the EMs without consulting its shareholders (OIS) in numerous situations – indicating its "ultimate authority" over the contents of the EMs.  *See id.* at 8.  In sum, the facts here, showing that Multiadvisors exercised some discretion independently of OIS, do not justify disregarding which corporate entity issued the statements, as it did in *Roseville*.  Finally, I note that *Roseville* does not address the discussion in *Janus* that imposing liability on an entity that influenced or controlled the "maker" of the statement would improperly broaden the scope of Rule 10b-5 liability, where Congress has already enacted a provision for such a scenario – section 20(a).  *See Janus*, 131 S. Ct. at 2304.

[51]    *See* 10/06 EM at 2, Ex. 14 to FAC; 6/04 EM at 2, Ex. 13 to FAC.

the "ultimate authority" test.[52]  Because the cover page indicates that OIS is only

the investment manager and Multiadvisors is the issuer, the cover page provides no

stronger a basis for Rule 10b-5 liability in this case than in *Janus*.

Second, I noted "the explanatory memoranda are attributable to OIS

because the underlying information being communicated that constituted the false

statements and material omissions are identified to plaintiffs as OIS's

responsibility."[53]  Again, after *Janus* this rationale cannot sustain liability under

Rule 10b-5.  To the extent one may conclude that the relevant statements in the

EMs were the type of statements that would typically be the responsibility of the

investment manager, and OIS was listed as the investment manager, this does not

give rise to Rule 10b-5 liability.  As noted above, *Janus* declined to impose Rule

10b-5 liability on an investment advisor based on its unique relationship with a

fund.[54]  Just as the statements in the *Janus* prospectuses could not be attributed to

---

[52]     *See Janus*, 131 S. Ct. at 2304 ("Although First Derivative and its
*amici* persuasively argue that investment advisers exercise significant influence
over their client funds, it is undisputed that the corporate formalities were observed
here.  JCM and Janus Investment Fund remain legally separate entities, and Janus
Investment Fund's board of trustees was more independent than the statute
requires.  Any reapportionment of liability in the securities industry in light of the
close relationship between investment advisers and mutual funds is properly the
responsibility of Congress and not the courts.").

[53]     5/10/11 Tr. at 5:10-13.

[54]     *See Janus*, 131 S. Ct. at 2304.

JCM, it follows that the statements in the EMs can not be attributed to OIS.

*Third*, I attributed the statements in the EMs to OIS because the CEO of OIS was also a director at Multiadvisors.[55]  Again, *Janus* dictates that this is insufficient to impose Rule 10b-5 liability on OIS.  *Janus* emphasizes that the corporate form should be respected.  Accordingly, although the CEO of OIS issued certain statements in his capacity as a director at Multiadvisors, it does not follow that those statements are imputed to OIS.  Indeed, in *Janus* one of the directors of Janus Investment Fund was also affiliated with JCM.[56]  Although this director's position in JCM is not clear, the Court did not attribute the statements to JCM on that basis.

### B.    Plaintiffs Cannot Pierce the Corporate Veil

Plaintiffs argue that even if Multiadvisors "made" the statements, OIS is still liable under a corporate veil-piercing theory.  In support of this argument, plaintiffs point to many of the same factual allegations they used to support their claim that OIS had "ultimate authority" over the statements – (1) Echeverria signed the IMA on behalf of OIS and Multiadvisors; (2) OIS owned all the voting shares of Multiadvisors and elected its officers; (3) Multiadvisors' independent directors

---

[55]    5/10/11 Tr. at 6:5-12.

[56]    *See Janus*, 131 S. Ct. at 2299.

gave Echevarria full control over Multiadvisors; (4) the IMA indemnification clause and other agreements demonstrate that dealings between OIS and Multiadvisors were not at arms-length; (5) OIS's use of Multiadvisors' funds to settle the Madoff Trustee action and eliminate OIS's liability; (6) Multiadvisors had only a P.O. box and no independent offices, operations, or employees; and (7) Multiadvisors had no assets other than those owned by investors.[57]  Defendants argue that plaintiffs' veil-piercing arguments miss the mark and cannot meet the heightened requirements of corporate veil-piercing under Bahamian law.

There will soon be a case where a court must decide whether a corporate veil-piercing theory can be used to avoid the legal strictures that would otherwise bar a Rule 10b-5 claim under *Janus*.  This is not that case.

Although New York and Bahamian corporate veil-piercing laws are largely similar, they depart in one determinative aspect – Bahamian law requires that the defendant incurs a liability to plaintiffs *before* creating a fraudulent shell entity.[58]  New York law does not have such a rule.  Because there is a conflict between New York and Bahamian law, I must apply the law of the place of

---

[57]    *See* Opp. Mem. at 9.

[58]    *See FR 8*, 2011 WL 1465765, at *10.

incorporation of Multiadvisors – the Bahamas.[59]  Indeed, I have already held that

Bahamian law applies to matters concerning the internal affairs of Multiadvisors.[60]

Plaintiffs cannot pierce Multiadvisors' corporate veil and render OIS

liable for Multiadvisors' alleged fraudulent statements because plaintiffs cannot

establish the third principle of English veil-piercing law: "[T]he plaintiff's ability

to recover from the defendant on a veil-piercing theory turns on whether the

defendant had already incurred some liability to the plaintiff at the time he

interposed the corporate structure."[61]  In other words, to pierce the corporate veil a

defendant must have already incurred a liability and then set up a fraudulent shell

entity to avoid that liability.  Multiadvisors was founded in 1995[62] and issued the

allegedly false and misleading statements – the acts, together with the losses

---

[59]      *See Fletcher*, 68 F.3d at 1456.

[60]      *See In re Optimal U.S. Litig.*, 2011 WL 1676067, at *13 ("Although
New York's interest in the litigation would be my primary focus were I
determining whether to apply New York or Bahamian tort law to Plaintiffs'
substantive claims, that is not my inquiry.  Rather, my inquiry is whether
Plaintiffs—the parties pleading those torts—have standing to assert them. And that
question is governed by the internal affairs doctrine.  Therefore, Plaintiffs'
argument for the application of New York law—at least on these grounds—is
inapposite.").  I only applied New York law because there was no conflict between
New York and Bahamian law.  *See id.*

[61]      *FR 8*, 2011 WL 1465765, at *9 (quoting *In re Tyson*, 433 B.R. at 88).

[62]      *See* FAC ¶ 70.

resulting from Madoff's 2008 arrest, which incurred liability – between July 2001 and October 2008.[63]  Because OIS had not incurred any liability to plaintiffs in 1995, and thus could not have created Multiadvisors to avoid such liability, plaintiffs' corporate veil-piercing claim must fail under Bahamian law.[64]

### C.   Section 20(a) Claims

#### 1.   Plaintiffs State a Cause of Action for Section 20(a) Claims Based on OIS's and Santdander's Alleged Control of Multiadvisors

Defendants' sole argument that plaintiffs' claims under section 20(a) must be dismissed is that the Complaint inadequately alleges Multiadvisors' scienter.  The parties dispute whether Madoff's scienter can be imputed to Multiadvisors.  In addition, the parties also dispute whether plaintiffs have adequately pled scienter based on Echeverria's receipt of the OIS memoranda raising "red flags" that Madoff was running a Ponzi scheme.

---

[63]    *See id.* ¶¶ 188-224.

[64]    *See FR 8*, 2011 WL 1465765, at *10 (rejecting a veil-piercing claim under English law where plaintiff FR8 did not " make an allegation that FR8 had a right of relief against the Prime Defendants at the time [the shell entity] was created.").  *Accord* 14 Halsbury's Laws of England ¶ 121 (5th ed. 2009) ("Nor is the court entitled to lift the veil as against a company which is a member of a corporate group merely because the corporate structure has been used so as to ensure that the legal liability (if any) in respect of particular future activities of the company will fall on another member of the group rather than the defendant company.").

Without reaching the issue of whether Madoff's scienter can be imputed to Multiadvisors,[65] there are sufficiently plausible allegations concerning Multiadvisors' scienter to support section 20(a) claims against OIS and Santander based on OIS's and Santander's control of Multiadvisors.  In the May 10 bench ruling I found that plaintiffs adequately pled that OIS acted with the requisite scienter:

> Plaintiffs allege that OIS and Clark had raised internally all of the critical questions about the risk that Madoff was running a Ponzi scheme, and yet failed to disclose these risks to plaintiffs. For example, in 2002, Banco Santander had, and I quote from the complaint, "detected a number of issues that may involve legal risks" and instructed OIS to meet with Madoff.  Those issues, still quoting from the complaint, "went to the heart of Madoff's Ponzi scheme because they concerned the existence of the assets supposedly held by Madoff, Madoff's self-custody and Madoff's secrecy."

> Indeed, after consulting with law firms in New York, OIS was advised to review transaction tickets to confirm that Madoff was conducting actual trades with real counterparties, an especially important check given that – as OIS identified – Madoff acted as investment adviser, broker, and custodian, a highly irregular combination that allowed Madoff to have no external controls. Despite the significance of these concerns, OIS failed to obtain any answers to its questions during its meeting with Madoff, as

---

[65]     On August 5, 2011, plaintiffs submitted a letter to the Court requesting that defendants' arguments concerning the imputation of Madoff's scienter be stricken from defendants' reply brief.  Alternatively, plaintiffs' requested leave to file a short sur-reply.  Although I did not need to reach this issue, plaintiffs' request to strike portions of defendants' reply brief is denied and plaintiffs' request to file a sur-reply is granted for purposes of a complete record.

revealed by the internal memorandum produced by in-house counsel subsequent to that meeting.

By 2006, OIS's concerns about Madoff had only grown larger. For example, around July 20, 2006 – following a February 1, 2006 visit to the offices of the company that is BMIS by Clark, Atkins and OIS senior risk officer Rajiv Jaitly – Clark wrote a report summarizing the due diligence conducted on Madoff over the prior two years.  He concluded that Madoff's "external auditor could not be considered realistically independent" – that's from the Clark report – and further expressed concern that Madoff was – and I quote again from the Clark report – "a privately owned family business shrouded in secrecy and not regulated as an investment adviser."

In a report written around the same time, Jaitly flagged – and now I'm quoting from the Jaitly report – "the current inability to verify actual trading activity in the market through counterparty and other market user intelligence as one of the difficulties with this account."  Then returning to the Clark report: "Indeed, although Clark had called the largest Wall Street players as of mid-2006 OIS had not yet found a source at the major dealers with whom to confirm Madoff options trading activity, neither has Fairfield."

Ultimately, Jaitly issued the following warning: "No request was made to review how a trade is made. There is absolutely no reason Optimal should not make such a request."

"Under the circumstances, the complaint portrays to defendants' fraud alert should have been flashing red. A fair inference that flows from the facts alleged is that if they failed to see the perceptible signs of fraud, it may have been because they chose to wear blinders." I didn't write that eloquent language; Judge Marrero did in the *Anwar* case.[66]

Just as the Complaint adequately pled that OIS acted with the requisite

---

[66]     5/10/11 Tr. at 6:19-8:18.

scienter, so too does it adequately plead scienter with respect to Multiadvisors.  As CEO of OIS, Echeverria was aware of the facts that gave rise to OIS's alleged scienter.  Moreover, the statements at issue in the EMs were suggested in memoranda addressed to Echeverria.  Although, as discussed above, a court must respect legal formalities with respect to Rule 10b-5 such that a statement made by Echeverria in his capacity as director of Multiadvisors is not imputed to OIS, it does not follow that Echeverria acts for Multiadvisors with blinders on as to facts he learned at OIS.  As a member of the Multiadvisors board of directors, which issued the EMs, Echeverria brought with him the knowledge that he acquired as CEO of OIS.  Thus, for the reasons stated in my May 10 bench ruling concerning OIS's scienter, scienter is adequately pled with respect to Multiadvisors.

### 2.    Plaintiffs Fail to State a Cause of Action Based on Santander's Alleged Control of OIS

Plaintiffs' Cause of Action XIV, alleging section 20(a) liability for Santander based on its control of OIS, must be dismissed.  There is no liability under section 20(a) without a primary violation by the controlled person – namely OIS.[67]  For the reasons stated above, OIS is not liable because it did not "make" the statements at issue.[68]  As a result, Santander cannot be liable under section 20(a)

---

[67]    *See ATSI Commc'ns*, 493 F.3d at 108.

[68]    *See supra* Section III.A.

based on its control of OIS.

## IV.   CONCLUSION

For the foregoing reasons, defendants' Motion to Dismiss Certain Federal Securities Fraud Claims in Fourth Amended Class Action Complaint is granted in part and denied in part.  Counts XI and XIV are dismissed.  Counts XIII and XV are sustained.  The Clerk of the Court is directed to close this motion [Docket No. 50].

The following claims remain in this action: common law fraud, negligent misrepresentation, and gross negligence[69] against OIS, Clark, and Banco Santander (Counts I-IV and XVI-XVII); aiding and abetting fraud against Banco Santander (Count VIII); and federal securities fraud against OIS (Count XIII), Clark (Count XII), and Banco Santander (Count XV).   Defendants' combined *forum non conveniens* motion and motion to dismiss (1) Counts I-II and VIII (as to Banco Santander only) and (2) Counts XVI-XVIII is currently pending.

---

[69]     Pioneer (the investment advisor) is the only plaintiff whose claim for gross negligence has not (yet) been dismissed.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            October 13, 2011

## - Appearances -

**For Plaintiffs:**

Edward W. Miller, Esq.
648 Franklin Avenue, 2nd Floor
Garden City, New York 11530
(516) 280-7377

Alan Ian Ellman, Esq.
Javier Bleichmar, Esq.
Labaton Sucharow, LLP
140 Broadway
New York, New York 10005
(212) 907-0877

Jack Reise, Esq.
Michael L. Greenwald, Esq.
Robbins Geller Rudman & Dowd LLP
120 E. Palmetto Park Road, Suite 500
Boca Raton, Florida 33432-4809
(561) 750-3000

**For Defendants:**

Gustavo J. Membiela, Esq.
Samuel A. Danon, Esq.
Hunton & Williams, LLP
1111 Brickell Avenue
Miami, Florida 33131
(305) 810-2500

Paulo Roberto Lima, Esq.
Shawn Patrick Regan, Esq.
Hunton & Williams, LLP (NYC)
200 Park Avenue, 52nd Floor
New York, New York 10166
(212) 309-1395