```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____            │
│ DATE FILED:   6/4/12             │
└─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                    :
IN RE OPTIMAL U.S. LITIGATION         :     OPINION AND ORDER
                                                    :
                                                    :     10 Civ. 4095 (SAS)
------------------------------------------------------------X

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.   INTRODUCTION

This putative class action arises out of plaintiffs' investment in the

Optimal Strategic U.S. Equity Fund ("Optimal U.S." or the "Fund"), which in turn

invested one-hundred percent of its assets with Bernard L. Madoff and his firm,

Bernard L. Madoff Investment Securities LLC ("BMIS").  Plaintiffs allege that

defendants failed to conduct adequate diligence regarding Madoff, ignored "red

flags" that should have alerted them to Madoff's fraud, and made misstatements

and omissions in connection with the sale of Optimal U.S. shares, causing

plaintiffs to lose their investments and allowing defendants wrongfully to collect

management fees.[1]

---

[1]     Defendants include (1) Optimal U.S.'s investment manager, Optimal
Investment Management Services, S.A. ("OIS"); (2) an employee thereof, Jonathan
Clark; and (3) OIS's corporate parent, Banco Santander, S.A. ("Banco Santander").
Plaintiffs include (1) Pioneer International Ltd. ("Pioneer"), an investment
advisory firm incorporated in the British Virgin Islands; (2) the "Pioneer
Plaintiffs," fifty-six non-U.S. persons and entities who invested in Optimal U.S.
based on advice provided by Pioneer (whose advice was in turn based on
Defendants' misrepresentations); (3) the "Santander Plaintiffs," three foreign

On May 2, 2011, I granted in part defendants' motion to dismiss

plaintiffs' Second Amended Complaint ("SAC") for improper forum, lack of

standing, and failure to state certain claims.[2]  I held, in pertinent part, that plaintiffs

had adequately pled application of the Exchange Act by alleging that "[t]he

purchases and sales of the shares of [Optimal U.S.] by Plaintiffs and the Class took

place in the United States."[3]  I reasoned that plaintiffs' allegation was supported by

a Contract Note issued to a non-party stating that "WE BOUGHT [SOLD] FOR

YOUR ACCOUNT IN: NYS."[4]  Finally, I noted that defendants' *Morrison*

argument was better resolved "in the context of a more fully-developed factual

---

citizens/non-U.S. residents to whom Banco Santander International ("Santander U.S.") marketed and sold Optimal U.S., and who held their Optimal U.S. investments in accounts with non-party Santander Bank & Trust, Ltd. in the Bahamas ("SBT Bahamas" or "SBT"); and (4) Silvana Worldwide Corp. ("Silvana"), a Plaintiff who invested in Optimal U.S. from a non-Santander-affiliated bank account.  *See In re Optimal U.S. Litig.*, 813 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2011) ("May 2 Opinion"); Fourth Amended Complaint ("FAC") ¶ 64.

[2]     *See* May 2 Opinion, 813 F. Supp. 2d at 363-83.  Defendants' motion to dismiss Plaintiffs' claims under the Securities Exchange Act of 1934 ("Exchange Act") was denied at a conference held on May 10, 2011.  *See* Transcript of 5/10/11 Conference ("5/10/11 Tr.") [Docket No. 36].  This Opinion assumes familiarity with the background and applicable law of this case, as stated in the May 2 Opinion and the May 10 bench ruling.

[3]     May 2 Opinion, 813 F. Supp. 2d at 371 (quoting Second Amended Complaint ¶ 352) (alterations in original).

[4]     *Id.* at 373 (quoting 4/15/11 Pl. Letter at 1; Contract Notes, Ex. A to 4/15/11 Letter; Certification of Inversiones Mar Octava, Ex. B to 4/15/11 Letter).

record that unequivocally establishes where all of Plaintiffs' shares were 'issued.'"[5]

On March 6, 2012, I issued an Order to Show Cause why the federal securities law claims should not be dismissed in light of the Second Circuit's decision in *Absolute Activist Value Master Fund, Ltd. v. Ficeto*,[6] which clarified the scope of extraterritorial application of the Exchange Act.  In a letter dated May 17, 2012, plaintiffs – after concluding discovery related to the location of plaintiffs' transactions in Optimal U.S. – withdrew their "allegations that the purchases or sales of Optimal U.S. shares took place in the United States."[7]

Plaintiffs now contend that the Exchange Act reaches their claims for two reasons: (1) plaintiffs' purchase of U.S. Optimal shares was "in connection with" Madoff's purported trades in the United States; and (2) the "economic reality" of plaintiffs' Optimal U.S. investments consisted of Madoff's purported transactions in the United States.[8]  For the reasons discussed below, plaintiffs' federal securities law claims are now dismissed.

## II.    EXTRATERRITORIAL APPLICATION OF THE EXCHANGE ACT

---

[5]    *Id.*

[6]    677 F.3d 60 (2d Cir. 2012).

[7]    5/17/12 Pl. Letter [Docket No. 153] at 1.

[8]    *Id.*

"Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States."[9]  The second prong of *Morrison* ("the purchase or sale of any other security in the United States") has presented many questions of interpretation for lower courts.

The Second Circuit recently clarified the second prong of *Morrison* holding that "to sufficiently allege the existence of a 'domestic transaction in other securities,' plaintiffs must allege facts indicating that irrevocable liability was incurred or that title was transferred within the United States."[10]  After looking at the Exchange Act definitions for "purchase" and "sale," the Second Circuit noted that "that the 'purchase' and 'sale' take place when the parties become bound to effectuate the transaction,"[11] thereby equating "irrevocable liability" with entering into a binding contract.

## III.  DISCUSSION

---

[9]     *Morrison v. National Australian Bank Ltd.*, — U.S. —, 130 S. Ct. 2869, 2888 (2010).

[10]     *Absolute Activist Value Master Fund*, 677 F.3d 60 (quoting *Morrison*, 130 S. Ct. at 2884).

[11]     *Id.*

Plaintiffs essentially concede that their claims do not satisfy the standard for extraterritorial application of the Exchange Act under *Absolute Activist*'s interpretation of the second prong of *Morrison* because they cannot show that "irrevocable liability was incurred . . . within the United States" or that "title was transferred in the United States" with respect to plaintiffs' purchases of Optimal U.S. shares.[12]  Rather, plaintiffs now claim that the Exchange Act reaches their claims because their purchases of Optimal U.S. shares were *"in connection with* the purchase or sale of a security listed on an American stock exchange" – namely, Madoff's purported trades on the New York Stock Exchange ("NYSE").[13]

## A.    "In Connection with"

Plaintiffs contend that, under a textual reading of *Morrison*, the purchase of Optimal U.S. shares was "in connection with" Madoff's purported purchases and sales of NYSE-listed stocks.[14]  Plaintiffs rely on the broad interpretation generally given to the phrase "in connection with" in Section 10(b)

---

[12]     *Id.*; *see also* 5/17/12 Pl. Letter at 1 (stating that plaintiffs no longer allege that "Optimal U.S. shares were purchased and sold in the United States").

[13]     *Morrison*, 130 S. Ct. at 2888 (emphasis added).

[14]     *Id.*

decisions.[15]  In short, this argument fails because plaintiffs rely on opinions construing "in connection with" outside of the *Morrison* context, which thereby ignores the presumption against applying securities laws extraterritorially.

In particular, plaintiffs point to *SEC v. Wyly*, where I rejected defendants' argument that "security-based swap agreements were not included within the Exchange Act's definition of a 'security' and were not otherwise subject to section 10(b) or Rule 10-5"[16] reasoning that a

> swap agreement like this one – which explicitly required the purchase of stock by Lehman and called for the Wylys' offshore entities to pay the transaction costs associated with those purchases – clearly "touches on" and "coincides" with the purchase or sale of securities so as to satisfy the "in connection with" requirement, regardless of whether the Wylys themselves purchased or sold the securities.[17]

*Wyly* is not dispositive here.  *Wyly* never considered the extraterritorial application of the Exchange Act.  Rather, it considered whether a novel theory for insider-

---

[15]      *See Merrill Lynch v. Dabit*, 547 U.S. 71, 85 (2006) ("[W]hen this Court has sought to give meaning to the phrase [in connection with] in the context of § 10(b) and Rule 10b-5, it has espoused a broad interpretation.").

[16]      788 F. Supp. 2d 92, 119 (S.D.N.Y. 2011).  The transactions at issue in *Wyly* pre-dated the Commodity Futures Modernization Act of 2000, which amended Section 10(b) to explicitly cover securities-based swap agreements.  *See id.*

[17]      *Id.* at 120.

trading liability advanced by the SEC based on stock-based swap agreements[18] was

sufficiently "in connection with" the purchase or sale of securities to be viable.  As

discussed below, the phrase "in connection with" cannot be construed as broadly in

the context of the extraterritorial reach of the Exchange Act as it is construed in

*Wyly* because there is a presumption against extraterritorial application of the

Exchange Act.

Relying partly on *Wyly*, Judge Denise Cote held that purchases in the

United Kingdom of contracts for difference ("CFD") referencing NYSE-listed

shares were within the scope of Section 10(b) under *Morrison* because they were

"in connection with" the purchases of shares on the NYSE.[19]  Although this

decision does, in fact, interpret "in connection with" to extend the Exchange Act to

a foreign transaction in a foreign instrument, plaintiffs give *Compania* a broader

reading than is warranted.  *Compania* noted that "the central issue here is insider

---

[18]    Specifically, I held that the SEC stated a viable cause of action by
alleging that because defendants "benefitt[ed] personally through fraudulent use of
material, nonpublic information about Sterling Software's planned sale without
disclos[ing] [that information] prior to trading, they breached their obligation to
place [Sterling Software shareholders'] welfare before their own.  In particular,
they placed their welfare ahead of the Sterling Software shareholders who sold on
the opposite side of Lehman's hedging purchases, purchases that were a known
requirement of the swap agreement that constituted their trading." *Id.* at 122
(quotations and citations omitted).

[19]    *See SEC v. Compania Internacional Financiera, S.A.*, No. 11 Civ.
4904, 2011 WL 3251813 (S.D.N.Y. July 29, 2011).

trading in the domestic securities of Arch stock listed on the NYSE" and that the

CFDs were functional equivalents of the NYSE-listed stock because "CFD holders

receive the benefit of dividends paid by the company on shares and CFD contracts

may include voting rights on the shares."[20]  In addition, "prices for CFDs are the

prices for the common stock that is traded on the American exchange, and any

profits or damages that holders of CFDs experience are identical to those

experienced by holders of the common stock."[21]

Even if *Compania* is correct in holding that the Exchange Act may

reach CFDs "in connection with" U.S.-listed stocks based on the facts in

*Compania*, the relationship between Optimal U.S. shares and NYSE-listed stocks

is much more attenuated.  The strategy disclosed in the EMs authorized the

purchase of a wide range of instruments not listed on a U.S. stock exchange –

commercial paper, certificates of deposit, bankers' acceptances, and shares in

money market mutual funds.  With respect to NYSE stocks, the EMs authorized

Madoff to purchase  a basket of up to forty unspecified stocks, then purchase put

options and sell call options on those same securities.  Given the complex strategy

disclosed in the EMs, the lack of evidence concerning how this strategy played out

---

[20]     *Id.* at *6.

[21]     *Id.*

in practice because no such trades were ever actually consummated, and the lack of a direct correlation between Optimal U.S. shares and shares listed on the NYSE, it would disregard *Morrison*'s presumption to extend the holding in *Compania* to reach the allegations here.

Finally, plaintiffs argue that other Madoff feeder fund cases have satisfied the "in connection with" requirement in the Securities Litigation Uniform Standards Act ("SLUSA").[22]  However, plaintiffs' reliance on SLUSA decisions is misplaced.  The policy considerations guiding the application of SLUSA differ greatly from those concerning the extraterritorial application of the Exchange Act.  SLUSA is applied broadly to effectuate Congress's purpose "to prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the [PLSRA]."[23]  Given the presumption against extraterritorial application of the Exchange Act, it would contravene the reasoning of *Morrison* to interpret the language "in connection with" broadly to extend the reach of the Exchange Act.

## B.    Economic Reality Test

In addition to their textual argument, plaintiffs also raise a functional

---

[22]    *See, e.g.*, *In re Merkin*, Nos. 08 Civ. 10922, 09 Civ. 6031, 09 Civ. 6483, 2011 WL 4435873, at *10-12 (S.D.N.Y. Sept. 23, 2011).

[23]    *Dabit*, 547 U.S. at 86.

argument based on *Morrison*'s first prong.  Plaintiffs argue that the "economic

reality" of plaintiffs' purchase of Optimal U.S. shares was essentially an

investment in the NYSE.  Plaintiffs rely heavily on *Elliott Associates v. Porsche

Automobile Holding*,[24] in which Judge Harold Baer, Jr. dismissed claims based on

a swap agreement signed in New York which referenced Volkswagen shares traded

on a German exchange.   The court held that the "swap agreements, which

referenced VW shares, were economically equivalent to the purchase of VW

shares."[25]

Without determining the viability of the "economic reality" test,

which the Second Circuit will consider in due course,[26] I conclude that such a test,

would not sustain plaintiffs' federal securities law claims here for two reasons.

*First*, the economic reality test was applied in *Elliot* based on *Morrison*'s

presumption against extraterritorial application of the Exchange Act.[27]  Here,

---

[24]     759 F. Supp. 2d 469 (S.D.N.Y. 2010), *appeal docketed*, No. 11-397.

[25]     *Id.* at 476.

[26]     Oral arguments were held in *Elliot* on February 24, 2012. Because I
do not believe the Second Circuit's decision in *Elliot* will be dispositive of the
issues in this case, I deny plaintiffs' request that I wait for the Second Circuit's
decision in *Elliot* before issuing this opinion.

[27]     *See id.* ("I am loathe to create a rule that would make foreign issuers
with little relationship to the U.S. subject to suits here simply because a private
party in this country entered into a derivatives contract that references the foreign

plaintiffs seek to use the test to *expand* the reach of the Exchange Act by applying

it in the reverse situation, where private parties with little relation to the United

States can enter into agreements referencing U.S. securities and take advantage of

the benefit of U.S. laws.[28]

       *Second*, *Valentini* and *Elliot* are distinguishable on the grounds that

they involve securities that had a direct, one-to-one relationship with the U.S.

security referenced, and the security at issue in those cases fluctuated in value in

direct correlation with the value of the U.S. security.  As discussed with respect to

*Compania*, the relationship between Optimal U.S. shares and shares listed on the

NYSE is highly attenuated (and hypothetical).   Therefore, the purchase of Optimal

U.S. shares is not "economically equivalent" to the purchase of stock on the

NYSE, such that the presumption against extraterritorial application of the

---

issuer's stock. Such a holding would turn *Morrison*'s presumption against
extraterritoriality on its head.").

[28]     Although I recognize that Judge Leonard Sand has applied the
economic reality test to extend the reach of the Exchange Act to foreign parties
entering into a transaction referencing U.S. securities, I cannot reconcile this
holding with the presumption against extraterritoriality in *Morrison*. *See Valentini
v. Citigroup, Inc.*, No. 11 Civ. 1355, 2011 WL 6780915, at \*14 (S.D.N.Y. Dec. 27,
2011).  To the extent that a broad reading of *Morrison* may raise policy concerns
that parties will engage in foreign transactions to avoid the reach of the Exchange
Act, Congress has attempted to remedy that problem by restoring the conducts and
effects test for SEC enforcement actions.  *See* Dodd-Frank Wall Street Reform and
Consumer Protection Act, Pub. L. No. 111-203, § 929P(b)(2), 124 Stat. 1376, 1862
(2010).  In addition, I note that *Valentini* pre-dates *Absolute Activist*.

Exchange Act is trumped.  Even assuming that the "economic reality" test survives *Absolute Activist*, it does not provide a basis to sustain plaintiffs' federal securities law claims.

The issue of the extent to which the Exchange Act may reach foreign instruments referencing U.S. stock is an issue that many district courts have grappled with and which requires further guidance from appellate courts. However, given that plaintiffs' federal securities law claims fail to satisfy the standard in *Absolute Activist* and their extremely tenuous and speculative connection to securities listed on a U.S. stock exchange, plaintiffs have failed to overcome the presumption against the extraterritorial reach of the Exchange Act.

## IV.    CONCLUSION

For the foregoing reasons, plaintiffs' federal securities law claims (Counts XII, XIII, and XV) are dismissed.  The following claims remain in this action: common law fraud and negligent misrepresentation against OIS, Clark, and Banco Santander (Counts I-IV); aiding and abetting fraud against Banco Santander (Count VIII).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             June 4, 2012

**- Appearances -**

**For Plaintiffs:**

Edward W. Miller, Esq.
648 Franklin Avenue, 2nd Floor
Garden City, New York 11530
(516) 280-7377

Alan Ian Ellman, Esq.
Javier Bleichmar, Esq.
Labaton Sucharow, LLP
140 Broadway
New York, New York 10005
(212) 907-0877

Jack Reise, Esq.
Michael L. Greenwald, Esq.
Robbins Geller Rudman & Dowd LLP
120 E. Palmetto Park Road, Suite 500
Boca Raton, Florida 33432-4809
(561) 750-3000

**For Defendants:**

Gustavo J. Membiela, Esq.
Samuel A. Danon, Esq.
Hunton & Williams, LLP
1111 Brickell Avenue
Miami, Florida 33131
(305) 810-2500

Paulo Roberto Lima, Esq.
Shawn Patrick Regan, Esq.
Hunton & Williams, LLP (NYC)
200 Park Avenue, 52nd Floor
New York, New York 10166
(212) 309-1395